**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING CO., LTD. AND NORTH** | § | |
| **CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY GP, LLC.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:09-CV-02556** |
| | § | |
| **CIGNA HEALTHCARE,** | § | |
| **CONNECTICUT GENERAL LIFE** | § | |
| **INSURANCE COMPANY, AND** | § | |
| **CIGNA HEALTHCARE OF TEXAS, INC.** | § | |
| | § | |
| **Defendants.** | § | |

---

### DEFENDANTS' PRE-TRIAL BRIEF

---

**LAW OFFICE OF ALAN W. HARRIS**

Alan W. Harris
Attorney-in-charge
State Bar No. 09050800
Southern District ID No. 2171
325 N. St. Paul Street, Suite 3100
Dallas, Texas 75201
Telephone: (214) 965-8200
Facsimile: (214) 965-8209

Joshua B. Simon
Warren Haskel
Dmitriy Tishyevich
Richard Nicholson
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

**COUNSEL FOR DEFENDANTS**

**OF COUNSEL**

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

I.    Only a Small Portion of NCMC's Benefit Claims Remain in Dispute..........................2

    A.    The Summary Judgment Ruling Eliminated All But 575 of NCMC's
        Claims. ......................................................................................................................2

    B.    Because Cigna Did Not Apply the Fee-Forgiving Protocol to 395 of the
        575 Claims that Survived Summary Judgment, Only 180 Claims Remain
        In Dispute for Trial. ..................................................................................................6

II.   Even as to the Claims that Remain at Issue, NCMC's Inequitable and
    Unlawful Conduct Bars It from Any Further Recovery. .................................................7

    A.    Equitable Defenses Apply to NCMC's ERISA Benefits Claim. ...........................10

    B.    NCMC Engaged in Illegal and Unethical Conduct...............................................11

        1.    NCMC Encouraged Its Physicians-Investors to Violate Their In-
            Network Referral Obligations by Sending Patients to NCMC, and
            Improperly Routed Patients through the ER to Get More Money............11

        2.    NCMC Lured Patients by Waiving Patients' Cost-Share
            Obligations, an Illegal Practice that Cigna's Plans Forbid. .....................14

        3.    After Charging Patients Based on an In-Network 125% Medicare
            Rate, NCMC Sought Payments from Cigna at Much Higher
            Charges, and Cigna Paid NCMC in Reliance on Those Charges. .............17

    C.    NCMC Is Barred from Recovering *Any* Additional Benefits. ...............................19

III.  If the Court Decides to Award Damages to NCMC Notwithstanding Cigna's
    Affirmative Defenses, At Most NCMC Could Recover $1.05 Million to $1.67
    Million. ...........................................................................................................................22

    A.    NCMC's Damages Models for Remaining Claims Are Flawed and
        Overestimate Damages. ..........................................................................................22

        1.    NCMC's Model 3, Its Primary Damages Model, Is Flawed
            Because It Relies on Billed Charges Rather than NCMC's Normal
            Charges in Violation of Cigna's Plan Language.......................................23

        2.    NCMC's Damages Models 1 and 2 Are Flawed. .....................................26

        3.    NCMC's Damages Model 4 Is Flawed.....................................................28

i

B.    Either of Cigna's Two Alternative Damages Models for NCMC's Non-Exhausted Claims Provides a Reliable Way of Calculating Damages. .................29

1.    Dr. May's Model 1: "Normal Charge" Damages. ....................................30

2.    Dr. May's Model 2: "In-Network" Damages. ..........................................32

**CONCLUSION** ............................................................................................................**33**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. Co. v. Humble Surg. Hosp., LLC*,
  2016 WL 7496743 (S.D. Tex. Dec. 31, 2016)............................................................ *passim*

*Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*,
  173 F. Supp. 3d 363, 404–05 (N.D. Tex. 2016) .................................................20

*Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*,
  293 F.3d 1139 (9th Cir. 2002) .............................................................................10

*Bigelow v. United Healthcare of Miss., Inc.*,
  220 F.3d 339 (5th Cir. 2000) ...............................................................................11

*Ellenburg v. Brockway, Inc.*,
  763 F.2d 1091 (9th Cir. 1985) .............................................................................11

*Franco v. Conn. Gen. Life Ins. Co.*,
  299 F.R.D. 417 (D.N.J. 2014), *aff'd in relevant part*, 647 F. App'x 76 (3d Cir.
  May 2, 2016) (unpublished)...........................................................................23, 25

*Franco v. Conn. Gen. Life Ins. Co.*,
  289 F.R.D. 121 (D.N.J. 2013).................................................................24, 25, 28

*Jones v. U.S. Life Ins. Co.*,
  12 F. Supp. 2d 383 (D.N.J. 1998) ........................................................................11

*Kennedy v. Conn. Gen. Life Ins. Co.*,
  924 F.2d 698 (7th Cir. 1991) ...............................................................................15

*Matter of HECI Exploration Co., Inc.*,
  862 F.2d 513, 523 n.18 (5th Cir. 1988) ...............................................................10

*McCorkle v. Metro Life Ins. Co.*,
  757 F.3d 452 (5th Cir. 2014) .........................................................................30, 31

*Medina v. Anthem Life Ins. Co.*,
  983 F.2d 29 (5th Cir. 1993) .................................................................................23

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*,
  781 F.3d 182 (5th Cir. 2015) .................................................................................2

*N.E. Med. Servs., Inc. v. State of Cal. Dept. of Health*,
  670 F. App'x 615 (9th Cir. Nov. 10, 2016) (unpublished) ...................................20

**Page**

*Ulico Cas. Co. v. Allied Pilots Ass'n,*
  262 S.W.3d 773 (Tex. 2008)............................................................................21

*US Airways, Inc. v. McCutchen,*
  569 U.S. 88 (2013)........................................................................................11

*Vessels v. Anschutz Corp.,*
  823 S.W.2d 762 (Tex. App. 1992).....................................................................21

**Statutes**

18 U.S.C. § 287 ..............................................................................................14

31 U.S.C. § 3729-33 .........................................................................................14

ERISA § 502(a)(1)(B).................................................................................2, 3, 11

ERISA § 502(a)(3).....................................................................................10, 11

Tex. Occ. Code § 102.001 ..............................................................................1, 14

Texas Ins. Code §1204.055............................................................................1, 8, 15

**Rules**

Federal Rule of Evidence 1006...........................................................................3, 6

## INTRODUCTION

NCMC's illegal conduct and unclean hands bar any recovery on the 575 benefit claims that remain in this case.[1] NCMC induced the doctors in Cigna's network to breach their contracts with Cigna by referring patients to NCMC in exchange for "the financial opportunity of a lifetime." This violated Texas Occupation Code Section 102.001, which makes it illegal to offer remuneration for a patient referral. NCMC routed Cigna patients through its emergency room—even where there was no emergency—to maximize its reimbursements from Cigna. That is billing fraud. NCMC waived the out-of-network copayments that it was supposed to collect under the terms of Cigna plans. That is illegal under Texas Insurance Code Section 1204.055. And NCMC submitted exorbitant charges to Cigna for reimbursement that were far higher than the charges it used to bill patients. That is also illegal under Texas law. *See Aetna Life Ins. Co. v. Humble Surg. Hosp., LLC*, 2016 WL 7496743, at *2 (S.D. Tex. Dec. 31, 2016) ("Texas law does not allow hospitals to bill patients one way and the plan another.").

