**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY, LTD. AND** | § | |
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY GP, LLC** | § | |
| | § | **NO. 4:09-CV-2556** |
| **V.** | § | |
| | § | |
| **CIGNA HEALTHCARE AND** | § | |
| **CONNECTICUT GENERAL LIFE** | § | |
| **INSURANCE COMPANY** | § | |

# PLAINTIFFS NCMC'S
# POST-TRIAL BRIEF

KELLY, SUTTER & KENDRICK, P.C.
J. Douglas Sutter
Federal Bar No. 3791
Texas Bar No. 1952550
3050 Post Oak Blvd., Suite 200
Houston, Texas 77056
Telephone: (713) 595-6000
Facsimile:  (713) 595-6001
ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................ii

TABLE OF AUTHORITIES .........................................................................vii

LIST OF EXHIBITS ......................................................................................xv

ABBREVIATIONS USED IN THIS BRIEF ................................................xvi

I.  FINDINGS, CONCLUSIONS AND HOLDINGS BY THE FIFTH CIRCUIT
    BINDING ON THIS CASE AND COURT ..............................................1

II.  THE HOLDING OF THE FIFTH CIRCUIT PANEL IN
     CASE NO. 16-20398, CONNECTICUT GENERAL LIFE
     INS. CO., et. al. v. HUMBLE SURGICAL HOSPITAL,
     LLC FILED ON DECEMBER 19, 2017, DOES NOT AND
     CANNOT APPLY TO THIS CASE ........................................................4

   A.  *This Court is Obligated to follow the Opinion and Instructions
       in North Cypress v. Cigna* ...............................................................4

   B.  *One Panel of the Fifth Circuit cannot
       Overrule another Panel in the same Circuit* ....................................5

   C.  *The North Cypress v. Cigna Panel's Directions to this Court to
       determine whether Cigna's Interpretation of the Plans
       is Legally Correct* ............................................................................8

   D.  *The Facts of this Case have not Changed from
       the Established Record in North Cypress v. Cigna* .........................12

   E.  *In the Alternative, the facts of Cigna v. Humble are
       Distinguishable from the Facts Herein* ...........................................15

   F.  *Kennedy v. Connecticut General* ..................................................18

   G.  *In the Alternative, No "Substantial Evidence" of Fee-Forgiving* ..20

III.  WHAT THE TRIAL WAS SUPPOSED TO BE ABOUT -
      THE FIFTH CIRCUIT OPINION ......................................................21

   A.  *Issues remaining after the Appeal* ...............................................21

   B.  *Claims and Defenses Available Under ERISA* .............................23

             i.      *Derivative Standing—* .......................................................37

             ii.     *Equitable Defenses—* .......................................................44

iii.   *Cigna's Cases do Not Support its Affirmative Defenses in a Derivative Action—* ............30

iv.   *Humble Surgical Hospital—* ............31

v.   *In The Alternative, Cigna's "Bad Faith" Precludes the Affirmative Defenses—* ............32

vi.   *In The Alternative, No Adverse Benefits Determinations Made—* ............33

vii.   *In The Alternative, ERISA Preemption of Affirmative Defenses—* ............33

viii.   *In The Alternative, Waiver/Estoppel of Affirmative Defenses—* ............35

**IV. NCMC'S ASSIGNMENTS** ............37

**V.   EXHAUSTION OF ADMINISTRATIVE REMEDIES** ............42

A.   *Cigna's Hijacked Appeals Process Under the Protocol* ............42

B.   *Trial Testimony of Cigna's Rule 30(b)(6) Representative, Wendy Sherry* ............44

C.   *Trial Testimony of SIU Manager and Rule 30(b)(6) Representative, Mary Ellen Cisar* ............44

D.   *Trial Testimony of SIU Investigator, Katrina M. Remlinger-Sharrow* ............44

E.   *Involvement of Kirkland Ellis lawyers and Cigna's In-House Counsel in the Appeals Process* ............46

F.   *Cigna's Appeal Requirements are Not in The Plans* ............47

G.   *NCMC's General Appeals Letters were Sufficient* ............48

H.   *Cigna's Pre-Authorizations Ignored* ............48

I.   *Encompass Office Solutions, Inc. v. Cigna, July 31, 2017* ............48

J.   *Encompass Office Solutions, Inc. v. BCBS, September 17, 2013 and June 26, 2017* ............50

K.  *Cigna's November 10, 2008, Letter to NCMC
    And its New Adjudication/Appeal Process
    Initially Created just for NCMC:* ..................................................53

L.  *This Court's Improper Requirement of "Certainty" in
    Addition to the Established "Hostility" and "Bias"
    Requirements* ........................................................................56

M.  *Bourgeois and Estoppel Regarding "Futility"* ..............................58

N.  *Cigna's Litigation is a "Contrary Position"* ................................60

O.  *Humble Surgical Hospital's Ruling on Exhaustion* ......................62

P.  *29 CFR § 2560.503-1(b), Inhibition of Claims Processing* ............62

Q.  *29 CFR § 2560.503-1(1) – ERISA § 1133, Failure to
    Establish and follow Reasonable Claims Procedures* ....................63

R.  *No "Full and Fair Reviews" of Both
    NCMC's Claims and Appeals* ....................................................64

S.  *The Exhaustion Of Administrative Remedies
    Doctrine is Not Intended for Mass Claims under
    a Plan Administrator's Protocol as Distinguished
    from Cases where There is a Single Plaintiff or
    a Mere Handful of Plaintiffs* .....................................................65

T.  *In The Alternative, NCMC Properly raised the UCR/MRC/
    Protocol Denials in its Appeal Letters,
    but That was Not Necessary* ....................................................66

U.  *Cigna Did Not Provide Plans/Policies to NCMC* .........................68

VI.  **THE COURT'S RULINGS ON CIGNA'S PROTOCOL
     EXCLUSION ARE STILL APPROPRIATE** ..................................68

VII.  **CIGNA'S FAILURE TO ADJUDICATE CLAIMS AS REQUIRED
      IN PLAN DOCUMENTS AND VIOLATIONS OF 29 USC § 1106(B)(1)** .................71

VIII.  **IN THE ALTERNATIVE, CIGNA PRESENTED
       NO EVIDENCE SUPPORTING ITS ALLEGED
       AFFIRMATIVE DEFENSES TO NCMC'S ERISA
       CLAIMS** ..........................................................................72

(a)  *Defense – NCMC induced physicians to Breach their In-Network
     Contracts with Cigna:* ..........................................................72

iv

   *(b) Defense – Improper Routing Patients Through the ER:* ..............................73

   *(c) Defense – Improper Referrals Pursuant to § 7204.055,*
       *Tex. Occ. Code:* ..........................................................................74

   *(d) Defense – Inflated or Excessive Charges:* .......................................76

   *(e) Defense – Alleged Fee-Forgiving:* ....................................................78

   *(f) Defense – Breach of Cigna Plans:* ....................................................80

   *(g) Defense – Two Chargemasters/Dual Billing Rates:* .........................81

**IX.   IN THE ALTERNATIVE, CIGNA WAIVED
      ITS ALLEGED AFFIRMATIVE DEFENSES** ....................................82

**X.   CIGNA'S BREACHES OF ERISA DUTIES
     OWED TO PLAN MEMBERS, PLANS AND PLAN SPONSORS** ............84

**XI.   THE COURT CANNOT CONSIDER DR. MAY'S
      ALTERNATIVE DAMAGE METHODOLOGIES** ....................................87

   A.  *May's Report dated January 20, 2016* .......................................87

   B.  *May's Updated Report Dated September 8, 2017* .....................89

   C.  *Cigna's Plans'/Policies' MRC Pricing* .....................................89

   D.  *Improper Exclusion of claims Based Upon NCMC's
       Appeal Letters' Content* .............................................................91

   E.  *Improper Exclusion of Claims Based Upon Assignments* .........92

   F.  *Alleged Offsets and Why They Are Barred* ..............................93

   G.  *Dr. May is Not a Credible Witness* .........................................95

**XII.  NCMC'S REMEDIES AND DAMAGES** ..............................................96

   A.  *NCMC's Claims for Under-Payments of Benefits* ....................96

   B.  *NCMC's Damages* ....................................................................96

   C.  *In The Alternative, Cigna must Reprocess all of the
      9,921 NCMC Claims for Plan Benefits* ...................................98

**XIII. NCMC IS ENTITLED TO THE AWARD OF ATTORNEY'S FEES
     AND COSTS PURSUANT TO ERISA** ...........................................100

**XIV. CONCLUSION**........................................................................................................103

    A. NCMC is "Left Holding the Bag" ...........................................................103

**CERTIFICATE OF SERVICE** .........................................................................104

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 792 F.2d 1368,
1371-72 (5th Cir. 1986) ...................................................................................5

*Admin. Comm. Of Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Varco*,
338 F.3d 680 (7th Cir. 2003) ...........................................................................29

*Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*, No. CV H-12-1206, 2016 WL
7496743 (S.D. Tex. 2016) .........................................................................31, 32

*Agnew v. United Leasing Corp.*, 680 Fed. Appx. 149 (4th Cir. 2017) ...........................94

*Am. Med. Ass'n v. United Healthcare Corp.*, 00-CV-2800, 2007 WL 1771498
(S.D. N.Y. June 18, 2007) ...............................................................................41

*Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.*, 2016 WL 1089697
(D.C. Colo., March 21, 2016) .....................................................................57, 62

*Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382 (1983) ...................................5

*Atlantis Dev. Corp. v. United States*, 379 F.2d 818, 828 (5th Cir. 1967) .........................7

*Ayers v. Life Ins. Co. of North America*, 869 F. Supp. 2d 1248 (D. Or. 2012) .............29

*B&S Welding LLC Work Related Injury Plan v. Oliva-Barron*, 447 S.W.2d 425
(Tex.App. – Dallas 2014, no pet.) .....................................................................61

*Bank of Louisiana v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237 (5th Cir. 2006) ..........33

*Banker v. Xerox Corp. Employees' Stock Ownership Plan*, No. SA-98-CV-0230-OG,
2000 WL 33348191 (W.D. Tex. Aug. 28, 2000) .............................................86

*Barboza v. Calif. Ass'n. of Prof. Firefighters*, 799 F.3d 1257
(9th Cir. 2015) ..................................................................................................71

*Bergt v. Retirement Plan for Pilots Employed by Markair, Inc.*, 293 F.3d 1139
(9th Cir. 2002) ..................................................................................................30

*Bigelow v. United Healthcare of Mississippi, Inc.*, 220 F.3d 339 (5th Cir. 2000) ..........31

*Bourgeois v. Pension Plan for Employees of Santa Fe Int'l Corps.*, 215 F.3d 475
(5th Cir. 2009) .....................................................................................58, 59, 60

*Brandoff v. Empire Blue Cross and Blue Shield*, 707 N.Y.S.2d 291 (1999) ..................41

*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000) ................................................... 85

*Cal-Tex Lumber Co., Inc. v. Owens Handle Co., Inc.*, 989 S.W.2d 802
   (Tex.App. – Tyler 1999) .................................................................................... 35, 36, 83

*Calder v. SBC Pension Ben. Plan*, 549 F. Supp. 2d 824 (W.D. Tex. 2008) ..................... 99

*Cigna Corp. v. Amara*, 563 U.S. 421, 131 S.Ct. 1866, 179 L.Ed.2d 843
   (2011) .............................................................................................................................. 10

*City of St. Paul, Alaska v. Evans*, 344 F.3d 1029 (9th Cir. 2003) .................................... 94

*Commc'ns Workers v. AT&T Co.*, 40 F.3d 426 (D.C. Cir. 1994) ..................................... 58

*Connecticut Gen. Life Ins. Co., et al v. Humble Surgical Hospital, LLC*,
   Case No. 16-20398 (5th Cir. Dec. 19, 2017) ........................................................ *passim*

*Connecticut Gen. Life Ins. Co., et al v. Humble Surgical Hospital, LLC*,
   C.A. No. 4:13-CV-3291, 2016 WL 3077405 (S.D. Tex. June 1, 2016) ................. 63, 75

*Corley v. Commonwealth Indus., Inc.*, No. 3:07-CV-196-H, 2014 WL 2200869
   (W.D. Ky. May 27, 2014) *aff'd sub nom. Corley v. Commonwealth Indus., Inc.
   Cash Balance Plan*, 602 F. App'x 637 (6th Cir. 2015) .................................................. 99

*Crowell v. Shell Oil Co.*, 541 F.3d 295, 313 (5th Cir. 2008) ............................................. 8

*Denton v. First Nat'l Bank*, 765 F.2d 1295 (5th Cir. 1985) .............................................. 58

*Dialysis Newco Inc. v. Cmty. Health Sys. Tr. Health Plan*, No. 5:15-CV-272,
   2017 WL 2591806 (S.D. Tex. Jun. 14, 2017) ............................................................... 99

*Donovan v. Estate of Fitzsimmons*, 778 F.2d 298 (7th Cir. 1985) ................................... 98

*Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307, n. 3 (5th Cir. 1994 ........................................ 9

*Dunnagan v. Watson*, 204 S.W.3d 30 (Tex.App. – Ft. Worth 2006, pet. denied) ........... 32

*Eckersley v. WGAL TV, Inc.*, 831 F.2d 1204 (3d Cir. 1987) ............................................ 99

*Electrostim Med. Servs., Inc. v. Healthcare Serv. Corp.*, 614 F. App'x 731
   (5th Cir. 2015) ................................................................................................................ 41

*Ellenburg v. Brockway, Inc.*, 763 F.2d 1091 (9th Cir. 1985) .......................................... 31

*Encompass Office Solutions, Inc. v. Connecticut General Life Ins. Co. d/b/a Cigna
   Healthcare of Texas, Inc., et al*, C.A. No. 3:11-cv-02487-L, 2017 WL
   3268034 (N.D. Tex. July 31, 2017).................................................................... *passim*

*Encompass Office Solutions, Inc. v. Louisiana Health Srv. & Indemn. Co. d/b/a*
   *Blue Cross/Blue Shield of Louisiana and Blue Cross/Blue Shield of Tennessee, Inc.*,
   C.A. No. 3:11-cv-1471-P, 2013 U.S. Dist. LEXIS 188315 (N.D. Tex.,
   Sept. 17, 2013) ..........................................................................50, 51, 52, 54, 56, 61

*ExxonMobil Corp. v. Starr Indem. & Liab. Ins. Co.*, 181 F.Supp.3d 347,
   355 (S.D. Tex. 2015) .................................................................................................5

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998) ...........................65, 66

*Fed. Deposit Ins. Corp. v. Berry*, 659 F. Supp. 1475 (E.D. Tenn. 1987) ..................27, 28

*Free v. Briody*, 732 F.2d 1331 (7th Cir. 1984) ..............................................................98

*Garza v. Sunlife Assurance Co. of Canada*, C.A. No. 7:12-cv-188, 2013 WL
   1816989 (N.D. Tex. April 29, 2013) ........................................................................67

*Gene & Gene, LLC v. BioPay, LLC*, 624 F.3d 698, 702 (5th Cir. 2010) ...........................4

*Gonzalez v. Southern Pacific Transp. Co.*, 773 F.2d 637 (5th Cir. 1985) ........................7

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ...........................28

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010) ...................100, 101, 102

*Harris v. Trustmark Nat'l Bank*, 287 F. App'x 283 (5th Cir. 2008) .................................67

*Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*,
   426 F.3d 330 (5th Cir. 2005) ..............................................................................38, 40

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 134 S.Ct. 604, 187 L.Ed.2d 529
   (2013) ......................................................................................................................98

*Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, fn. 2 (5th Cir. 2009) ............9

*In re Household International Tax Reduction Plan*, 441 F.3d 500
   (7th Cir. 2006) .........................................................................................................51

*Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir. 1980) ........................102

*Jones v. United States Life Ins. Co.*, 12 F. Supp. 2d 383 (D. N.J. 1998) .......................31

*Keith v. St. George Packing Co.,* 806 F.2d 525, 526 (5th Cir. 1986) ...............................7

*Kennedy v. Connecticut Gen. Co. Life Ins.*, 924 F.2d 698 (7th Cir. 1991) .......9, 13, 18, 19

*Koehler v. Aetna Health, Inc.*, 915 F. Supp. 2d 789 (N.D. Tex. 2013) ...................10, 101

*Laurenzano v. Blue Cross & Blue Shield of Massachusetts, Inc. Ret. Income Tr.*,
   134 F. Supp. 3d 189 (D. Mass. 2001) ................................................................100

*Legacy Health Community Srvcs. V. Dr. Kyle Janek*, C.A. No. 4:15-cv-25,
   204 F. Supp. 3d 923 (S.D. Tex. 2016) ...............................................................103

*Lifecare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835
   (5th Cir. 2013) ..............................................................................................100, 101

*Lindquist v. City of Pasadena*, 669 F.3d 225, 238-39 (5th Cir. 2012) ................................................. 5

*Makoul v. Prudential Ins. Co. of America*, No. 12 C 1240, 2013 WL 3874045
   (N.D. Ill., July 25, 2013) .......................................................................29, 30, 93

*Matter of HECI Exploration Co., Inc. v. Holloway (In re HECI Exploration Co.)*,
   862 F.2 513 (5th Cir. 1988) .................................................................................30

*Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420 (5th Cir. 2004) ..............................33, 34

*Menchaca v. CAN Group Life Assurance Co.*, No. 08-20658, 331 Fed. Appx. 298
   (5th Cir. 2009) ........................................................................................................34

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ..........................................................28

*Metzler v. Graham*, 112 F.3d 207 (5th Cir. 1997) ........................................................85

*Mezyk v. U.S. Bank Pension Plan*, No. 3:09-cv-384-JPG-DGW, No. 3-10-cv-696-JPG-DGW,
   2011 WL 6729570 (S.D. Ill. Dec. 21. 2011) .............................................................99

*Neil v. Zell*, 767 F. Supp. 2d 933 (N.D. Ill. 2011) ........................................................98

*New Jersey Primary Case Assoc., Inc. v. New Jersey Dept. of Human Srvcs.*,
   722 F.3d 527 (3d Cir. 2013) ..............................................................................103

*North Cypress Medical Center Operating Company, Ltd., et al v. Aetna Life Ins. Co., et al*
   C.A. No. 4:13-cv-03359, U.S. Dist. Ct., So. Dist. Tx. (June 20, 2016) .......................82

*North Cypress Medical Center Operating Company, Ltd, et al v. Cigna Healthcare
   of Texas, Inc., et al*, 781 F.3d 182 (5th Cir. 2015) ...............................................*passim*

*Novella v. Westchester Cty.*, 661 F.3d 128 (2nd Cir. 2011) ........................................99

*O'Brien-Shure v. U.S. Labs, Inc. Health & Welfare Ben. Plan*, No. 12 C 6101,
   2013 WL 3321569(N.D. Ill. July 1, 2013) ...............................................30, 34, 35, 93

*Palmi v. Metro. Prop. & Cas. Ins. Co.*, No. 975617, 1999 WL 1327911
   (Mass. Super. Feb. 25, 1999) .............................................................................26

*Pension Ben. Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362
   (5th Cir. 2004) ................................................................................................99

*Pettit v. Pettit*, 626 N.E.2d 444 (Ind. 1993) ..................................................27

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39
   (1987) ..............................................................................................................98

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross and Blue Shield of Mich.*, 722 F.3d 861
   (6th Cir. 2013) ........................................................................................72, 86

*Productive MD, LLC v. Aetna Health, Inc.*, 969 F. Supp. 2d 901
   (M.D. Tenn. 2013) .................................................................................65, 66

*Rhorer v. Raytheon Eng'rs & Constructions, Inc.*, 181 F.3d 634, 642 (5th Cir. 1999) ..................10

*Schilling v. Louisiana Dep't of Transportation & Dev.,* 662 F. App'x 243,
   247 (5th Cir. 2016) .........................................................................................7

*Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483 (Tex. 1991) ........................................36, 84

*Scott v. Durham*, 772 F. Supp. 2d 978 (N.D. Ind. 2011) ........................25, 26, 27, 28

*Sheet Metal v. Fabricated Specialties*, 987 F.2d 770 (5th Cir. 1993) ........................................4, 103

*Sorenson v. Dawdi*, 196 S.W.2d 687 (Tex.Civ.App. – Fort Worth 1946, no writ) ........................40

*Spenrath v. The Guardian Life Ins. Co.*, 4:11-cv-1979, 2014 WL 710412
   (S.D. Tex. Feb. 21, 2014) *aff'd* 13-20196 (5th Cir. 2014) ........................................102

*Springer E.R., LLC v. Aeta Life Ins. Co.,* 2010 WL 598748 (S.D. Tex.,
   Feb. 17, 2010) ..............................................................................................42

*Tango Transport v. Healthcare Financial Services, LLC*, 322 F.3d 888
   (5th Cir. 2003) ........................................................................................23, 24

*Texas Health & Human Servs. Comm'n v. El Paso Cty. Hosp. Dist.*, 351 S.W.3d 460,
   (Tex. App. 2011), *aff'd* 400 S.W.3d 72 (Tex. 2013) .................................................99

*Thomason v. Metro Life Ins. Co.*, 703 F. App'x 247 (5th Cir. 2017) .............................................10

*U.S. Airways, Inc. v. McCutchen*, __ U.S. __, 133 S.Ct. 1537, 185 L.Ed.2d
   654 (2013) ..........................................................................................25, 30

*U.S. Fidelity & Guaranty Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353
   (Tex. 1971) ..............................................................................................35

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ..................................................85

*Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.E.2d 598 (1986) ........................................7

*Victory Medical Center Houston, L.P. v. Carefirst of Maryland, Inc.*, Case No. 15-10053, *per curiam* (5th Cir. Jan. 2, 2018) ...........................................................101

*Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468,  494, 107 S.Ct. 2941, 97 L.E.2d 389 (1987) ..............................................................6

*Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850 (N.D. Ill. 2009) ...........................................................................................29

*1 Lincoln Fin. Co. v. Metro Life Ins. Co.*, 428 F. App'x 394 (5th Cir. 2011) ...............................102

## Statutes

ERISA § 336(4) ...............................................................................................26, 27

ERISA § 404(a)(1)(A) ....................................................................................................85

ERISA § 404(a)(1)(D) ....................................................................................................85

ERISA § 409 ....................................................................................................................98

ERISA § 502(a) ...............................................................................................................63

ERISA § 502(a)(1)(B) ......................................23, 24, 28, 29, 32, 85, 86, 96, 98, 99

ERISA § 502(a)(3) ...........................................23, 25, 28, 29, 34, 35, 85, 86, 103

ERISA § 502(a)(3)(B) ....................................................................................................96

ERISA § 502(g)(1) .......................................................................................................100

29 U.S.C. § 1022(a) .....................................................................................................8, 9

29 U.S.C. § 1102(a)(1) ..................................................................................................25

29 U.S.C. § 1102(a)(2) ..................................................................................................85

29 U.S.C. § 1104(a)(1)(D) ............................................................................................25

29 U.S.C. § 1106(b)(1) ..................................................................................................71

29 U.S.C. § 1132(a)(1)(B) ............................................................................................98

29 U.S.C. § 1132(a)(3) ..................................................................................................25

29 U.S.C. § 1132(g)(1) ............................................................................ 100, 101, 102

29 U.S.C. § 1133 ............................................................................................ 49, 63, 64

42 U.S.C. § 1395dd ................................................................................................ 20, 21

29 C.F.R. 2560.503-1(b) ................................................................................................ 62

29 C.F.R. 2560.503-1(l) ......................................................................................... 62, 63

29 C.F.R. 2560.503(h)(1) ............................................................................................. 64

29 C.F.R. 2560.503(h)(2) ............................................................................................. 64

29 C.F.R. 2560.503(h)(3) ............................................................................................. 64

29 C.F.R. 2560.503(h)(3)(i) ......................................................................................... 33

29 C.F.R. 2560.503(h)(3)(ii) ........................................................................................ 34

§ 1204.055, Tex. Ins. Code ......................................................................................... 80

§ 102.001, Tex. Occ. Code ......................................................................................... 15

§ 7204.055, Tex. Occ. Code .................................................................................. 74, 76

## Rules

Rule 35, Fed. R. App. P. .................................................................................................. 8

Rule 35(a), Fed. R. App. P. .......................................................................................... 8

Rule 35(c), Fed. R. App. P. .......................................................................................... 7

Rule 11, Fed. R. Civ. P. ............................................................................................... 82

Rule 23(b)(2), Fed. R. Civ. P. ...................................................................................... 99

Rule 30(b)(6), Fed. R. Civ. P. ....................................................................... 24, 44, 100

## Treatises/Opinions

6 Am. Jur.2d *Assignments* § 116 ................................................................................ 26

4 Corbin on Contracts § 892 (1951) ............................................................................ 26

Kevin Wiggins, *Medical Provider Claims:  Standing, Assignments, and ERISA Preemption*, 45 J. MARSHALL LAW L. REV. 861, 884 (2012) ................................................24

Restatement (Second) of Contracts § 336 cmt. h. ...........................................................27

Restatement (Second) of Contracts § 336(4) ........................................................26, 27

Texas Attorney General Opinion DM-215 (April 13, 1993) ...........................................80

The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) ........................................................7

Westlaw Citing References to *North Cypress Medical Center Operating Co., Ltd. v. Cigna Healthcare*, dated December 26, 2017 ..................................................................12, 101

William M. Landes & Richard A. Posner, Legal Precedent: A Theoretical and Empirical Analysis,19 J.L. & Econ. 249 (1976) ..................................................7

**LIST OF EXHIBITS**

**Exhibit A:**    Fifth Circuit Opinion in *North Cypress Medical Center Operating Company, Ltd., et al. v. Cigna Healthcare*, 781 F.3d 182 (5th Cir. 2015)

**Exhibit B:**    Fifth Circuit Opinion in *Connecticut General Life Ins. Co. v. Humble Surgical Hospital, L.L.C.*, Case No. 16-020398 (5th Cir. Dec. 19, 2017)

**Exhibit C:**    NCMC's Remaining Claims For Trial

**Exhibit D:**    Chronology of NCMC's Claims Processing With Cigna

**Exhibit E:**    BlueQ Ribbon and Affordability Scale Effective Calendar Year 2018 for North Cypress Medical Center

**Exhibit F:**    Breach of ERISA Duties to Plans and Plan Members

**Exhibit G:**    Questions Posed by the Court to Counsel During the Closing Arguments on October 10, 2017, and the Answers Thereto

## ABBREVIATIONS AND REFERENCES USED IN THIS BRIEF

| | |
|---|---|
| ABD | – Adverse Benefits Determinations or denials of health claims. |
| ASO | – Administrative Services Only Agreements between Cigna and its plan sponsors which authorize Cigna to act as the claims fiduciary/administrator/Third Party Administrator with delegated authority to process, decide and pay claims based upon plan terms. |
| Cigna | – Collectively, Cigna Healthcare, Connecticut General Life Insurance Company and Cigna Healthcare of Texas, Inc. |
| CMS | – Centers for Medicare & Medicaid Services. |
| Demon. Evid. | – NCMC's Trial Demonstrative Evidence. |
| DX | – Defendants' Trial Exhibit(s). |
| EOB | – Explanation of Benefits issued by Cigna to the patient member after Cigna processes and pays for or denies a provider's medical claim providing an explanation of the action taken on the claim. |
| EMTALA | – Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, *et seq.* |
| EOP | – Explanation of Payments issued by Cigna to the provider after Cigna processes and pays for or denies a provider's medical claim providing an explanation of the action taken on the claim. |
| E.R. | – NCMC's Emergency Room. |
| *Humble* | – *Connecticut Gen. Life Ins. Co., et al v. Humble Surgical Hospital, L.L.C.*, Case No. 16-20388 (5th Cir. Dec. 19, 2017), Ex. "B." |
| FCO | – Cigna's Field Claims Offices which under normal circumstances receive and adjudicate providers' claims. |
| INN | – In-network, where a provider has entered into an in-network contract or a Hospital Services Agreement with Cigna to be reimbursed contractually agreed-upon amounts for each good and service. |
| MRC | – "Maximum Reimbursable Charge" or what is usually called "Usual and Customary Rate"/UCR in Cigna's plans and the ASOs between Cigna and plan sponsors which provides for the manner of calculating "allowed" amounts from the charges made by OON providers. ("MRC-1" is a charge-based method used to calculate the "allowed" amount based upon the lesser of the OON provider's Chargemaster rates/billed charges and a database with "geographic" charges selected by Cigna. "MRC-2" was devised under Cigna's Fee-Forgiving Protocol and is a cost-based method of calculating the "allowed" amount of the OON provider's billed charges based upon a percentage of Medicare, *i.e.* 110%, 140% or 200%.) |

NCMC       – Collectively, North Cypress Medical Center Operating Company, Ltd. and its General Partner, North Cypress Medical Center Operating Company GP, LLC.

*North Cypress*       – *North Cypress Medical Center Operating Company, Ltd., et al v. Cigna Healthcare, et al*, 781 F.3d 182 (5th Cir. 2015), Ex. "A."

OON       – Out-of-network, where a provider has no INN agreement with a commercial payor such as Cigna with regard to reimbursement rates for the provider's billed charges.

Protocol       – Cigna's "Fee Forgiving Protocol" with the "Four Prong Approach" or "Attack" initiated as a "pilot" program *only* against NCMC and applied to NCMC's claims from November 17, 2008 through July 31, 2012. After this "pilot" program was successfully applied against NCMC, the Protocol was extended and applied to other OON providers' claims across the United States.

PX       – Plaintiffs' Trial Exhibit(s).

SIU       – Cigna's Special Investigations (Fraud) Unit.