If the Court does award NCMC damages notwithstanding its illegal and unethical conduct, the amounts NCMC seeks are dramatically overstated—and have become more so in the last two weeks. Even beyond seeking damages on claims that have already been dismissed (as NCMC is asking the Court to do), each of NCMC's damages models fails to account for the fact that Cigna's plans expressly limit reimbursement for out-of-network claims to the provider's ***normal*** charge. Here, NCMC maintained two sets of books—one set of charges that it normally charged patients, and another, much higher set of charges that it submitted to the school districts and other employers who fund Cigna plans. The proper way to calculate damages under the terms of Cigna's plans is to use NCMC's normal charges ***to patients***, which were 125 percent of

---

[1] "NCMC" refers to Plaintiffs, and "Cigna" refers to Defendants. Unless otherwise noted, all emphasis has been added, and all ellipses, citations, and alterations have been omitted.

Medicare rates for non-emergency room claims.  Thus, at most NCMC can recover $1.67 million on the 575 claims that remain in this case.

## I.     Only a Small Portion of NCMC's Benefit Claims Remain in Dispute.

The scope of this long-running case has been greatly narrowed by the Court's 2016 ruling on the parties' cross-motions for summary judgment—which dismissed all of NCMC's claims save for its ERISA § 502(a)(1)(B) count, and also eliminated all but 575 of NCMC's near-10,000 benefit claims that were originally in dispute.  (*See* D.E. 521, 568.)  And of those 575 claims, only 180 actually remain in dispute, because the rest were not subject to the fee-forgiving protocol.  Cigna will briefly recap the relevant procedural history before addressing the very few issues that remain for trial.

### A.     The Summary Judgment Ruling Eliminated All But 575 of NCMC's Claims.

NCMC filed this lawsuit in 2009, disputing Cigna's calculation of payments for medical services it provided to Cigna's plan members, and challenging Cigna's application of a fee-forgiving protocol to NCMC's claims.  This case was initially resolved by this Court's grant of summary judgment to Cigna.  (D.E. 318, 326, 313.)  The Fifth Circuit vacated summary judgment and remanded with instructions to develop a more fulsome record.  *See N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182 (5th Cir. 2015).  The parties then had further proceedings, including further discovery, before this Court.

During that time, Cigna completed the monumental task of reviewing each of NCMC's nearly 10,000 disputed benefit claims to detail their relevant aspects—such as the governing plan language, appeal history, and much more.  On this more complete record, Cigna and NCMC cross-moved for summary judgment.  (D.E. 443, 447; *see also* Ex. 2 to D.E. 447, Decl. of R. Nicholson (Cigna spreadsheet detailing relevant aspects of each of NCMC's disputed claims).)

In moving for summary judgment, Cigna unequivocally demonstrated through a painstaking claim-by-claim analysis that NCMC failed to exhaust administrative remedies for the vast majority of its claims—all but 575 of them.  (*See* D.E. 447 at 28-29.)  Cigna arrived at this number through a mechanical exercise, which involved eliminating all claims from Cigna's Rule 1006 summary that were not exhausted or were subject to the fee-forgiving protocol but had no damages, and which left 575 claims.  (*See id.* at 28-30 and Ex. 2 (identifying such claims and explaining that they were listed on Exhibits C, D, E and K of the Nicholson Decl.).)  Relying on these summary judgment materials, Cigna's damages expert also calculated damages on the assumption that all but 575 of NCMC's claims would be dismissed.  (D.E. 603, Ex. 4, Jan. 20, 2016 May Report at 14, 15 & Ex. 1.)

NCMC did ***not*** dispute this claim-by-claim exhaustion showing at summary judgment; instead, NCMC argued only that ERISA does not require exhaustion and that exhaustion would have been futile given Cigna's fee-forgiving protocol.  (*See* D.E. 458 at 18-20.)  But as this Court found, these arguments were wrong both on the law and facts.  Fifth Circuit precedent is clear that exhaustion is a prerequisite to filing a lawsuit to recover ERISA benefits.  (*See* D.E. 462 at 19 (collecting cases).)  And NCMC was also wrong on futility because notwithstanding the fee-forgiving protocol, Cigna in fact ***reversed*** a number of its denials after NCMC appealed.  (*Id.* at 20-21.)

In ruling on summary judgment, the Court dismissed all of NCMC's causes of action except its ERISA § 502(a)(1)(B) count.  (*See generally* D.E. 521.)  And even as to that surviving count, the Court correctly rejected NCMC's arguments on exhaustion and dismissed most of NCMC's disputed benefit claims for failure to exhaust.  The Court recognized that to prove futility, "the claimant must show a '*certainty* of an adverse decision,'" but it found that NCMC

could not make that showing because Cigna had reversed a number of its determinations after NCMC appealed. (*See id.* at 5-6, 15-16 (emphasis in original).) The Court also concluded that exhaustion is a prerequisite to recovering benefits under ERISA, and that because NCMC did "***not*** dispute that it failed to exhaust administrative remedies for the ***vast majority*** of the benefit claims at issue," it dismissed all of NCMC's non-exhausted claims. (*See id.* at 5-6, 15.)

Realizing that its failure to dispute Cigna's evidence on exhaustion doomed most of its claims, NCMC then tried various fallback tactics. First, NCMC moved for reconsideration and spent twenty pages arguing that the Court got it wrong on futility (D.E. 525 at 2-22) and that the Court erred by dismissing NCMC's other claims too. But NCMC ***still*** did not dispute that it in fact failed to exhaust most benefit claims; instead, NCMC merely raised a cavalcade of new arguments and evidence it could have presented earlier—but did not. As Cigna detailed in its response, none of NCMC's arguments came close to showing that the Court's ruling was wrong, let alone that NCMC met the high burden for reconsideration. (*See* D.E. 534 at 3-16.) The Court agreed and denied NCMC's motion. (D.E. 557.) In doing so, the Court again reaffirmed that Cigna's reversal of certain of NCMC's appealed claims "defeat[ed] any claim by [NCMC] of a '*certainty* of an adverse decision'—regardless of any other evidence of "hostility or bias." (*See id.* at 6 (emphasis in original).)

Still undeterred, NCMC then tried to proceed as if the Court had not already dismissed most of its benefit claims—arguing that the Court supposedly reserved for trial the question of which claims NCMC did not appeal, and producing a new master spreadsheet and nearly 85,000 pages of new appeals-related documents to Cigna presumably in an effort to show that additional appeals had been exhausted. (*See* D.E. 525 at 2 n.2; D.E. 542 at 1.) Cigna moved to exclude this belatedly-produced evidence because it was irrelevant (in that it related to claims that the Court

had already dismissed) and also in plain violation of NCMC's discovery obligations and Court-ordered discovery deadlines. (*See* D.E. 542.) After briefing and a hearing, the Court granted Cigna's motion and excluded this evidence. (Apr. 11, 2017 Minute Entry.)[2] Since summary judgment, NCMC has argued at least *six* times that the Court should reconsider its ruling on exhaustion (*see* D.E. 581 at 1 (collecting NCMC's filings)), but it never offered any convincing arguments why reconsideration would be warranted—particularly since NCMC *still* has no answer to the fact that Cigna reversed a number of its determinations after NCMC's appeals.