TPA       – Third Party Administrator, Cigna.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY, LTD. AND** | § | |
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY GP, LLC** | § | |
| | § | **NO. 4:09-CV-2556** |
| **V.** | § | |
| | § | |
| **CIGNA HEALTHCARE AND** | § | |
| **CONNECTICUT GENERAL LIFE** | § | |
| **INSURANCE COMPANY** | § | |

**PLAINTIFFS NCMC'S POST TRIAL BRIEF**

**TO THE HONORABLE JUDGES OF SAID COURT:**

      **COME NOW**, Plaintiffs North Cypress Medical Center Operating Company, Ltd. and North

Cypress Medical Center Operating Company GP, LLC (collectively "NCMC") and show the

following:

**I.**

**FINDINGS, CONCLUSIONS AND HOLDINGS BY THE**
**FIFTH CIRCUIT BINDING ON THIS CASE AND COURT**

      1.    The findings, conclusions and opinions of the Fifth Circuit panel which included the

Chief Judge of the Circuit in the *North Cypress Medical Center Operating Company, Ltd., et al. v.*

*Cigna Healthcare, et al.,* 781 F.3d 182 (5th Cir. 2015) exclusively govern the remaining claims in

this case which were tried to the bench in October, 2017. The Fifth Circuit made the following

findings, conclusions and opinions based upon the Summary Judgment Record before it which was

developed in this Court and which was the same Record for the bases of this Court's ruling that

Cigna's interpretation of the exclusion supporting its "Fee-Forgiving Protocol," "*charges for which*

*you are not obligated to pay,*" was/is not "*legally correct*" (Dkt. 521, p. 9):

- The exclusion which Cigna utilized to support its Protocol found in the plans and policies was "[P]ayment for the following are specifically excluded from this Plan:… charges which you are not obligated to pay or for which you are not billed or for which you would not have billed except that they were covered under this Plan." *North Cypress*, 781 F.3d at 187. <u>This Court has ruled that this interpretation is "legally incorrect."</u> (Dkt. 521, p. 9).

- All of the plans and policies also state that "[Y]ou and your [D]ependents *may* be required to pay a portion of the Covered Expenses for services and supplies. That portion is the Co-payment, Deductible or Co-insurance….The provider *may* bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, *in addition to* applicable deductibles, co-payments and co-insurance" *North Cypress*, 781 F.3d at 187. Thus, NCMC is not obligated to collect 100% of the patients' OON responsibility amounts. Besides, there is no contract between NCMC and Cigna requiring NCMC to do so. (Tr. 1-143:25 – 1-144:6; 5-165:25 – 5-166:6; 7-8:1-10 – 7-41:13-15) <u>Even when NCMC went INN with Cigna, it still was not contractually obligated to collect any portion of the patient INN responsibility amount.</u> (DX. 83, p. 8, ¶ 4.3.1.)

- NCMC's Prompt Pay Discount Program offered Cigna patients the opportunity to obtain a discount on the OON patient responsibility amount based upon an up-front payment that is determined by a multiple of 125% of Medicare and if the patient fails to pay the agreed-upon amount, the Prompt Pay Discount is reversed and the patient is billed for the difference between what the Prompt Pay Discount patient responsibility is and the payor-determined patient OON responsibility amount. The Program is not offered to ER patients, Medicare patients or any patient using government benefits. *North Cypress*, 781 F.3d at 188. <u>NCMC's up-front collection was very successful in that the hospital was able to collect up to $14 million per year under the Program.</u> (Tr. 1-84:8-24; 2-190:13-19)

- "North Cypress calculates the total cost of care for a patient based on its main fee schedule—called the 'Chargemaster'….In the admitting [patient registration] process, patients acknowledge their ultimate responsibility for this total cost of case, even the portion covered by insurance." *North Cypress*, 781 F.3d at 188. <u>There are no dual fee schedules.</u> (TR. 1-72:21 - 1-73:1; 1-105:13-17; 2-174:1-12)

- "Cigna does *not* contend that it was ever charged more than its…share of the Chargemaster rates…. *The dispute solely concerns the fact that the patients'…portion of the bill was reduced in various ways." North Cypress*, 781 F.3d at 188.

- "Despite Cigna's concerns, it initially paid North Cypress based on the Chargemaster rates as billed" *North Cypress*, 781 F.3d at 189. "*In other words, Cigna accepted the Chargemaster rate as the total cost of care "subject to the plans Maximum Reimbursable Charge," and calculated its share of the cost based on that rate." North Cypress*, 781 F.3d at 189 & n.8 (emphasis added). <u>Hence, Cigna cannot contend that NCMC's charges were "excessive." It knew those charges and voluntarily reimbursed NCMC based upon them.</u> (DX. 83, p. 1, ¶ 1.3)

2

- "To reiterate, Cigna's claim was that if North Cypress did not *bill* patients for their co-insurance responsibility, the patients had *no insurance coverage* for their medical costs." *Id.* (emphasis added) <u>Under NCMC's Prompt Pay Discount Program, it did bill patients if they did not pay the agreed amount upfront.</u> (Tr. 2-193:19 – 2-194:2; 5-54:11-23)

- "Instead, Cigna would assume the patient was billed $100.00; *working backwards* from that assumption, Cigna would calculate the "total cost of care" to be only $250.00. Accordingly, it would reimburse the hospital only $150.00--- sixty percent of $250.00. *Cigna told North Cypress that it would calculate payments this way until clear evidence was presented that (1) the charges shown on the claims were actual charges for services rendered, and (2) the plan member had paid the applicable out-of-network co-insurance and deductible in accordance with the relevant plan." North Cypress*, 781 F.3d at 189-90 (emphasis added).

- Cigna did this as a result of "[A] position drawn largely from the results of its *modest* survey" *Id.* at 189 & n.13 (emphasis added).

- "Cigna paid a minuscule portion of the [members'] medical costs [incurred at NCMC]." *Id.* at 189. <u>All of the goods and services provided were legitimate.</u> (Tr. 1-27:11 – 1:28:2; 5-21:16-20)

- "Under the plans [fully-insured policies] funded by Cigna rather than employers, it seems clear that Cigna *directly benefited* from its drastic reductions in reimbursement—*Cigna kept the money*." *North Cypress*, 781 F.3d at 190 (emphasis added). <u>This profit went to Cigna's "bottom line."</u> (Tr. 4-145:15-23)

- "*When reduced payments were appealed [by NCMC], Cigna would likewise explain that it would not increase payment unless it was given evidence that the patient was held financially responsible for her portion of the total charge reported by North Cypress." North Cypress*, 781 F.3d at 190 & n.14. (emphasis added) <u>This was proven at trial when it was shown that Cigna's SIU "directed" that almost 12,000 NCMC appeals be denied per the Protocol.</u> (PX. 86, 86A).

- With regard to the inquiry pertaining to whether Cigna's interpretation of the exclusion was "legally correct," "[T]he inquiry is thus whether ordinary plan members who read that 'payment for the following is specifically excluded from this plan:…charges which you are not obligated to pay or for which you were not billed,' would understand that they *have no insurance coverage* if they are not charged for co-insurance. That is, would a plan member understand the language to condition coverage on the collection of co-insurance rather than simply describing the fact that insurance does not cover all of the patient's costs. Also relevant is whether Cigna denied all coverage to patients who were not charged or 'billed' for their co-pays or co-insurance by *in-network providers*…[T]here are strong arguments that Cigna's plan interpretation is not 'legally correct.'" *North Cypress*, 781 F.3d at 196. <u>Based upon this law, this Court has thus found that Cigna's interpretation of the exclusion was/is "legally incorrect."</u> (Dkt. 521, p. 9).

3

- Cigna's Protocol was a "sweeping response to NCMC's [Chargemaster] charges." *North Cypress*, 781 F.3d at 196.

- "HERE, THE ERISA PLANS COVER THE SUBJECT MATTER OF THE DISPUTE." *North Cypress*, 781 F.3d at 204 (emphasis added). This Court also so concluded. (Dkt. 409, 2:24 – 3:7)

- Cigna claimed fraudulent over-payments of [NCMC's] charges. …. [O]ver-payments were made in contravention of the plan terms, not whether NCMC's conduct was fraudulent. Indeed, given that NCMC expressly informed Cigna of its discounts prior to any representation about [Chargemaster] charges, *fraud seems particularly inapt*." *North Cypress*, 781 F.3d at 205 (emphasis added). Indeed, NCMC's conduct cannot be at issue in an ERISA derivative claim. *See* ¶¶ 32-56, *infra*.

2.     The foregoing conclusions affect every issue presented in this case as demonstrated in this Brief.

## II.
## THE HOLDING OF THE FIFTH CIRCUIT PANEL IN
## CASE NO. 16-20398, CONNECTICUT GENERAL LIFE INS.
## CO., et. al. v.  HUMBLE SURGICAL HOSPITAL, LLC FILED ON
## DECEMBER 19, 2017, DOES NOT AND CANNOT APPLY TO THIS CASE

**A.** *This Court is Obligated to follow the Opinion and Instructions in North Cypress v. Cigna:*

3.     This case and Court are bound by the Fifth Circuit Opinion in *North Cypress*, 781 F.3d 182.  When a district court does not follow the express instructions of the Fifth Circuit panel that overturned and vacated its earlier rulings, the Circuit will vacate and remand the case a second time for the district court to follow those instructions.  *Sheet Metal v. Fabricated Specialties*, 987 F.2d 770 (5th Cir. 1993) (vacating and remanding a case a second time because the district court did not follow the "explicit directions set forth in [its] prior opinion"); *Gene & Gene, LLC v. BioPay, LLC*, 624 F.3d 698, 702 (5th Cir. 2010) ("[A]n issue of law or fact decided on appeal may *not* be reexamined….by the appellate court on a subsequent appeal.")  "Because a panel of this Court has already heard an appeal of this case, involving some or all of the same issues that are before us today, we are *bound* by the doctrine of '*the law of the case*'….Those holdings *must be followed* in all

4

subsequent proceedings in the same case, both in the trial court and/or on a later appeal in the appellate court." *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 792 F.2d 1368, 1371-72 (5th Cir. 1986) (emphasis added).

4.      The law of the case doctrine "posits that when a court decides upon a rule of law, that decision *must* continue to govern the same issues and subsequent stages in the same case." *ExxonMobil Corp. v. Starr Indem. & Liab. Ins. Co.*, 181 F.Supp.3d 347, 355 (S.D. Tex. 2015) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382 (1983)). "This doctrine bars a court when a case on remand to the district court or on a subsequent appeal, from reexamining *an issue, a fact or law* previously decided on appeal." *ExxonMobil Corp.* 181 F.Supp.3d at 355 (quoting *Lindquist v. City of Pasadena*, 669 F.3d 225, 238-39 (5th Cir. 2012)).

5.      Therefore, the law of the case doctrine bars this Court from following or applying the holdings in *Humble*. Cigna obviously believes that the *Humble* holdings are different from the *North Cypress* holdings on the same legal issue of "legal correctness" because it asked this Court for an extension of the deadline to file the post-trial briefs to include the effects of the *Humble* decision on this case. Cigna wants this Court to commit reversible error by following the *Humble* holdings and ignoring the *North Cypress* holdings.

**B.  One Panel of the Fifth Circuit cannot
      Overrule Another Panel in the same Circuit:**

6.      With regard to the identical exclusion in Cigna's plans/policies, "charges for which you are not obligated to pay," the Fifth Circuit panel of Barksdale, Dennis and Clement in *Humble* ruled differently as matter of law than did the panel of Stewart, Higginbotham and Elrod in *North Cypress* 781 F.3d at 187. Both panels ruled on the *identical* Cigna plan exclusion and on the *identical* ERISA question/issue and each panel came to a different conclusion on this case:

| *North Cypress*, 781 F.3d at 195 | The *Humble* Opinion at p. 5 |
|---|---|
| **"The first question is whether Cigna's reading of the plans is 'legally correct.'"** | **"The first question is whether Cigna's reading of the plans is 'legally correct'" citing *North Cypress*, 781 F.3d at 195.** |

7.      In answering this identical question, the *Humble* panel came to a different conclusion than did the *North Cypress* panel finding that Cigna's reading of the plan exclusion is "legally correct" whereas the *North Cypress* panel specifically directed this Court how to answer that question while finding that "[T]here are strong arguments that Cigna's plan interpretation is not legally correct…". *North Cypress* 781 F.3d at 196.  (However, the facts in *North Cypress* are substantially different from the facts in *Humble*.  See ¶¶ 21 – 30, *infra*.)  While the *Humble* panel agreed that the *North Cypress* panel ruled on the identical plan exclusion, its statement that the *North Cypress* panel "vacated [this Court's] opinion on other grounds in 2015" citing *North Cypress*, 781 F.3d at 196, is patently inaccurate.  That is *exactly* what the *North Cypress* panel did:  it vacated this Court's previous Summary Judgment opinion/ruling that Cigna's interpretation of the exclusion was "legally correct" (Dkt. 331 at pp. 12-14) and remanded the case to this Court for "a full opportunity to consider all of North Cypress's claims for underpayment of benefits and its other closely related ERISA claims with a fully developed record, including claims that Cigna breached duties owed its insureds under ERISA." *North Cypress*, 781 F.3d at 197.  There can be no doubt that this is what occurred in this case no matter how the *Humble* panel may choose to characterize it, obviously in an attempt to claim that it is not overruling the decision of a previous panel which it cannot do.  *See* ¶¶ 9-11, *infra*.

8.      "The doctrine of *stare decisis* is of fundamental importance to the rule of law." *Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 494, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987).  "*Stare decisis* is a *basic self-governing principle* within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential

system that is not based upon 'an arbitrary discretion.'" The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton); *see also Vasquez v. Hillery*, 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (*stare decisis* ensures that "the law will not merely change erratically" and "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals").

9.     An appeals court's "power to reverse the decisions of lower courts,…checks any tendencies on the part of lower-court judges to disregard precedent (reversal foils a judge's attempt to create his own precedent), and its own position in the judicial hierarchy checks its members' tendencies in that direction." *See* William M. Landes & Richard A. Posner, Legal Precedent: A Theoretical and Empirical Analysis, 19 J.L. & Econ. 249 (1976). "This Court, unlike some of our sister Circuit Courts who occasionally follow a different course, has long tried earnestly to follow the practice in which a decision announced by one panel of the Court is followed by all others until such time as it is reversed, either outright or by intervening decisions of the Supreme Court, or by the Court itself *en banc*." *Atlantis Dev. Corp. v. United States*, 379 F.2d 818, 828 (5th Cir. 1967). A prior decision of a three-judge panel of the Circuit Court of Appeals binds another three-judge panel as law of the Circuit unless it is modified *en banc*. *Keith v. St. George Packing Co.,* 806 F.2d 525, 526 (5th Cir. 1986); *Schilling v. Louisiana Dep't of Transportation & Dev.,* 662 F. App'x 243, 247 (5th Cir. 2016), as revised (Oct. 5, 2016).  Hence, the *Humble* panel erred when it failed to follow the earlier holdings of the *North Cypress* panel.

10.     *En banc* determination is addressed by Fed. R. App. P. 35.  The suggestion for rehearing *en banc* remains within plenary control of panel that decided the case unless voted *en banc* by majority of Circuit Judges.  *Gonzalez v. Southern Pacific Transp. Co.*, 773 F.2d 637 (5th Cir. 1985).  The *en banc* hearing must be filed within 14 days after entry to judgment by Fed. R. App. P. 35(c).  A petition for rehearing *en banc* is to be used *only* for cases involving questions of exceptional

importance or to secure or maintain uniformity of the court's decisions.  Fed. R. App. P. 35(a).  As the Internal Operating Procedures of the Fifth Circuit provide, "[a] suggestion for rehearing *en banc* will be treated as a petition for rehearing by the panel if no petition is filed.  The panel may grant rehearing without action by the full Court."  International Operating Procedures of the United States Court of Appeals for the Fifth Circuit, accompanying Local Rule 35.  Cigna never moved for a rehearing *en banc* after the Opinion in *North Cypress*, 781 F.3d 182 was issued on March 15, 2015.  Therefore, the *North Cypress* Opinion is final and binding on both this case and this Court.

11.    For the forgoing reasons, this Court is not permitted to consider different holdings and findings from another Fifth Circuit panel decision in *Humble* which are contrary to the holdings of the *North Cypress* panel.

### C.  The North Cypress v. Cigna Panel's Directions to this Court to Determine whether Cigna's Interpretation of the Plans is Legally Correct:

*12.*    The *North Cypress* panel was extremely definitive and specific with regard to its instructions to this Court.  *North Cypress* dictated that the "most important factor to consider" in the legal correctness inquiry is whether Cigna's interpretation is consistent with a fair reading of the plan[s]."  *North Cypress*, 781 F.3d at 195 citing *Crowell v. Shell Oil Co.*, 541 F.3d 295, 313 (5th Cir. 2008).  *North Cypress* correctly stated that "ERISA requires that summary plan descriptions be written in a manner calculated to be understood by the average plan participant, and….be sufficiently accurate and comprehensive to reasonably apprise such participants….of their rights and obligations."  *North Cypress*, 781 F.3d 183 at 195, citing to 29 USC § 1022(a).  Incredibly, the *Humble* panel completely ignored this statutory requirement of ERISA.  Not a word was even mentioned about the "average plan participant" or 29 U.S.C. § 1022(a).  Instead, the *Humble* panel "skipped" this  requirement and  went directly to whether Cigna had abused its discretion.  *Humble*

Opinion at p. 5.[1]  The *Humble* panel must have known that it was not following the *North Cypress* panel's holdings, but rather, was ruling on the particularly egregious facts in *Humble* wherein the provider actually had a written agreement with physicians, chiropractors and lawyers wherein 33 1/3¢ of every dollar collected from an insurance company like Cigna was paid to the referring person, and wherein the provider increased each bill/UB-04 claim form by at least that percentage to cover the kick-back that was then anticipated to be paid in the future.  Hence, the *Humble* panel stated, "*We do <u>not</u> adopt the reasoning [that Cigna/an administrator can never abuse its discretion if it follows some prior case law like Kennedy v. Connecticut Gen. Life Ins. Co., 924 F.2d 698 (7th Cir. 1991)] as a bright-line rule because even if a legally incorrect interpretation is supported by prior case law, employing the interpretation could [still] cause a plan administrator to abuse its discretion*."  *Humble* Opinion at \*7.

13.     ERISA requires that summary plan descriptions "be written in a manner calculated to be understood by the average plan participant, and…be sufficiently accurate and comprehensive to reasonably apprise such participants…of their rights and obligations."  *North Cypress*, 781 F.3d at 195 (quoting 29 U.S.C. § 1022(a)).  "A summary plan description is ambiguous when 'a reasonable plan participant could not read the summary plan description and know with any degree of certainty' which 'conflicting interference[  ]' should control, and would have to refer to the actual

---

[1] The *Humble* panel stated that it could and did "skip the first step" citing to *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, fn. 2 (5th Cir. 2009). In turn, *Holland* cited to the holding in *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307, n. 3 (5th Cir. 1994) for this proposition. However, in *Duhon*, the Court stated that "[T]he parties…have not conformed [presented] their arguments to [the Fifth Circuit's] traditional two-step analysis, instead focusing only on whether the Plan Administrator abused its discretion in denying Holland benefits." *Duhon*, 15 F.3d 1307, n. 3. Therefore, the *Duhon* Court was forced to "bypass, without deciding, whether the Plan Administrator's denial was legally correct, reviewing only whether the Plan Administrator abused its discretion in denying the claim." Here, the parties have fully briefed, "conformed" and presented the Fifth Circuit's "traditional two-step analysis" in both this Court and at the Fifth Circuit on appeal, and the *North Cypress* panel clearly directed this Court to utilize that two-step process. *See*, *North Cypress*, 781 F.3d at 195. The *Humble* holding does not permit this Court to "skip" the Fifth Circuit's traditional two-step analysis.

9

policy for clarification." *Thomason v. Metro Life Ins. Co.*, 703 F. App'x 247 (5th Cir. 2017) (citing

*Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 642 (5th Cir. 1999) *abrogated on*

*other grounds by Cigna Corp. v. Amara*, 563 U.S. 421, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011)).

"In such circumstances, we apply the rule of *contra proferentem*, which resolves ambiguities against

the drafter.  Therefore, the administrator's proposed interpretation will be deemed legally incorrect

under the first part of our two-part inquiry."  *Thomason*, 703 F. App'x at 247 (citing *Koehler v.*

*Aetna Health, Inc.*, 683 F.3d 182, 188-89 (5th Cir. 2012)).  This, the *Humble* panel ignored.

14.    The Fifth Circuit then concluded the following:

> "ERISA plans are interpreted in their ordinary and popular sense as
> would a person of average intelligence and experience….[and] must
> be interpreted as they are likely to be understood by the average plan
> participant.  The inquiry is thus whether ordinary plan members who
> read that 'payment for the following is specifically excluded from this
> plan;….charges for which you are not obligated to pay or for which
> you are not billed,' would understand that they *have no insurance*
> *coverage* if they are not charged for co-insurance.  That is, would a
> plan member understand the language to *condition* coverage on the
> collection of co-insurance, rather than simply describing the fact that
> the insurance does not cover all of the patient's costs.  Also relevant
> is whether Cigna denied all coverage to patients who were not charged
> or 'billed' for their co-payments or co-insurance by *in-network*
> providers."  *North Cypress*, 781 F.3d at 195-196.

15.    The Fifth Circuit then ruled that based upon the Record before it which has not

changed to this date, but rather, was confirmed at trial, "[T]here are strong arguments that Cigna's

plan interpretation is not 'legally correct,' in which case the inquiry proceeds to determine whether

Cigna nevertheless had discretion to interpret the plan as it did."  *Id*. at 196.  The Fifth Circuit then

held the following:

> "On a finding that the plans read correctly, do not condition coverage
> on collection of co-insurance, the question would be whether Cigna
> nevertheless had discretion to absolve itself of responsibility for
> payment of the greater part of thousands of claims.  At this stage of

the analysis, the inquiry would include among other factors, whether Cigna had a conflict of interest, as well as the 'internal consistency of the plan' and 'the factual background of the determination and any inferences of lack of good faith.' If Cigna's interpretation was found to be either legally correct or within its discretion, a determination would also be required as to whether its sweeping response to North Cypress's charges were based upon 'substantial evidence." *Id.* at 196.

16.     This Court necessarily concluded on a objective basis that ordinary plan members who read the exclusion would never understand that they "*have no insurance coverage*" if they are not charged for OON co-insurance, that is, "would a plan member understand that the plan exclusion '*conditions*' OON coverage on the collection of co-insurance, rather then simply describing the fact that the insurance does not cover all of a patient's costs." *North Cypress*, 781 F.3d at 195-196. After the case was remanded, this Court would not permit NCMC to take depositions of several plan members to determine what they subjectively believed the exclusion to mean, but rather, reserved that issue to itself to be determined as a matter of law on an objective basis. (Tr. 3-128:23 – 3-130:1) Furthermore, the evidence presented in this case as to "whether Cigna denied all coverage to patients who were not charged or 'billed' for their co-payments or co-insurance by *in-network* providers" clearly established that this never occurred, but rather, Cigna *only* denied coverage to patients who allegedly were not charged or "billed" for their co-pays or co-insurance by OON providers. (Tr. 3-128:23 – 3-130:1; *North Cypress*, 781 F.3d at 196. See also Dkt. 521, p. 9; Dkt. 557, p. 3) Hence, Cigna's interpretation of the plan exclusion cannot be "legally correct" pursuant to the Fifth Circuit's instructions in *North Cypress*, 781 F.3d at 196.

17.     After finding that Cigna's interpretation of the exclusion based upon the Fifth Circuit rulings and directions in *North Cypress* was not "legally correct," this Court then proceeded to the second question of whether the interpretation was an abuse of discretion. (Dkt. 557, p. 3) This Court determined, as did the Fifth Circuit in *North Cypress*, that the factors at this stage, include, but or not limited to, whether the plan administrator had a conflict-of-interest, the internal consistency of

11

the plan, the factual background of the determination and any inferences of lack of good faith.  (Dkt. 557, p. 3 citing *North Cypress*, 781 F.3d at 196)  This Court found that Cigna had abused its discretion based on the factual background of the determination of not only the many inferences of, but *direct evidence* of, the lack of good faith.  (Dkt. 557, p. 4; Dkt. 521, pp. 12-15)  This Court concluded that Cigna abused its discretion in interpreting the plan exclusion based upon *numerous* "inferences of lack of good faith," "hostility" and "bias."  (Dkt. 521, pp. 10-14, 16)  This conclusion that NCMC prevailed on the overall question of abuse of discretion was sufficient enough so that there was no reason for this Court to revisit its findings on the other factors "since the outcome [the finding that Cigna abused its discretion] would remain unchanged."  (Dkt. 557, p. 4)  This Court conclusively found that Cigna offered "nothing to dispute the strong evidence that the fee-forgivng protocol was designed to pressure North Cypress back to the negotiating table."  (Dkt. 557, p. 5)  And, the evidence in this regard did not change one *iota* at trial.   (*See* ¶ 19, *infra*.)  Thus, the Court decided the evidence and properly followed the directives of the *North Cypress* panel.

18.     As of December 26, 2017, *North Cypress*, 781 F.3d 182, has been cited 314 times as ERISA legal authority on this issue.  *See* Westlaw Citing References to *North Cypress Medical Center Operating Co., Ltd., et al v. Cigna Healthcare, et al*, dated December 26, 2017.  The Opinion has been cited in no less than 80 cases; including six times by the Fifth Circuit, once by the Third Circuit, and once by the Second Circuit.  The Texas federal district courts have cited the Opinion on 49 occasions, including 14 times in the Southern District of Texas alone.  Hence, this Court is legally compelled to follow the *North Cypress* Opinion.  To do otherwise would create havoc among the courts of this Circuit and invite another reversal and remand of a now 9 year old case.

### D.   The Facts of this Case have Not Changed from the Established Record in North Cypress v. Cigna:

19.     The facts that were in the Record on Appeal before the Fifth Circuit in *North Cypress*,

781 F.3d 182, have *not* changed in any respect since that decision was made, but rather, the facts of that Record were confirmed and re-presented during the trial of this case in October, 2017.  The following, pertinent facts were again established during trial all of which support this Court's and the Fifth Circuit's opinions, findings and conclusions in *North Cypress*:

- as Cigna was paying NCMC's charges based upon NCMC's Chargemaster rates, Cigna mobilized an "Interdisciplinary Team" to address NCMC's billing practices and pressure NCMC to come INN (Tr. 3-245:18 – 246:15);

- the Team came up with a "Multi-Pronged Approach" which contemplated making "no payment or reduced payments" to NCMC and "convincing plan sponsors to switch to cheaper MRC-2 reimbursement among other measures (PX. 16, pp.5; Tr. 4-10:23 – 4-14:7; *North Cypress*, 781 F.3d at 189);

- Cigna claimed that NCMC was involved in illegal "fee-forgiving" even though both its in-house legal counsel and its SIU Director knew that there was no law in Texas prohibiting either alleged "fee-forgiving" or discounting of the patient responsibility amounts and advised the Team members of same on several occasions (Tr. 3-248-10-16);

- no Cigna plan or policy requires NCMC or any OON provider to collect the patient responsibility amounts (PX. 87, pp. 12);

- Cigna's Fee-Forgiving Protocol was a "pilot" program created *solely* for NCMC so Cigna did not rely on any case authorities from the 1990s for the application of the Protocol to NCMC's claims (Tr. 4-15:16 – 4-16:19);[2]

- Cigna repeatedly stated in emails and internal documents that the "goal" of the "Four-Pronged Attack" was to "force NCMC to the [negotiating] table" to enter into an INN contract with Cigna at low reimbursement rates (PX. 16, 17, 75);

- several dozen Cigna Departments were involved in the "Attack" against NCMC which included the SIU, the Legal Department, the Products Department and the Medical Directors' Department as well as outside legal counsel at Kirkland & Ellis, LLP, the latter of which participated in the

---

[2] Since Cigna created the Protocol as a "pilot" program applied first only to NCMC's claims (PX. 16; Tr. 4-15:16 – 4-16:19), it cannot possibly claim that it relied upon the holdings of the 1991 *Kennedy* case, 924 F.2d 698.

Protocol with regard to the SIU's involvement in the processing of NCMC's appeals (Tr. 3-157:14 – 3-158:12);

● after the Protocol was enacted on November 17, 2008, "ALL" claims from NCMC were subjected to the Protocol and were sent to Cigna's SIU for processing, adjudication and appeal purposes (PX. 86);

● Cigna reduced the amount of reimbursements to NCMC for all claims where the Prompt Pay Discount was applied but then changed that to "ALL" claims, including many ER claims and in most instances, paid only $100 per claim no matter what the amount of the legitimate claim was (PX. 82, 85D, p. 2; Tr. 4-119:18 – 4-120:1);

● Cigna ignored the fact that NCMC reversed the discount and billed thousands of patients under the Prompt Pay Discount Program the full amount of the patient OON responsibility amount when they did not comply with the payments of the up-front amounts (Tr. 5-54:12-23);

● Cigna knew that its plan language does not require NCMC or any OON provider to collect any portion or all of the patients' responsibility amounts or conditions coverage on the collection of those amounts (PX. 87, pp.12);

● Cigna *never* applied the Protocol to INN providers who failed to collect all or any portion of the patients' INN responsibility amounts (PX. 103, Depo. of Mary Ellen Cisar, November 11, 2015, pp.26);

● not even Cigna's INN Agreements with providers require the INN providers to collect the patient responsibility amounts (DX. 83, p. 8, ¶ 4.3.1);

● even after Cigna had agreed to pay NCMC on 337 Repricing Agreements and the amounts of the reimbursements noted therein, it subsequently applied the Protocol to those claims and paid only $100 per claim (PX. 23; Tr. 5-77:8-11);

● Cigna knew that paying nothing to NCMC *smacked of a lack of a genuine effort* to determine proper plan charges and apply the correct amounts (PX. 107, Depo. of Susan Morris, March 3, 2011 at p. 10); NCMC was "*targeted*" in order to "*drive a contract*" (PX. 22);  the Protocol was "*Cigna's most potent tactic*" to "*force a co*ntract" (PX. 45; Tr. 3-237:19 – 3-240:10); Cigna improperly told NCMC's competitors that its non-payment "*will hit NCMC hardest*" (Tr. 1-37:4-16)  Cigna did not follow the plan language to determine

14

the allowed amounts, but rather, "*backed into the allowed amount*" which was a calculation devised/invented by the SIU Manager, Mary Ellen Cisar, to make it appear as if Cigna was adjudicating the claims during the Protocol pursuant to plan language (PX. 23; Tr. 3-203:12 – 3-206:7); and, the Interdisciplinary Team members determined "*do not settle*" with NCMC (PX. 72, pp. 3; Tr. 4-70:6 – 4-72:6); and,

- Cigna used NCMC as a pretext to plan sponsors for paying more money to NCMC from 2008-2012 when it did so to make $3 million to $8 million in additional "Contingency Fees" for itself in accordance with its "Network Savings Program" that is part of its ASO Agreements with employers *via* wrapper networks, repricing agreements and "funneling" platforms.  (Tr. 4-145:5 – 4-148:3; 4-149:19 – 4-150:3)

20.    The foregoing clearly established that Cigna abused its discretion and acted arbitrarily and capriciously.  *See* Dkt. 557, p. 4.