The Court has also squarely rejected any suggestion that the question of which particular claims had been exhausted was reserved for trial. Confronted with NCMC's repeated attempts to re-argue its case on exhaustion—including NCMC's unsuccessful attempt to produce a new master spreadsheet and more than 85,000 pages of documents on the issue more than a year after the close of discovery—the Court clarified its summary judgment order, noting that in connection with summary judgment, Cigna submitted a "spreadsheet that included detailed, claim-by-claim exhaustion analysis for the nearly 10,000 claims then at issue," and that because "[NCMC] did not specifically refute Cigna's claim-by-claim exhaustion analysis, the Court regarded that fact as undisputed for summary judgment purposes." (D.E. 568 at 1-2.) Thus, the Court again confirmed that its order had "granted summary judgment to Cigna on *all* claims identified by Cigna as unexhausted" (*id.* at 2)—*i.e.*, on all but 575 of NCMC's claims.

---

[2] Notably, despite this ruling, NCMC still included the updated master spreadsheet as Exhibit 99 in its list of trial exhibits. Contemporaneously with this filing, Cigna is filing a motion in limine to again exclude this previously-excluded evidence.

**B. Because Cigna Did Not Apply the Fee-Forgiving Protocol to 395 of the 575 Claims that Survived Summary Judgment, Only 180 Claims Remain In Dispute for Trial.**

The Court's summary judgment ruling left 575 benefit claims intact—a small fraction of the claims that NCMC originally put at issue. But even that number overestimates the number of claims that are truly in dispute for trial.

As NCMC concedes, it cannot recover any damages on claims to which Cigna did not apply the fee-forgiving protocol.[3] But that describes the majority of the 575 claims left in this case: of the 575 claims that the Court has not already dismissed, 395 were not subject to the fee-forgiving protocol, which leaves only 180 claims. As Cigna's Rule 1006 summary shows, Cigna assigned an explanation of benefit ("EOB") comment (as reflected in Ms. Tankersley's master spreadsheet) to each claim to indicate how that claim was adjudicated. When Cigna applied the fee-forgiving protocol, the claim was assigned a fee-forgiving EOB comment (generally, "Charges for Services or Supplies for Which You Are Not Required to Pay Are Not Covered Under Your Plan"). In contrast, claims that were not processed using the fee-forgiving protocol were assigned different EOB comments. For instance, as multiple Cigna witnesses testified in depositions,[4] Cigna did ***not*** apply the fee-forgiving protocol to MRC2 claims, instead paying such claims at a percentage of Medicare schedule at a rate selected by the plan sponsor (usually

---

[3] *See* D.E. 521 at 19 (the Court acknowledging Cigna's argument at summary judgment that NCMC "may not recover damages for claims that were denied or reduced for reasons unrelated to fee-forgiving," and noting that NCMC "does not contest this argument").

[4] For example, when Ms. Wendy Sherry (one of Cigna's 30(b)(6) witnesses, who will also be a trial witness) was asked whether Cigna had made a "decision . . . to exclude MRC2 pricing from the application of the [fee-forgiving] protocol," she testified unequivocally that "[t]here was a decision that was made to ***exclude*** MRC2 from the SIU fee forgiving protocol." (Ex. A, Sherry 30b6 Dep. Tr. 79:8-13; *see also* Ex. B, Sherry Nov. 10, 2015 Dep. Tr. 124:6-9 ("The overwhelming majority of our fully-insured plans had MRC2, which would have been ***outside*** the scope of our fee-forgiving protocol.").)

110%, 150%, or 200%).[5]  Consistent with this policy, of the 575 surviving claims, 393 are MRC2 claims which were generally assigned an EOB comment of "MAXIMUM REIMBURSABLE CHARGE," confirming the fee-forgiving protocol was not applied.[6]

At summary judgment, the Court also found a dispute as to whether Cigna had applied the fee-forgiving protocol to a small subset of NCMC's MRC2 claims (D.E. 521 at 18)—specifically, 75 MRC2 claims for emergency room services, where NCMC contended that the EOB comment referred to Cigna's fee-forgiving plan language.  (*See* D.E. 443-12, Tankersley Aff. at 1.)  To be clear, any dispute on this at summary judgment was limited to just these 75 claims because even NCMC concedes that Cigna did ***not*** apply the protocol to the vast majority of NCMC's MRC2 claims.  (*See* D.E. 458 at 31.)  In any event, as a result of the Court's ruling on exhaustion, 72 of these 75 pre-summary judgment claims are no longer at issue for trial.  That leaves only three claims covered by MRC2 plans (out of the 575 claims that remain for trial) that were subject to the fee-forgiving protocol, and two of those three surviving claims have zero damages under NCMC's original, timely-filed damages models.  So in the event the Court elects to award NCMC any damages on this subset of claims, it can disregard all but one of the MRC2 claims.

## II.    Even as to the Claims that Remain at Issue, NCMC's Inequitable and Unlawful Conduct Bars It from Any Further Recovery.

NCMC's illegal conduct and unclean hands bar it from recovering anything further on the remaining 180 disputed claims.  NCMC set up a scheme designed to generate windfall profits for NCMC's founder and investors at the expense of school district and employers who fund Cigna's

---

[5] *See* Ex. DX014, at CIG-NCMC0114138; *e.g.*, Ex. B, Sherry Nov. 10, 2015 Dep. Tr. 149:13-15 ("MRC2 uses Medicare as a basis" for reimbursement).

[6] Of the other two non-protocol claims, one was paid based on a third-party repricing agreement and the other was not processed by Cigna at all.

plans. NCMC got patients in the door by encouraging its physicians-investors to send their patients there—in violation of Cigna's contracts with its doctors, which prohibit such out-of-network referrals (subject to some exceptions not relevant here). ███████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████ and which NCMC said would generate so much money that its investors could retire. (Ex. DX058, NCMC71 0327256-58 at 57-58.) ███████████████████████████ are not just inequitable; they violate Texas law. *See* Tex. Occ. Code § 102.001(a) ("A person commits an offense if the person knowingly offers to pay or agrees to accept . . . any remuneration in cash or in kind to or from another for securing or soliciting a patient").

But that was only one piece of the scheme. NCMC also knew that Cigna's plans require members to pay more in co-payments when they go to out-of-network providers, and it knew that no economically rational patient would choose NCMC over one of Cigna's many in-network providers if the patient actually had to pay their share of NCMC's out-of-network costs. As NCMC's Patient Access Director candidly admitted, ████████████████████████████

████████████████████████████████████████████████████

██████████ NCMC solved this problem by telling Cigna's plan members that they would only have to pay NCMC as if it were an in-network provider. And in some cases, NCMC charged members nothing at all. Of course, Cigna's plans do not allow NCMC to unilaterally reduce members' cost-share responsibilities in this fashion; indeed, in Texas, health care providers are not allowed to "waive a deductible or copayment by the acceptance of an assignment." Tex. Ins. Code § 1204.55(b).

Finally, even as NCMC charged Cigna's plan members substantially below what the plans required them to pay, NCMC submitted exorbitant and unreasonable charges to Cigna for these same services based on a secret schedule, different from what NCMC used to calculate member costs, and which were on average more than double the amounts charged by comparable providers in the area. NCMC never disclosed to Cigna that it used one fee schedule to bill Cigna members but then used another, higher schedule to bill Cigna. And NCMC's charges were striking indeed. For example, the 575 benefit claims that survived summary judgment include a claim where NCMC charged Cigna $1,791 for services where the Medicare allowed amount was $44.70 (*i.e.*, NCMC billed Cigna ***4,008%*** of Medicare); a claim where NCMC charged Cigna $80,867 for services where the Medicare allowed amount was $4,945 (*i.e.*, NCMC billed Cigna ***1,635%*** of Medicare); and a claim where NCMC charged Cigna $22,434 for services where the Medicare allowed amount was $1,413 (*i.e.*, NCMC billed Cigna ***1,588%*** of Medicare). These are just a few examples, and there are plenty more.