### E.  In the Alternative, the Facts of Cigna v. Humble are Distinguishable from the Facts Herein:

21.    In the alternative, the facts of *Cigna v. Humble* are substantially different from the facts herein as noted below:

- Humble Surgical, an ambulatory surgery center, actually had written agreements between it and potential referral sources such as physicians, chiropractors and lawyers.  In those agreements, Humble agreed that for each patient referred to the surgery center by a referral source, once the insurance company such as Cigna had paid Humble's invoice/UB-04 claims form charges, 33 1/3¢ on every dollar actually collected was then paid as a kick-back to the referral source in violation of § 102.001, Tex. Occ. Code.  What made these kick-backs even worse was that when the referral was made, Humble Surgical knew that there would be a kick-back paid for the referral once its invoice had been paid, so it literally bumped-up its Chargemaster amount for the services actually provided by at least 33 1/3% so that the provider would not be out any money for the amount of the kick-back.  In other words, the payor/Cigna would pay for the kick-back.

- Humble Surgical did not have a Prompt Pay Discount Program like NCMC did. It simply told patients that it would not collect the patient responsibility amounts. NCMC's Prompt Pay Discount Program required payment on the part of the patient and if the patient did not agree to promptly pay the amount agreed to, the Prompt Pay Discount was reversed and the patient was billed for the difference between what the payor had "allowed" and the patient's Prompt Pay Discount consideration amount and the patient responsibility amount. (Tr. 5-54:12-23)

- Humble did not notify Cigna in advance that it had told its patients that it would not collect any of the patient responsibility amounts. With regard to NCMC's program, Cigna was notified of the Prompt Pay Discount Program in at least 24 consecutive, monthly letters delivered to Cigna *via* Certified Mail, Return Receipt Requested. (Tr. 1-88:5-16) NCMC also advised Cigna on each claim wherein the Prompt Pay Discount was applied by a notation to that effect in Box No. 80 of the UB-04 claims form on thousands of claims from 2007 through most of 2012. (PX. 3A; Tr. 1-111:14-23; 5-51:11-21) NCMC specifically advised Cigna that its plan members would be eligible to participate in the NCMC Prompt Pay OON Discount Policy "on patient responsibility amounts for services and items rendered." (PX. 1, 60; Tr. 1-92:6-22)

- There was no evidence in *Humble* that the "Total Charges" required in Box No. 47 of the UB-04 are always submitted by providers whether the provider is OON or INN with Cigna. (Tr. 5-40:13-24) Furthermore, *Humble* did not consider that the UB-04 claim form does not provide a box or field for listing any patient discounts and that both the CMS and Cigna instead require that the provider submit the exact "Total Charges" billed in Box No. 47 by "summing all charges" for the billing period. (Tr. 5-40:13-24) There was also no evidence in *Humble* that Cigna was familiar with these procedures and in its own website, instructs providers to comply with them, including the submission of UB-04 claims form and the "Total Charge" amounts. (Dkt. 457, Ex. 6, pp. 504–506, 509; PX. 3, pp. 1-6; Tr. 5-46:6 – 5-51:10)

- *Humble* also ignored the fact or was not advised of the fact that all of Cigna's plans specifically state that an OON provider "*may*" require that a portion of the OON responsibility amounts, co-payment,

16

deductible, or co-insurance be paid. *North Cypress*, 781 F.3d at 187. The *Humble* opinion did not even mention this fact.

- With regard to NCMC, Cigna paid NCMC based on NCMC's Chargemaster rates as billed. "In other words, Cigna accepted the Chargemaster rate as the total cost of care (subject to the plan's Maximum Reimbursable Charge), and calculated its share of the cost based on that rate." *North Cypress*, 781 F.3d at 189.

- Instead of applying the exclusion pursuant to the plan language and paying thereunder, here, Cigna "*worked backwards*" to determine the $100 to be paid to NCMC on its claims. *Id.*, 781 F.3d at 189. In *Humble*, there was no evidence of this made-up "*back-in*" process of paying Humble, but rather, after losing the appeal in *North Cypress*, Cigna claimed that "[I]f a member paid less than his full co-pay or co-insurance, Cigna would pay what it deemed to be its 'proportionate share.'" *Humble* Opinion at *3. "Proportionate share" was never argued or used by Cigna in this case or with regard to NCMC's claims.

- With regard to Humble's claims, Cigna sent surveys to *all* of its members who had received treatment at Humble and had their claims paid by Cigna. *Humble* Opinion at *2. Here, Cigna only sent out a very small number of surveys out of more than 10,000 claims which the Fifth Circuit referred to as a "modest survey." *North Cypress*, 781 F.3d at 189, fn. 13.

- All of NCMC's patient members, including the Cigna members, signed a contract with NCMC agreeing to be responsible for and obligating themselves to pay all of NCMC's charges. (PX. 2, p. 2) This is consistent with the Fifth Circuit holding that the inquiry of what an ordinary plan member would understand the exclusion to mean would have to understand "that they *have no insurance coverage* if they are not charged for co-insurance. That is, would a plan member understand the language to *condition* coverage on the collection of co-insurance, rather than simply describing the fact that the insurance does not cover all of a patient's cost." *North Cypress*, 781 F.3d at 196. The point is whether the patient is "obligated to pay or 'billed.'" *Id.*

- In *Humble*, there was no evidence submitted that Cigna "denied all coverage to patients who were not charged or 'billed' for their co-pays or co-insurance by *in-network* providers." *Id.* at 196. With regard to NCMC, substantial evidence was submitted that Cigna *never* denied coverage to patients who were "not charged or 'billed' for their co-pays or co-insurance." *Id.*

## F. *Kennedy v. Connecticut General:*

22.    The *Humble* panel relied upon *Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.3d 698 (7th Cir. 1991). *Humble* Opinion at *7-8. This case does not apply to NCMC, and this Court has so found. (*See* ¶ 25, *infra.*) In *Kennedy*, the Seventh Circuit did *not* find that Cigna's interpretation of the exclusion it applied against NCMC was legally correct. In fact, the *Kennedy* court never even reviewed or made a ruling on Cigna's fee-forgiving exclusion/Protocol. The fee-forgiving Protocol was not even in existence in 1991 when *Kennedy* was decided. (Tr. 4-33:15 – 4:34:1; 6-28:5-10) Cigna developed the Protocol as a "pilot" program to initially use *only* against NCMC in 2008. (PX. 16; 4-15:16 – 4-16:19; *North Cypress*, 781 F.3d at 189)

23.    Regardless, if Cigna wants to rely on *Kennedy* to demonstrate that its interpretation of its exclusionary provision is legally correct, it is Cigna's application of the provision to NCMC's claims that demonstrates Cigna abused its discretion. *Kennedy* involved no assignments and a specific, written agreement between the patient and the provider relieving the patient of any obligation to pay and collecting no payment. *Kennedy*, 924 F.2d at 701. In *Kennedy*, the chiropractor provider did not have any assignments with the plan members. *Id.* The chiropractor had only a written contract that said he would "look exclusively to Cigna for payment." *Id.* The *Kennedy* court then held that if the chiropractor "wishes to receive payment under a plan that requires co-payments, then he must collect those co-payments – or at least leave patient legally responsible for them." *Kennedy*, 924 F.2d at 702. The rationale was that the "chiropractor had a contract waiving any and all patient responsibility at the time of service; he did not even attempt to collect, or hold

18

the patient responsible for any payment; and, the chiropractor's charge to the patient was zero, and 80% of nothing is nothing." *Kennedy*, 924 F.2d at 701.  However, here, it has been established that *none* of Cigna's plans at issue required NCMC to collect any of the patient OON responsibility amounts.  (PX.87. p. 12; *North Cypress*, 781 F.3d at 187)  Waiving any or all patient amounts at the time of service is also different than NCMC's Prompt Pay Discount Program, assuming that NCMC had an obligation to collect same, which it did not. (PX. 87, p. 12)  NCMC's patients also remained legally responsible for the full cost of services and NCMC collected payments from the patients at the time of service.  (*North Cypress*, 781 F.3d at 188; DX. 17; PX. 2, p. 2)  And, if the patient did not live up to the prompt pay discount agreement  and pay the consideration for same, the discount was reversed and the patient was billed *on two occasions* for the full amount of the charges noted in the program.  (Tr. 5-54:12-23)

24.    Cigna relies upon *Kennedy* that its interpretation of the exclusion "charges" was appropriate or "legally correct" because it allegedly relied upon the *Kennedy* opinion when applying the Protocol to NCMC's invoices.  This is incorrect.  First, the fee forgiving Protocol against NCMC was devised/created by Cigna's Interdisciplinary Team in 2008, 17 years *after* the *Kennedy* decision.  (*See* fn. 2, *supra*.)  Second, even the *Humble* Opinion so holds, the *Humble* panel stated that *"[W]e do not adopt the reasoning as a bright-line rule because even if a legally incorrect interpretation is supported by prior case law, employing the interpretation could [still] cause a plan administrator to abuse its discretion."  Humble* opinion at *7.  This demonstrates that the *Humble* panel limited its findings and conclusions only to the particular, and egregious facts of that case.

25.    Finally, this Court did not accept the *Kennedy* rationale.  This Court held that "the Seventh Circuit found that Cigna was entitled to withhold payment where a healthcare provider had intentionally collected its entire fee from Cigna by waiving patient contribution….However, there is a great deal of evidence that Cigna's primary motivation was not to root out fee-forgiveness, but

19

instead to pressure North Cypress into negotiating an in-network contract." (Dkt. 521, p. 13)

**G. In the Alternative, No "Substantial Evidence" Of Fee-Forgiving:**

26.     In the alternative, in this case, there was no "substantial evidence" of alleged fee-forgiving, assuming that Cigna's plans required NCMC to collect patient responsibility amounts which they did not. *North Cypress*, 781 F.3d at 187. Of the 29,902 accounts of patients receiving services at NCMC (Tr. 5-22:23 – 5-23:1), Cigna claimed that it relied upon 27 surveys to prove NCMC's alleged fee-forgiving behavior. Out of those 27, Cigna highlights that 12 surveys show that patients were "billed nothing and paid nothing." (DX. 14 pp. 3-4) Unlike *Humble,* no survey stated that they were told "everything was covered at 100%" or the amount "was all he was responsible for." *Humble* Opinion at p 9. Regardless, these "modest" surveys were deficient for several reasons and are not substantial evidence to prove any fee-forgiving actions. *North Cypress,* 781 F.3d at 189 n.13.[3]

27.     First, the surveys do not indicate if these patients' claims were paid based upon a repricing agreement. If they were paid pursuant to a repricing agreement, NCMC is contractually obligated not to bill the patient for the balance. (PX. 84) Every claim paid pursuant to a repricing agreement (90% of NCMC claims) would have "*no*" circled for whether they were balance billed.

28.     Second, the surveys do not detail if the claims are ER claims, or scheduled outpatient procedures. One survey that registers as a "billed nothing and paid nothing" response, is an emergency room visit according to the explanation received from the patient's mother. (DX. 14 pp. 20-21, 88-89) Another "billed nothing paid nothing" survey response has the notation that the patient was unsure "to be honest I was unconscious at the time of my stay there. I almost died I don't ever remember being there at all." (DX. 14, pp. 42-43) EMTALA prevents facilities like NCMC from

---

[3] The surveys provided are incomplete. The enclosures were only provided for some of the surveys received. One survey says the patient enclosed papers signed on the day of her hip surgery, which are not provided with the survey. (DX. 14, p, 104).

making a patient pay its co-pay or cost share before a patient is stable and before receiving treatment.

29.     Other "billed nothing and paid nothing" surveys indicate that the patient was not sure and would need to double check if they paid anything or if they were billed by NCMC. (DX. 14, pp. 40-41) This very well could have been an EMTALA situation because she "went into respiratory failure a couple of times." (DX. 14, p 41) Another "billed nothing and paid nothing" survey says the answer was based upon looking at cancelled checks for a period of four months because the patient passed away, the person answering the survey did not have any actual knowledge of what occurred. (DX. 14, pp.109-110) Another survey states that their second insurance was billed, which not exactly a black and white "billed nothing paid nothing" situation. (DX. 14, pp.57-58) In a chicken or the egg scenario, one "billed nothing and paid nothing" survey used to prove NCMC's alleged fee-forgiving was for services rendered where Cigna already had applied its Protocol on the claim. (DX. 14, pp. 112-113)

30.     Cigna cannot justifiably rely on the results of its "modest survey" as "substantial evidence" that NCMC engaged in "fee- forgiving" behavior, assuming that behavior is prohibited to begin with, which it is not.  *North Cypress,* 781 F.3d at 189 n.13.

### III.

### WHAT THE TRIAL WAS SUPPOSED TO BE ABOUT  – THE FIFTH CIRCUIT OPINION

31.     As noted above, the findings, conclusions and opinions of the Fifth Circuit in *North Cypress,* 781 F.3d 182 govern the remaining claims in this case which were tried during the bench trial.  See Ex. "C" for a list of the remaining NCMC claims.

**A.  *Issues remaining after the Appeal*:**

32.     After reviewing this Court's original 2012, summary judgment orders and opinions, the Fifth Circuit vacated those orders and remanded the case for trial on three specific issues more

21

fully described in Ex. "C":

> **We vacate and remand to allow the district court a full opportunity to consider [1] all of North Cypress's claims for underpayment of benefits and [2] its other closely related ERISA claims with a fully developed record, including [3] claims that Cigna breached duties owed its insureds under ERISA.** *North Cypress*, 781 F.3d at 197 (emphasis added).

33.     Both this Court and the Fifth Circuit have ruled that *only* the Cigna ERISA plans/policies govern the remaining disputes between NCMC and Cigna regarding NCMC's claims. (Dkt. 283, pp. 19, 30-31; Dkt. 409, 2:24 – 3:7; *North Cypress*, 781 F.3d at 204)  There are no remaining state law claims by either party and there are no remaining claims or defenses by Cigna against NCMC.  NCMC's claims are exclusively derivative in nature and are not direct claims established on its own.  Cigna has no defenses to its members' ERISA claims which NCMC derivatively brings by virtue of the Assignments to NCMC of the members' claims.  *This trial was unnecessarily and intentionally prolonged and complicated by Cigna's last minute, incorrect insistence that it could raise affirmative defenses, without any evidence supporting same, against NCMC's alleged, individual conduct in the course of an ERISA trial wherein NCMC's claims are only derivative and come solely from the members' assignments of their plan benefits claims. Cigna's intention was to cloud simple ERISA issues hoping that this Court would create reversible error to buy another three years on appeal before its final day of reckoning.*

34.     After all of Cigna's state court claims had been preempted by this Court (Dkt. 283, p. 32), which ruling was affirmed by the Fifth Circuit,[4] and this Court's subsequent dismissal of Cigna's Counterclaim and Answer based upon limitations (Dkt. 283, p. 34, Dkt. 326, p. 8), the only remaining claims for trial were those noted in ¶ 31, *supra*.  By the time of trial, Cigna had no

---

[4] Cigna did not appeal this Court's ruling on the preemption of its state court counterclaims against NCMC. Therefore, after the appeal to the Fifth Circuit in 2012, this Court's Order dismissing those claims (Dkt. 283, p. 34) became final and non-appealable.

pleadings which would have included or supported any affirmative defenses because it had failed to re-plead its Answer "consistent" with this Court's summary judgment rulings.  (Dkt. 283, p. 33).[5] Nor did Cigna have any defenses against any of its members/participants because both Cigna's counsel, Joshua B. Simon (Tr. 3-132:7-23), and Cigna's corporate representative, Wendy Sherry (Tr. 4-4:11-19), judicially stipulated and admitted that Cigna had neither claims, nor defenses against any claims made on behalf of Cigna's members which are now derivatively brought herein by NCMC as the members' assignee.

***B. Claims and Defenses Available Under ERISA***:

35.     As the assignee of Cigna's members claims, NCMC's suit for benefits falls under ERISA § 502(a)(1)(B) which allows a participant or beneficiary to seek an award of benefits due under a plan, enforce rights under the terms of a plan, or to clarify rights to future benefits under the terms of the plan.   Without the Assignments from Cigna's members, NCMC as an OON provider, would have no standing to sue Cigna.  *Tango Transport v. Healthcare Financial Services, LLC*, 322 F.3d 888 (5th Cir. 2003); (Dkt. 521, pp. 16-17)

36.     On the other hand, ERISA § 502(a)(3) allows a participant, beneficiary or fiduciary to bring a civil action to enjoin any act that violates ERISA or the terms of the plan, but the relief available under that section is limited to the "*appropriate equitable relief*."  Cigna's own Trial Brief contends that the Court has already dismissed all of NCMC's claims against Cigna *except* for NCMC's § 502(a)(1)(B) claims seeking the award of benefits due under the Cigna's plans. (Dkt.

---

[5] After the pre-emption and dismissal of all of Cigna's claims, this Court reluctantly permitted Cigna to late-file an "Amended Counterclaim" and "Amended Answer" consistent with this Court's rulings dismissing Cigna's state causes of action, that is, by adding or bringing any ERISA § 502(a)(1)(B) claims.  (Dkt. 283, pp. 33-34) Thereafter, Cigna filed a Counterclaim based upon ERISA § 502(a)(1)(B) which was subsequently dismissed by this Court based upon the analogous two-year statute of limitations (Dkt. 326, p. 8) and thereafter affirmed by the Fifth Circuit.  *North Cypress*, 781 F.3d at 206-7. However, Cigna *never* filed an "Amended Answer" as the Court permitted. Hence, Cigna has no extant Answer on file and no affirmative defenses to NCMC's derivative claims.

630, p. 2)

37.    ***i. Derivative Standing***— NCMC's claims for benefits under ERISA § 502(a)(1)(B) are purely derivative in nature and made pursuant to the Assignments of Benefits made by the Cigna plan beneficiaries in NCMC's favor.  Cigna has not alleged or produced any evidence that the plan beneficiaries engaged in any inequitable conduct amounting to "unclean hands" or "waiver."  This was established at trial by judicial admissions. (Tr. 3-132:7-23; 4-4:11-19)  However, just before trial and long after the Fifth Circuit's March 10, 2015, Opinion in *North Cypress*, Cigna changed position and argued that NCMC's own alleged misconduct gives rise to equitable defenses against NCMC's derivative claims, something which is *not* possible in an ERISA lawsuit.  NCMC is only bringing the claims in the members' shoes or *in personae* of the members.  The member Assignments demonstrate this.  Cigna's President of Payor Solutions and Rule 30(b)(6) Representative admitted that NCMC "stands in the shoes" of the member patient, is "never a direct beneficiary" and "under the assignments," NCMC can bring claims based upon "benefits in members' plans."  (PX. 85D, pp. CIG-NCMC00572548-572549)

38.    An OON healthcare provider such as NCMC which has no INN contract with Cigna, but which has an assignment from a plan participant, has only derivative standing to bring a cause of action to recover benefits from an ERISA plan pursuant to ERISA §502(a)(1)(B).  *Tango Transport*, 322 F.3d at 889.  A valid assignment gives the assignee neither greater nor lesser *rights* then those held by the assignor.  Kevin Wiggins, *Medical Provider Claims*: *Standing*, *Assignments, and ERISA Preemption*, 45 J. MARSHALL LAW L. REV. 861, 884 (2012).  As this Court has already ruled, the Cigna members' Assignments are necessary for NCMC to bring claims against Cigna as an OON provider.  (Dkt. 521, pp. 16-17)

39.    Supreme Court authority precludes Cigna's affirmative defenses, assuming that they have not already been dismissed by this Court, which they have, as discussed below.  The

24

plan/agreement itself "becomes the measure of the parties' equities." *U.S. Airways, Inc. v. McCutchen*, __ U.S. __, 133 S. Ct. 1537, 1548, 185 L.Ed.2d 654 (2013).

40.     The Supreme Court made the following conclusions as to parties' attempts to utilize the States' common law, affirmative defenses in an ERISA case:

> The result we reach, based on the historical analysis our prior cases prescribe, fits lock and key with ERISA's focus on what a plan provides.  The section under which this suit is brought [ERISA § 502(a)(3)] "does not, after all, authorize 'appropriate equitable' relief at large; rather, it countenances only such relief as will enforce "*the terms of the plan*" or the statute, § 1132(a)(3). That limitation reflects ERISA's principle function: "to protect contractually defined benefits." The statutory scheme, we have often noted, "is built around reliance on the face of the written plan documents." "Every employee benefit shall be established and maintained pursuant to a written instrument," § 1102(a)(1), and an administrator must act "in accordance with the documents and instruments governing the plan" insofar as they accord with the statute, § 1104(a)(1)(D).  The plan, in short, is at the center of ERISA.  And precluding [the plaintiffs'] equitable defenses from overriding plain contract terms helps it to remain there. *McCutchen,* 133 S. Ct. at 1548 (citations omitted).

41.     In his Dissent, Justice Scalia agreed with the majority of the Court that "equity cannot override the plain terms of the contract." *McCutchen,* 133 S. Ct. at 1551 (Scalia, J., dissenting). Cigna is attempting to override what the plans provide with regard to what NCMC is due to be paid for the goods and services it provided to Cigna's members.  NCMC has prevailed on the plan exclusion Cigna used in the Fifth Circuit, and now in this Court.  Therefore, Cigna has no affirmative defenses amounting to denials of plan benefits.

42.     In *Scott v. Durham*, 772 F. Supp. 2d 978, 979-80 (N.D. Ind. 2011), the plaintiff sued a defendant and, as part of the settlement, assigned to that defendant his claims against the other co-defendants.  *Id*.  In response, the co-defendants asserted fraud and illegality as affirmative defenses just as Cigna now asserts.  *Id*.  The assignee moved to strike the affirmative defenses, arguing that

the other co-defendants confused the assignee's "individual identity with their status as [the assignor's] assignees" and that the co-defendants could not assert the affirmative defenses against the assignee, because the assignee only stood in the assignor's shoes. *Id*. The district court agreed:

> More specifically on the matter of affirmative defenses, "[b]ecause an assignee acquires no greater rights than was possessed by the assignor, in an action on the claim assigned, the assignee of a chose in action is ordinarily subject to any setoff or counterclaim available to the obligor against the assignor, and to all other defenses and equities that could have been asserted against the assignor at the time of the assignment." *Scott*, 772 F. Supp. 2d at 983 (quoting 6 AM.JUR.2D. *Assignments* § 116). Thus, "[i]t is generally stated that the assignee ... takes [the chose in action] subject to defenses and counterclaims *that were available to the obligor against the assignor*." *Scott*, 772 F. Supp. 2d at 983 (quoting 4 CORBIN ON CONTRACTS § 892 (1951)).

The court then considered "whether an exception to the general principles of assignment applies that would allow [the assignee, Lyons co-defendant(s)] to assert…alleged misconduct of the Lyons. . . . - a defense that has no applicability against Scott- as a defense against the Lyons in their capacity as Scott's assignee." *Scott,* 772 F. Supp. 2d at 981.  The only possible exception the court noted was that an obligee who is subject to a defense or claim cannot improve his or her position by assigning the right to an assignee who is not subject to the defense or claim and then taking a reassignment. *Id.* at 982. The court found this exception was inapplicable:

> Concerning the alleged misconduct of the Lyons…the Court is not confronted with a situation where the Lyons should arguably be barred by their own conduct from pursuing a claim against the [co-defendant], the *raison d'etre* of § 336(4); indeed, the Lyons never had a claim against the [co-defendant] *in their own capacity*. Thus, the Lyons "could not possibly have pursued the claim they now press until they obtained the assignment from [Scott]." *Scott,* 772 F. Supp. 2d at 982 (quoting *Palmi v. Metro. Prop. & Cas. Ins. Co.*, No. 975617, 1999 WL 1327911, *4 n. 3 (Mass. Super. Feb. 25, 1999) (emphasis added)).

***

> Thus, this is *not* a case falling within the scope of the exception in which the Lyons attempted to "launder" their misconduct by assigning a claim without notice to an innocent purchaser and then taking the

26

claim back by a reassignment from that innocent purchaser. *See Scott,* 772 F. Supp. 2d at 982 (citing RESTATEMENT (SECOND) OF CONTRACTS § 336 cmt. h.) (emphasis in original).

*** 

In fact, if the exception articulated in § 336(4) of the Restatement was applied here, it would cause a result wholly inapposite to the general principles of assignment—that a valid assignment gives the assignee "neither greater nor lesser rights than those held by the assignor." *Scott,* 772 F. Supp. 2d at 982 (quoting *Pettit v. Pettit,* 626 N.E.2d 444, 447 (Ind. 1993)). **If the exception were to apply, the [co-defendant] could now assert the Lyons's alleged misconduct as a complete defense to the claims assigned from Scott and still pursue its third-party claim against the Lyons individually for actual fraud (Docket # 180), creating, in effect, a fortuitous opportunity for the [co-defendant] and a perverse result for the Lyons. Under that scenario, "[t]he assignee would be subject to actions not assertable against the assignor, and therefore would have additional characteristics not applicable to the assignor and would not be, as it were, stepping into the shoes of the assignor or merely assuming the position of the assignor."** *Scott,* 772 F. Supp. 2d at 982-83 (quoting *Fed. Deposit Ins. Corp. v. Berry,* 659 F. Supp. 1475, 1482 (E.D. Tenn. 1987)) (emphasis added).

The court held that the co-defendants' "fraud and illegality" allegations against the Lyons, in their capacity as assignees, *were "miscast" as defenses. Scott,* 772 F. Supp. 2d at 983. "The alleged fraud and illegality" contention according to the court, was "more appropriately cast as a counterclaim, cross-claim, or third-party claim." *Id.* The court therefore struck the defenses. *Id.* Here, NCMC has made the same argument and therefore, Cigna's affirmative defenses are "masquerading" as direct counterclaims which this Court has already dismissed and the Fifth Circuit affirmed. (Dkt. 326, p. 8; *North Cypress*, 781 F.3d at 207) To permit Cigna to allege affirmative defenses against the assignee NCMC in an ERISA derivative claim wherein Cigna has no defenses against the assignor members would create a *"perverse result"* wherein the assignee, NCMC, "would be subject to actions not assertable against the assignor [members], and therefore would have additional characteristics not applicable to the assignor [member] and would not be as it were,

stepping into the shoes of the assignor [member] on merely assuming the position of the assignor [member]." *Scott,* 772 F. Supp. 2d at 982-83 (quoting *Berry,* 659 F. Supp. at 1482). This Court has already dismissed Cigna's fraud and other claims based upon pre-emption. (Dkt. 283, p. 19) and the Fifth Circuit has affirmed same. *North Cypress,* 781 F.3d at 204-207. Cigna cannot now get around those final, non-appealable claims by raising them again in the form of dismissed "affirmative defenses."

43.     As the assignee of the CIGNA plan beneficiaries, NCMC only stands in the shoes of its assignors and acquires no greater or lesser rights that the patients held at the time of the assignments. Following the reasoning in *Scott v. Durham*, Cigna may not assert NCMC's alleged, independent bad conduct as affirmative defenses against NCMC in its capacity as an assignee in a purely derivative claim for ERISA benefits. Otherwise, this ceases to be an ERISA case. To hold otherwise would completely neuter the provisions and purpose of ERISA. If payors could assert affirmative defenses against the OON assignee provider as a result of its own actions, we are back to pre-1972, ERISA days when every State jurisdiction's laws would apply to healthcare claims. Cigna's New York counsel must know this. They have simply clouded the simple ERISA issues.

44.     ***ii. Equitable Defenses***— As noted, Cigna's own Trial Brief contends that the Court has already dismissed all NCMC's claims against Cigna except for ERISA §502(a)(1)(B) claims benefits under the Cigna plans. (Dkt. 630, p. 2) ERISA §502(a)(3) does not authorize monetary damages, but instead limits relief to "appropriate legal equitable relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253 (1993); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002). Equitable relief is that which is "typically available in equity." *Mertens*, 508 U.S. at 256. These include equitable remedies such as "injunction, mandamus and restitution but not compensatory damages." *Id.* NCMC's ERISA §502(a)(1)(B) claims do not include requests for equitable relief for itself, but rather, benefits under the plans. (*See* ¶¶ 138-140, *infra*.) Indeed, the Court has already

ruled that NCMC cannot also have the same claims for §502(a)(3) equitable remedies because §502(a)(1)(B) already provides the remedies for NCMC as the assignee of the plan members. (Dkt. 521, p. 20)

45.    In *Makoul v. Prudential Ins. Co. of America*,  No. 12 C 1240, 2013 WL 3874045, **4-5 (N.D. Ill., July 25, 2013), the court discussed the "unclean hands doctrine" in ERISA cases. "'The "unclean hands" doctrine allows the court to deny equitable relief to a party who is engaged in unlawful or inequitable conduct *in connection with the matter from which he or she seeks relief*.'" *Makoul*, 2013 WL 3874045, at *5 (quoting *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 905 (N.D. Ill. 2009)) (emphasis added).   However, this case deals specifically with the unclean hands of the plan member, not the OON provider, Cigna which is the assignee of the members' derivative claims.  The court ruled:

> In any event, the Supreme Court recently held that, "in an action brought under § 502(a)(3) based on an equitable lien by agreement, *the terms of the ERISA Plan govern*.  Neither general principals of unjust enrichment nor specific doctrines reflecting those principles—such as—recovery are common-funds—rules—can override the applicable contract. [T]he equitable doctrine of unclean hands is similar to the equitable doctrine of unjust enrichment and thus *cannot* be used to defend against an overpayment counter claim based on plan language. *Makoul*, 2013 WL 3874045, at *5 (citations omitted). *It is inappropriate to fashion a common law rule that would override the express terms of a private plan unless the overridden plan provision conflicts with statutory provisions or other policies underlying ERISA."  Makoul*, 2013 WL 3874045, at *5 (quoting *Admin. Comm. of Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Varco*, 338 F.3d 680, 691-92 (7th Cir. 2003)) (emphasis added).