Through this scheme, NCMC attempted to collect tens of millions of dollars from Cigna and Cigna's clients—clients like Texas school districts and other employers, whose benefit plans Cigna administers. And NCMC's scheme was also functionally identical to the one that Judge Hughes recently condemned in *Aetna Life Insurance Company v. Humble Surgical Hospital, LLC*—where an out-of-network hospital likewise "charge[d] a lot more than a hospital in Aetna's network would," and where to overcome the fact that "no economically rational patient would choose it over an in-network provider, [the hospital] paid referral fees to doctors, waived patient costs, and submitted inflated bills to [the insurer]." 2016 WL 7496743, at *1. Judge Hughes ordered Humble to return every cent it had received from Aetna from this improper

scheme, finding that Humble's hands were "filthy up to the elbows[.]"  *See id.* at *3-4.  So too are NCMC's; its unclean hands bar any argument that it is entitled to a penny more from Cigna.

### A.    Equitable Defenses Apply to NCMC's ERISA Benefits Claim.

Cigna has a number of defenses—including unclean hands, waiver, and estoppel—against NCMC's misconduct.  (*See* D.E. 220, Cigna's Answer and Counterclaims, Sixth, Eighth, and Tenth Affirmative Defenses.)   These defenses have been a part of this case since the beginning, when Cigna raised them in its Answer in 2011.  (*See id.*)[7]  Cigna described the basis for those defenses in its Answer and Counterclaims, and the parties had extensive discovery on the fact issues that these defenses implicate.  (*See* D.E. 600 at 7-11 (detailing the discovery taken on these issues).)  And as set out in more detail in Cigna's brief on affirmative defenses, NCMC has never moved to dismiss any of these defenses, nor are they subsumed by any of this Court's prior rulings.  (*See id.* at 4-6.)

Cigna's defenses are also legally valid because courts have long recognized that equitable defenses apply to a claim for benefits under ERISA, and can preclude recovery on such a claim.  For example, in *Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*, the Ninth Circuit acknowledged that "the affirmative defenses of fraud and estoppel are available to plan administrators against employees seeking benefits."   293 F.3d 1139, 1146 n.3 (9th Cir. 2002).   And in *Matter of HECI Exploration Co., Inc.*, the Fifth Circuit similarly noted that "federal

---

[7] NCMC has argued recently that this November 2011 Answer is somehow inoperative because Cigna later filed amended counterclaims but did not file an amended Answer.  (*See* D.E. 610 at 2.)  NCMC never raised this argument at summary judgment, when it assumed that Cigna's Answer was operative in arguing that Cigna did not raise other defenses (*see* D.E. 466 at 27, 30); regardless, it is wrong in any event.  Cigna filed those amended counterclaims because in ruling on NCMC's motion to dismiss, the Court dismissed Cigna's **counterclaims**—not its affirmative defenses—as preempted, but gave Cigna leave to re-file those counterclaims "to bring claims under ERISA in light of this Court's ruling[.]"  (*See* D.E. 283 at 19, 34.)  Cigna then refiled its counterclaims as an ERISA § 502(a)(3) claim (D.E. 292), but there was no need for Cigna to file an amended Answer.  So, the November 2011 Answer remains operative.

courts have entertained the defense of waiver in actions to recover benefits under ERISA." 862

F.2d 513, 523 n.18 (5th Cir. 1988). Other courts reached similar conclusions. *See, e.g.*,

*Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) (claimant's unclean hands in

falsifying age to obtain retirement benefits barred relief).[8]

Tellingly, NCMC never argued that Cigna's other defenses—recoupment and offset—do

not apply to its ERISA benefits claim; instead, NCMC previously attacked those defenses on the

merits at summary judgment. (*See* D.E. 443 at 33-35.) NCMC has not even tried to explain why

certain defenses (like recoupment or offset) admittedly apply to its ERISA claim, while other

comparable defenses (like unclean hands, waiver, and estoppel) do not. There is no principled

distinction; NCMC's claim for ERISA benefits is subject to Cigna's equitable defenses.[9]

**B.      NCMC Engaged in Illegal and Unethical Conduct.**

> **1.      NCMC Encouraged Its Physicians-Investors to Violate Their In-Network Referral Obligations by Sending Patients to NCMC, and Improperly Routed Patients through the ER to Get More Money.**

During the relevant time, NCMC was out-of-network with Cigna. And as an out-of-

network provider, NCMC did not have access to the pool of patients that insurers like Cigna

---

[8] *See also Bigelow v. United Healthcare of Miss., Inc.*, 220 F.3d 339 (5th Cir. 2000) (denying equitable relief to plaintiff with unclean hands who brought claims under the Public Health Service Act, an ERISA equivalent that applies to government-sponsored health plans); *Jones v. U.S. Life Ins. Co.*, 12 F. Supp. 2d 383, 390 (D.N.J. 1998) (finding that equitable fraud applied as an affirmative defense against a plaintiff seeking additional benefits where plaintiff had made misrepresentations in coverage application).

[9] In a recent filing, NCMC also argued for the first time that *US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013), bars Cigna from raising equitable defenses to NCMC's ERISA benefits claim. But *McCutchen* supports only the limited proposition that a participant sued by an administrator on an equitable lien by agreement under ERISA § 502(a)(3) may not assert equitable defenses that ***expressly contradict*** plan terms. *See id.* at 103. It says nothing about whether an administrator sued for benefits under ERISA § 502(a)(1)(B) can assert equitable defenses that are not addressed by the plans. And here, Cigna's reliance on equitable defenses does not contradict plan terms—in contrast with other cases, where plans specifically bar the application of equitable defenses.

offer to providers in exchange for their agreement to accept lower reimbursement rates.  (*See* Ex. DX003, May 2012 Report ¶ 6, 22, 30-37 (explaining this so-called selective contracting system, whereby providers agree to contract rates with insurers, and insurers then "steer" their members to the contracted in-network providers by requiring members to pay more for out-of-network services).)  The problem of out-of-network hospitals like NCMC not having access to a pool of patients is further compounded by the fact that such hospitals often find it challenging to secure physician referrals—because except in cases of emergencies, in-network physicians are contractually obligated to refer their patients to in-network facilities.  Just ask Dr. Behar, NCMC's founder and CEO, whose own contract with Cigna had such a requirement.  (Ex. DX082, CIG-NCMC0011981-2029 at CIG-NCMC0011985.)  Indeed, Dr. Behar clearly knew about these in-network referral requirements not just from his own contract with Cigna, but from the fact that in December 2006—before NCMC even opened—he received an email from another doctor in Texas that told Dr. Behar that █████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

        █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



The incentive for NCMC to encourage such referrals is obvious: NCMC received increased patient volume, while physicians who invested in NCMC shared in NCMC's profits. (*See, e.g.*, Ex. D, Tr. of Feb. 23, 2012 Dep. of Brian Hamilton, NCMC's former CFO, at 101:17-21 ("Q. But physicians who were owners or investors in North Cypress would have a financial incentive to try to refer their patients to North Cypress, correct? A. *Absolutely.*").) But NCMC's payments to physicians as a reward for breaching their Cigna contracts and for sending their patients to NCMC were not just improper and inequitable; they were against the law. *See*

*Humble*, 2016 WL 7496743, at *2 ("Texas prohibits hospitals from paying doctors to refer patients.") (citing Tex. Occ. Code § 102.001(a)).[11]

Cigna further expects trial evidence will show that after NCMC's investors-physicians sent their Cigna patients to NCMC, NCMC sought to extract more money from these patients still by improperly routing them through its emergency rooms. For instance, in 2007, NCMC's founder Dr. Behar imposed a rule that required all Cigna patients to be admitted through the emergency room, while Medicare and Medicaid patients could be admitted to the hospital directly. As a result, NCMC billed Cigna for emergency room claims that were not emergencies, knowing full well that insurers like Cigna typically pay emergency room claims at a higher rates than non-emergency claims. Dr. Behar cleverly sought to avoid the dire penalties of the False Claims Act by not applying the same policy for NCMC's Medicare patients. *See* False Claims Act, 31 U.S.C. § 3729-33; 18 U.S.C. § 287 (criminalizing knowing submission of false or fraudulent claims).