46.    The defense of unclean hands is *only* applied when the plan member has committed some fraud in making his/her claim for plan benefits, usually within the context of misrepresenting one's age in order to obtain pension payments prior to the time the plan member would have otherwise be entitled.  *Ayers v. Life Insurance Company of North America*, 869 F. Supp. 2d 1248, 1266-67 (D. Or. 2012).  Here, NCMC has consistently argued that Cigna's equitable defense (for

which there is no support in the pleadings—*see* fn. 5, *supra*) of unclean hands "*is similar to equitable doctrine of unjust enrichment and thus cannot be used to defend against an under-payment claim based upon plan language*." *Makoul*, 2013 WL 3874045, at *5; *O'Brien-Shure v. U.S. Labs., Inc. Health & Welfare Ben. Plan,* No. 12 C 6101, 2013 WL 3321569, *4 (N.D. Ill. July 1, 2013); (Dkt. 283, p. 34)  Furthermore, cases Cigna cites in support of its position supporting equitable defenses all pertain to claims wherein the plan member himself committed fraudulent acts in the course of making plan benefit claims, e.g. lying about his date of birth in an application for pension benefits. None of these cases deal with the alleged fraudulent acts of the OON assignee provider as demonstrated below.

47.     ***iii. Cigna's Cases do Not Support its Affirmative Defenses in a Derivative Action—*** The case law cited by Cigna does not support its affirmative defenses in a derivative action:

- *Bergt v. Retirement Plan for Pilots Employed by Markair, Inc.*, 293 F.3d 1139 (9th Cir. 2002).  This is a claim brought by a plan participant regarding an ambiguity between the plan master document and the summary plan description.  The Ninth Circuit simply stated in passing in a footnote that "the affirmative defenses of fraud and estoppel are available to plan administrators against employees seeking benefits" for their own wrong-doing, not the alleged wrong-doing of the assignee of their claims without citing any authorities and certainly not to *McCutchen,* 133 S. Ct. 1537.  Here, Cigna's common law fraud claims have already been preempted by this Court (Dkt. 263, pp. 32-33) and there is no authority in the Fifth Circuit to permit common law estoppel to an ERISA derivative claim.

- *Matter of HECI Exploration Co., Inc. v. Holloway (In re HECI Exploration Co.)*, 862 F.2d 513 (5th Cir. 1988).  This case dealt with whether a profit sharing plan had waived application of federal law wherein the Fifth Circuit stated that there was no case authority identifying a federal common law defense of waiver to ERISA actions. *Id.* at 523 & n.18.

Again, the Fifth Circuit did not rule that there was a federal common law defense of waiver available in ERISA cases.

- *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091 (9th Cir. 1985).  This is a Ninth Circuit case wherein the retirement plan participant lied about his birthdate in an application for benefits.  There, the court specifically stated that with regard to "unclean hands," that claim could be brought against the participant because he had *"dirtied [his hands] in acquiring the [ERISA] right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants."  Id.* at 1097. That situation certainly does not apply here.  NCMC did not "dirty its hands" with regard to the submissions of the UB-04 claims forms.

- *Bigelow v. United Healthcare of Mississippi*, *Inc.,* 220 F.3d 339 (5th Cir. 2000).  Cigna claims that the Fifth Circuit denied equitable relief to a plaintiff with unclean hands.  That is not true.  The issue was whether the plan participant's state law claims were preempted by the PHSA which the Court refused to address and therefore upheld the decision of the trial court.  *Id.* at 346.  The Court did not deny relief due to unclean hands.

- *Jones v. United States Life Insurance Company*, 12 F. Supp. 2d 383, 390 (D.N.J. 1998).  The issue was whether there was equitable fraud as an affirmative defense with regard to a retirement plan participant lying about her medical history on a benefit application.  *Id.* at 390. Here, Cigna's fraud claim has been dismissed as being preempted, and Cigna never appealed this to the Fifth Circuit.  (Dkt. 263, pp. 31-33). Furthermore, Cigna has made no claims or raised any defenses to its member's claims.  (Tr. 3-132:7-23; 4-4:11-19)

48.     ***iv. Humble Surgical Hospital—*** Cigna has cited to *Aetna Life Ins. Co. v. Humble Surgical Hospital, LLC*, No. CV H-12-1206, 2016 WL 7496743 (S.D. Tex. 2016) for the proposition that the unclean hands doctrine bars "any argument" that NCMC is entitled to a recovery from Cigna.

31

This case is not applicable in this specific instance.  In *Humble Surgical*, Aetna brought a *separate* State law claim against Humble seeking to recoup the money it paid the hospital alleging fraud. *Humble Surgical,* 2016 WL 7496743, at *3-4.  In its capacity as defendant, Humble asserted equitable defenses against Aetna including unclean hands, which this Court rejected on the merits. *Id.* There, Aetna had sued Humble for common law claims wholly outside of ERISA.  Here, Cigna has no such claims or defenses against NCMC outside of ERISA.  *Id.* at **3-4. They were all dismissed.  (Dkt. 283, p. 34)

49.     ***v. In The Alternative, Cigna's "Bad Faith" Precludes the Affirmative Defenses—***
This Court has *already* concluded as a matter of law that (a) the Cigna Protocol's interpretation of the plan language/exclusion, "charges for which you are not legally obligated to pay," was **"legally incorrect;"** (Dkt. 521, p. 9); (b) "there is a great deal of evidence that Cigna's primary motivation [with regard to the Protocol] was not to root out fee-forgiveness, but instead, to pressure NCMC in negotiation and in-network contract" (*Id*. pp. 12-13); (c) Cigna **"abused its discretion"** and acted in **"bad faith"** (*Id*. pp. 14-15); (d) Cigna **"abused its discretion"** in violation of ERISA § 502(a)(1)(B) (*Id*. pp. 14-15); (e) Cigna does *not* deny that the Fee-Forgiving Protocol was **improperly** applied to some ER claims (*Id*. p. 19); (f) Cigna **waived** the affirmative defense of recoupment (*Id*. pp. 25-26); and, (g) Cigna acted with **"hostility"** and **"bias"** towards NCMC.  (Dkt. 557, p. 6)

50.     Cigna *cannot* possibly maintain an equitable claim for offset based upon unclean hands or waiver.  Unclean hands and waiver are equitable defenses.  Assuming that Cigna could maintain affirmative defenses against OON providers' derivative claims, Cigna *must* first do equity before it can claim any equitable relief.  *Dunnagan v. Watson*, 204 S.W.3d 30, 41 (Tex. App. -- Ft. Worth, 2006, pet. denied).  Acting in "bad faith," and abusing one's discretion with "hostility" and "bias" defeats any equitable claim or defense.

32

51.     ***vi. In The Alternative, No Adverse Benefits Determinations Made—*** By attempting to off-set all previously adjudicated and paid claims under the plans from January 4, 2007, through November 17, 2008, Cigna is in fact re-adjudicating those claims and finding that they are not covered under the plans'/policies' MRC definitions, albeit not in a "legally correct" manner.  To do this, Cigna *is* required to issue to each plan member involved written Adverse Benefits Determinations ("ABD") on *each* and *every* claim previously adjudicated, approved and paid during the 22 ½ month period from January 4, 2007, through November 17, 2008.  *See* 29 C.F.R. 2560.503(h)(3)(i).  Cigna is now attempting to withdraw from its members millions of dollars' worth of plan benefits.  This, Cigna has utterly failed to do within the 30 days prescribed in the plans, policies and ASOs.  (PX. 89A, pp. 9, 48-49; Dkt. 624, Ex. B.2)  Now, 9+ years later, is far *too* late for Cigna to issue those ABD letters to its members even if it now attempts to do so.  Cigna's expert, Dr. May, who is supposed to be a healthcare expert whose time is billed at $785 per hour, completely ignores or forgets about the required ABDs.  Therefore, there is *no* basis for Dr. May's "off-set" claims of $13.1 million and $10.3 million, assuming that one could be maintained in an ERISA derivative case. (PX. 95, p. 5)

52.     ***vii. In The Alternative, ERISA Preemption Of Affirmative Defenses—*** Assuming they could be maintained to begin with, Cigna's claims of unclean hands and other affirmative defenses are preempted by ERISA.  Preemption occurs when (a) the claim "addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of the plan; and, (b) the claim directly affects the relationship among traditional ERISA entities – the employer, the plan and its fiduciaries, and the participants and beneficiaries as well as the beneficiaries' assignees.  *Bank of Louisiana v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 242 (5th Cir. 2006) (quoting *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 432 (5th Cir. 2004)).  Cigna's claim of offset is just another derivative of its long dismissed claim for damages based upon restitution/recoupment, the

dismissed unjust enrichment defense/claim and now unclean hands that it unsuccessfully attempts to bring pursuant to ERISA § 502(a)(3).  *See O'Brien-Shure*, 2013 WL 3321569, at *4.  The claims of unclean hands and waiver leading to offset and restitution/recoupment, unjust enrichment and/or a reduction of benefits paid under the plans also "address an area of exclusive federal concern," that being the right to receive benefits under the plan.  As this Court has held while dismissing Cigna's unjust enrichment claim, *"liability in this case derives <u>entirely</u> from the rights and obligations <u>established</u> <u>by</u> <u>the</u> [ERISA] <u>benefit</u> <u>plans</u>."*  (Dkt. 283, pp. 19, 30-31; *See also North Cypress*, 781 F.3d at 209)  Similarly, the Fifth Circuit has held that Texas *equitable* common law duties of good faith and fair dealing are pre-empted by ERISA and fall under no exceptions to the statute. *Menchaca v. CNA Group Life Assurance Co.*, No. 08-20658, 331 Fed. Appx. 298, 304 (5th Cir. 2009).

53.     Cigna is *still* effectively attempting to take away from NCMC the plan benefits that it adjudicated and paid between January 4, 2007, and November 17, 2008, which were paid under the terms of the plans (*North Cypress*, 781 F.3d at 189) without issuing the ERISA-required ABDs to each affected member made on a claim-by-claim basis.  29 C.F.R. § 2560.503(h)(3)(ii).  The Fifth Circuit found that Cigna accepted NCMC's Chargemaster rates as billed *"<u>subject</u> <u>to</u> <u>the</u> <u>plan's</u> <u>Maximum</u> <u>Reimbursement</u> <u>Charge</u> [MRC-1]."  North Cypress*, 781 F.3d at 189.  As NCMC is the assignee of the beneficiaries per the patient Assignments, Cigna's attempt to obtain restitution/recoupment or offsets through an affirmative defense directly "affects the relationship among traditional ERISA entities." *Mayeaux*, 376 F.3d at 432.  Even Dr. May reluctantly acknowledged these rulings.  In his second Report, he writes, *"I understand that Cigna filed a lawsuit to recover alleged overpayments related to these claims, but that lawsuit was dismissed by the Court."* (PX. 95, p. 5)

54.     Cigna originally pled a claim for unjust enrichment with regard to the alleged overpayments made by it to NCMC.  This Court concluded that claim is *completely* preempted by ERISA and that *"liability in this case <u>derives</u> <u>entirely</u> <u>from</u> <u>the</u> <u>rights</u> <u>and</u> <u>obligations</u> <u>established</u> <u>by</u> <u>the</u> <u>benefit</u> <u>plans</u>."*  (Dkt. 283 at 19, 30-31; *North Cypress*, 781 F.3d at 204)  Cigna's claim for offset was pled in its Amended Counterclaims on April 20, 2012, stating that it is entitled to "restitution" pursuant to ERISA § 502(a)(3) (Dkt. 292) which was subsequently dismissed based upon limitations.  (Dkt. 326, p. 8)  This new, dismissed ERISA claim is *identical* to Cigna's affirmative defenses of "unclean hands" and "waiver" where Cigna is attempting to "offset" or receive restitution/recoupment of the ERISA plan benefits previously paid to NCMC.  *See O'Brien-Shure*, 2013 WL 3321569, at *4.  The defense is preempted and now gone forever.  Cigna *never* appealed to the Fifth Circuit this Court's ruling on ERISA preemption.  Therefore, that ruling is final and not subject to any further appeals.

55.     ***viii. In the Alternative, Wavier/Estoppel of Affirmative Defenses—*** This Court has already dismissed Cigna's alleged defense of recoupment based upon waiver.  (Dkt. 521, pp. 25-26)

56.     Additionally, based upon the facts and the Fifth Circuit's finding/conclusion, Cigna has waived any alleged affirmative defense of unclean hands or any other affirmative defense allegedly providing offsets.  Cigna could have easily appealed the pre-emption ruling but did not.  Cigna's counsel at Kirkland Ellis in New York purposefully chose to wait more than two years to bring their counterclaims. (Tr. 8-5:20 – 8-7:23) It was a calculated maneuver wherein Cigna chose to risk a waiver.  "Waiver" is defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it.  *U.S. Fidelity & Guaranty Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971) (citation omitted).  Waiver may be expressed or indicated by conduct that it is inconsistent with an intent to claim the right.  *Cal-Tex Lumber Co., Inc. v. Owens Handle Co., Inc.*, 989 S.W.2d 802, 812 (Tex. App. – Tyler 1999)  Not only did Cigna intentionally

wait for more than two years to bring its counter-claims, but more importantly, it adjudicated and paid NCMC's claims pursuant to plans' MRC-1 pricing based upon the amounts of NCMC's billed Chargemaster rates/charges notwithstanding that for 22 ½ months from January 4, 2007 through November 17, 2008, it had full knowledge of the amounts of NCMC's charges and the particulars of the Prompt Pay Discount Program but still "accepted NCMC's Chargemaster rates as billed subject to the plan's Maximum Reimbursable Charge." *North Cypress*, 781 F.3d at 189.  (Even after NCMC went INN with Cigna on August 1, 2012, Cigna accepted those very same Chargemaster rates – DX. 83, p. 1, ¶ 1.3.)  This *is* both a relinquishment of a known right *and* intentional conduct inconsistent with claiming it. *Cal-Tex Lumber Co.,* 989 S.W.2d at 812. Cigna also had complete control over how to determine the "allowed" amounts on NCMC's claims based upon a database that it maintained (Tr. 4-25:1-4), but rather, chose to pay NCMC based upon its billed charges so that it could make a 29% contingency fee and earn millions of dollars in additional fees from its plan sponsors. (PX. 85e, p.5; *North Cypress*, 781 F.3d at 189)

57.     Based upon the foregoing, Cigna is *also* estopped from making the claim of offset and the affirmative defenses.  Estoppel in Texas contains the following elements:

(1)     a representation of material fact;

(2)     made with knowledge, actual or constructive, of those facts;

(3)     with the intention that it should be acted on;

(4)     to a party without knowledge or means of obtaining knowledge of the facts; and

(5)     who detrimentally relies on the representations. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991).

Cigna cannot make millions of dollars off its conduct and then claim that it should not pay NCMC the benefits mandated by the plans.  This is the essence of estoppel.

## IV.

## NCMC'S ASSIGNMENTS

58.     NCMC presented uncontested and uncontroverted testimony at trial with regard to the existence of all relevant Assignments obtained from Cigna's members.  Both NCMC's Kirk Jones (Registration Director) and Peggy Morgan (Patient Access Manager) testified that when all individuals, including Cigna's insureds/members, are registered at NCMC prior to any treatment for any non-ER care, they routinely sign a Consent and Assignment. (Tr. 2-127:2-17; PX. 113, pp. 151-152)  If the patients did not sign a Consent and Assignment, they would *not* be admitted.  (Tr. 2-152:4 – 2-153:1)  Otherwise, in the absence of a signed Consent and Assignment outside of an emergency context, NCMC's staff could commit a battery upon touching any patient.  (Tr. 2-127:9-13)  The meaning and contents of the Consent and Assignment are explained to each patient.  (Tr. 2-159:25 – 2-160:8)  These witnesses testified that the only occasion that an Assignment may not be signed is when an individual comes through the ER and he is unconscious or unable to sign an Assignment but thereafter, the Assignment is obtained. (Tr. 1-101:23-7; 2-154:14 – 2-156:1)  If any of the Assignments are missing, they were simply misplaced or misfiled. (Tr. 2-156:8-24)  Both individuals testified that NCMC always collects from each patient his driver's license or photo identification card and his insurance card evidencing the intention of obtaining an Assignment and the involvement of the third party insurance company.  (Tr. 2-148:23 – 2-150:16)  On cross-examination, Cigna's counsel did *not* even attempt to examine the witnesses on this testimony. (Tr. 3-36:17 – 3-64:8) Therefore, this testimony establishing the existence of all the Assignments supporting NCMC's claims is both uncontroverted and now uncontested.

59.     In an *identical* case and fact situation with regard to missing patient assignments, *Encompass Office Solutions, Inc. v. Connecticut General Life Ins. Co. d/b/a Cigna Healthcare of Texas, Inc., et al*, C.A. No. 3:11-cv-02487-L, 2017 WL 3268034, *13 (N.D. Tex. July 31, 2017), the

court found that under Texas law and ERISA, *both* verbal and written Assignments of Benefits are acceptable and may be proven by either direct or indirect evidence as was done in this case.

60.    In *Encompass v. Cigna*, the provider could not find and produce Assignments for 169 out of 1,245 claims at issue because that paperwork could have ended up in pre-op or post-op notes, in the provider's filing system or in the physicians' files.  *Encompass,* 2017 WL 3268034, at *8. The provider's testimony established that the provider "routinely received executed Assignment of Benefits forms from its patients; that it was the provider's standard practice to require each of its patients prior to the procedure to execute such a form; the provider fully explained to each patient what the provider was; what the insurance company's role in the patient's procedures would be; the provider would bill the patient's health insurance company after providing its services to the patient; the patients understand that there is a third party involved; and, it is very possible that the executed Assignments could have ended up in the doctor's file, the anesthesia's paperwork, the pre-op and post-op notes or in the provider's filing system."  *Id.* at **6, 8.

61.    In determining whether the provider obtained valid assignments, the *Encompass v. Cigna* court interpreted the assignments in accordance with Texas contract law principles and any ERISA plan documents in accordance with ERISA principles.  *Id.* at *6 (citing *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 334 (5th Cir. 2005)). In *Encompass v. Cigna*, the assignment language was the following:

> I hereby instruct and direct [Cigna] Insurance Company to pay by check made out to the *Encompass* address below.  Or, if my insurance policy prohibits direct payment, I hereby instruct and direct myself to make a check payable to *Encompass*.  *Encompass,* 2017 WL 3268034, at *7.

62.    Here, NCMC's two forms of Assignment language were substantially more specific:

> **2. Assignment of Benefits:** I hereby assign and transfer to North Cypress Medical Center all right, title and interest in any and all health insurance and/or health plan proceeds/benefits from any of my plans arising from the provision of any goods and services provided by

North Cypress Medical Center and/or any physicians/healthcare providers thereof….I hereby assign and transfer, and do intend knowingly and expressly assign and transfer to North Cypress Medical Center Operating Company, Ltd. and to North Cypress Medical Operating Company GP, LLC (collectively, "North Cypress") all causes of actions that exist (now or in the future) in my favor against any health benefits Plan, Plan Sponsor, insurance company, plan administrator, underwriter and/or ANY OTHER PARTY concerning (1) any action taken (or omissions made) which regard to any claim that North Cypress submits on my behalf to any health benefits plan, insurance company and/or plan administrator, whether arising at law or in equity, pursuant to statute, pursuant to regulation or under anybody of common law; (2) all claims based upon breaches of fiduciary duty pursuant to any statute, regulation or under body of common law, including but not limited to the Employment Retirement Income Security Act "ERISA" against any fiduciary, including, but not limited to, any health benefit plan, plan sponsor, insurance company, plan administrator or other fiduciary…., I hereby authorize North Cypress to prosecute any such causes of action in my name or in North Cypress, or to otherwise resolve such causes of action as North Cypress determines in its sole discretion. The aforementioned assigned and transferred causes of action specially include (but are not limited to) all possible causes of action arising under any provision of ERISA or the Texas Insurance Code, including (but not limited to) any causes of action premised upon breach of fiduciary duty under ERISA and any other law or statute.  In the event that I am entitled to hospital benefits arising out of any policy or insurance providing coverage to me or to any other party liable to me, I hereby assign to North Cypress Medical Center the right to obtain said insurance proceeds and apply same to my hospital bill at North Cypress Medical Center." (PX. 2, Bates NCMC 64 228324)

**3. Assignment of Benefits**:  By executing this assignment of benefits, I am directing the health insurance carrier or other health benefit plan providing my coverage (including, but not limited to, any employer, employer group or trust sponsored or offered plan) to pay the hospital and/or hospital-based physicians (hospital-based physicians include but are not limited to: Emergency Department Physicians, Pathologist, Radiologists, and Anesthesiologists.  These services will be billed for separately by their companies) directly for the service the hospital and/or hospital-based physicians provided to the patent during this admission.  In return for the services rendered and to be rendered by the hospital and / or hospital-based physicians. (*Id.*, Bates CIG-NCMC0054875)

39

63.     The *Encompass v. Cigna* court found that the language noted above in ¶¶ 59-61, *supra*, satisfies Texas' requirement that "an assignment must manifest an intent to grant or vest in another the right, title or interest in the benefits payable under a policy without the need for any further action." *Encompass,* 2017 WL 3268034, at *7 (citing *Harris Methodist Fort Worth*, 426 F.3d at 335).   Therefore, NCMC's assignment language far exceeds that which was approved by the *Encompass v. Cigna* court and satisfies the Texas requirements. An Assignment of Benefits may also be established by direct or circumstantial evidence and may be written or verbal.  *Harris Methodist Fort Worth*, 426 F.3d at 335; *Sorenson v. Dawdi*, 196 S.W.2d 687, 690 (Tex.Civ.App. – Fort Worth 1946, no writ); *Encompass,* 2017 WL 3268034, at **7-8.

64.     Both NCMC and Encompass routinely had an Assignment of Benefits signed by every patient; the patients understand that there is a third party (insurance company) involved and that their insurance company will be billed; the patients are advised and understand that they are assigning their rights; and, it is possible that copies of the Assignments that could not be found were mistakenly left in the physician's files, the anesthesia's paperwork, the pre-op or post-op notes or in the provider's filing system. (*Encompass,* 2017 WL 3268034, at *9; Tr. 2-156:8-24; 5-49:8-17; PX. 113, p. 2)

65.     The *Encompass v. Cigna* court found that the Encompass testimony that all patients signed "an Assignment of Benefits" form is sufficient under Texas law.  *Encompass,* 2017 WL 3268034, at *9. The same is true here.  There is no issue that NCMC obtained valid Assignments from each patient at issue in this case.  (Tr. 2-127:2-13; 2-152:19 – 2-153:1; PX. 113, pp. 151-152)

66.     It is well established that a provider has standing to sue derivatively as an assignee to enforce an ERISA plan beneficiary's claim.  *Encompass,* 2017 WL 3268034, at *7 (citing *Harris Methodist Fort Worth*, 426 F.3d at 334. Similarly, under Texas law, a healthcare provider has standing to sue under a patient's insurance policy that is not governed by ERISA if it obtained an

40

assignment of the patient's right under the insurance policy.  *Encompass,* 2017 WL 3268034, at *7

(citing *Electrostim Med. Servs., Inc. v. Healthcare Serv Corp*, 614 F.App'x 731, 740 (5th Cir. 2015)).

67.     Courts have confirmed that a provider "still may be able to prove *at trial* [its] patients

assigned their benefit rights to [it] despite any failure to produce a written Assignment during

discovery."  *Am. Med. Ass'n v. United HealthCare Corp.,* 00-CV-2800, 2007 WL 1771498, *17

(S.D.N.Y. June 18, 2007) (quoting *Brandoff v. Empire Blue Cross and Blue Shield*, 707 N.Y.S.2d

291, 294 (1999)).  Indeed, this Court refused to grant Cigna's summary judgement motion on this

issue stating that NCMC had the opportunity to establish at trial the existence of its Assignments.

(Dkt. 521, p. 17)  This, NCMC did.  (Tr. 2-127:2-13; 2-152:19 – 2-153:1; 5-29:3-7; PX. 113, pp.

151-152)  Furthermore, whenever NCMC populates Box No. 53 on the UB-04 claims form with a

"Y" for "yes," the NCMC employee at the time understands that an Assignment was obtained.

Glenda Tankersley so testified.  (Tr. 5-25:19-22; 5-38:2-22; 5-49:3-21) A provider is not so

constrained how it may prove the receipt of a valid Assignment.   "Neither case law nor any

provision of the plan agreements [including Cigna's plans] requires that assignments be in writing."

*United Healthcare*, 2007 WL 1771498, at *17.    NCMC established the existence of the

Assignments *without* having to produce either a written assignment or evidence of "any agreement

with [its] patients to use their signatures to evince their intent to execute assignments."  *Id*. (quoting

*Brandoff*, 707 N.Y.S.2d at 294)  (Tr. 2-127:2-13; 2-152:19 – 2-153:1; 5-29:3-7)

68.     This Court has also held that based upon (a) the provider indicating "yes" in the

UB-04 claims form as did NCMC, there was an assignment; (b) a UB-04 claims form indicating

that it is used by institutions such as hospitals to submit electronic claims for payment of healthcare

expenses under patients' health benefit plans; and, (c) the use of field number 53 in the "Assignment

of Benefits Certification Indicator" were sufficient to demonstrate "*by a preponderance of the

evidence* that plaintiffs [providers] were assignees to the benefits conferred to patients under the

ERISA plans." *Springer E.R., LLC v. Aetna Life Ins. Co.*, 2010 WL 598748, *4 (S.D. Tex., Feb. 17, 2010) (Ellison, J.).   In *Springer*, it was the payor, Aetna, which submitted this evidence to establish an assignment of the benefits from the patient member to the provider in order to ensure that the case remained in federal court due to ERISA and was not remanded to state court.  *Id.*  Thus NCMC's UB-04 claims forms which all indicate an "Assignment" obtained in Box No. 53 are sufficiently demonstrated "*by a preponderance of the evidence*." *Id.*  (PX. 66, p. 9)

## V.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

69.     After hearing the testimony of the Cigna representatives and reviewing the Cigna documents, this Court must reconsider its previous exhaustion of administrative remedies rulings.

**A**. *Cigna's Hijacked Appeals Process Under the Protocol*:

70.     If 100% "certainty" is indeed required to prove "futility," there is substantial amount of both documentary and testimonial evidence to establish the "certainty" of how Cigna' Appeals Committee would rule on the Adverse Benefits Determinations made on NCMC's claims by the SIU on NCMC's claims, all of which was not refuted by Cigna at trial. *See* PX. 86; 86A.  *First*, based upon NCMC's provider number, the SIU Manager, Mary Ellen Cisar, "flagged" all of NCMC's claims and routed them to the SIU for adjudication per the Protocol instead of using the normal, in-house claims adjudication process through the Claims Field Offices. (PX. 50, 54, 86)  *Second*, the SIU employees never even read the plans when adjudicating the claims (PX. 104, pp. 56, 92) and did not even know what the Protocol exclusion meant.  (*Id.* at 112-113, 126-127) *Third*, after the denials of NCMC's claims, the SIU remained actively involved in the subsequent appeal process "*handling*" and "directing" almost 12,000 NCMC appeals of its own ABDs. (PX. 86; 86A; Tr. 4-160:21 – 4-161:23)  The primary SIU Investigator overseeing the appeal part of the Protocol involving NCMC's appeals of her very own ABDs was Katrina M. Sharrow-Remlinger. (*Id.*)

42

Sharrow and other SIU employees maintained detailed diaries/case notes of their tracking of and direct involvement in the appeals of claims originally denied by the SIU.  (PX. 86, 86A)  From the date of the application of the Protocol, November 17, 2008, through July 31, 2012, 44 ½ months, Sharrow and other SIU employees oversaw, "handled" and "directed" more than 11,782 appeals from NCMC.  (*Id*.)[6]  On these appeals which Sharrow and other SIU employees "handled" during the 44 ½ month period, they "tracked" and reviewed each NCMC appeal and then sent them back to the Appeals Committee "*telling*" the Appeals Committee members how to rule on NCMC's appeals with regard to the ABDs previously made by the SIU "<u>with instructions,</u>" "<u>with directions,</u>" "<u>to uphold</u>" and/or how "<u>to handle NCMC's appeals</u>." (*Id*.)  On these and other occasions, the Appeals Committee representative responded to Sharrow's instructions "*Appeal will be upheld. Thanks*!" (*Id*., CIG0547729)  In one situation on June 2, 2010, at 1:47 p.m., Sharrow instructed the Appeals Committee representative, Elizabeth A. Brewer, to uphold the adverse benefits determination previously made by the SIU under the Protocol and *eleven minutes later, at 1:58 p.m.*, Brewer responded to Sharrow-Remlinger telling her that she would. (PX. 86; 86A; Tr. 4-166:9 – 4-167:3) Fourth, after NCMC sued Cigna, Cigna's trial counsel at Kirkland Ellis LLP and in-house General Counsel both counseled Cigna's SIU on how to handle NCMC's appeals.  (*See* ¶ 76, *infra*.) This can hardly be characterized as a "full and fair review" of an ABD.   No matter what NCMC argued or presented on appeal, the SIU instructed the Appeals Committee members to uphold the SIU's earlier ABS.  (*Id*.)  As this Court advised Mr. Simon during his closing argument, "That sounds like futility to me." (Tr. 8-60:9)

71.    Cigna's plans state the following as to how NCMC's appeals must be reviewed:

> **"*Your appeal will be reviewed and the decision made by someone <u>not</u> involved in the initial decisions.*"**

---

[6] All of the diaries/case notes evidencing these appeal activities were not produced by Cigna until August 31, 2017.  (Dkt. 576, Ex. "A")

***

**"Anyone involved in the prior decision [first appeal] may
not vote on the [Appeals] Committee."** (PX. 87, p.52 Bates
CIG-NCMC0094400; 88, Bates CIG-NCMC0579702)

Cigna violated the plans' appeal requirements by having the SIU representative(s) "review" and be

"involved" in the appeals decisions.  Cigna did not even make an effort to follow the plans in regard

to appeals.