2. **NCMC Lured Patients by Waiving Patients' Cost-Share Obligations, an Illegal Practice that Cigna's Plans Forbid.**



---

[11] Under Tex. Occ. Code § 102.001(a), "[a] person commits an offense if the person knowingly offers to pay or agrees to accept, directly or indirectly, overtly or covertly ***any remuneration*** in cash or in kind to or from another for ***securing or soliciting a patient*** or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency."

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████ *compare Humble*, 2016 WL 7496743, at *1 (noting that absent fee-waiver by the out-of-network hospital, "no economically rational patient would choose it over an in-network provider").

How did NCMC solve this problem?  By devising a so-called "prompt pay discount" program whereby NCMC improperly and secretly discounted patients' cost-share so that it approximated what an ***in-network*** provider would charge.  In some cases, NCMC waived patients' cost-share altogether.  Needless to say, these unilateral discounts are not allowed by Cigna's plans.  These improper discounts destroyed the financial incentives that Cigna's plans use to steer patients away from out-of-network providers and toward in-network providers— mechanisms that courts have long recognized are legitimate.  *See, e.g.*, *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 699 (7th Cir. 1991) ("Co-payments sensitize employees to the costs of health care, leading them not only to use less but also to seek out providers with lower fees.").  And these discounts are also forbidden by Texas law, which makes it illegal for health care providers to "waive a deductible or copayment by the acceptance of an assignment."  Tex. Ins. Code § 1204.55(b).

Here is how this system worked.  In calculating the amounts that it would bill patients, NCMC used rates set forth in the Medicare fee schedule and multiplied them by 125% to arrive at a baseline rate.  (Ex. G, Tankersley Tr. at 27:9-28:5.)  To determine the patient's out-of-pocket costs, NCMC then took this baseline rate and applied the patient's in-network coinsurance

percentage and deductible amounts to it. ██ ████████████████████████████████
██████

In calculating patient charges, NCMC did ***not*** take into account "the patient's out-of-network patient responsibility amounts." (*See* Ex. G, Tankersley Tr. at 30:7-10; Ex. C, Jones Tr. at 38:22-24 (agreeing that NCMC did "not collect out-of-network co-insurance and deductibles" from patients).) █████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████

Notably, while Cigna's plans obligate patients to pay more when they visit out-of-network providers (as NCMC well knows), NCMC made clear to patients that they would ***not*** have to pay anything more than their estimated in-network amount. After estimating a patient's out-of-pocket expenses based on the in-network 125% Medicare rate, NCMC would give the patient 120 days to pay this discounted amount; if the patient paid in that time, NCMC did not require or expect the patient to pay anything else. (Ex. G, Tankersley Tr. at 37:23-38:4, 40:21-

41:24; ████████████████████████████████████████

████████████████████████████████████████

████████████ So as long as the patient paid what was essentially NCMC's in-network estimate of their cost-sharing responsibility—which was substantially below what patients' plans actually obligated them to pay for NCMC's out-of-network services—NCMC would not hold the patient responsible for any further payments. ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████[12]

Finally, while this Court had previously found that Cigna acted in bad faith by applying the fee-forgiving protocol to NCMC's claims supposedly in part due to a desire to bring NCMC in-network, NCMC's *own documents* show NCMC employed this so-called discount program██

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████



**3.** **After Charging Patients Based on an In-Network 125% Medicare Rate, NCMC Sought Payments from Cigna at Much Higher Charges, and Cigna Paid NCMC in Reliance on Those Charges.**

The last piece of the scheme is how NCMC then actually reaped its windfall profits from Cigna and its clients. While NCMC discounted its charges to in-network levels when charging

---

[12] ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

patients, it did not do the same when it submitted bills to Cigna—far from it. ████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████—which reflected rates that were generally 600% to 1,000% of the rates set by

Medicare (DX006, May 2016 Report ¶ 20), *i.e.*, substantially higher than the 125% Medicare

methodology that NCMC used to charge patients.  This, too, is not allowed under Texas law.

*Humble*, 2016 WL 7496743, at *2 ("Texas law does not allow hospitals to bill patients one way

and the plan another.").

Moreover, even though NCMC charged patients based on the 125% Medicare rate, it

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████

Finally, ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ But this is
simply not true. NCMC charged Cigna outrageous amounts for basic procedures at rates that
were substantially above what comparable providers would charge, and many of NCMC's
charges to Cigna-administered plans ran into hundreds of percent of Medicare rates (*see supra* at
9, listing examples of NCMC's claims where it charged Cigna 4,008%, 1,635%, and 1,588% of
Medicare). Indeed, NCMC's chargemaster-based charges were more than double the average
charges of comparable hospitals in the Houston area. (Ex. DX003, May 2012 Report ¶ 78.) To
say that NCMC's charges to Cigna were anything near normal is nonsense.

### C. NCMC Is Barred from Recovering *Any* Additional Benefits.

NCMC's conduct described above amounts to unclean hands, estoppel, and waiver.
NCMC should be precluded from recovering any benefits. At bare minimum, NCMC should be
precluded from recovering any benefits beyond the 125% Medicare rate that it used to calculate
patients' costs, or alternatively, the rate that NCMC would have received as an in-network
provider, given its billing practices for Cigna's members were designed to mimic that of an in-
network provider.

First, NCMC should not be allowed to recover any additional benefits because its hands
were far from clean. Rather, like another Texas medical provider who ran a functionally
identical fee-waiving program, NCMC's hands are "filthy up to the elbows[.]" *Humble*, 2016
WL 7496743, at *3. NCMC encouraged its physicians-investors to breach their contracts by
improperly sending their Cigna patients to NCMC, routed patients through the ER to get more
favorable reimbursement on claims that were not actual emergency claims, hid from Cigna the
fact that it was charging patients substantially less than their cost-sharing responsibilities under
the plans, and obtained reimbursement from Cigna based on its inflated billed charges rather than
based on its normal 125%-Medicare charges. Given all this, NCMC certainly has unclean hands

and it is not entitled to recover any more money.  *Cf. N.E. Med. Servs., Inc. v. State of Cal. Dept. of Health*, 670 F. App'x 615, 616 (9th Cir. Nov. 10, 2016) (unpublished) (finding that a provider had unclean hands where it claimed that it should be allowed to seek reimbursement under one type of Medicaid program where it for years reaped the benefits of obtaining reimbursement under another program).

Second, at bare minimum, NCMC should not be allowed to recover any additional benefits beyond the 125% Medicare rate that it used to calculate patients' cost-sharing responsibilities—whether under a waiver, equitable estoppel, or quasi-estoppel theory.