**B.** ***Trial Testimony of Cigna's Rule 30(b)(6) Representative,
Wendy Sherry:***

72.    Wendy Sherry, Cigna's Rule 30(b)(6) representative, testified that even though

Katrina Sharrow-Remlinger was in the SIU, she assisted with appeals for NCMC's claims because

of the Protocol that was put in place.  (PX. 114, p. 20)  Remlinger would share information with the

SIU employees that was to be sent back to the Appeals Committee members indicating how she

arrived at the payment information with regard to the SIU's initial ABD of NCMC's claims.  *Id.* at

21.

**C.** ***Trial Testimony of SIU Manager and
Rule 30(b)(6) Representative, Mary Ellen Cisar:***

73.    Cisar is another Cigna Rule 30(b)(6) representative and also the SIU Manager. (PX.

114, p. 50)  She testified that the entity which made the initial ABD of NCMC's claims, the SIU had

"input into the response as to answering the appeals organization."  (PX. 114, p. 146)  Both the SIU

and the Cigna Legal Department had their "hands in the drafting of letters" on the appeals.  (*Id.* p.

152.)

**D**. ***Trial Testimony of SIU Investigator,
Katrina M. Remlinger-Sharrow***:

74.    The following trial testimony seals the demise of any exhaustion requirement and

precludes the "full and fair review" by Cigna of both NCMC's claims and appeals of ABDs:

Q: Now, if the appeals come in, do you look at all of them?

44

A: **Yes**.  (PX. 104, 114, p. 64).

Q: And then you make a determination as to if you were going to stay with your denial or allowance or backing into a claim, or if you were going to change that, correct?

A: Based on what's been provided by the provider, **yes.** (*Id.*)

Q: **So, basically, what's happening here is that the normal claim handling process is taken out of the normal situation and routed through SIU, so it can be – the Protocol can be applied, correct?**

A: With regards to the initial handling of the claim, **yes**.

Q: Now when the claim comes in and there is an **appeal** and you look at it, do you have the authority to make that determination, that is, look at the appeal and determine if you were going to change your mind on what your earlier determination was?

A: **Yes….So the direction would actually go back directly to the appeals processor.** (*Id.* at pp. 64-68)

Q: With regard to North Cypress, did you ever know of any situation where any claim processor did not follow the SIU investigation with regard to its determination on alleged fee-forgiving?

A: I have seen where claims were not handled per our recommendation.
Q: With regard to those, was it because somebody overruled your determination or they **just messed up** and did not follow it, for some reason they **made a mistake**?

A: **Majority of them were processing errors**. (*Id.* at pp. 64-68)[7]

75.     Cigna's discovery abuse by not producing all of the SIU's appeals case notes until August 31, 2017, and the effect of same on the Court's determination of "futility" *vis-a-vis* the exhaustion of administrative remedies issue must be considered because NCMC was unable to present these documents to the Court in response to Cigna's 2016 dispositive motions.  For the first time on August 31, 2017, 7+ years late, Cigna produced 38 pages of Cigna SIU case notes, Bates

---

[7] This testimony demonstrates why Cigna refused to bring Sharrow to Houston to testify at trial.

stamped nos. CIG 0718988 – 0719026, (Dkt. 575, p. 20; PX. 86A) which, together with other case notes, included proof of thousands of appeals directly handled by the Cigna SIU wherein the SIU which made the initial adverse benefits determinations of NCMC's claims,[8] and then later directed the Cigna Appeals Committee members how to rule on NCMC's appeals under the Protocol.  (PX. 86, 86A)  In addition to demonstrating the foregoing, the following is established by this late production:

| Bates Number | Narrative |
|---|---|
| 0719001 (PX. 86A) | *"No additional money will be paid" to NCMC even on appeals.* |
| 0719004 (PX. 86A) | "We do address all appeals giving our [SIU] recommendation to uphold based on our findings and within NCMC appeal requests they ask for documentation to support their decision with that they are sent the original letter which states our findings and the additional information we would like to review." SIU upholds the appeal. |
| 0719007 (PX. 86A) | The SIU determines how to send letters back to NCMC in response to appeals rather than to uphold the appeal in order to "reduce the volume of appeals to SIU." |
| 0719008 (PX. 86A) | *Whenever NCMC files an appeal, the SIU continues to instruct the Appeals Committee to uphold the original determination based upon the Protocol.* |
| 0719022 (PX. 86A) | SIU directs revision of appeals. |

**E.  *Involvement of Kirkland Ellis Lawyers and Cigna's In-House Counsel in the Appeals Process:***

76.     The lately produced documents noted above evidence that for the 44.5 month period of the Protocol from November 17, 2008, through July 31, 2012, Cigna's SIU directed and instructed the Cigna Appeals Committee members on almost 12,000 appeals/occasions on how to uphold the

---

[8] Cigna diverted NCMC's claims from the normal claims adjudication process through the Field Claims Offices ("FCO") to the SIU to deny or issue ABDs per the Protocol. (PX. 86; 86A; Tr. 3-215:24 – 3-217:11)

SIU's original adverse benefits determinations.  There are additional 14 days listed in the newly produced documents wherein perhaps hundreds of additional appeals were worked on by the SIU but the exact number of those appeals during those days are not provided in the notes.  (PX. 86A) Furthermore, it was learned on August 31, 2017, that during this period of time, on 29 occasions, Cigna's outside trial counsel and advocates, <u>Andrew Dunlap</u>, <u>Melody Wells</u> and <u>Ryan McEnroe</u> of <u>Kirkland & Ellis, LLP</u> in New York and Cigna's General Counsel, <u>Michael Wade</u>, were advising the SIU on NCMC's appeals.  (PX. 86, 86A, pp. 68a, 77-78, 80-81, 84, 86-87, 91-93, 97, 100-101) Not one plan/policy permits Cigna's professional advocate, trial counsel or its general counsel to be involved in the determination of appeals.  (PX. 87,88)    This is not a "full and fair review" of NCMC's claims and appeals.

**F. *Cigna's Appeal Requirements are Not in The Plans:***

77.    When Cigna denied NCMC's first level appeal, it would then advise NCMC in writing that in order to obtain and request a second appeal review, any request for additional documents and information needed to make that second appeal would *not* be provided by Cigna *without* NCMC first obtaining *another* signed authorization from the patient member.  (PX. 86B, pp. 5, 5E, 8, 32, 37) This effectively made a second level appeal impossible since the provider cannot obtain additional information in order to make a second level appeal without the patient member's involvement *via* a written authorization which is difficult, if not impossible, to obtain once the patient has left the hospital. (Tr. 5-14:6-18; 5-28:8-21; 5-30:9-15; DX. 55)  The plans do *not* require such an authorization for a second level appeal.  (Tr. 4-129: 1-8; PX. 87, 88)  Besides, NCMC's Consents signed by the patient members upon registration already contained this authorization.  (PX. 2) Therefore, Cigna created a *de facto* impossibility for NCMC to make second level appeals.

**G. *NCMC's General Appeals Letters were Sufficient:***

78.     When NCMC provided Cigna with generally worded, UCR appeal letters, Cigna still responded and imposed the Protocol exclusion, "charges for which you are not obligated to pay." (PX. 86B, pp. 2, 12, 20; Tr. 5-36:19 – 5-37:2)  Therefore, Cigna's position through its expert Dr. May, that NCMC was required to provide a "specific Protocol appeal letter" in order to perfect an appeal is bogus.  No plan maintains such a requirement.  (PX. 87,88)  The plans simply state that in the appeal, "*[Y]ou should state the reason why you feel your appeal should be approved....*" (PX. 87, p. 52)  The appeal does not even need to be in writing but can be accomplished "by telephone." (*Id.*)  While Dr. May excluded NCMC claims with appeal letters that did not have the exact language "charges which you are not obligated to pay" in them, neither he nor Cigna's counsel raised the issue at trial, but May still excluded these claims from his damages calculations—another reason for the Court to disregard May's calculations.

**H. *Cigna's Pre-Authorizations Ignored:***

79.     Cigna also pre-authorized/pre-certified both inpatient and outpatient procedures to be reimbursed at the MRC level.  NCMC relied upon the pre-authorizations/pre-certifications and treated the patients. (PX. 86B; Tr. 2-136:5-13; 2-137:3-6; 3-42:7-13)  Cigna later denied the claims based upon the exclusion "charges for which you are not obligated to pay."  (PX. 86B, pp. 2, 12, 20; Tr. 5-36:19 – 5-37:2)  Also, with regard to numerous ER claims, Cigna applied the Protocol exclusion "charges for which you are not obligated to pay and substantially reduced the "allowed" amount.  (PX. 86B, pp. 2, 12, 20; Tr. 5-36:19 – 5-37:2; Dkt. 521, pp. 18-19) Cigna did not deny this. (Dkt. 461, pp. 18-19)

**I. *Encompass Office Solutions, Inc. v. Cigna,*
    *July 31, 2017:***

80.     The facts of *Encompass v. Cigna*, with regard to both the initial claims adjudications

of NCMC's claims as well as NCMC's appeals of ABD's are _identical_, involve the _same_ SIU

Manager, Mary Ellen Cisar, the _identical_ flagging and diversion of the claims adjudication process

from the FCOs to be instead adjudicated by the SIU, the _identical_ manner of the SIU subsequently

directing the Appeals Committee members how to rule on appeals, and _directly_ affect this Court's

earlier rulings on the "futility" of exhausting administrative remedies.  Based upon the _identical_ facts

present in this case, Judge Lindsay made the following findings and conclusions[9]:

a. both the administrative claims process as well as the administrative appeal process were "**_stymied_**"[10] by Cigna's SIU and its main investigator, **_Mary Ellen Cisar_**, **_when they placed a permanent flag on all claims submitted by the provider which prevented its appeals from being decided under the plans' appeals protocol which violated ERISA._**  (_Encompass_, 2017 WL 3268034, at **13, 15-16) (emphasis added);

b. ERISA procedural requirements for processing administrative appeals "are set forth in [29 U.S.C.] § 1133 of ERISA and in the Department of Labor Regulations promulgated pursuant to that section".  _Encompass_, 2017 WL 3268034, at *13;

c. "Cigna did not substantially comply with ERISA procedural requirements because the manner in which Cigna processed [the provider's] claims _and appeals_ **did not give [the provider]** a **_reasonable opportunity to have a full and fair review_** of the claim denials" _Id._ at *18;

d. under both Texas law and ERISA, an Assignment of Benefits may be made either _oral_ or in _writing_ and may be established by _direct_ or _circumstantial_ evidence. _Id._ at *7;

e. Cigna waived its anti-assignment clause found in its plans/policies by processing the provider's claims for a

---

[9] Incredibly, in _Encompass v. Cigna_, Cigna continues to raise the same, discredited Article III standing argument that it raised in this Court which the Fifth Circuit wholly rejected in _North Cypress_, 781 F.3d at 195.  _See Encompass_, 2017 WL 3268034, at *5.  Fortunately, the Dallas court followed _North Cypress_ and rejected Cigna's Article III argument.

[10] NCMC has been triple "stymied" by Cigna's claim and appeal processes: (1) the diversion of NCMC's appeals from the FCOs to the SIU for initial denials of NCMC's claims per the Protocol; (2) the SIU's direct involvement in NCMC's appeals (PX. 86; 86A; 104, pp. 63-64); and, (3) Cigna's outside counsel, Kirkland & Ellis, LLP's direct involvement and Cigna's General Counsel, Michael Wade's direct involvement in the appeals process (_Id._) – all preventing a "full and fair review" of NCMC's claims and appeals.

number of years without asserting that provision *Id.* at *11; and,

f. the administrative record ***"demonstrates that deference was effectively given to all of SIU's original denials and recommendations to summarily uphold the denials with little discussion within Cigna or with Encompass, and without considering the appeal record or information submitted by [the provider]."*** *Id.* at *17 (emphasis added)

81. In *Encompass v. Cigna*, the provider's claims were denied because of the Protocol/plan exclusion involving licensure. *Id*. at 26. That is the *only* difference between *Encompass v. Cigna* and this case. Here, all of the facts are *identical* with the exception of a different plan exclusion supporting Cigna' Protocol to NCMC's claims which not only prohibited a "full and fair review" of NCMC's claims, but also prevented a "full and fair review" of NCMC's appeals of adverse benefit determinations.

**J. *Encompass Office Solutions, Inc. v. BCBS,***
  ***September 17, 2013 and June 26, 2017:***

82. In *Encompass Office Solutions, Inc. v. Louisiana Health Srv. & Indemn. Co. d/b/a Blue Cross/Blue Shield of Louisiana and Blue Cross/Blue Shield of Tennessee, Inc.*, C.A. No. 3:11-cv-1471-P, 2013 U.S. Dist. LEXIS 188315 (N.D. Tex., Sept. 17, 2013) (Solis, J.), the district court reviewed a case wherein only one claim was exhausted but the court found that the provider "provides other critical evidence that seeking further review would have been futile: the exhausted benefits claim." *Encompass v. BSBC*, 2013 U.S. Dist. LEXIS 188315, at *15. The court found that the provider's subsequent claims were rejected for the same reason that the initial claim was rejected which is "evidence about a review committee's actions and disposition, not just the company's position." *Id.*

83. Judge Solis further held the following:

Though only one claim was exhausted, it, taken together with the other evidence, provides a factual inference about the futility of seeking

50

further review of the claims.   The Seventh Circuit…held in an analogous context that when claims are "very similar," exhaustion is not required for each claim; instead, **exhaustion of just one claim is sufficient to re-litigate the rest**….[The provider here has] a representative claim that looks "very similar" to its other claims. While that claim cannot vicariously exhaust every other claim, it can provide an inference that reviewing committees in the administrative process are ***hostile*** to the claims.  The inference is even stronger when ***company officials loom in the background***, potentially setting company policies that are ***hostile*** to the claims.  Requiring exhaustion "would merely produce an avalanche of duplicative proceedings…and it is not required."  Thus, one claim is sufficient to raise *a genuine issue of material fact* about whether exhausting the other claims was futile.  *Encompass v. BSBC*, 2013 U.S. Dist. LEXIS 188315, at *15 (citing *In re Household International Tax Reduction Plan*, 441 F.3d 500, 501-02 (7th Cir. 2006)) (emphasis added).

84.     Here, NCMC had almost 12,000 appeals which were treated the same by the SIU and usually by  just one SIU Investigator, Remlinger-Sharrow, establishing the inference of futility which is even stronger "when company officials [SIU's Manager Mary Ellen Cisar, the Legal Department's Susan F. Morris and Michael Wade, not to mention Cigna's outside counsel at Kirkland Ellis] *loom in the background…setting company policies that are hostile to the claims."* *Id.*  (PX. 86, 86A)  Actually, Cigna's lawyers and company officials not only "loomed in the background," but they were directly involved in the appeal process of NCMC's claims.

85.     On June 26, 2017, the *Encompass v. BCBS* court entered Findings of Fact and Conclusions of Law in favor of the provider concluding the following as a matter of law:

> 10.     Encompass was excused from exhausting administrative appeals for claims that BCBSLA denied because it would have been futile for *Encompass* to do so, in light of BCBSLA's October 4, 2010, demand letter to Encompass, **its posture before and during this litigation that it intended to reject any claim by Encompass, its long-standing policy to deny the types of claims Encompass submits, and its assertion of counterclaims against Encompass.**

> 11.     Encompass became aware on October 4, 2010, that it was futile for it to exhaust administrative appeals.  *See Encompass*

*v. BCBS* Conclusions of Law Nos. 10, 11, Dkt. 601, p. 5, June 26, 2017.  (emphasis added).

Judge Solis entered a Final Judgment against BCBS in the amount of $9,525,650.71 for only 102 healthcare claims. *Encompass v. BCBS*, Final Judgment, Dkt. 602, p. 2, June 26, 2017.

86.    The holdings of *Encompass v. Cigna* and *Encompass v. BCBS* are game changers for this case.  Judge Solis ruled on the identical facts and issues presented at trial herein and found that BCBS's demand letter (almost identical to Cigna's November 10, 2008, demand letter in this case (PX. 39)), "its posture before and during this litigation that it intended to reject any claim by Encompass, its long-standing policy to deny the type of claims Encompass submits, and *its assertion of counterclaims against Encompass"* all establish futility. *Encompass v. BCBS* Conclusions of Law No. 10 Dkt. 601, p. 5, June 26, 2017.  Here, Cigna did the same thing.  It wrote the November 10, 2008, demand letter *via* Mr. Matheny, Cigna's V.P. of Network Management, the June 19, 2009, and the July 21, 2009,  demand letters written by Cigna's General Counsel, its posture before and during this litigation that Cigna intended to reject any claim by NCMC and Cigna's longstanding policy to deny the types of claims that NCMC submitted were proof of futility.  (PX. 39, 66, 70) Cigna's policy was that until NCMC (a) wrote what it collected from the patient in Box No. 47 of the UB-04 and (b) collected 100% of the patient's OON patient responsibility amount, the Protocol would continue to be applied to NCMC's claims and appeals.  *Id*.; *North Cypress*, 781 F.3d at 189-90. Also, Cigna decided what it was going to do with NCMC's claims and appeals *before* it ever finished its investigation.  (PX. 104, pp. 65, 279-280, 285-286)  This Court must therefore reconsider its summary judgment orders disallowing most of NCMC's claims based upon the failure to exhaust administrative remedies and the nature of NCMC's Assignments of Benefits obtained from Cigna patients to avoid yet another costly and time-consuming appeal of this case.  Cigna has known since and during the 44.5 month Protocol period, November 17, 2008, through July 31, 2012, exactly

which NCMC claims it has underpaid so it *cannot* be prejudiced by the Court's reconsideration.  It is NCMC that is being prejudiced by the provision of more than $50 million in legitimate goods and services benefitting Cigna, its patient-members and plan sponsors.  (PX. 99-100)

**K.** ***Cigna's November 10, 2008, Letter to NCMC***
     ***and its New Adjudication/Appeal Process***
     ***Initially Created just for NCMC:***

87.    The November 10, 2008, letter to NCMC from Cigna's John W. Matheny, *Vice President of Contracting*, advised NCMC what Cigna was going to do with regard to *not* some, but *"each billing received from NCMC."*  (PX. 39)  Seven days before the implementation of the Protocol on November 17, 2008, Matheny wrote the following to NCMC's Chief Financial Officer who oversees its Business Office and all claims collections and appeals:

> "The Special Investigations Unit (SIU) of Cigna HealthCare…has been reviewing claims received from [NCMC]. Through the SIU's efforts, information has been uncovered which appears to confirm that NCMC is engaging in a practice known as 'fee-forgiving'....
>
> More to the point, the SIU has compiled evidence of a pattern of behavior by NCMC in which NCMC generally collects $100.00 from the Cigna Participant, if any amount is collected at all.
>
> Any portion of a charge which is in any way waived or for which a Cigna Participant is not personally responsible should not be reflected on a billing [Box No. 47 of the UB-04 Claims Forms] submitted to Cigna for reimbursement.
>
> *Accordingly and as of November 17, 2008, the calculated allowable amount Cigna* <u>*shall*</u> *consider for reimbursement for* <u>*any billings*</u> *received from NCMC will reflect our understanding of NCMC's current fee-forgiving practice.*
>
> *This process* <u>*will continue*</u> *for* <u>*each billing received from NCMC until*</u> *such time as* <u>*clear evidence*</u> *is presented to Cigna that:*
>
>> *1)    the charges shown on the NCMC submitted billing are NCMC's actual charges for the services rendered;* <u>*and*</u>
>> *2)    the Cigna Participant has paid their [sic] applicable out-of-network coinsurance and/or*

> *deductible in accordance with their Cigna benefit plan.*
>
> *Cigna reserves the right to pursue collection of any overpayments to NCMC issued prior to November 15, 2008 as a result of NCMC's fee-forgiving practices." (Id.*).

Cigna took the same position in two other letters dated June 19, 2009, (PX. 66) and July 31, 2009 (PX. 70) when its General Counsel, Corianne Iacovelli, reiterated the *identical* words that Matheny initially used that the Protocol would continue to be applied to all of NCMC's claims and appeals.  Therefore, NCMC became aware on *November 10, 2008*, (which was reiterated by Cigna on June 19, 2009 and July 21, 2009), "that it was futile for it to exhaust administrative appeals."  *See Encompass v. BCBS* Conclusions of Law Nos. 10, 11, Dkt. 601, p. 5, June 26, 2017.

     88.    This Court must also consider NCMC's response to Cigna's letter of November 14, 2008, evidencing NCMC understanding of Cigna's new and "sweeping" adjudication process created just for NCMC:

> "Cigna has recently terminated its provider agreements with a number of physicians that refer patients, *at the patients' requests,* to NCMC . . . Cigna has refused to provide these physicians with any Cigna policy, law or regulation that states a physician cannot make a medically-appropriate out-of-network ('OON') referral at a patient's request.
>
> Cigna's current allegations of "fee-forgiving and *threat not to pay* are similarly inappropriate tactics intended to effectively eliminate Cigna's insureds' ability to use the OON benefits for which the insureds pay.
>
> Finally, your letter indicates that *Cigna will begin <u>arbitrarily underpaying</u> NCMC until NCMC provides '<u>clear evidence</u>' that charges billed to Cigna are NCMC's '<u>actual charges</u>.' NCMC assures you that charges shown on claim forms submitted to Cigna are NCMC's actual charges.*
>
> *Before Cigna begins reducing payment to NCMC, NCMC <u>requests copies of the claims</u> that Cigna contends support its allegations. Cigna had nearly <u>two years</u> since NCMC's and Cigna's last discussion of this issue* to provide such claims to NCMC and discuss this matter further . . . Cigna's sudden threat to underpay NCMC claims <u>after two years</u> is contrary to this end.  If Cigna

provides the claims about which it has questions to NCMC. NCMC may be able to answer Cigna's questions.

Such discussions could avoid the costs of <u>litigation</u> for both parties that would likely arise if NCMC is forced to pursue full payment of its claims from Cigna's in court . . . *Cigna's must understand that reducing payment to NCMC for a <u>costly service like surgery to $100</u>, as indicated in your letter is a serious matter to NCMC, much like insurers' use of artificially low "usual and customary rates."* (PX. 46)

89.     Cigna ignored these statements and was not deterred from its position as evidenced in its General Counsel's subsequent letters of June 19, 2009 and July 31, 2009. (PX. 66, 70) Cigna's three letters made it clear that the Protocol and the reimbursement of only $100 per claim notwithstanding the legitimacy and amount of the claim, Cigna will process "each billing received from NCMC" in this manner. (PX. 39, 66, 70) Cigna's officials and General Counsel stated that Cigna would not stop this process "until" NCMC provides Cigna with "clear evidence of (a) the charges shown on the NCMC UB-04 claims form [Box No. 47] contain the amount that was collected from the member patient" as opposed to the "Total Charges" which NCMC is legally required to place in that box; and (b) the Cigna patient member has paid all of its OON coinsurance or deductible (Id.) which is not even required.  (Id.; *North Cypress*, 781 F.3d at 196)  "**Futility**" is therefore established on **November 10, 2008**, the date of Matheny's letter.  (PX. 39)  Also, as the Fifth Circuit held in North Cypress, the inquiry is whether an average plan member would think that if he has "not paid or not been billed" for his patient responsibility amounts . . . he would have no insurance coverage." (Id.)  In other words, NCMC could never offer any evidence, much less "clear evidence," of changing its "Total Charges" in Box No. 47 of the UB-04 to the amount it collected from the plan participant because NCMC is required by CMS regulations to "sum all charges" during the billing period and to place that total sum in that field/box. (PX. 3; Dkt. 457, Ex. 4; Tr. 5-40:13-21)[11]  To do

---

[11] Cigna's website instructions require all INN and OON providers to do the same thing: place the "Total Charges" for all goods and services in Box No. 47.  (Dkt. 457, Ex. 6, pp. 504-506, 509; PX. 3, pp. 1-6; Tr. 5-46:6 – 5-51:10)

anything else would amount to a fraudulent misrepresentation of the "Total Charges." (Tr. 5-34:15-25; 5-40:1-18)

90.     It would also have been impossible for NCMC to present any evidence, much less "clear evidence," that each Cigna participant had "paid all" of the "OON responsibility amounts" when that is not required by the Cigna plans, ERISA or by the Fifth Circuit. (PX. 87, p. 12; *North Cypress*, 781 F.3d at 196) The Fifth Circuit found that Cigna's "sharp reduction" in payments to NCMC in part resulted from the fact that "[NCMC] patients were billed only $100 or less . . . [A] position drawn largely from the results of its modest survey." *North Cypress*, 781 F.3d at 189 & n. 13. The Fifth Circuit emphasized this fact to this Court by stating "[T]o reiterate, Cigna's claim was that if North Cypress did not bill patients for the co-insurance responsibility, the patients had no insurance coverage for medical costs." *Id.* at 189 (emphasis added) Therefore, Cigna's reading of the exclusion is "legally incorrect." *North Cypress*, 781 F.3d at 196; Dkt. 521, p. 9. Cigna plans do not require OON providers like NCMC to collect the patient responsibility amounts. (PX. 87, p. 12; *North Cypress*, 781 F.3d at 187)

91.     This Court must also consider the evidence that by November 17, 2008, Cigna had implemented and applied the Protocol to NCMC's claims as a "pilot program" whereby "**ALL** NCMC <u>claims</u>," including ER claims were immediately submitted or "dropped" to Cigna's SIU for processing. (Dkt. 278, p. 21; PX. 16) The Fifth Circuit found this to be a "*sweeping response to [NCMC's] charges.*" *North Cypress*, 781 F.3d at 196; *Encompass,* 2017 WL 3268034, at *13.

**L. *This Court's Improper Requirement of "Certainty" In Addition to the Established "Hostility" and "Bias" Requirements:***

92.     Contrary to both *Encompass v. Cigna* and *Encompass v. BCBS*, this Court previously held NCMC not only to the standard of proving "bias" and "hostility," which it did, but also showing

100% "certainty of an adverse decision on the appeals of claims."[12] (Dkt. 521, p. 15). *First*, how can any claimant ever prove 100% "certainty of an adverse decision" on appeal when there are almost 10,000 claims at issue?  This would literally require NCMC to more than double appeal all 10,000 claims thereby being required to file 27,700 appeals and other associated letters (623 per month during the 44.5 month Protocol period (Tr.5-27:1-19; Demon. Evid. 2) in order to establish that level of "certainty."  This would be in addition to the 30,000+ appeals NCMC would have to file at the same time with other  commercial payors. (Tr. 5-211:8-11)  That creates a burden unforeseen by the court-made exhaustion doctrine.  Attached as Ex. "D" is the Chronology of NCMC's claim processing with Cigna further evidencing the futility of the exhaustion of administrative remedies.  (Tr. 5-27:1-19; Demon. Evid. 2) As such, this Court's interpretation of the "futility" exception to the requirement of exhaustion makes it a "useless formality."  *Second*, contrary to this Court's ruling, in a case with the ***identical*** facts as here, *Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.,* 2016 WL 1089697, *17 (D.C. Colo., March 21, 2016)  wherein Cigna subsequently applied the *identical* Protocol to an OON provider's claims for alleged fee-forgiving, the court ruled that the claimants "had shown futility for those claims that were not appealed *after* the imposition of Cigna's fee-forgiving Protocol….[O]nce Cigna imposed a ***blanket policy*** of how to handle the [claimants'] claims, the [claimants] could be *certain* that Cigna would reject their appeals pursuant to that policy."  This Court must consider the *Arapahoe* opinion that deals with Cigna's *underline* Protocol and *underline* facts of alleged fee-forgiving as present in this case.  *Encompass v. Cigna's* finding that the Cigna SIU's usurpation of the determinations of both the providers' claims and appeals also makes it impossible ("stymied") for Cigna to "substantially comply" with ERISA procedural requirements of providing the provider with a "full and fair review"

---

[12] This Court *did* find and conclude that NCMC easily established both "hostility" and "bias" with regard to Cigna's unique adjudication process of NCMC's claims as evidenced by Cigna's Interdisciplinary Team emails. (Dkt. 521, p. 16)

of both claims and appeals of adverse benefit determinations which must also be considered. *Encompass,* 2017 WL 3268034, at *18. Otherwise, this Court will be out-of-step with other courts ensuring yet another round trip to the Fifth Circuit.