The elements of waiver are "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right."  *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 404–05 (N.D. Tex. 2016).  Here, NCMC had both the right and the obligation to charge Cigna plan members their appropriate cost-share amounts; and NCMC also knew that those amounts are generally higher (and often significantly so) than in-network costs.  But rather than charge Cigna plan members their proper cost-share, NCMC charged them as if it were an in-network provider.  And NCMC then waived the right to collect more money from members by specifically promising them that they would not be required to pay a dollar more.  (*See* Ex. G, Tankersley Tr. at 37:23-38:4, 40:21-41:24; Ex. C, Jones Tr. at 53:1-16; Ex. E, Behar Tr. at 125:19-25.)

NCMC should similarly be barred from seeking any additional money under an equitable estoppel theory, the elements of which are: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the

facts; (5) who detrimentally relies on the representations." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). NCMC falsely represented to Cigna members that they did not have to pay their fair share of the out-of-network costs, while knowing that Cigna's plans in fact prohibit such waiver; NCMC made these representations with the intent of luring members to its facilities—which otherwise it would make no economic sense for members to visit; and Cigna plan members relied on these representations in deciding to receive treatment at NCMC.

Finally, any attempts by NCMC to recover more money beyond the 125% Medicare rate are also independently foreclosed by quasi estoppel, which "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him," and it "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765-66 (Tex. App. 1992).[13] NCMC consistently calculated the cost-share of Cigna's plan members at the 125% Medicare rate as if it were an in-network provider, but it now tries to turn around and contend that Cigna should be required to pay its claims at a different and much higher out-of-network rate. The positions that NCMC took with respect to its billing with Cigna and Cigna's plan members are plainly inconsistent, and the disadvantage to Cigna from these changing positions—having to pay significantly more on NCMC's claims—is equally clear too. NCMC charged members as if it were an in-network provider; it is only fair that Cigna should have to pay NCMC's claims at no more than such rate. *Cf. Humble*, 2016 WL 7496743, at *2 ("Texas law does not allow hospitals to bill patients one way and the plan another.").

---

[13] For quasi estoppel, "no misrepresentation on one side, and no reliance on the other, is necessary to make out the defense." *Id.* at 765.

**III.    If the Court Decides to Award Damages to NCMC Notwithstanding Cigna's Affirmative Defenses, At Most NCMC Could Recover $1.05 Million to $1.67 Million.**

As detailed above, although 575 of NCMC's benefit claims survived summary judgment, most of them in fact do not raise any triable issues:  Cigna did not apply the fee-forgiving protocol to 395 of these and NCMC thus cannot recover damages on them.  That leaves only 180 benefit claims for trial, which fall under the following categories:  (1) claims for non-emergency care (104 total); (2) claims for emergency services covered by Cigna's MRC1 plans (71 total); (3) claims for emergency services subject to a repricing agreement (4 total); and (4) a single claim for emergency services covered by an MRC2 plan that has a remark code reflecting application of the fee-forgiving protocol.  Below, Cigna addresses these categories of claims, as well as what damages model the Court should apply in the event it decides to award any damages to NCMC.

**A.    NCMC's Damages Models for Remaining Claims Are Flawed and Overestimate Damages.**

NCMC originally submitted four damages models on MRC1 claims,[14] but in a recent filing, NCMC seems to have abandoned three of its four models, stating that "Mrs. Tankersley's methodology/Model No. 3 . . . is what NCMC is going to proffer at trial during its case in chief (not during its Offer of Proof) to calculate its damages based upon Cigna's list of remaining claims."  (D.E. 597 at 5.)  Ultimately, though, it does not matter which of Ms. Tankersley's four models NCMC may try to use at trial—because ***none*** of them is reliable, and all of them overstate damages.  So to the extent the Court may award NCMC any damages on its surviving

---

[14] Three weeks before trial and with no advance warning or leave of Court, NCMC also served four new damages expert opinions.  Cigna moved to exclude those opinions, and that motion is pending.  (D.E. 603.)  Undeterred, a week after Cigna filed its motion, NCMC served yet another new expert report.  Cigna supplemented its motion to strike this untimely report too.  (D.E. 617.)

MRC1 claims, it should not use any of NCMC's damages models, and it should rely on one of Cigna's expert's models instead.

       **1.      NCMC's Model 3, Its Primary Damages Model, Is Flawed Because It Relies on Billed Charges Rather than NCMC's Normal Charges in Violation of Cigna's Plan Language.**

Model 3—which NCMC now says it intends to use as its only model at trial—relies on NCMC's calculations of how Cigna actually paid NCMC's claims before Cigna implemented the fee-forgiving protocol. Applying the percentages of NCMC's billed charges that Cigna historically paid NCMC before applying the protocol to claims subject to the protocol, NCMC calculates damages based on a range of 28% of billed charges (for laboratory claims) to 80% of billed charges (for inpatient claims). (Ex. DX005, Tankersley Report at 27-8.)

But the problem with this model is that NCMC assumes that but for the protocol, Cigna would have paid claims based on NCMC's ***billed*** charges to Cigna—rather than basing them on the substantially lower 125% Medicare amounts that NCMC ***normally*** charged patients. This theory is foreclosed by Cigna's plan terms, as further detailed below, and damages in an ERISA case cannot be based on some hypothetical framework untethered from the plan and the administrator's actual payment practices. Instead, the only proper measure of damages is the amount of benefits "due to [the participant] ***under the terms of his plan***." *See* 29 U.S.C. § 1132(a)(1)(B); *e.g.*, *Medina v. Anthem Life Ins. Co.*, 983 F.2d 29, 32-33 (5th Cir. 1993) (recovery in suits for ERISA claims for benefits is limited "to the terms of the plans at issue"); *Franco II*, 299 F.R.D. at 430 ("In an ERISA action to recover unpaid benefits . . . the theory of liability, and thus the awardable damages, must be grounded in the plan documents.").

Cigna's plans impose various reimbursement limits on provider claims, one of which is the Maximum Reimbursable Charge ("MRC"). A typical definition of MRC in Cigna's plans is "the lesser of the provider's ***normal charge*** for a similar service or supply; or a percentile of

charges made by providers of such service or supply in the geographic area where the service is received." (DX001.112, CIG-NCMC0659414, at 504.) Alternatively, the plans sometimes refer to this limitation as "Reasonable and Customary (R&C) Charges," which is typically (and very similarly to MRC) defined as "charges . . . based on what your provider normally charges and on what other medical and dental providers in your geographic region charge." (DX001.107, CIG-NCMC0656667, at 673.) The plans also make clear that provider charges that exceed the MRC or the R&C are not covered expenses, and that patients are responsible for paying any portion of the charge in excess of the MRC or the R&C. (*See, e.g.*,DX001.173, CIG-NCMC0703203, at 250 ("Expenses Not Covered" include "that portion of expenses that exceed the reasonable and customary amounts that are charged for similar services and supplies elsewhere in the area.")[15].)