**M. *Bourgeois* and Estoppel Regarding "Futility":**

93.    In *Bourgeois v. Pension Plan for Employees of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2009), citing *Commc'ns Workers v. AT&T Co.*, 40 F.3d 426, 432 (D.C. Cir. 1994), the Fifth Circuit found that it was not certain that the plan's appeal committee would have denied one single pension claim (not 10,000 claims) in its final determination; however, noted that for the establishment of futility, "hostility" or "bias" on the part of the payor *is* required. *Bourgeois*, 215 F.3d at 479 (citing *Denton v. First Nat'l Bank*, 765 F.2d 1295, 1300-01 (5th Cir. 1985)). In *Bourgeois*, a "high-ranking officer of the plan sponsor" told the *pension plan participant* that "he would receive no further consideration of his [one] claim." *Bourgeois*, 215 F.3d at 479. Therefore, the issue before the Fifth Circuit was "whether a denial of benefits by a high-ranking officer of a plan sponsor (or an officer of the corporate parent) might be sufficient to establish futility *absent a showing a bias or hostility* within the [plan's] benefits committee." *Id.* Bourgeois had failed to even attempt to establish bias or hostility which NCMC had easily established and this Court has so found. (Dkt. 521, p. 16) In *Bourgeois*, as here, the plan sponsor also failed to provide a copy of the plan/Summary Plan Description to the plaintiff. *Bourgeois*, 215 F.3d at 480. It was not only John Matheny, Cigna's *Vice President of Contracting* and "*high ranking officer*" who decided upon the implementation of the Protocol. The Fifth Circuit found that "Cigna mobilized an "Interdisciplinary Team" to address [NCMC's] billing practices and pressure [NCMC] to come INN. The Team came up with the multi-pronged approach which contemplated making '[n]o payment or reduced payment' to [NCMC] and convincing plan sponsors to switch to the cheaper MRC-2 reimbursement *among other measures*. Cigna's Special Investigation Unit . . . also surveyed a *few* dozen members about

58

their experience with [NCMC] and eventually received 27 responses, allegedly confirming its suspicion that [NCMC] was engaged in 'fee-forgiving.'" (*North Cypress*, 781 F.3d at 189; DX. 14, pp. 26-89, 103-124).

94.     The decision of Cigna here was *not* made by *only* one "high-ranking officer of the plan sponsor," but rather, Cigna coordinated many departments[13] comprising dozens of Cigna employees into one "Inter-Disciplinary Team" to implement the "attack" against NCMC. (*North Cypress*, 781 F.3d at 189; PX. 5, 6, 16, 17, 22)  The Team included *the Network Division, the Products Division, the In-House Legal Department, the SIU and numerous other Departments*. (*Id*.; Dkt. 266)  The *SIU* and the *Legal Department* were involved in and orchestrated *every step* of the Team's "approach" together with Cigna's Senior Medical Directors, Dr. James L. Nadler and Dr. Jeffrey Kang.  (*Id*.; Dkt. 278)  It was a *company-wide* decision which also included Cigna's so-called, unbiased Appeals Committee members.  (PX. 86, 86A)  In *Bourgeois*, the Fifth Circuit considered the appeal of only one, small pension claim, not 10,000 healthcare claims with 27,700 appeals and associated letters (Tr. 5-27:1-19; Demon. Evid. 2) which this Court's summary judgment rulings would require.  *Bourgeois*, 215 F.3d at 479.

95.     Also, in *Bourgeois*, the pension participant, Bourgeois, relied upon information from the plan official that "*his claim would not be further considered*."  *Bourgeois*, 215 F.3d at 481 (emphasis added). Therefore, Bourgeois argued that the plan should be *estopped* from claiming that he did not establish futility by the facts noted above.  The Fifth Circuit[14] found that a state *estoppel* theory is <u>*not*</u> preempted by ERISA.  *Bourgeois*, 215 F.3d at 481 (emphasis added).  The Fifth Circuit ruled:

---

[13] As many as a dozen departments on a company-wide basis.  (PX. 5; Tr. 3-158:1-12)

[14] The same Fifth Circuit Justice, J. Higgenbotham, who wrote the Opinion in *North Cypress* wrote the *Bourgeois* Opinion.

> "... *a court should <u>not</u> relinquish its jurisdiction because of a failure to exhaust administrative remedies when there was a <u>valid</u> <u>reason</u> for such failure*. A promissory estoppel theory would recognize such a basis when, as in the current situation, a claimant relies to his detriment on the words and actions of high-ranking company officers who purport to negotiate benefit decisions without actual authority . . . Thus, we *are* inclined to *estop* the defendants [plan] from asserting certain defenses." [15] *Bourgeois*, 215 F.3d at 482 (emphasis added)*.

96. The Fifth Circuit then ruled that it would refer the claim to the plan's benefits committee for an *initial* benefits determination and *estop* the plan from making any limitations argument. *Bourgeois*, 215 F.3d at 482. The Court permitted *estoppel* to allow a claimant to overcome the affirmative defense of failure to exhaust. *Id.* Here, there can be *no* better "valid reasons" of where Cigna should be *estopped* from claiming that NCMC failed to exhaust administrative remedies considering (a) the involvement of not only the *Vice President of Contracting*, the SIU, the Legal Department, the executive branches and almost a dozen departments of Cigna who *all* decided on a company-wide basis to establish the "pilot program" (PX. 5; PX. 16; Tr. 3-158:1-12), the Protocol, the implementation of same applied to "*all of NCMC's claims*" and advised NCMC of this unique claims procedure upon which NCMC relied; and, (b) Cigna's SIU determining/adjudicating all of NCMC's claims *and* appeals of the SIU's own adverse benefit determination. (PX. 86, 86A)

**N. *Cigna's "Litigation" is a "Contrary Position"*:**

97. As early as November 1, 2008, and later on November 10, 2008, Cigna advised NCMC in writing that it would "pursue collection of any identified overpayments to NCMC issued prior to November 15, 2008, as a result of NCMC's [allegedly] fee-forgiving practices." (PX. 3B, 39). This litigation process *was* in fact initiated by Cigna and it did indeed litigate alleged overpayments not only in the form of its Counterclaim, but in its defenses before they were

---

[15] The "exhaustion of remedies" defense. *Bourgeois,* 215 F.3d at 482.

dismissed.  (Dkt. 220)  Courts have ruled that once a plan or the administrator is engaged in a suit or advises that it will engage in a suit seeking damages for fraud, which Cigna did, exhaustion is *not* required.  *See Encompass v. BCBS* Conclusions of Law Nos. 10, 11, Dkt. 601, p. 5, June 26, 2017, ¶¶ 82-86, *supra*.  "If an administrative appeal was required under these circumstances, the plan would be attempting to act as an unbiased tribunal for [the claimants'] appeal at the *same time* as it was actively litigating a *contrary position* in the court."  *B&S Welding LLC Work Related Injury Plan v. Oliva-Barron*, 447 S.W.3d 425, 431 (Tex. App. – Dallas 2014, no pet.).  Here, Cigna even had its trial counsel at Kirkland Ellis, LLP become involved in advising SIU members on at least *29 separate occasions* on NCMC's appeals.  (*See* ¶ 76, *supra*.)  Cigna and its counsel did not even pretend to "act as an unbiased tribunal for [NCMC's] appeals."  *B&S Welding*, 447 S.W.3d at 431.  Cigna was actually litigating its counterclaims in the appeals process.  Under this circumstance, futility *is* established.  (*Id*.)  Cigna could not simultaneously take contrary positions in court with regard to NCMC's claims. In *B&S Welding*, the administrator also conducted video surveillance for a long period of time on the claimant, claimed that the claimant grossly exaggerated his claims and that the claimant's actions were fraudulent in nature.  *B&S Welding*, 447 S.W.3d at 430-31. Similarly here, Cigna investigated NCMC for almost two years *before* the Protocol was enacted and four years thereafter, ran both NCMC's claims and appeals through the SIU, wrote numerous letters accusing NCMC of fraud and instructed its Appeals Committee members to affirm all SIU denials of claims pursuant to the Protocol.  (PX. 39, 66, 70, 86, 86A)  NCMC filed suit on August 11, 2009. (Dkt. 1) *Cigna* continued applying the Protocol to NCMC's claims until July 31, 2012, when NCMC went INN with Cigna. (Tr. 5-21:11-14; DX. 83)  In *B&S Welding*, 447 S.W.3d at 431, the court held that an administrative appeal would be futile *after* suit was filed because the "[P]lan would be attempting to act as an unbiased tribunal for [the claimant's] appeal at the same time as it was actively litigating a *contrary position* in court." *Id.*  Therefore, NCMC's claims *after* the filing of the lawsuit

61

on August 11, 2009, were *not* required to be appealed through Cigna's "biased," "hostile" and "stymied" claims processing procedures.

**O.** *Humble Surgical Hospital's*
   *Ruling on exhaustion***:**

98.      By virtue of the fact that Cigna applied its Protocol to most of *Humble's* claims as it did with regard to NCMC's claims in *Aetna v. Humble Surgical Hospital*, 2016 WL 7496743 and the *Arapahoe* claimant's claims, this Court "deemed" the claims "exhausted" under 29 C.F.R. § 2560.503-1(l) "given Cigna's failure to follow claims procedures," *Humble* Dkt. 489-1, p. 3; *Arapahoe*, 2016 WL 1089697, at *17.  The same *is* true in this case.

**P.** *29 CFR § 2560.503-1(b),*
*Inhibition of Claims Processing:*

99.      The Department of Labor Regulations regarding claims and *appeals procedures* provide that in the administration of such written claims and appeals procedures, there shall not be any activity which "unduly inhibits or hampers the initiation or processing of claims for benefits." 29 CFR § 2560.503-1(b)  As noted, there were "triple stymies" involved with regard to Cigna's processing of NCMC's appeals which violate 29 CFR § 2560.503-1(b) (*see* fn. 10, *supra*):

> (a)      all claims were diverted from the normal FCO adjudication process and routed to the SIU to apply ABDs and deny the claims or substantially reduce them;

> (b)      all appeals from NCMC were diverted from the normal appeal process through the "independent" Appeals Committee and then routed to the SIU in order to then give instructions to the appeals processors on how to uphold the previous SIU ABDs/denials; and,

> (c)      Cigna's trial counsel, Andrew Dunlap, Melody Wells and Ryan McEnroe of Kirkland & Ellis and Cigna's General Counsel, Michael Wade, intervened on no less than 29 occasions in the appeals process involving NCMC's appeals. (PX. 96, p. 68A)

**Q.** *29 C.F.R. §2560.530-1(l) – ERISA §1133, Failure to Establish and Follow Reasonable Claims Procedures:*

100.    The Court must also consider §1133:

Failure to establish and follow reasonable claims procedures.  In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, the claimant shall be *deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under § 502(a) of* [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim. 29 C.F.R. § 2560.503-1(l).

101.    Since this Court ruled that Cigna was *not* "legally correct" in the manner in which it interpreted and enforced the exclusion, "charges for which are not [legally] obligated to pay," and that both this Court in *Connecticut General Life Insurance Company, et al v. Humble Surgical Hospital, LLC*, C.A. No. 4:13-CV-3291, 2016 WL 3077405, *6 (S.D. Tex. Jun. 1, 2016) as well as the conclusions in this case that Cigna "abused its discretion" and demonstrated "hostility" and "bias" to NCMC's claims (Dkt. 521, pp. 6-14), it is *incongruent* that somehow Cigna would then maintain a fair and impartial appeals process especially in light of Cigna's SIU instructing the Appeals Committee members to affirm its initial decisions to deny NCMC's claims pursuant to the Protocol. (PX. 86).[16] Thus, the existence of this Court's findings of "*legally incorrect interpretation*" of the exclusion and the "abuse of discretion" associated therewith based upon "hostility" and "bias" together with the undisputable fact that Cigna set up a new and different claims adjudication process ("pilot program" – PX. 16; Tr. 4-15:16 – 4-16:19) just for this one OON provider, NCMC *must* be "deemed to have exhausted the administrative remedies available under the plans and [was] entitled to pursue any available remedies under § 502(a) of the Act."  *See* Cigna's letters dated November

---

[16] PX. 86 and 86A evidence Cigna's SIU Managers instructing the Appeals Committee members, Traci Robertson – *Senior Appeal Associate*, Tina Taylor – *National Appeal Organization*, Joanne Busiewicz – *Senior Appeal Associate*, Erika Alburg – *Customer Advocate*, Tricia Jankoski - *National Appeal Organization* and Elizabeth Brewer – *Cigna Texas Appeals* to affirm all of the SIU's initial denials (ABDs) of NCMC's claims based upon the Protocol.

10, 2008 (PX. 39), June 19, 2009 (PX. 66) and July 31, 2009 (PX. 70) establishing a claims adjudication "*process*" that "*will continue for each billing received from NCMC until such time as clear evidence is presented to Cigna that: (a) the charges shown on the NCMC submitted billing are NCMC's actual charges for the services rendered; and (b) the Cigna Participant has paid their applicable out-of-network coinsurance and/or deductible in accordance with their Cigna benefit plan.*" *See also North Cypress*, 781 F.3d at 189-90. Since Cigna was "*legally incorrect*" in its interpretation of the exclusion and acted in "*bad faith*" with "*bias*" and "*hostility,*" it could *not* have possibly "followed fair claims procedures consistent with the requirements of [ERISA] §1133." *Id.*

**R.** *No "Full and Fair Reviews" of both*
  *NCMC's Claims and Appeals:*

102.   ERISA requires an employee benefit plan to maintain a procedure that provides a claimant "reasonable opportunity" to appeal ABDs, and under which will there will be a "full and fair" review of the claim and adverse determination. 29 C.F.R § 2560.503(h)(1). ERISA regulations list a number of requirements that the claim procedure must have in order to provide a reasonable opportunity for a full and fair review of the adverse benefit determination. 29 C.F.R. § 2560.503(h)(2)   With respect to group health plans, ERISA specifically requires the claims procedure must:

> provide for a review that **does not afford deference to the initial adverse benefit determination** and is conducted by an appropriate named fiduciary of the plan **who is neither the individual who made the adverse benefit determination** that is the subject of the appeal, **nor the subordinate of such individual**. 29 C.F.R. § 2560.503(h)(3) (emphasis added)

103.   Cigna's SIU's review of its own ABDs of NCMC's appeals (PX. 86, 86A) *certainly* afforded deference to its own ABDs. It could not otherwise. "*Appeal will be upheld. Thanks!*" some *eleven minutes* after being instructed by the SIU "handler" of NCMC's appeal, Sharrow-Reminger, to deny based upon the Protocol. (PX. 86, 86A, CIG0547729); 29 C.F.R. § 2560.503(h)(3) requires

that the Appeal Committee individual reviewing the adverse benefits determination not be the "subordinate" of the SIU individual who made the initial determination to deny NCMC's claim based upon the Protocol. *Id.* When SIU's Sharrow provides "<u>instructions</u>," "<u>directions</u>," "<u>to up-hold</u>," and/or "<u>handles</u> <u>appeals</u>" (PX. 86, 86A) the Appeals Committee members then effectively become the "subordinates" of the SIU.

**S. *The Exhaustion Of Administrative Remedies Doctrine is not Intended for Mass Claims under a Plan Administrator's Protocol as Distinguished from cases where there is a single Plaintiff or a mere handful of Plaintiffs:***

104.    The Sixth Circuit provides sound reasoning and guidance behind a general principle that where an insurer/administrator takes a firm position, enacts a policy, or establishes methodology as to certain types of claims or specific claimants, the futility exception should apply notwithstanding minor deviations.  In *Productive MD, LLC v. Aetna Health, Inc.*, 969 F. Supp. 2d 901, 931-33 (M.D. Tenn. 2013), an OON provider filed an action against the health insurer alleging that it wrongfully failed to pay claims in order to coerce it into a network contract at unreasonably low rates.  Plaintiff alleged that Aetna: (a) adopted and implemented a policy as to plaintiff's claims for testing as medically unnecessary, (b) "flagged" claims for payment to plaintiff for special treatment by its SIU department and (c) came up with a variety of excuses for denying plaintiff's technical component claims. *Id.* at 932.

105.    The court relied on a prior Sixth Circuit case, *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998), for several propositions. *First*, "the law does not require parties to engage in meaningless acts or to needlessly squander resources as a prerequisite to commencing litigation." *Productive*, 969 F. Supp. 2d at 931 (quoting *Fallick*, 162 F.3d at 420). *Second,* it listed several factors that were relevant in *Fallick* toward establishing futility. Of particular note, the claimant had made unsuccessful inquiries to the insurer to change its methodology for two years,

but the parties had reached a "stalemate." *Productive*, 969 F. Supp. 2d at 931.  *Third*, further administrative procedures would have caused the parties additional, not less, litigation costs. *Id.* Fourth, notwithstanding "*token concessions*" in which the claims administrator corrected several individual accounting errors, it was certain that the insurer would not seriously reconsider the disputed *methodology*. *Productive*, 969 F. Supp. 2d at 931-32.  Cigna's granting a few NCMC appeals based upon the improper calculation of the MRC-2 calculation or by not paying an "enhanced benefit" for an MRC-2 ER claim (Tr. 5-204:17-25) amount to "token concessions" and a "*de minimus departure from otherwise systemic denials* of payment." *Productive*, 969 F. Supp. 2d at 932 (emphasis added).

106.     Thus, when Aetna introduced evidence that it paid a handful of 167 medical test claims at issue, the court held that this evidence did not preclude a finding of futility: "*a de minimus departure from otherwise systematic denials of payment does not preclude a finding of exhaustion. Indeed, it would gut the futility exception set forth in Fallick if a claims administrator could evade review by, every so often, paying a few cents on the dollar for substantially identical claims for payment.*"  *Productive*, 969 F. Supp. 2d at 932 (emphasis added). The court concluded, "*[i]t would serve little practical purpose to force Productive MD to complete the process with respect to those appeals.*" *Id.* at 933.  The same is the situation here wherein the Court found several instances out of thousands where an appeal was granted.  (Dkt. 529, p. 15).  Cigna's testimony establishes that this only occurred because of a "mistake" on the part of the appeals processor after being instructed by the SIU to uphold the original ABDs.  (PX. 104, pp. 66-67)

**T. *In The Alternative, NCMC Properly Raised the UCR/MRC/
   Protocol Denials in its Appeal Letters, but That was Not Necessary:***

107.     In the alternative, since no plan so requires, prior to mid-2011, NCMC appealed Cigna's Protocol determinations/denials with its UCR form appeal letters.  (PX. 85, pp. 67-68; PX.

66

87, p. 61; Tr. 5-85:19 - 5-86:10)  In those letters, NCMC appealed based upon "significant reductions due to [Cigna's] determination that the billed charges are more than the usual and customary rate [UCR or MRC] for certain procedures or items."  (*Id.*)  In response to these forms of appeal letters, Cigna would routinely respond that the ABD was being upheld because of the exclusion "charges for which you are not obligated to pay." (PX. 86B, pp. 2, 12, 20; Tr. 5-36:19 – 5-37:2) This established that when NCMC appealed based on UCR/usual and customary/MRC language, Cigna fully understood that this included an appeal of the Protocol exclusion determination "charges for which you are not obligated to pay."  (Tr. 5-36:19 – 5-37:2) The fact is that under Cigna's plans and policies, the exclusion "charges for which you are not obligated to pay" exceeds UCR.  The whole purpose of the Protocol is to modify the "allowed" amount/UCR/MRC applied to NCMC's claims based upon the Fee-Forgiving Protocol.  (PX. 16) If NCMC collected $100, then the allowed amount or the UCR/MRC amount would be $200.  (PX. 49, 50, 54)

108.   Notwithstanding, Cigna's expert witness, Dr. May, calculated NCMC's damages which excluded those NCMC appeals wherein the appeal letter did not specifically state the exclusion "charges for which you are not obligated to pay" (PX. 95, p. 140; Tr. 7-22:3-7) without any plan so requiring. (PX. 87, pp. 51-52) Dr. May did not do this because of any opinion that he has or any plan language so requiring, but rather, because he was directed to do so by Cigna's counsel.  (Tr. 7-24:1-10; 7-117:23 – 7-118:9; 7-144:2–9; Dkt. 624, Ex. B.2) Only Cigna's counsel has argued that if NCMC did not specifically raise this exclusion in its appeal letter and only raised the UCR/MRC basis for the appeal, then the appeal letter is not sufficient and the claim must be rejected, citing *Harris v. Trustmark Nat'l Bank*, 287 F. App'x 283, 288 (5th Cir. 2008) and *Garza v. Sunlife Assurance Co. of Canada*, C.A. No. 7:12-cv-188, 2013 WL 1816989,  *7 (N.D. Tex. April 29, 2013).  However, this is *not* what Cigna's plans require nor did Cigna ultimately argue this at trial.  (PX. 87, pp. 51-52; Tr. 7-89:19 – 7-90:4) Cigna did not question Dr. May on this issue and

67

decided not to argue same at the close of trial.  It is therefore now a dead issue.  The Cigna plans only require the following, non-specific appeal letter:

> "*You <u>should</u> state the reason why you feel your appeal should be approved and include any information supporting your appeal.*"  (PX. 87, pp. 51-52)

Again, all of Dr. May's calculations must be discarded because he assumed that many of NCMC's appeal letters to be defective and rejected the attendant claim.  (PX. 95, p. 140)  It is too late for Dr. May to now correct this error.

### U. *Cigna Did Not Provide Plans/Policies to NCMC:*

109.    Cigna refused to provide copies of any plans or policies to NCMC even though on every appeal letter and inquiry, NCMC requested same.  (Tr. 5-13:2 – 5-14:5; PX.85, 86B) Thus, it would have been impossible for NCMC to know what the plans/policies required or suggested be done with regard to appeals and the number of appeals.  (Tr. 5-14:17 – 5-15:3, 5-35:11-16)  As a matter of fact, some plans/policies required or suggested one appeal, others two appeals and yet others, three appeals.  (Dkt. 624, Ex. B.2.; Tr. 7-144:11 - 7-145:19)

## VI.

## *THE COURT'S RULINGS ON CIGNA'S PROTOCOL*<br>*<u>EXCLUSION ARE STILL APPROPRIATE</u>*

110.    After the appeal, this Court concluded that (a) Cigna's interpretation of the exclusion, "charges for which you are not [legally] obligated to pay," is "***not legally correct***" (Dkt. 521, p. 9) and that ***collateral estoppel applies*** to this Court's ruling in *Humble* which decided the identical issue in this case on whether Cigna was "legally incorrect" in its reading and determination of the exclusion (*Id.*, p. 8); and, (b) Cigna ***abused its discretion*** in interpreting the plan exclusion based upon numerous "inferences of lack of good faith," "hostility" and "bias."  (*Id.*, pp. 10-14, 16).  This Court nonetheless concluded that NCMC must exhaust its administrative remedies and that it was not excused from same because even though it had clearly established, and this Court found, Cigna's

"*hostility*," "*bias*" and "*inferences of lack of good faith*" toward NCMC, NCMC "cannot show '*with certainty*' that appeals would have been futile" and therefore granted summary judgment to Cigna "*for all claims for which [NCMC] did not exhaust administrative remedies.*" (*Id.*, p. 15-16). This Court has also ruled that it will make the decision as to what an "ordinary plan member" would understand based upon an objective standard.  (Dkt. 409, 2:24 – 3:7)

111.    There are no legal or factual reasons/bases for the Court to change its prior ruling of "legally incorrect."  The Fifth Circuit provided the "inquiry" which this Court was required to follow in order to arrive at its decision in this regard: *"The inquiry is thus whether ordinary plan members who read that payment for the following is specifically excluded from this plan; . . . . charges for which you are not obligated to pay or for which you were not billed, understand that they have <u>no insurance</u> <u>coverage</u> if they are not charged for co-insurance.  That is, what a plan member understands the language to <u>condition</u> coverage on the collection of co-insurance, rather than simply describing the fact that the insurance does not cover all of a patient's costs.  Also relevant is whether Cigna denied all coverage to patients who were not charged or billed for their copays or coinsurance by <u>in-network</u> providers....[T]here are strong arguments that Cigna's plan interpretation is not "legally correct....."* North Cypress*, 781 F.3d at 196 (emphasis added).

112.    The substantial evidence presented at trial was the same as the substantial evidence previously submitted to this Court in the 2016 dispositive motion filings only more:  the purpose of the Protocol was to force NCMC into a low-reimbursement INN contract (PX. 16, 17, 75); and, Cigna's interpretation of the exclusion "charges for which you are not obligated to pay" had nothing to do with the meaning of the exclusion, but rather, was used as a pretext to "force NCMC to the table."  (PX. 16, 17, 75)  Cigna's "claims processors" in the SIU did not even know what the exclusion means.  (PX. 104, pp. 112-113, 126-127) This is accentuated by the fact that all of Cigna's plans and polices, including the MRC-2 plans and policies, contain this identical exclusion; however,

by its own admission, Cigna did not apply the Protocol to MRC-2 plan claims. (Tr. 3-187:10-17; 4-10:15-19; 4-187:9 – 4-190:3)  There was no reason for this.  Had Cigna truly believed that the exclusion meant what it said it means, then the Protocol's exclusion would have also been applied to MRC-2 claims but they were not.  Since Cigna had already exerted enough pressure on NCMC by the creation by MRC-2 "allowed" amounts based upon a small percentage of Medicare in order to "force NCMC to the table," it ignored the exclusion in the MRC-2 plans.  (PX. 16, 17, 89, pp. 41-44; Tr. 3-187:10-17; 4-10:15-19; 4-187:9 – 4-190:3)  Cigna cannot just ignore an ERISA plan provision interpreting the benefits whenever it suits its purposes.  Furthermore, no ordinary plan member would ever objectively believe that if he did not pay all of his patient responsibility amounts, then he would have "no insurance coverage." *North Cypress*, 781 F.3d at 196.  Cigna's interpretation of the exclusion was not "legally correct." (Dkt. 521, pp. 9)

113.    As the Fifth Circuit instructed this Court to consider, it was shown that Cigna did not "deny all coverage to patients who were not charged, or billed for their copays or coinsurance by *in-network* work providers." *North Cypress*, 781 F.3d at 196.  Cigna's Protocol was *never* applied to INN providers; MRC-2 pricing was *never* applied to INN providers; denials of claims for alleged fee-forgiving were *never* made against INN providers; Cigna's practice of paying $100.00 per claim was *never* applied to INN providers; and, the "Multi-Prong Approach" was *never* applied to INN providers.  (PX. 103; Depo. of Mary Ellen Cisar, November 11, 2015 at pp. 28-29, 46, 57-58, 68-69, 99-100).

114.    Finally, since the affirmative defense of unclean hands cannot possibly be brought against NCMC as the assignee of the plan members' claims wherein NCMC is only bringing derivative ERISA claims, Cigna's argument that NCMC's unclean hands outside of the ERISA context has no effect on this Court's or the Fifth Circuit's rulings.

## VII.

### CIGNA'S FAILURE TO ADJUDICATE CLAIMS AS REQUIRED
### IN PLAN DOCUMENTS AND VIOLATIONS OF 29 USC § 1106(b)(1)

115.    By Cigna's own admission, it failed to apply MRC-1 pricing plan language to

NCMC's claims.   (Tr. 4-18:4-18; 4-19:23 – 4-20:15; 4-21:24 – 4-22:20)   In every MRC-1

plan/policy utilized during the 22 ½ month period from January 4, 2007 through November 17, 2008,

the following is stated:

> Maximum Reimbursable Charge is determined based on the lesser of
> the provider's normal charge for a similar service or supply; or [A]
> percentile of charges made my providers as such service or supply in
> the geographic area where the service is perceived.  These charges are
> compiled in a **database** [Cigna has] selected.  (PX. 88, p. 17)

116.    Cigna never followed the plans' requirement to utilize a "database" which that have

provided at an "allowed" amount which would have been less than those of the "provider's

[NCMC's] normal charge."  Cigna itself maintained a database of all hospital's charges based upon

CPTs codes that it could have utilized as the plans required.  (Tr. 3-165:12-23)   Instead, from 2008

through 2012, a period of almost five years, Cigna collected contingency fees of between $3 million

and $8 million off of NCMC's billed charges. (PX. 85B, 85C; Tr. 4-145:5 – 4-148:3; 4-149:19 – 4-

150:3; 4-154:9-22) Rather than to follow the plan language as required, Cigna ignored same so that

it could make millions of additional dollars in contingency fees while involving itself in a blatant

conflict-of-interest.  This $3 million to $8 million went directly to Cigna's "bottom line."  (Tr. 4-

145:5-23; Sherry deposition, November 10, 2015 at pp. 193 & 223)  These fees were automatically

debited from the plan sponsor's bank accounts which is a violation of ERISA.  In *Barboza v. Calif.*

*Ass'n. of Prof. Firefighters*, 799 F.3d 1257, 1269-70 (9th Cir. 2015), the court held that Aetna, the

third party administrator, is a fiduciary and that it paid its own fees from plan assets and thus,

engaged in a prohibited transaction under 29 U.S.C. § 1106(b)(1); and, it is "irrelevant that [the

payor] was authorized to pay its own fees and expenses from plan assets pursuant to its Administrative Service Agreement."  In *Pipefitters Loc. 636 Ins. Fund v. BlueCross and BlueShield of Mich.*, 722 F.3d 861, 867-68 (6th Cir. 2013), the court held that a claims administrator breaches its fiduciary duty by discretionarily assessing extra fees – "using the plans funds for its own purposes."

117.    During the Protocol's wrongful and hijacked SIU adjudication of both NCMC's claims and appeals, the SIU members never even reviewed the plans to ensure that they were properly adjudicating them.  (PX. 104, p. 56, 92)  An administrator cannot fairly review claims without knowing what is in the plans.

## VIII.

### IN THE ALTERNATIVE, CIGNA PRESENTED NO EVIDENCE SUPPORTING ITS  ALLEGED <u>AFFIRMATIVE DEFENSES TO NCMC'S ERISA CLAIMS</u>

118.    Even if Cigna could somehow assert affirmative defenses against NCMC in its individual capacity at the last minute in this case even though NCMC is/was only acting *in personae* for or "in the shoes of" the Cigna members *vis-a-vis* their claims, there was *no evidence* submitted by Cigna at trial to support any of these claims/defenses:

    (a)    <u>Defense - NCMC induced Physicians to Breach their In-Network Contracts with Cigna:</u>

●    no names of involved physicians whose contracts were allegedly breached were ever provided;

●    no allegedly breached physicians' contracts with Cigna were presented except for that of Dr. Behar; (DX. 82);

●    no physician witnesses were presented except for Dr. Behar;

- Dr. Behar testified that he did not refer patients to NCMC because he was a hospital-based oncologist and Cigna presented no controverting evidence regarding same.  Therefore, NCMC could not have possibly interfered with that contract (Tr. 1-74:7-16); and,

- there are approximately 145 NCMC physician owners and not one single one was called to provide any evidence of this "defense."