This difference between billed charges and normal charges is important. Courts have recognized this distinction, and they also recognized that Cigna's plans only obligate it to pay providers' normal charges to patients—not billed charges. *See Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121 (D.N.J. 2013) ("*Franco I*"). In *Franco I*, the court denied class certification to a putative class of out-of-network providers who claimed that Cigna failed to pay their claims correctly and argued that they could prove classwide damages by reference to their billed charges. *See id.* at 137. But after reviewing Cigna's plans and noting that they "do not use the term 'billed charge'" and instead typically limit reimbursement to "the '*normal*' charge made by the provider," the court rejected the providers' attempt to equate billed charges with normal charges for reimbursement purposes. *See id.* at 138 (emphasis in original); *see also id.* ("'normal charge'—not the 'billed charge'—is the key factor in the damages formula supported by [Cigna]

---

[15] *See also* DX001.073, CIG-NCMC0626113 at 182 ("Exclusions" include "Out-of-network charges which are in excess of Reasonably and Customary."); DX001.032, CIG-NCMC0578812 at 887 ("some providers may exceed the MRC limits. If a provider charges you more than the Plan's allowable fee, the Plan will cover only the MRC amount.").

plan language.").  Indeed, *Franco I* noted that providers-plaintiffs had "not presented a ***single [Cigna] plan*** that states that a provider's billed charge may serve as an alternative basis for paying ONET [out-of-network] claims, much less any evidence that this payment appeared in the plans of putative class members generally."  *Id.* at 139.  And the court in *Franco* then also rejected plaintiffs' renewed motion for class certification that again depended on a "billed charge model of damages," explaining that it previously "rejected th[at] model because it does not adhere to plan language" and that the model ignored the "normal charge" limitations in Cigna's plans.  *Franco v. Conn. Gen. Life Ins. Co.*, 299 F.R.D. 417, 429 (D.N.J. 2014) ("*Franco II*"), *aff'd in relevant part*, 647 F. App'x 76 (3d Cir. May 2, 2016) (unpublished); *see also Franco II*, 299 F.R.D. at 429 ("the plan language the Court is called upon to consider provides that the ONET [out-of-network] allowed amount cannot exceed the healthcare provider's '***normal charge***.'  Nothing in the plan documents suggests that the word 'normal' should be read out of the ONET provision.").

As the court recognized in *Franco*, this "distinction between the terms 'billed charge' and 'normal charge' is not . . . merely semantic or hypothetical," because the "amount billed by a Nonpar [non-participating provider] on any given Cigna plan member's particular service could, for example, ***far exceed*** that provider's 'normal' charge if . . . the provider has a practice of forgiving or 'writing off' the unreimbursed balances of his insured patients."  *Franco I*,  289 F.R.D. at 138.  This is precisely how NCMC's so-called prompt pay discount worked:  NCMC agreed to accept discounted amounts from patients and not to seek any more money from them later.  Call it waiver or a discount, the end result was the same:  NCMC's normal charges to patients were not the same as what it charged Cigna.

So the appropriate focus in determining reimbursement under Cigna's plans must be on the provider's normal charges—*not* billed charges—as *Franco* recognized. And here, NCMC's "normal charge" for non-emergency care services was indisputably 125% of the Medicare fee schedule, far below the billed charges that NCMC then submitted to Cigna (which were generally 600% to 1,000% of Medicare). (*See, e.g.*, Ex. G, Tankersley 30(b)(6) Dep. at 27:9-28:5; Ex. DX006, May 2016 Report ¶ 20.) But in calculating damages under Model 3, Ms. Tankersley used these higher billed charges amounts rather than the normal charges (125% of Medicare), even though NCMC never actually charged patients at the higher billed-charge rate. (*See, e.g.*, Ex. G, Tankersley Tr. 27:6-12 (the "uniform way" that NCMC calculated patient charges for "all non-emergency room claims" was "125 percent of Medicare fee schedules times the patient's coinsurance.").)[16] Any valid damages methodology must take into account the "normal" charge limitation in Cigna's plans. Because NCMC's Model 3 does not, it is unreliable and wrong.

### 2. NCMC's Damages Models 1 and 2 Are Flawed.

NCMC says it has abandoned Models 1, 2, and 4—and with good reason, because they too ignore the "normal" charge limitation in Cigna's plans, and suffer from other flaws besides.

NCMC's Model 1 assumes that Cigna would have paid NCMC's claims at 86% and 91% of billed charges for outpatient and inpatient claims, respectively. (Ex. DX005, Tankersley 2016 Report at 8-9.) NCMC's Model 2 assumes that Cigna would have paid NCMC's claims at 80% of billed charges for both outpatient and inpatient claims. (*Id.* at 17.) NCMC's support for both

---

[16] *See also* Ex. F. 373:21-23 ("NCMC rate" is "the Medicare payment rate times 125 percent."); Ex. H, Tankersley 2016 Tr. 26:23-25 ("125 percent of Medicare is utilized to determine the amount that the patient is to pay for their services that are going to be rendered."). If anything, treating the 125% Medicare rate as the "normal" charge is too generous because, as Cigna discovered during its investigation of NCMC's billing practices, a number of patients were in fact charged nothing and paid nothing to NCMC. (Ex. DX014, Sharrow Aff. ¶ 7.)

these models is one internal Cigna document that shows hypothetical payments to NCMC at various percentage discounts off billed charges.  (Ex. DX005, CIG-NCMC0288168.)  But this document cannot support any reliable damages model, for multiple reasons.

First, any methodology that calculates damages based on NCMC's ***billed*** charges rather than its ***normal*** charges to patients is inconsistent with Cigna's plans—which, as detailed above, cap reimbursement for out-of-network claims at the provider's normal charge.

Next, even setting aside this major conceptual flaw, the deposition of Ms. Tankersley confirmed that the Cigna document on which she relied cannot serve as a reliable predicate for any damages model.  ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████  But whether Ms. Tankersley's calculations are correct as a matter of basic arithmetic is not the relevant standard for the admissibility of expert opinions.  Instead, the standard is reliability, and any damages model based on a single document about which Ms. Tankersley knows nothing plainly cannot be reliable.

Third, the unreliability of this single document as a basis to calculate damages is further illustrated by the fact that it is contradicted by how Cigna ***actually*** paid NCMC's claims before it

imposed the fee-forgiving protocol.  Ms. Tankersley interprets this document to say that Cigna would have allowed NCMC's claims at between 80% and 91% of billed charges.  (Ex. DX005, Tankersley 2015 Report at 8-9, 17.)   But her own calculations show that before the fee-forgiving protocol, Cigna did *not* process NCMC's claims at those rates, and instead paid them at much more substantial discounts—ranging from 20% to 72% off NCMC's billed charges, depending on the type of claim.  (Ex. DX005, Tankersley 2015 Report at 27-8.)  Because the reimbursement percentages under NCMC's Models 1 and 2 are irreconcilable with Cigna's actual pre-protocol payment practices, they cannot provide a reliable way to calculate damages.

### 3.    NCMC's Damages Model 4 Is Flawed.

Finally, under Model 4, NCMC assumes that Cigna would have paid its claims at ***100%*** of billed charges—*i.e.*, at no discount whatsoever.  (*See* Ex. DX005, Tankersley 2015 Report at 32.)  This is even less grounded in reality than NCMC's other models.  NCMC's basis for this methodology is its contention that in a prior brief, Cigna had stated that for MRC1 claims, "if a vendor negotiated rate is not available, then Cigna generally pays the claim at the provider's billed charges."  (*Id.* at 10.)  But this is incorrect for multiple reasons, including because Cigna's plans actually limit reimbursement for out-of-network claims to the provider's "normal" charge, rather than paying such claims at 100% of the provider's billed charges.    While Cigna generally considers a provider's normal charge to be the billed charge, that is not always the case, as NCMC's own billing practices show.  *See Franco I*, 289 F.R.D. at 138 (the distinction between "billed" and "normal" charges is not "merely semantic or hypothetical," because the billed amounts can "far exceed" normal charges if the provider "has a practice of forgiving or 'writing off' the unreimbursed balances of his insured patients.").