**(b)** **Defense - Improper Routing Patients through the ER:**

- no medical records were produced to demonstrate this which would have been necessary to establish a medical fact, that is, whether the patient's condition was emergent in nature;

- Cigna neither designated nor called a medical expert to opine on a medical fact;

- no NCMC ER doctors were called to testify in this regard;

- no patient testimony was presented to establish same;

- no effort was made by Cigna to determine the existence of an emergent situation as defined in Cigna's plans:  *"the sudden, unexpected onset of a bodily injury or serious Sickness which could reasonably be expected by a prudent lay person to result in serious medical complications, loss of life or permanent impairment....;"*

- there are over 500 physicians with privileges at NCMC (Tr. 1-198:18-21) and not one was called to testify about this;

- there were dozens of ER physicians and nurses at NCMC (Tr. 1-198:18-21; 2-94:12-16) and not one was called to support this claim;

73

- the only alleged "evidence" (which is no evidence at all) was presented by Cigna's counsel, Joshua B. Simon, who argued at the trial's closing: "with regard to the patient's armbands, I guarantee you NCMC charged them for ER prices" (Tr. 7-177:17-20);

- not one document or bill was presented to evidence any alleged ER billing rates being charged for non-ER conditions;

- no evidence of non-ER claims being charged for ER services;

- there were over 29,902 Cigna patients treated at NCMC (Tr. 5-21:9-15; Demon. Evid. 2) and not one was called as a witness to testify what "a prudent lay person" would believe about his condition; and,

- another commercial payor, Aetna conducted an extensive investigation of NCMC's ER admissions and charges after making the same claim as Cigna makes here.  After reviewing ER medical records of its own selection, Aetna's physician expert/Medical Director concluded that all of the NCMC ER admissions were for legitimate, emergency circumstances.  (Tr. 4-69:16 – 4-70:5)

(c)   **Defense - Improper Referrals pursuant to § 7204.055, Texas Occ. Code:**

- there were approximately 145 NCMC physician owners (Tr. 1-95:5-8; 1-198:22-25) and not one was called to testify in this regard except for Dr. Behar;

- Dr. Behar testified, without any controverting evidence, that there were no improper patient referrals or payments made for referrals (Tr. 1-199:1-14; 1-289:9-17; 2-98:11-13);

- there were 500+ physicians with privileges at NCMC (Tr. 1-198:18-21) and not one was called to establish same;

74

- there was not one shred of evidence indicating payments made in exchange for patient referrals;

- Partnership distributions are based solely upon the unit holder's percentage ownership interests which are calculated by an independent, third party CPA (Tr. 2-97:25 – 2-98:23);

- many NCMC physician owners never refer patients to the hospital and still receive Partnership distributions regardless. (Tr. 2-98:11-13)  Cigna claims that the payments of distributions were the "kick-backs" for the referrals yet NCMC made no distinction between referring and non-referring physicians in this regard.  Furthermore, units were provided to physicians based solely upon hospital and community medical needs  even though Cigna claimed that the entitlement to unit ownership was based upon patient referrals (Tr. 1-211:15-22);

- no improper payments were shown to be made to any physicians unlike in *Cigna v. Humble Surgical Hospital,* 2016 WL 3077405, wherein pursuant to a written contract with referring third parties, 33.3¢ of every dollar collected by the provider, Humble, from the insurance company was paid to the referring physician, chiropractor or lawyer;

- there were 29,902 Cigna patients and not one was called to testify about referrals;

- NCMC's Physician Vital Statistic Reports included all 500+ physicians with privileges at NCMC, the vast majority of whom were/are not NCMC owners, and had nothing to do with referrals, but rather, were used to tract hospital needs and requirements (Tr. 9-94:12 – 2-96:25);

●     as early as February 9, 2007, Cigna knew that the amount of money collected by NCMC from the patient upfront in order to be eligible for the subsequent Prompt Pay Discount was only the "*patient portion of charges*" and was not the "*entire charge*" that NCMC was willing to accept for its goods and services. (*Id.*) In an NCMC letter to Cigna dated February 9, 2007, NCMC made it abundantly clear that "by implementing a prompt pay policy, NCMC does not intend to accept only the *patient portion of charges* as payment for the *entire charge*." (PX. 47) At no time did Cigna ever reply to this or state that it did not understand the advices; and,

●     § 7204.055, Tex. Occ. Code is a penal statute enforceable only by Texas law enforcement officials and the Texas Attorney General and is inapplicable to this case. Asking physicians to send patients to a facility (DX. 58) is not an unlawful act. Every hospital does this. *North Cypress Medical Center Operating Co., Ltd. et al. v. Aetna Life Ins. Co., et al*, CA No. 4:13-cv-003359, U.S. Dist. Ct., So. Dist. Tx. (June 20, 2016) (Hoyt, J.) The illegality comes when one is paid for a referral which did not occur here.

**(d)**    **Defense - Inflated or Excessive Charges:**

●     no effort was made to compare NCMC's Chargemaster rates to other hospital Chargemaster rates which would be required to demonstrate a proper comparison of respective charges. Dr. May did not do this. He only "compared" "average in-patient charges per discharge" based upon "DRG relative weights."(DX. Demon. Evid. 1) This is not a Chargemaster rate-by-rate comparison of each CPT code amount for all charges, whether they be in-patient, out-patient, observation or ER. (Tr. 6-20:5 – 6-24:16) Furthermore, May made no effort to compare these rates with NCMC's comparable competitors. (Tr. 1-132:6-16) His improper "comparison" only utilized primarily rural or outlying hospital systems' smaller facilities. (DX. Demon. Evid. 1);

- Cigna did not designate or call any expert to compare NCMC's Chargemaster rates to other hospitals' Chargemaster rates;

- When NCMC went INN with Cigna on August 1, 2012, Cigna accepted those very Chargemaster rates in its contract with NCMC and used those rates to calculate the contractual, INN discount amounts (DX. 83, p. 1, ¶ 1.3);

- Cigna's MRC definitions in the plans and policies controlled whatever Cigna would "allow" on each claim and Cigna had sole discretion to determine these amounts, not NCMC or its Chargemaster rates (Tr. 4-193:12 – 4-194:25; 4-206:15 – 4-207:2);

- Cigna had complete discretion to determine the "allowed" amount from NCMC's billed charges and to pay based upon that. (Tr. 4-200:11-14; 5-31:25 – 5-32:9; 5-179:13-16) NCMC's charges were therefore irrelevant to whatever Cigna would ultimately pay;

- Cigna failed to use a plan-required database of its own "selection" that would have substantially reduced the "allowed" amount on all of NCMC's claims instead of determining the "allowed" amount based upon NCMC's billed charges (Tr. 4-18:4-18; 4-19:23 - 4-20:15; 4-21:24 – 4-22:20);

- PX. 85 evidences the millions of dollars made off of NCMC's billed, Chargemaster rate charges by Cigna from its contingency fees from 2008-2012, during the 44.5 month Protocol period, a blatant conflict-of-interest;

- Cigna knew all of NCMC's charges and Chargemaster rates and paid NCMC's claims notwithstanding that for a period of 22.5 months from January 4, 2007, through November 17, 2008 (Tr. 3-169:18 – 3-172:16; 3-173:14 – 3-175:14 – 3-175:7; 4-18:4-24; 4-34:2 – 4-35:13; *North Cypress*, 781 F.3d at 189);

- Cigna should have reviewed and adjudicated all NCMC's charges based upon the plan-required database that it maintained of all hospital charges in the geographic area but refused to do so (Tr. 4-18:4-18; 4-19:23 – 4-20:15; 4-21:24 – 4-22:20) – a breach of the ASOs between Cigna and its plan sponsors;

- no direct evidence was provided in this regard from any of the Cigna plan sponsors; and,

- NCMC's charges are "average" "compared to its peers." (Ex. "E")

**(e)**    **Defense - Alleged Fee-Forgiving:**

- In *North Cypress*, 781 F.3d at 189-90, the Fifth Circuit reversed on this issue in NCMC's favor as did this Court when it found Cigna's interpretation of the plan/Protocol exclusion to be "legally incorrect" (Dkt. 521, p. 9);

- the Court has already ruled that Cigna's interpretation of the exclusion was "legally incorrect" (Dkt. 521, p. 9);

- the Court has already ruled that Cigna acted in "bad faith" and with "bias" and "hostility" toward NCMC (Dkt. 521, p. 16);

- all of NCMC"s claims were diverted from the FCOs to the SIU to apply the Protocol  (PX. 49, 50, 54) and almost 12,000 appeals were diverted from the Appeals Committee and routed to the SIU with the SIU then directing the Appeals Committee members to uphold the original SIU's ABDs/denials of NCMC's claims (PX. 86, 86A);

- Cigna waived any right to make this complaint as indicated in PX. 85D, 3B, 66, 70 and 85B which demonstrate Wendy Sherry's handwritten notes showing that "[Cigna] sent a letter [to NCMC] indicating that *[Cigna] understands [NCMC's] billing practices*;" Cigna knew that NCMC's Prompt

Pay Discount up-front payment was calculated on INN patient benefit amounts; and, Cigna made millions of dollars off of NCMC's billed charges;

- Cigna knew all of NCMC's Chargemaster charges and paid based upon same even when it knew of alleged "fee-forgiving" (Tr. 3-165:12-23; 4-117:13-16; PX. 85D, p. 2); and, Cigna later accepted those very rates when it went INN with NCMC on August 1, 2012.  (DX. 83, p. 1, ¶ 1.3);

- whatever NCMC collected from its patients and how NCMC calculated those amounts based upon 125% of Medicare were irrelevant because Cigna was not going to pay any of NCMC's claims until (1) NCMC changed the total amount of billed charges that it put in Box No. 47 of the UB-04 claims form to the amount which NCMC had collected from the patient to be eligible for the Prompt Pay Discount and (2) collected 100% of the patient's OON patient's responsibility, neither of which it was required to do (PX. 39, 66, 70; Tr. 4-109:22 – 4-110:16);

- Cigna did not apply the Protocol to any INN claims (PX. 103, pp. 57-58, 68/69, 99-100);

- Cigna inconsistently adjudicated MRC-1 and MRC-2 claims when both plans had the same Protocol exclusion.  Cigna did not apply the Protocol exclusion to MRC-2 claims even though the same exclusion was in MRC-2 plans and policies demonstrating that the Protocol was a ruse and that the exclusion did not hold for what Cigna claimed (Tr. 3-187:10-17; 4-10:15-19; 4-187:9 – 4-190:3; PX. 89, pp. 40-43);

- there were 29,902 Cigna patients treated by NCMC (Tr. 5-21:9-15; Demon. Evid. 2) and not one was called to testify about alleged exorbitant charges; and,

79

- § 1204.055, Tex. Ins. Code does not apply.  This statute only applies to the "<u>contractual</u> <u>responsibility</u>" on the part of an INN provider to collect deductibles and co-payments and is titled "<u>Contractual Responsibility for Deductibles and Co-Payments</u>."  The statute states that just because an (INN) provider obtains an assignment from a patient, that does not relieve it of its "*<u>contractual</u> <u>responsibility</u>*" to collect deductibles and co-payments.  Here, Cigna admits that NCMC is OON and has no contract with Cigna.  (Tr. 3-89:9 – 3-90:4; 3-200:24 – 3-201:7; 3-238:1-5)  Therefore, NCMC has *<u>no</u> "contractual responsibility*" to collect deductibles or co-payments.  The Commentary to the statute explains that the statute simply "clarifies that a healthcare provider who accepts an assignment of benefits is *not relieved of any <u>obligations</u> regarding billing or collecting a co-payment or deductible*." (*Id.*)  Since NCMC has no such obligation, the statute does not apply to it.  The statute does not even speak to or apply to co-insurance, usually the largest portion of the patient responsibility amount.  The statute is a part of the Insurance Code enforceable only by the Texas Insurance Commissioner.  NCMC is neither licensed by nor regulated by the Texas Insurance Commission.  The Texas Attorney General has interpreted this statute in the same manner noted above, to wit:  by virtue of accepting an assignment, the (INN) provider is not relieved of its (contractual) obligation "regarding billing for or collecting co-payment or deductible." (Texas Attorney General Opinion DM-215 (April 13, 1993))  Finally, § 1204.055 has been a Texas statutory law since 1991 and there is not one case interpreting it, let alone interpreting it in the manner Cigna does.  For good reason, it does *not* apply to OON providers and the Texas Insurance Commission has no authority over licensed healthcare providers' licenses.

**(f)** **<u>Defense - Breach of Cigna Plans:</u>**

- NCMC is not in a contract with Cigna and therefore could not "breach a plan" (Tr. 1-81:24 – 1-82:17, 1-168:15-18, 1-201:10-18);

80

- the plan is not a contract *vis-a-vis* the member and therefore cannot be "breached" (PX. 87, pp. CIG-NCMC0094352-94354);

- there is no such claim or cause of action against a non-contracting party; and,

- Cigna made no "breach of plan" claims against its members. (Tr. 3-132:7-23; 4-4:11-19) Therefore, no such claims against NCMC could be maintained on an ERISA derivative action.

**(g)** **Defense - Two Chargemasters/Dual Billing Rates:**

- Cigna was aware of NCMC's billing practices beginning in January, 2007 (PX. 85D, p. CIG-NCMC00572544);

- Collateral Estoppel is applicable as Judge Hoyt has already ruled in C.A. No. 4:13-cv-003359; *North Cypress* (June 20, 2016) that NCMC only has one Chargemaster;

- the evidence establishes that there was only one Chargemaster as presented by Dr. Behar, Kirk Jones and Glenda Tankersley. (Tr. 1-72:21 – 1-73:1; 1-105:13-17; 2-174:1-12; 3-33:15-19) There was no controverting evidence in this regard;

- out of the 29,902 Cigna patients treated at NCMC (Tr. 5-21:9-15), not one was ever called to testify to what NCMC advised them with regard to the amount they were to pay to be eligible for the Prompt Pay Discount;

- the only evidence presented at trial was that patients are *never* told that there are two Chargemasters, or that they will be billed one amount and the insurance company will be billed another amount and/or the amount collected from the patient for the discount is the total billed charges (Tr. 1-72:24 – 1-73:1; 1-103:13 – 1-105:2; 2-174:1-12; 3-33:15-19);

- NCMC cannot determine what the total billed charges are at registration so it could not have a dual billing system used during the "registration process" (Tr. 2-167:17 – 2-168:9); and,

- NCMC never "bills" patients for the amount of the prompt pay discount so it cannot possibly have two "billing" systems. (Tr. 2-211:9-11; 3-32:15 – 3-33:19.)

119.    The wholesale lack of evidence with regard to Cigna's asserted affirmative defenses demonstrates that they were hastily made at the last minute with no discovery ever having been taken with regard to same.  Cigna's counsel knew that the assertion of these defenses in an ERISA derivative action was bogus and amounts to bad faith, and probably a violation of Rule 11, Fed. R. Civ. P.  Aetna previously made the same argument and asserted the same defenses in the ERISA trial in *North Cypress Medical Center Operating Co., Ltd., et al v. Aetna Life Ins. Co., et al*, C.A. No. 4:13-cv-03359, U.S. Dist. Ct., So. Dist. Tx. (June 20, 2016).  Judge Hoyt made short shift of same and would not accept the argument or allow the defenses.  Cigna's counsel just subsequently copied Aetna's lead in this case.

## IX.

## IN THE ALTERNATIVE, CIGNA WAIVED
## ITS ALLEGED AFFIRMATIVE DEFENSES

120.    For the 22 ½ month period from January 4, 2007, through November 17, 2008, Cigna paid all of NCMC's claims based upon NCMC's billed charges. *North Cypress*, 781 F.3d at 189. (Tr. 4-150:21 – 4-151:15) During this period of time, Cigna knew exactly what NCMC's Chargemaster rates were since it maintained a database of all of NCMC's charges as well as all other facility providers' charges based upon CPT code identification numbers (Tr. 1-104:8 - 1-105:12; 3-165:12-23); Cigna accepted these same Chargemaster rates when NCMC went INN with Cigna on August 1, 2012. (DX. 83, p. 1, ¶ 1.3); Cigna was aware of the particulars of NCMC's Prompt Pay Discount Program as it had been advised of same on at least 24 occasions *via* Certified Mail, Return

82

Receipt Requested and on thousands of occasions on NCMC's UB-04 claims forms (Tr. 1-88:5-16; 1-92:6-25; 1-111:20 - 1-112:13; 5-157:14-22; PX. 1, 60); Cigna knew that the amount of money collected from the patient for the patient to be eligible for the Prompt Pay Discount was based upon the patient's plan INN benefit amount/percentage (PX. 85D, p. 2; Tr. 3-165:12-23; 4-117:13-16); and, Cigna knew of all of NCMC's billing practices which were standard to all OON providers as well as INN providers and was able to make an additional 29% contingency fee or between $3 million and $8 million of additional fees for itself based upon NCMC's billed charges.  (PX. 3B, 39, 66, 70; Tr. 4-145:5 – 4-148:3; 4-149:19 – 4-150:3; 4-154:9-22)

121.    The Firth Circuit has also ruled in this regard as follows:

> Cigna was concerned when it learned of North Cypress' Prompt Pay Discount Program, believing the program would undermine plan incentives designed to encourage providers to join Cigna's network, and patients to seek care within that network.  *Despite Cigna's concerns, it initially paid North Cypress based on the Chargemaster rates as billed....In other words, Cigna accepted the Chargemaster rate as the total cost of care (subject to the plan's Maximum Reimbursable Charge), and calculated its share of the cost based on that rate.....*"  Indeed, given that North Cypress expressly informed Cigna of its discounts prior to any representations about charges, *fraud seems particularly inapt*.  *North Cypress*, 781 F.3d at 189, 205 (emphasis added).

The Fifth Circuit is clearly stating that Cigna waived any claims of "excessive" charge and based upon this evidence, is also estopped from doing so.  Further, it means that Cigna knowingly accepted NCMC's billed charges under the terms of the plans.

122.    Waiver is defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it.  *Bimco Iron,* 464 S.W.2d at 357.  Waiver may be expressed or indicated by  conduct that is  inconsistent with an intent to claim the right.  *Cal-Tex Lumber Co.,*

83

989 S.W.2d at 812.  The foregoing evidence of the adjudication and payment of claims pursuant to plan MRC-1 pricing based upon NCMC's billed charges for a period of 22½ months is clearly the establishment of waiver.  Cigna is also estopped from making a claim or defense with regard to NCMC's Chargemaster rates/charges and being "excessive."  *Schroeder*, 813 S.W.2d at 489.  Cigna had dozens of departments, employees and lawyers investigating NCMC during this period of time. It was also making millions of dollars off of NCMC's billed rates.  Cigna knew exactly what it was doing.  It therefore waived any affirmative defenses and is certainly now estopped from making those defenses based upon the millions of dollars it pocketed.

## X.

### CIGNA'S BREACHES OF ERISA DUTIES
### OWED TO PLAN MEMBERS, PLANS AND PLAN SPONSORS

123.   Attached as Ex. "F" is the testimony of Cigna's representatives establishing breaches of ERISA duties owed to both the plan members, the plans and the plan sponsors:

- Cigna made between $3 million and $8 million in contingency fees off of NCMC's billed charges which were improperly and directly debited from the plan sponsors' bank accounts (Tr. 4-145:5 – 4-148:3; 4-149:19 – 4-150:3; 4-154:9-22);

- with regard to fully insured policies, Cigna "kept the money" and did not pay benefits on behalf of its insureds (*North Cypress*, 781 F.3d at 190);

- Cigna failed to uniformly apply its exclusion "charges which you are not obligated to pay" on MRC-1 and MRC-2 plan claims (PX. 103, pp. 181-182 (1/27/11); 3-187:10-17; 4-10:15-19; 4-187:9 – 4-190:3);

- Cigna failed to use its database to determine the allowed amounts for ONN providers' claims (Tr. 4-18:4-18; 4-19:23 – 4-20:15; 4-21:24 – 4-22:20);

- plan sponsors were never told that a database was not used to determine MRC-1 clams (Tr. 4-23:10 – 4-24:8);

- Cigna spent over $1.11 million on Dr. May, a mere "bean counter," when it could have easily re-processed all of NCMC's claims (PX. 92, 92; Tr. 6-86:19 – 6-87:15);

- instead of paying benefits for its members, Cigna employees immediately reported OON providers to the SIU for alleged fee-forgiving without any evidence of same (PX. 108, p. 211);

- Cigna knew that NCMC's Prompt Pay Discount Program did not violate any Texas law yet refused to pay benefits on behalf of plan members (PX. 13);

- Cigna failed to provide a full and fair review of NCMC's claims and appeals (PX. 86; 86A; 104, pp. 21-22, 62-67, 126-127);

- Cigna used an exclusion that it knew did not apply in order to not pay benefits on behalf of plan members (PX. 13); and,

- Cigna's SIU "claims processors" never even reviewed plans in order to determine benefits for its members. (PX. 104, p. 56, 92)

124.   The Fifth Circuit previously reversed this Court's Summary Judgment Orders *"to consider all of North Cypress' claims for underpayment of benefits…<u>including</u> <u>claims</u> <u>that</u> <u>Cigna</u> <u>breached</u> <u>duties</u> <u>owed</u> <u>its</u> <u>insureds</u> <u>under</u> <u>ERISA</u>." North Cypress*, 781 F.3d at 197 (emphasis added). Under ERISA, Cigna is a fiduciary by the receipt and exercise of discretionary authority over or control over the management of the plans at issue.  29 U.S.C § 1102(a)(2)  These fiduciary duties include loyalty - the duty to act solely in the interest of the plan members for the purpose of providing benefits (ERISA § 404(a)(1)(A)); avoidance of misrepresentations - the fiduciary duty to communicate truthfully, accurately and not to mislead the plan members regarding benefits (*Varity Corp. v. Howe*, 516 U.S.489, 506 (1996);  the management of plan funds in the interest of the plan members (*Metzler v. Graham*, 112 F.3d 207, 213 (5th Cir. 1997));  the exercise of prudence – thorough the impartial investigation of transactions (*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300 (5th Cir. 2000));  and, acting in accordance with plan documents (ERISA § 404(a)(1)(D)).

125.   The plan members and plan sponsors have a right pursuant to ERISA § 502(a)(3) to bring a civil action for equitable relief even though at the same time, NCMC brings a derivative claim for plan benefits under ERISA § 502(a)(1)(B) under certain circumstances:  if there is a distinction between the breach of fiduciary duty claim and the claim for benefits under the plan, both

claims may be made.  *Banker v. Xerox Corp. Employees' Stock Ownership Plan*, No. SA-98-CA-0230-0G, 2000 WL 33348191, *8 (W.D. Tex. August 28, 2000).  While it is true that this Court previously dismissed NCMC's ERISA § 502(a)(3) claims because NCMC could receive its remedies pursuant to ERISA § 502(a)(1)(B) (Dkt. 521, p. 20), it did so because NCMC could not recover for itself under both sections of the statute.  (*Id.*)  However here, after the submission of all the evidence at trial, it is obvious that NCMC is permitted to obtain § 502(a)(3) relief on behalf of the plan member-assignors who assigned those rights to NCMC and their respective plans.  With regard to the § 502(a)(3) claims, the plans themselves were harmed by Cigna's action, but by different ways as NCMC was damaged.  By the collection of the 29% contingencies fees and the other evidentiary excerpts noted hereinabove wherein the plan sponsors were not fully advised of the multiple breaches of fiduciary duties on the part of Cigna, those contingency fees of $3 million to $8 million must be returned to each respective plan.  Cigna breached its duty of loyalty to manage the plan funds in the interests of the plans and its participants by taking the contingency fees and directly removing same from the plan sponsors' bank accounts.  *See Barboza*, 799 F.3d at 1269-70*; Pipefitters Loc.*, 722 F.3d at 867-68*.* It is permissible for both ERISA § 502(a)(1)(B) seeking the payment of benefits and ERISA §502(a)(3) seeking equitable relief to be simultaneously maintained under these circumstances.  *Xerox*, 2000 WL 33348191, at *8. With regard to the ERISA §502(a)(1)(B) claims, NCMC is to be paid the damages for the benefits under the plans not previously paid and pursuant to the §502(a)(3) claims, the plan sponsors are to be reimbursed the $3 million to $8 million in contingency fees that Cigna wrongfully collected during the five year period from 2008 through 2012.  These are two different claims with two different remedies available to two different parties.

## XI.

## THE COURT CANNOT CONSIDER DR. MAY'S
## ALTERNATIVE DAMAGE METHODOLOGIES

**A. *May's Report dated January 20, 2016:***

126.     On January 20, 2016, Dr. May presented a 37-page Report with numerous Excel spreadsheets and uncommon and difficult to open "SAS" files[17] attached thereto which he claimed was "responsive" to Glenda Tankersley's damage opinions. (PX. 95)  In that Report, Dr. May and/or his staff did the following:

(a)     calculated NCMC's damages based upon what Dr. May called "***normal charges,***" that being based upon 125% of Medicare (the formula applied by NCMC to the attending physician's prescribed primary/first CPT code for the patient's care to be provided in order to determine what the patient was to pay up-front to subsequently receive the credit for the back-end balance, the prompt pay discount) to arrive at the "allowed" amounts for each OON claim even though *not* one single Cigna plan/policy provides for the Maximum Reimbursable Charge (MRC) for OON claims to be calculated upon 125% of Medicare, to arrive at NCMC damages of $1.5 million[18]  (PX. 95, pp. 136-141);

(b)     calculated NCMC's damages on what Dr. May called "***in-network rates***" utilizing the in-network contract rates in the Hospital Services Agreement entered into

---

[17] "SAS" files are "un-openable" under the majority of software programs available to the public.  *See* "File.org."

[18] May comes up with a maximum of $1.5 million in damages for NCMC under this flawed methodology but charged Cigna more than $1.2 million doing it.  After the Fifth Circuit's reversal and Opinion, this case should have been settled; however, time is on Cigna's side.  Money not spent is money earned, and the plan sponsors do not yet have to be informed how Cigna mismanaged their health fund accounts.  The prejudice is suffered entirely by NCMC for providing four years (2008-2012) of admitted legitimate goods and services to Cigna members valued in excess of $50 million for a "miniscule" payment of approximately $100.00 per claim according to the "legally incorrect" Protocol interpretation of the plan exclusion.  (Dkt. 521, p. 9)

between NCMC and Cigna on August 1, 2012, even though *no* Cigna plans/policies permit an "allowed" amount for OON claims to be calculated in this manner, to arrive at NCMC damages in the amount of $962,000. (PX. 95, pp. 141-143)  While Dr. May explains how he calculated his damages in his Report, *none* of the attached Excel spreadsheets provide any of the calculations for one to actually determine the mathematical formulas being applied.  (*Id.*)  Those calculations, if any, are provided in difficult to open and access SAS files.  May did not even show which specific accounts are used in which calculation in the Excel spreadsheets.[19]  (*Id.*)  Dr. May provides an Exhibit "1" to his second Report with the conclusory damage figures based upon his two methodologies, 125% of Medicare and the in-network rates (PX. 95 at Exhibit "1"); and,

(c)  calculated "offsets" to NCMC's damages due to alleged overcharges and overpayments made to NCMC from January 4, 2007, when the hospital opened, until November 17, 2008, when the Protocol was applied to "ALL" of NCMC's claims.  (*See* PX. 95, pp. 20-25)  The methodologies of the offset were again (i) 125% Medicare to arrive at the "allowed" amount and (ii) the subsequently negotiated, in-network contract amounts between NCMC and Cigna to arrive at the "allowed" amount, *neither* of which methodology is contained or permitted in any Cigna plan/policy, in order to arrive at an offset of $13.1 million for the first methodology and an offset of $10.3 million for the second methodology.  May does this when he knows that Cigna's counter-claim for the *identical* offset and recoupment theory was dismissed by this Court based upon limitations which was later affirmed by the Fifth Circuit in *North Cypress*, 781 F.3d at 204-07.  (PX. 95, pp. 20-25)

---

[19] During discovery, undersigned counsel and Cigna's previous counsel, Andrew Dunlap, agreed to produce to one another all calculations and information on Excel spreadsheet form.

**B.** *May's updated Report dated September 8, 2017*:

127.    On September 8, 2017, just *one* business day *before* the Pre-Trial Conference on September 12, 2017, Dr. May produced yet another report containing 575 claims which had *never* been segregated and/or delineated in either May's first or second Reports.  (PX. 96)  This latest Report consisting of numerous Excel spreadsheets does *not* contain or show any calculations as to how May arrived at whatever amount of damages he is going to testify to at trial.  (*Id.*)  Additionally, this Report contains a new Excel spreadsheet column of information, "A-K" entitled "ER vs. Non-ER (from Tankersley's Report)" *without* providing any information as to the purpose of the column, how the calculations are affected by the information in the column or what the associated numbers represent.  (*Id.*)  Then, for the first time at trial, Dr. May presented damages of $1.05 and $1.67 million under this new Report for the alleged remaining 169 claims.  (Tr. 6-19:2-5)  NCMC objected to this new damage figure because days before, Cigna had successfully objected to NCMC's calculation of these numbers under Tankersley's Model No. 3 wherein the Court excluded NCMC's calculations.  (Tr. 5-214:3 – 5-215:8)  The Court rejected NCMC's calculation of $2,770,086.92.  (Tr. 5-215:4-8) When NCMC made the same objection to Dr. May's new calculation presented at trial and demanded that it also be excluded, the Court permitted Dr. May's new number and stated that it would reconsider NCMC's offer contained in PX. 115.  (Tr. 6-52:3-13)

**C.** *Cigna's Plans'/Policies' MRC Pricing*:

128.    It has already been established in both this case and in the Fifth Circuit Court of Appeals that Cigna's plans/policies at issue contain two methodologies under the "Maximum Reimbursable Charge" or MRC provisions to arrive at the "allowed" amount for OON providers' claims:  **MRC-1** being based upon the lesser of the provider's billed charges or a database of "geographic" charges selected by Cigna and **MRC-2** being based upon a plan-specified percentage of Medicare reimbursement rates, either 110%, 150% or 200%.  *North Cypress*, 781 F.3d at 189.