The unreliability of Model 4 is further evidenced by the fact that, like Models 1 and 2, the damages amounts it generates far exceed what Cigna actually paid on NCMC's claims before the

fee-forgiving protocol. Ms. Tankersley's own calculations show that Cigna certainly did ***not*** pay NCMC's claims at anything close to 100% of billed charges, and she admitted as much in her deposition. (*See* Ex. DX003, May 2012 Report at 9; Ex. H, Tankersley Tr. at 16:2-5 ("[Cigna's] payment would have been less than 100 percent."); *id.* at 25:2-7 (Cigna reimbursed 65% of NCMC's billed charges on average); *id.* at 67:3-7 (Cigna reimbursed 46% of billed charges for outpatient claims on average).) Indeed, any argument that NCMC could reasonably expect to be reimbursed at 100% of billed charges is foreclosed by the fact that ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████    ████████████████████████████

(referring to Ex. DX030, NCMC Business Office, Decision & Business Office Assistance Manual, June 2010, NCMC8 30067).) For these reasons, Model 4 likewise cannot support NCMC's damages calculations.

Nor would it make any sense for Cigna to pay NCMC's billed charges, given how much higher those charges were than comparable hospitals in the same market. As Dr. May found, NCMC charged Cigna more than double what its peers charged Cigna for the same types of services.

**B.      Either of Cigna's Two Alternative Damages Models for NCMC's Non-Exhausted Claims Provides a Reliable Way of Calculating Damages.**

Cigna's expert, Dr. May, proposes two methods of calculating damages for MRC1 non-emergency claims that survived summary judgment: (1) "normal charge" damages, which account for the fact that NCMC normally charged patients based on a 125% Medicare rate; or (2) "in-network" damages, which calculate damages based on estimated rates Cigna would have

paid NCMC if it had been an in-network provider during the relevant time. Either model provides a more reliable way of calculating damages than any of NCMC's proposals.

## 1. Dr. May's Model 1: "Normal Charge" Damages.

This approach applies the "normal charge" limits in Cigna's MRC plans, which, as described above, cap the maximum out-of-network charges that Cigna will cover at the provider's "normal" charge. As the plans set forth (and as Cigna's corporate representative, Ms. Sherry, will testify at trial), this "normal charge" cap is the lesser of the provider's normal charge or the percentile of charges based on a geographic database or Medicare.[17] For MRC1 non-emergency room claims, Cigna interprets NCMC's "normal charge" to be 125% of Medicare—because this is what NCMC generally charged patients on such claims during the relevant time period. (*See, e.g.*, Ex. G, Tankersley Tr. at 27:6-12.)

Under well-settled core ERISA principles, Cigna's interpretation of what "normal charge" means under its plans is entitled to significant deference under the "abuse of discretion" standard—which in the ERISA context is "the functional equivalent of arbitrary and capricious review." *McCorkle v. Metro Life Ins. Co.*, 757 F.3d 452, 457 n.10 (5th Cir. 2014). That is, Cigna's interpretation can only be overturned if it is "arbitrary" or "not supported by substantial evidence," with substantial evidence meaning simply that it is "merely more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as

---

[17] *See, e.g.*, Ex. DX060, at CIG-NCMC0094360 (MRC1 plan limiting reimbursement for out-of-network services to "the lesser of the provider's normal charge for a similar service or supply; or [a] percentile of charges made by providers of such service or supply in the geographic area where the service is received."); Ex. DX015, CIG-NCMC0094531-600 at 596 (MRC2 plan limiting reimbursement for out-of-network services to "the lesser of: the provider's normal charge for a similar service or supply; or a policyholder-selected percentage of a fee schedule developed by CG [Cigna] that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.").

adequate to support a conclusion." *Id.* at 457-58; *see also id.* at 457-59 (emphasizing that "[o]bviously, no court may substitute its own judgment for that of the plan administrator," and that the question "is not whether the interpretation of the Plan is most persuasive, but whether the plan administrator's interpretation is unreasonable").

Based on this interpretation, Dr. May calculates a "but-for" allowed amount applying MRC "normal charge" plan limitations to any remaining non-emergency claims, and then applies the patient's cost-sharing amount to determine the "actual allowed amount." To calculate damages, Cigna then subtracts what it paid NCMC from this "actual allowed amount."

Since NCMC has represented that it did not offer a "prompt pay" discount for emergency claims, and thus did not charge emergency room patients based on a rate of 125 percent of Medicare, Dr. May did not calculate damages based on NCMC's 125 percent charge and instead adopted Ms. Tankersley's methodologies for these claims. For the remaining 71 MRC1 emergency room claims, this meant Dr. May followed NCMC's Model 3—which calculated Cigna's historical reimbursement of NCMC's claims as 72% of billed charges. (Ex. DX005, Tankersley 2015 Report at 28.) Applying this methodology to NCMC's remaining 71 MRC1 emergency room claims results in $ 1,472,845 in damages.

That leaves only five claims: four repricing emergency room claims,[18] and a single MRC2 emergency room claim with a remark code indicating that it was processed under the fee-forgiving protocol. For the four remaining repricing emergency room claims, Dr. May simply uses Ms. Tankersley's result, which adopts the rate in the parties' repricing agreement as the

---

[18] NCMC originally put 337 claims at issue that it asserted were subject to repricing agreements. Following the Court's summary judgment ruling, only thirteen such claims remain, and only ten of those were subject to the protocol: four were for emergency room services, and six were for non-emergency room services, but Ms. Tankersley did not calculate damages for four of those non-emergency room claims.

allowed amount.  Similarly, for the single claim covered by an MRC2 plan adjudicated under the protocol, Dr. May adopts Ms. Tankersley's method of adjudicating the claim ███████ ██ ██████    In total, these five claims result in $36,418 in damages.

In summary, and as Cigna's expert Dr. May will testify at trial, the damages for the disputed claims remaining in this case under this "normal charge" model are $1.667 million.

### 2.    Dr. May's Model 2:  "In-Network" Damages.

███████████████████████████████████████████████████████████████
██████████████████████████████████[19]  Thus, NCMC was able to get higher patient volumes, without accepting the lower rates an in-network provider would have to accept in exchange for greater patient access.  (Ex. DX003, May 2012 Report ¶ 27.) Because NCMC received the full benefit of additional patient volume as if it had been an in-network provider—███████████████████████████████████████████████████████ ██████████████████████████████████████—it is only fair to reimburse NCMC's claims at in-network rates as well.

Thus, as an alternative damages approach, Dr. May also calculates damages based on amounts that it would have paid NCMC under the terms of the in-network contract that the parties negotiated in August 2012.  In addition to better reflecting the relationship NCMC had with its patients, these rates provide a reasonable measure of damages because Cigna and NCMC agreed to them in arm's-length negotiation as the fair market value for NCMC's services.

Applying these rates to NCMC's out-of-network claims for the period during the fee-forgiving protocol would result in $1.05 million in damages.

---

[19] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████

## CONCLUSION

Cigna respectfully requests that following trial, the Court enter the proposed findings of fact and conclusions of law that Cigna is filing herewith, enter an order dismissing all of NCMC's remaining claims, and awarding NCMC nothing in damages, fees, or costs.

DATED this 2nd day of October, 2017

Respectfully submitted,

*/s/ Joshua B. Simon*
Alan W. Harris
Attorney-in-charge
State Bar No. 09050800
Southern District ID No. 2171
325 N. St. Paul Street, Suite 3100
Dallas, Texas 75201
Telephone: (214) 965-8200
Facsimile: (214) 965-8209

**COUNSEL FOR DEFENDANTS**

Joshua B. Simon
Warren Haskel
Dmitriy Tishyevich
Richard Nicholson
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

**OF COUNSEL**

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2017, I served a true and correct copy of the foregoing document via email on J. Douglas Sutter, counsel for Plaintiff.


*/s/ Warren Haskel*_____
Warren Haskel