Both the Fifth Circuit and this Court have already correctly held that only "the ERISA plans cover the subject matter of the dispute." *North Cypress*, 781 F.3d at 204; Dkt. 283, pp. 19, 30-31.  The *only* exception to MRC-2 pricing is when a Cigna patient with MRC-2 pricing in his plan/policy goes to the NCMC emergency room, then the percentage of Medicare reimbursement is automatically "enhanced" to 300%, but if NCMC appeals the ER claim just once, no matter what the plans claim to require *vis-à-vis* the number of appeals, under Cigna's "Enhanced Benefits Process," the "allowed" amount for the ER charge is then automatically "enhanced" to be based upon the provider's/NCMC's billed charges.  This is how Cigna was supposed to have reimbursed NCMC ER MRC-2 claims.  (PX. 101, pp. 5, 35, 55, 62-63, 79-80, 211-221)  Also, under the MRC-2 "Enhanced Benefits Process" for OON provider's/NCMC's ER claims, "*the member's liability is zero.*"  (*Id.*, pp. 211-221)  May *also* completely ignored in his calculations the required "enhancements" to NCMC's ER MRC-2 claims and ignored that under the ER MRC-2 "Enhanced Benefits Process," the "*member's liability is zero.*"  May *never* considered these matters in his calculations of NCMC's damages. (PX. 95)[20]  Furthermore, not *one* single plan permits Cigna to calculate the "allowed" amounts for the OON provider's claims based either on (a) 125% of Medicare or (b) the NCMC-Cigna in-network/Hospital Services Agreement negotiated amounts.

129.    The Fifth Circuit in *North Cypress*, 781 F.3d at 189, also concluded that *"[D]espite Cigna's concerns, it initially paid North Cypress based on the Chargemaster rates as billed.… [I]n other words, Cigna* *accepted* *the Chargemaster rate as the* *total* *cost* *of* *care (subject to the plan's* *Maximum* *Reimbursable* *Charge), and calculated its share of the cost* *based* *upon* *that* *rate."*  This occurred from the day the hospital opened on January 4, 2007, through the first date of the

---

[20] In Tankersley's calculations, she provides Cigna with the benefit of the doubt using only MRC-2 ER claims with two appeals to be used for the "enhanced benefits."  (PX. 115, 116; Tr. 5-201:5 - 5-202:9)  Under Cigna's program, she could have calculated the higher MRC-2 ER "enhanced benefits" for *all* claims with only *one* appeal thereby increasing NCMC's MRC-2 ER damages.  (PX. 101, pp. 55, 62-63, 79-80)

implementation of the Protocol on November 17, 2008, a period of 22½ months.  In other words, the plans' required MRC-1 pricing was applied by Cigna with regard to NCMC's claims during the 22½ month period for which Cigna now seeks "offsets."   Again, May *completely* ignored this. Contrary to the Fifth Circuit's finding, Dr. May actually rejected NCMC's Chargemaster rates as being "inflated" (PX. 95, p. 5) and contrary to the fact that his client, Cigna, had accepted NCMC's "Chargemaster rate as the *total cost of care*" for MRC-1 pricing of NCMC's claims for 22 ½ months (*North Cypress*, 781 F.3d at 189), made up out of whole cloth his own two methodologies/MRCs. May also ignored the fact that when NCMC went INN with Cigna on August 1, 2012, Cigna accepted these very same Chargemaster rates (DX. 1, ¶ 1.3) and used them as the starting point to calculate the contractual, INN discount rates.  (*Id.* at 25, ¶ A)  Cigna never claimed that these Chargemaster rates were "excessive" in August, 2012, or thereafter.  Cigna could have easily provided Dr. May access to its database of "geographic" charges to calculate the MRC-1 reimbursement and "allowed" amounts but would not do so.  (Tr. 3-166:3-24; 4-233:3-13; 7-60:14 - 7-61:2)  Cigna did not want NCMC and its counsel to also have access to this information.  Instead, it paid Dr. May almost $1.2 million to make up two, non-plan sanctioned methodologies.

**D.** *Improper Exclusion of Claims Based*
   *upon NCMC's Appeal Letters' Content:*

130.    Dr. May also excluded from his damage calculations all of NCMC's claims wherein NCMC did not use the specific language "charges for which you are not obligated to pay" in its appeal letters.  (PX. 95, p. 140)  Even when NCMC did not use this language in its form of appeal letters, but rather, used general UCR language, Cigna would routinely respond that the ABD was being upheld because of the exclusion "charges for which you are not obligated to pay."  (PX. 86B, pp. 2, 12, 20; Tr. 5-36:19 – 5-37:2)  This established that when NCMC appealed based on UCR/usual and customary/MRC, Cigna fully understood that this included an appeal of the exclusion

determination.  (Tr. 5-36:19 – 5-37:2)  More importantly, the plans do not require the specific statement in the form of appeal letters.  The plans only require the following, non-specific appeal letter:

> **"You should state the reason why you feel your appeal should be approved and include any information supporting your appeal."**  (PX. 87, pp. 51-52)

May also made this requirement up out of whole cloth.  All of Dr. May's calculations must then be disregarded because he assumed the appeal letters to be defective and rejected each NCMC claim with the alleged defective appeal letter.  (PX. 95, p. 140)  It now too late for Dr. May to correct this error.

### E. *Improper Exclusion of Claims based upon Assignments:*

131.    Dr. May excluded all of NCMC's claims wherein Cigna's counsel could not find a written Assignment of Benefits.  (PX. 95, p. 140) This was incorrect.  Dr. May ignored the fact that Assignments of Benefits may be either in writing or oral.  *Encompass*, 2017 WL 3268034, at *5. Dr. May also ignored the testimony of Kirk Jones, NCMC's Registration Director and Peggy Morgan, NCMC's Patient Access Manager, who both testified that Cigna patients at issue in this case signed Consents and Assignments of Benefits prior to being admitted at the hospital and the other facts establishing the existence of Assignments.  (Tr. 2-127:2-17; PX. 113, pp. 151-152) *See* ¶¶ 58-68, *supra*)  Therefore, the Court must disregard all of Dr. May's calculations based upon the faulty premise that Assignments of Benefits were not obtained by NCMC.

132.    This Court has already ruled as a matter of law that all "*liability in this case derives entirely from the rights and obligations established by the benefit plans.*" (Dkt. 283, pp. 19, 30-31) So did the Fifth Circuit. *North Cypress*, 781 F.3d at 204.  All of NCMC's claims in this case were brought under ERISA on a derivative basis.  (Dkt. 292)  Therefore, Dr. May *cannot* now go outside

of those ERISA plans, ignore this Court's and the Fifth Circuit's rulings and invent methodologies/MRCs to suit his client who is attempting to create off-set figures that are larger than NCMC's remaining damages per the Summary Judgment Orders.

133.    Based upon the foregoing, *both* of Dr. May's methodologies used to calculate NCMC's damages as well as overpayments/off-sets run completely afoul of Cigna's plans' language and are found *nowhere* in *any* Cigna plan/policy.  Dr. May *must* use the MRC in the plans and not invent out of whole cloth different methodologies for the MRC, no matter how many millions of dollars Cigna may pay him to do so.  This *is* an ERISA case, *not* a state court tort damages case which sometimes permits creative damage methodologies.  Therefore, Dr. May's methodologies are improper, unreliable and may *not* be utilized in this Court.

**F.** *Alleged offsets and Why They are Barred*:

134.    Cigna belatedly attempts to bootstrap Dr. May's methodologies and opinions based upon the affirmative defenses of "unclean hands" and "waiver."   This is tantamount to restitution/recoupment and unjust enrichment claims/defenses.  "The equitable doctrine of unclean hands is similar to the equitable doctrine of unjust enrichment and thus cannot be used to defend against an overpayment claim based upon plan language."  *Makoul*, 2013 WL 3874045, at **4-5; *O'Brien-Shure*, 2013 WL 3321569, at *4.  Cigna's restitution/recoupment claim has already been dismissed by this Court and that ruling has been affirmed by the Fifth Circuit Court of Appeals. *North Cypress*, 781 F.3d at 204-07.  Cigna and its New York counsel simply missed the ERISA analogous 2 year limitations period when they untimely filed Cigna's restitution/recoupment counterclaim.[21]  As both this Court and the Fifth Circuit reasoned, Cigna's "unjust enrichment claims

---

[21] That is probably why Cigna's counsel is so vociferously arguing "prejudice" to whatever NCMC proposes with regard to "futility" of administrative remedies and damages.  The statute of limitations applicable to Cigna's counsel's malpractice does *not* even begin until this case is completely final, non-appealable and a Mandate is issued by the Fifth Circuit Court of Appeals.

are based on quasi-contract… [and] unjust enrichment characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *Id*. at 204.  Cigna *cannot* now circumvent that non-appealable, final dismissal by making the identical claim of "offset" and recoupment through affirmative defenses of unclean hands and waiver. *City of St. Paul, Alaska v. Evans* 344 F.3d 1029, 1034 (9th Cir. 2003) ("the City's defenses to those counterclaims are *mirror images* of its time-barred claims.  No matter what *gloss* the City puts on its defenses, they are simply time-barred claims *masquerading* as defenses and are likewise subject to the statute of limitations bar."); *Agnew v. United Leasing Corp.*, 680 Fed. Appx. 149, 154 (4th Cir. 2017) ("The Agnews also attempted to avoid the statute of limitations by *styling* their breach of contract claims…on an affirmative defense….The [A]gnews *cannot* characterize these time-barred claims as affirmative defenses…."). Cigna's dismissed claim/defense of unjust enrichment is now being "*masqueraded*" as unclean hands and waiver.  *See also Scott*, 772 F. Supp. 2d at 983 (plaintiff's "fraud and illegality allegations…were *miscast* as defenses.")  This Court also previously ruled that Cigna's affirmative defense of "unjust enrichment" regarding the alleged overpayments is preempted by ERISA and dismissed same.  (Dkt. 283, pp. 19, 30-31)  Thereafter, *both* of these rulings were affirmed by the Fifth Circuit in *North Cypress*, 781 F.3d at 207 and are *not* subject to any further review or appeal. If Cigna's affirmative defense of unjust enrichment is preempted so must its affirmative defenses of unclean hands and waiver be preempted.  There is nothing about the elements of unclean hands and waiver that can escape pre-emption just as there was nothing about the elements of unjust enrichment which could escape pre-emption.  *Nonetheles*s, as is his expensive practice, Dr. May assumes in his reports and calculations that Cigna is *still* entitled to an off-set.  (PX. 95, p.18)  Therefore, Dr. May's conclusions in this regard are unacceptable.

94

### G. *Dr. May is Not a Credible Witness:*

135.    When Dr. May presented his first Report dated January 13, 2012, he was presented as an expert in ERISA matters and pontificated at length about "the role a of managed care organizations, the causes of increasing health plan premiums, selective contracting, cost-sharing's important role in the healthcare design, the effect of waiver of patient-cost sharing and requirements under ERISA."  (PX. 94)

136.    In his second Report dated January 20, 2016, Dr. May again was presented as an ERISA and healthcare expert.  (PX. 95)  When he was first hired in this case, he was charging $525 per hour (PX. 94, p. 61); by the time of the second Report, he was charging $705 per hour (PX. 95, p. 127); and, by the time of trial, Dr. May was charging $785 per hour.  (Tr. 6-17:10-13)  Also by the time of trial, Dr. May had billed and collected almost $1.2 million dollars for his "services."  He was billing approximately $8,000 per day just to sit in the courtroom and watch the proceedings during the two week trial.  Even though he was allegedly an independent expert, he was in fact a consultant to Cigna and its trial counsel as was demonstrated in his engagement letter dated May 12, 2011. (PX. 91)  To further highlight the fact that he was not an independent expert witness, the contract between him and Cigna stipulated that all of his "work, opinions, conclusions and communications will be covered by the attorney-client privilege and attorney-work product rule, and [he] agrees to do all things reasonably necessary and as instructed by Kirkland and Ellis… to preserve those privileges." (PX. 91, p. 6)

137.    During his direct examination by Cigna's counsel, Dr. May again pontificated at length about ERISA, the plans and policies, how bad NCMC had acted and his philosophy of the managed care system in order to persuade this Court that damages should not be awarded to NCMC. (Tr. 6-18:22 – 6:27:4)  However, on cross-examination, May backed-peddled on these positions and basically claimed that he was simply a PhD. in economics, effectively a "bean-counter," who only

arithmetically calculated damages based upon two made-up methodologies as instructed by Cigna's counsel.  (Tr. 7-24:1-10; 7-117:23 – 7-118:9; 7-144:2–9)   Clearly, no one would pay a man $1.2 million to only add and subtract numbers.  As such, Dr. May's opinions were not credible, were unbelievable and in all respects, should not be considered by this Court.

## XII.

## NCMC'S REMEDIES AND DAMAGES

**A.** *NCMC's Claims for Under–Payment of Benefits:*

138.   The Fifth Circuit sent this case back to this Court *"to consider all of North Cypress's claims for underpayment of benefits and its other closely related ERISA claims with a fully developed record, including claims that Cigna breached duties owed its insureds under ERISA."*   *North Cypress*, 781 F.3d at 197.  Therefore, NCMC is entitled to the appropriate payment of all benefits under the plans and policies pursuant to ERISA § 502(a)(3)(B).  This Court has already held that NCMC's claims are for underpayment of benefits pursuant to ERISA § 502(a)(1)(B).  (Dkt. 521, p. 20)

**B.** *NCMC's Damages:*

139.   Glenda Tankersley is the only expert witness in this case to have calculated NCMC's damages based upon the Cigna plan language. (DX. 2, 4, 5)  Now that it has been established that NCMC did in fact obtain Assignments from all of the Cigna patients at issue; NCMC utilized the appropriate appeal letters when it did make its appeals; and, that it would have been futile for NCMC to have filed over 27,700 appeal and associated letters with regard to its claims to Cigna, the Court must utilize Tankersley's Damage Model No. 3 for all 9,921 claims.  (PX. 99, 100) Tankersley's Damage Model No. 3 is based upon the actual reimbursement "allowed" amounts that Cigna used based upon MRC-1 pricing from January 4, 2007, through November 17, 2008, the 22 ½ month period of time prior to the application of the Protocol.  (DX. 5, pp. 8-10; PX. 95, pp. 9, 23, PX. 100)

Even Dr. May opined that this methodology was the most "reliable:" "*Cigna's actual payments to NCMC prior to implementing the Fee-Forgiving Protocol provide* **the most reliable bases** *on which to estimate the but-for allowed amounts for the [NCMC] damage claims.*" (PX. 95 - p. 25) It is inescapable that the Fifth Circuit not only noted that despite knowledge of the Prompt Pay Discount Program, NCMC's Chargemaster rates, the manner that NCMC billed for services and NCMC's billing practices, Cigna "*paid North Cypress based on the Chargemaster rates as billed....In other words, Cigna accepted the Chargemaster rate as the total cost of care (subject to the plans' Maximum Reimbursable Charge [MRC-1]), and calculated its share of the cost based on that rate.*" *North Cypress*, 781 F.3d at 189. Clearly, Cigna is now estopped from claiming that Tankersley's damage calculations are inappropriate. Furthermore, Tankersley included in her Damage Model No. 3 the 336 repricing agreements which Cigna agreed to pay but after the enactment of the Protocol, reneged on these agreements and only paid $100 per claim. (DX. 5, pp. 10-16; Tr. 5-77:8-11) Therefore, according to Tankersley's Damage Model No. 3 as provided in NCMC's Offer of Proof No. 1 the total amount of NCMC's damages is **$41,971,502.57**. (PX 100, p. 101)

140. In the alternative, and if this Court is inclined to accept Dr. May's 575 remaining claims notwithstanding all of the reasons why Dr. May's claims must be disregarded, then pursuant to Tankersley's Damage Model No. 3, NCMC's total amount of damages for those 575 "remaining" claims is **$5,215,528.50**. (Demon. Evid. 1) Further in the alternative, should this Court accept Dr. May's improper calculations of 169 remaining claims, then pursuant to Tankersley Damage Model No. 3, NCMC's total amount of damages for these 169 "remaining" claims is **$2,770,086.92**. (PX. 115) This Court cannot possibly accept Dr. May's calculations for these two, alternative damage numbers because they are based upon wholly made-up methodologies not found in one Cigna plan or policy. However, NCMC is only providing these theories/calculations in the alternative and does not by any means waive the arguments made herein as to why Dr. May's calculations must be

disregarded.

**C. *In The Alternative, Cigna must Reprocess All of the 9,921 NCMC Claims for Plan Benefits:***

141.    If the Court is not inclined to accept Tankersley's Methodology No. 3 for NCMC's damages, then the only thing that this Court can do is to require Cigna to reprocess all of NCMC's 9,921 claims.  *See* NCMC's Motion to Compel Cigna to Adjudicate Claims (Dkt. 415, 11/13/15) which is still outstanding.

142.    ERISA § 502(a)(1)(B) allows NCMC to recover assigned benefits due under the terms of an insured's plan, to enforce NCMC's assigned rights under the terms of the plan, or to clarify NCMC's assigned rights under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B); *Heimeshoff v. Hartford Life & Acc. Ins. Co*., 134 S. Ct. 604, 612, 187 L. Ed. 2d 529 (2013) (citing *CIGNA Corp. v. Amara*, 563 U.S. 421, 131 S.Ct. 1866, 1877, 179 L.Ed.2d 843 (2011)). "Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits*." Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

143.    "Remedies for ERISA violations rest within the discretion of the district court." *Neil v. Zell*, 767 F. Supp. 2d 933, 940 (N.D. Ill. 2011). "The enforcement provisions of ERISA are intended to provide the Secretary [of Labor], as well as participants and beneficiaries, with broad, flexible remedies to redress or prevent statutory violations." *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 302 (7th Cir. 1985). "ERISA grants the courts the power to shape an award so as to make the injured plan whole." *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir.1984) (discussing ERISA § 409).

144.    Courts have allowed recalculation of benefits by the plan administrator to determine the damages due under the plan, however, most often the recalculation was a by-product of granting

injunctive relief, and not for calculating ERISA § 502(a)(1)(B) damages. *See*:

*Dialysis Newco Inc. v. Cmty. Health Sys. Tr. Health Plan,* No. 5:15-CV-272, 2017 WL 2591806, *15 (S.D. Tex. June 14, 2017) (court remanded plaintiffs' claims to the Plan Administrator to re-evaluate them under the correct definition of usual and customary as defined by the plans.)

*Pension Ben. Guar. Corp. v. Wilson N. Jones Mem'l Hosp*., 374 F.3d 362, 372 (5th Cir. 2004) (in granting summary judgment, the court ordered that the Plan Sponsor/Plan Administrator recalculate the lump sum distributions using the correct rate and to pay the additional benefits to the participants with interest.)

*Calder v. SBC Pension Ben. Plan*, 549 F. Supp. 2d 824 (W.D. Tex. 2008) (allowed claim to seek recalculation finding that it was not dependent on seeking declaratory judgment that amendments to plan were invalid, but rather was an independent, stand-alone claim for benefits.)

*Texas Health & Human Servs. Comm'n v. El Paso Cty. Hosp. Dist.,* 351 S.W.3d 460, 488 (Tex. App. 2011), *aff'd*, 400 S.W.3d 72 (Tex. 2013) (the Supreme Court required that HHCS recalculate the applicable Medicaid reimbursement rates for hospitals pursuant to injunction issued by district court.)

*Mezyk v. U.S. Bank Pension Plan,* No. 3:09-cv-384-JPG-DGW, No. 3:10-cv-696- JPG-DGW, 2011 WL 6729570, *2 (S.D. Ill. Dec. 21, 2011) (the court certified a class under Rule 23(b)(2) even though an ultimate decision in favor of plaintiffs would require defendant to make individual benefit determinations and monetary awards. The court concluded that recalculating benefit payments was incidental to declaratory relief.)

*Eckersley v. WGAL TV, Inc*., 831 F.2d 1204, 1210 (3d Cir. 1987) (Release signed by former employee in settlement of suit against employer for profit sharing benefits under employment contract did not justify pension plan administrator's refusal to recalculate pension benefits based on average salary including profit sharing benefits employee received in settlement of suit against employer, in light of lack of evidence that parties intended to confer benefit on pension plan.)

*Novella v. Westchester Cty*., 661 F.3d 128, 146 (2d Cir. 2011) ("The defendants' bright-line approach is too harsh in that it places the burden on the pensioner—a party less likely to have a clear understanding of the terms of the pension plan and their application to his case—to confirm the correctness of his pension award immediately upon the first payment of benefits, regardless of the complexity of the calculations, or of the adequacy of the defendants' explanation of the basis for the calculation.")

*Corley v. Commonwealth Indus., Inc.*, No. 3:07-CV-196-H, 2014 WL 2200869, *2 (W.D. Ky. May 27, 2014), *aff'd sub nom. Corley v. Commonwealth Indus., Inc. Cash Balance Plan*, 602 F. App'x 637 (6th Cir. 2015) (The Sixth Circuit remanded the matter to the Benefits Committee. The Benefits Committee reviewed its benefit calculation)

99

*Laurenzano v. Blue Cross & Blue Shield of Massachusetts, Inc. Ret. Income Tr.*, 134 F. Supp. 2d 189, 210 (D. Mass. 2001) ("this Court holds that a claim for recalculation of benefits is not sufficiently different from a claim for benefits under the terms of the plan as to justify a different accrual rule.)

145.    Wendy Sherry, Cigna's Rule 30(b)(6) Representative, testified that Cigna has the ability to reprocess all of NCMC's claims at issue in the manner in which the claims were processed from January 4, 2008, through November 16, 2008, just as Mrs. Tankersley did in her Damage Model/Methodology No. 3. (DX. 5, pp. 8-10, 26-31; *see also* PX. 100; NCMC Offer of Proof No. 1)  Therefore, this Court should alternatively order that those claims be adjudicated in that manner. As noted, this Court has not yet ruled on NCMC's Motion to Compel Cigna to Adjudicate Claims. (Dkt. 415, 11/03/15) This Motion was made to require Cigna to adjudicate all of NCMC's claims from November 17, 2008 through July 31, 2012 (the Protocol period) consistent with ERISA and the holdings in *North Cypress*, 781 F.3d at 182 and *Encompass,* 2017 WL 3268034, at \*5.

## XIII.

## NCMC IS ENTITLED TO THE AWARD OF <u>ATTORNEY'S FEES AND COSTS PURSUANT TO ERISA</u>

146.    ERISA provides that "[i]n any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(l).  Pursuant to ERISA § 502(g)(l), this Court "in its discretion may allow a reasonable attorney's fee and costs of action to either party so long as the party has achieved "*some degree of success on the merits."   LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.,* 703 F.3d 835, 846 (5th Cir. 2013) (quoting *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 243 (2010)).  Not required to be a prevailing party, a party meets the success on the merits threshold "if the court can fairly call the outcome of the litigation *some success on the merits* without conducting a lengthy inquir[y] into the question [of] whether a particular party's

success was 'substantial' or occurred on a 'central issue." *ld.* (quoting *Hardt,* 560 U.S. at 255).  *See*

also, *Victory Medical Center Houston, L.P. v. Carefirst of Maryland, Inc.*, Case No. 15-10053, *per*

*curiam* (5th Cir. Jan. 2, 2018).  By contrast, a party does not satisfy the "success on the merits"

requirement by achieving only "trivial success on the merits or a purely procedural victor[y]."

*Hardt,* 560 U.S. at 255.

147.    Success on the merits is viewed in light of the *overall* litigation. *LifeCare Mgmt.,* 703

F.3d at 847. Furthermore, success on the ERISA claims, or even final judgment in the case is not

necessary to recover attorney fees. *Koehler v. Aetna Health Inc.,* 915 F. Supp. 2d 789 (N.D. Tex.

2013) (holding plaintiff was entitled to attorney fees under Section 1132(g)(l), even when no final

judgment was rendered and the ERISA dispute was moot.). In *Koehler,* Aetna was granted summary

judgment against a 29 U.S.C. § 1132(a)(l)(B) claim, with the court relying on the Fifth Circuit's

ERISA abuse of discretion standard.  On appeal, the Fifth Circuit reversed and remanded for further

consideration on the merits of the plaintiff's claim. Without a final judgment, the district court found

that an award of attorney's fees was proper because the plaintiff achieved *some* success on the merits

because there was some evidence of bad faith on the part of Aetna. *Koehler,* 915 F. Supp. 2d at 797.

Here, NCMC obtained the overwhelming majority of success on the merits during the appeal to the

Fifth Circuit and in this Court's rulings on the second set of summary judgment motions. ***The***

***holdings in*  North Cypress *have been cited more than* **314** *times in ERISA cases, appellate briefs,*

***secondary sources and pleadings since the Opinion was issued on March 10, 2015***. *See* Westlaw

Citing References to *North Cypress Medical Center Operating Co., Ltd. v. Cigna Healthcare*, dated

December 26, 2017.    NCMC obtained a significant victory in that case and the ***314*** **citations** to

*North Cypress* more than demonstrate "success on the merits."  Few ERISA cases have been cited

as frequently as *North Cypress*.  That is why Cigna is so vociferously fighting this case by raising

inapplicable affirmative defenses to ERISA derivative claims, paying an "expert" more than $1.2

101

million to invent non-plan sanctioned claims methodologies and employing an army of lawyers to defend it.  Therefore, the Court need not wait for another appeal of this case before awarding NCMC its attorneys' fees and costs.

148.    Once it is determined  that a party is eligible for a fee award under § 1132(g)(l), a court "may consider,"  whether  fees are appropriate  by assessing  the five Bowen  factors: (a) the degree of the opposing party's culpability or bad faith; (b) the ability of the opposing party to satisfy an award of attorney's fees; (c) whether a fee award would deter other persons acting under similar circumstances; (d) whether the party seeking fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve  a significant question regarding ERISA itself; and, (e) the relative merits of the parties' position. *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir. 1980); *LifeCare Mgmt.,* 703 F.3d at 846; *see also I Lincoln Fin. Co. v. Metro. Life Ins. Co.,* 428 F. App'x 394, 396 (5th Cir. 2011). However, the Supreme Court recently clarified that "because these five factors bear no obvious relation to § 1132(g)(l)'s text or to our fee-shifting jurisprudence, they are not required for channeling a court's discretion when awarding fees under this section." *Hardt,* 130 S. Ct.  at 2158; *Spenrath v. The Guardian Life Insurance Company,* 4:11-cv-1979, 2014 WL 710412 (S.D. Tex. Feb. 21, 2014), *aff 'd,* 13-20196 (5th Cir.  2014) (court declined to apply the Bowen factors in light of *Hardt.).*

149.    This Court does *not* need to consider the five *Bowen* factors that were traditionally considered prior to *Hardt* to determine whether a fee award is appropriate. *LifeCare Mgmt.,* 703 F.3d at 846.  However, such consideration only endorses NCMC's success on the merits in both trials and that an award of attorneys' fees and costs in favor of NCMC is appropriate.

XIV.

<u>**CONCLUSION**</u>

**A.** *NCMC is "Left holding the Bag:"*

150.     In a similar case where the payor failed to pay the provider's legitimate healthcare claims for the actual and legitimate provision of valuable goods and services, this Court found that the provider *must* be paid for the goods and services, otherwise, "*<u>[the provider] will 'be left holding the bag,' [which] is a clearly impermissible result [.]</u>*" *Legacy Health Community Srvcs. v. Dr. Kyle Janek*, C.A. NO. 4:15-cv-25, 204 F. Supp.3d 923, 932 (S.D. Tex. 2016) (Ellison, J.) (citing *New Jersey Primary Case Assoc., Inc. v. New Jersey Dept. of Human Srvcs.*, 722 F.3d 527, 541 (3d Cir. 2013)) (emphasis added).  The *same* rationale *must* be applied to NCMC's claims for it would be "a clearly impermissible result" for Cigna and its plan sponsors to be unjustly enriched at NCMC's expense.  Based upon the facts of this case and the case law interpreting ERISA and the Regulations associated therewith, as well as the statute itself, the Court *must* reassess its previous summary judgment rulings, especially those with regard to (a) the "exhaustion of administrative remedies" and "futility;" (b) how NCMC is permitted to establish and prove the Assignments of Benefits at issue herein; and, (c) NCMC's damages and its ERISA § 502(a)(3) claims brought on behalf of the plan members, plan sponsors and plans.  Finally, the *Humble* holdings are not and cannot be binding on this Court and case.  To follow the *Humble* panel's rulings would doom this case and Court to another reversal by the Fifth Circuit.  *See Sheet Metal*, 987 F.2d 770.

151.     Attached hereto as Exhibit "G" are the short and concise answers to the Court's questions and inquiries directed to counsel during the closing arguments on October 10, 2017.

103

Respectfully submitted,

By: ___/s/ J. Douglas Sutter_____
       J. Douglas Sutter
       Fed. ID No. 3791
       SBN 19525500
**ATTORNEY FOR PLAINTIFFS**
**NORTH CYPRESS MEDICAL CENTER**
**OPERATING COMPANY LTD. AND**
**NORTH CYPRESS MEDICAL CENTER**
**OPERATING COMPANY GP, LLC**

**OF COUNSEL:**
**KELLY, SUTTER & KENDRICK, P.C.**
3050 Post Oak Boulevard, Suite 200
Houston, Texas 77056
Tel.: (713) 595-6000
Fax: (713) 595-6001
Email: dsutter@ksklawyers.com

## CERTIFICATE OF SERVICE

     I hereby certify that on this 18th day of January, 2018, a true and correct copy of the foregoing document was provided to opposing counsel via electronic mail and the Court's ECF filing system as follows:

Joshua B. Simon
Warren Haskel
Richard Nicholson
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
E-Mail: joshua.simon@kirkland.com

Alan W. Harris
Law Office of Alan W. Harris
325 N. St. Paul St., Suite 3100
Dallas, Texas  75201
Telephone: (214) 965-8200
Facsimile: (214) 965-8209
Email: alan@alanharris.com

          _/s/ J. Douglas Sutter_____
            J. DOUGLAS SUTTER