**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY, LTD. AND** | § | |
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY GP, LLC** | § | |
| | § | **NO. 4:09-CV-2556** |
| **V.** | § | |
| | § | |
| **CIGNA HEALTHCARE AND** | § | |
| **CONNECTICUT GENERAL LIFE** | § | |
| **INSURANCE COMPANY** | § | |

## QUESTIONS POSED BY THE COURT TO COUNSEL
## DURING THE CLOSING ARGUMENTS ON
## <u>OCTOBER 20, 2017, AND THE ANSWERS THERETO</u>

**TO THE HONORABLE JUDGES OF SAID COURT:**

  **COME NOW**, Plaintiffs North Cypress Medical Center Operating Company, Ltd. and

North Cypress Medical Center Operating Company GP, LLC (collectively "NCMC") and show

the following:

1.    During the closing arguments at trial, the Court posed to counsel numerous questions and

inquires.   Based upon the evidence and the law, the following are the concise answers to those

inquires.   NCMC's Post-Trial Brief filed simultaneously herewith contains the more fully

developed answers together with legal authorities and citations to the admitted trial evidence and

the Trial Transcript.

## <u>QUESTIONS AND ANSWERS</u>

  **<u>QUESTION NO. 1 TO MR. SIMON:</u>  "Mr. Sutter makes a point that its—it's the**

**plan member's unclean hands that defeats a recovery rather than the [provider]." (Tr. 8-**

**37:16-19)**

**ANSWER:** NCMC's suit for benefits falls only under ERISA § 502(a)(1)(B) based upon the Assignments obtained from the Cigna members. *Tango Transport v. Healthcare Fin. Srv., LLC*, 322 F.3d 888, 889 (5th Cir. 2003); *North Cypress Medical Ctr. Operating Co, Ltd. v. Cigna Healthcare*, 781 F.3d 182, 204 (5th Cir. 2015). OON healthcare providers such as NCMC which have no INN contract with Cigna, but which have valid Assignments from the plans' participants have only derivative standing to bring causes of action to recover benefits from the ERISA plans. *Tango Transport*, 322 F.3d at 889. "The plan, in short, is at the center of ERISA and precluding [the plaintiff's] equitable defenses from overriding plan contract terms helps it to remain there." *U.S. Airways, Inc. v. McCutchen*, __ U.S. __, 133 S. Ct. 1537, 1548, 185 L.Ed.2d 654 (2013). An assignee acquires no greater rights than were possessed by the assignor….[otherwise] the assignee would be subject to actions not assertable against the assignor, and therefore would have additional characteristics not applicable to the assignor that would not be, as it were, stepping into the shoes of the assignor or merely assuming the position of the assignor." *Scott v. Durham*, 772 F. Supp. 2d 978, 982-83 (N.D. Ind. 2011). Therefore, NCMC's claims herein are only those of the Cigna patient assignors. NCMC acquired "no greater rights than were possessed by the assignor" patients. Cigna's Rule 30(b)(6) representative, Wendy Sherry, admitted this. (PX. 85D, pp. Cig. 572548-572549) Hence, NCMC's alleged improper conduct is irrelevant.

\* \* \*

**QUESTION NO. 2 TO MR. SIMON:** **"….but unclean hands, that was something that did not come with the Assignment. That is a separate—separate issue. That is the conduct of North Cypress rather than the plan participant." (Tr. 8-38:13-17). "Is it the same as the plan member committing fraud?" (Tr. 8-38:23-24)**

**ANSWER:**  The "unclean hands" *must* be those of the assignor, plan member, not NCMC. NCMC only stands in the shoes of its assignor and acquires no greater or lesser rights than the patient held at the time of the Assignment.  *Scott,* 772 F. Supp. 2d at 982-83. Here, Cigna's Rule 30(b)(6) Representative, Wendy Sherry, admitted under oath and Cigna's lead counsel, Joshua B. Simon, stipulated on the record that Cigna has no defenses or claims against any of its members' healthcare claims at issue in this case. (Tr. 3-132:7-23; 4-4:11-19)  To hold otherwise would neuter the provisions and purpose of ERISA.  If payers could assert affirmative defenses against the OON assignee provider as a result of its own actions, we are back to the pre-1974 ERISA days when every State adjudication's laws would apply to healthcare claims.  The "unclean hands" doctrine in an ERISA case can only be utilized in the situation wherein *"the party who is engaged in unlawful or inequitable conduct [does so] in connection with the matter from which he or she seeks relief."  Makoul v. Prudential Ins. Co. of America*, No. 12 C 1240, 2013 WL 3874045, **4-5 (N.D. Ill., July 25, 2013). Here, there is no claim or defense that any member involved himself in "unlawful or inequitable conduct in connection with the matter for which he seeks relief;" in other words, during the act of providing the Assignment that he made to NCMC.  *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 905 (N.D. Ill. 2009).  Furthermore, Cigna's direct claims against NCMC for fraud and other alleged wrongdoing was long ago pre-empted by ERISA and dismissed by this Court.  (Dkt. 283, pp. 19, 30-31)

* * *

**QUESTION NO. 3 TO MR. SIMON:  "What is the best evidence that North Cypress offered financial incentives, just that one letter from Behar?"  (Tr. 8-40:11-13)  "Do we have any evidence that that actually happened?" (Tr. 8-41:2-3)**

**ANSWER:**   Assuming that Cigna could raise these affirmative defenses in an ERISA derivative claim, Cigna presented no evidence at trial that any NCMC unit holder or any non-owner physician was offered "financial incentives" to refer patients to the hospital.  There are approximately 140-145 NCMC physician owners (Tr. 1-95:5-8; 1-198:22-25) and not one was called to testify in this regard except for Dr. Behar.  Dr. Behar testified, without any controverting evidence, that there was no improper patient referrals or payments made for referrals and no units issued to physicians based upon referrals.  (Tr. 1-199:1-4; 1-289:9-17: 2-98:11-13) Units are offered to physicians based upon the medical needs of the hospital and the community.  (Tr. 1-211:15-22)  There were also 500+ physicians with privileges at NCMC and not one was called to establish same. (Tr. 1-198:18-25)  Partnership distributions are based solely upon the unit holder's percentage ownership interest in the NCMC Partnership which are calculated by an independent, third party CPA.  (Tr. 2-98:14-23)  Partners who refer no patients to NCMC receive distributions the same as do referring physicians.  (Tr. 2-97:25 – 2-98:13)   No distinction is made between referring and non-referring physician owners. (Tr. 2-97:25 – 2-98:13) No payments were shown to be made to any physician unlike in *Connecticut General Life Insurance Company, et al v. Humble Surgical Hospital, LLC*, C.A. No. 4:13-CV-3291, 2016 WL 3077405 (S.D. Tex. Jun. 1, 2016) wherein based upon a written contract with referring third parties, 33.3¢ of every dollar collected by the provider, Humble, from the insurance company was paid to the physician, chiropractor or lawyer who referred the patient to the surgery center.  NCMC's Physician Vital Statistic Reports included all 500+ physicians with privileges at NCMC, the vast majority of whom (357+) were *not* NCMC owners and had nothing to do with referrals, but rather, were used to tract hospitals needs and requirements.  (Tr. 2-94:18 – 20-96:25); § 7204.55, Tex. Occ. Code is a penal statute enforceable only by Texas law enforcement officials and the Texas Attorney General and

is inapplicable to this case.  Asking physicians to send patients to a facility (DX. 58) is not an unlawful act.  Every hospital does this.  *See North Cypress Medical Center Operating Co., Ltd., et al v. Aetna Life Insurance Co., et al*, CA No. 4:13-cv-003359, U.S. District Court, Southern District of Texas (June 20, 2016) wherein Judge Hoyt so held under the *identical* factual circumstances involving NCMC and the *identical* allegations made by another payor, Aetna.

\* \* \*

**QUESTION NO. 4 TO MR. SIMON:** **"So, North Cypress standing in the shoes of the ERISA plan participant, that's saying you—I cannot collect any more money because I didn't collect any sufficient money for myself, basically, right?  It's a—the same person who was asking for money is the same person who didn't pay money?"  "Well, that is a huge issue in this case, and I'll need to study that—whether—North Cypress can be held accountable for alleged sins committed by it rather than by the plan participant." (Tr. 8-43:8-23)**

**ANSWER:**  As noted above, this is an ERISA derivative action wherein NCMC only stands in the shoes of the assignor, plan participants.  As an OON provider, NCMC has no contract with Cigna and has no standing to sue Cigna without the Assignments of Benefits from the Cigna members.  Therefore, NCMC's only claims are derivative in nature, that is, they are actually the members' claims for benefits under the Cigna plans and policies and not any direct claims by or against NCMC.  Cigna's Counterclaim which was, however, brought directly against NCMC for alleged fraud and the same alleged misconduct now contained in Cigna's asserted affirmative defenses was dismissed by this Court on July 25, 2012.  (Dkt. 326, p. 8)  This Court held that these claims were pre-empted by ERISA (Dkt. 283, pp. 19, 30-31)  Therefore, there is no direct claim by Cigna against NCMC based upon alleged misconduct and likewise, there can be no affirmative defenses "masquerading" as those pre-empted and dismissed claims.  *Agnew v. United Leasing*

5

*Corp.*, 680 Fed. Appx. 149, 154 (4th Cir. 2017) ("the [plaintiffs] cannot characterize [their] time-barred claims as affirmative defenses…..") All liability and remaining issues in this case "derive entirely from the rights and obligations established by the benefit plans." (Dkt. 283 at 19, 30-31; *North Cypress Medical Center Operating Company, Ltd., et al v. Cigna Healthcare, et al*, 781 F.3d 182, 208 (5th Cir. 2015)). Otherwise, Cigna just gets around this Court's dismissal of its counterclaims (Dkt. 326, p. 8) and the Fifth Circuit's affirmation of same. *North Cypress*, 781 F.3d at 205-07. Finally, when the Court asks about the collection of "sufficient money," it is referring to the fact that in reality, the patient is making the claim against Cigna by virtue of the Assignment through NCMC and saying "I did not pay enough for myself and therefore I cannot collect any more money." With regard to the collection of money from the insurance company, that is not accurate. The Firth Circuit specifically held that this Court's inquiry must be "whether ordinary plan members who read that payment for the following is specifically excluded from this plan;…charges for which you are not obligated to pay or for which you are not billed, would understand that they *have no insurance coverage* if they are not charged for coinsurance. That is, would a plan member understand the language to *condition coverage* on the collection of coinsurance rather than simply describing the fact that the insurance does not cover all of the patient's costs." *North Cypress*, 781 F.3d at 196. Clearly, the Fifth Circuit is ruling that the fact that the patient does not pay 100% of the OON patient responsibility amount would not preclude him from having "*insurance coverage.*" Objectively speaking, no plan member would ever believe that if he did not pay 100% of his patient OON responsibility amounts, he would therefore "*have no insurance coverage.*" *Id.* at 196. Also, this Court has already ruled that Cigna's interpretation of the exclusion, "charges for which you are not obligated to pay," is legally

incorrect. (Dkt. 521, p. 9)  Therefore, "the same person who was asking for money is the same person who didn't pay money" is irrelevant.

\* \* \*

**QUESTION NO. 5 TO MR. SIMON:**  **How could…I mean, how could you have seen this happen and not been alert to it?  I mean, there's that one letter from Hilgers that you allege is misleading.  Was there any follow-up?  Was there any—I mean, it does seem like for 22 ½ months you would have had more of an opportunity with what evidence you did have.  One question.  Second question is didn't you accept the Chargemaster when North Cypress went in network later?" (Tr. 8-46:24 – 8-47:7)**

**ANSWER:**  First answer:  for the 22 ½ month period from January 4, 2007, when the hospital opened, through November 17, 2008, when the Protocol was put in place, Cigna paid all of NCMC's claims based upon NCMC's billed Chargemaster rate/charges.  (*North Cypress*, 781 F.3d at 189; 7-44:15-19)  During this period, Cigna knew exactly what NCMC's Chargemaster rates were since it maintained a database of all of NCMC's charges as well as all other facility providers' (both OON and INN) charges based upon CPT Code identification numbers.  (Tr. 1-104:8-23); Cigna was aware of the particulars of NCMC's Prompt Pay Discount Program as it had been advised of same by NCMC on at least 24 occasions *via* Certified Mail, Return Receipt Requested and on thousands of occasions on NCMC's UB-04 claims forms (Tr. 1-88:5-16; 1-92:6-25; 1-111:20 –  1-112:13); Cigna knew that the amount of money collected from the patient for the patient to be eligible for the Prompt Pay Discount Program was based upon the patient's plan INN benefit amount/percentage (PX. 3B, 39, 66, 70, Tr. 3-114:10-17; 4-88:1 – 4-89:22); Cigna knew of all of NCMC's billing practices which were standard to all OON providers as well as INN providers and Cigna was able to make additional 29% contingency fees of between $3 million and

$8 million for itself based upon NCMC's known billed charges. (PX. 85E, p. 5; PX. 85D, pp. Cig. 572548-572549; Tr. 4-145:5 - 4-148:3; 4-149:19 – 4-150:3; 4-154:9-22); and, there was no "follow-up" by Cigna with regard to these payments. The Fifth Circuit has already found that based upon the evidence while NCMC was OON, Cigna accepted NCMC's Chargemaster rates during this 22 ½ month period and "calculated its share of the cost based on that rate." *North Cypress*, 781 F.3d at 189. The Fifth Circuit also found that since NCMC "expressly informed Cigna of its discounts prior to any representations about charges, fraud seems particularly inapt." *North Cypress*, 781 F.3d at 205. Cigna cannot get around these Fifth Circuit holdings. Cigna also had dozens of departments, employees and lawyers investigating NCMC during this period of time and was also making millions of dollars off of NCMC's known billed rates. (PX. 85B; Tr. 4-145:5 - 4-148:3; 4-149:19 – 4-150:3; 4-154:9-22) Cigna knew exactly what NCMC was doing. (PX. 85D, pp. Cig. 572548-572549) Cigna not only waived the affirmative defenses, assuming they can even apply to a derivative ERISA action, but Cigna is now estopped from making those defenses based upon the millions of dollars that it pocketed for itself that went to its "bottom line" profits. (Tr. 4-37:18-24) It made no difference whether Cigna knew that the amount of money collected from the patient to be eligible for the discount was based upon 125% of Medicare or some other figure or calculation because Cigna advised NCMC on numerous occasions that it would not pay NCMC's charges until (a) NCMC improperly placed in the UB-04 claims form Box No. 47 the amount of money collected from the patient and (b) collected 100% of the patient's OON responsibility amounts, neither of which was required. (Tr. 4-109:22 - 4-111:16) Second answer: Cigna in fact accepted NCMC's Chargemaster's rates when NCMC went INN on August 1, 2012, to use in order to arrive at the contractual discounts. (DX. 83, p. 1, ¶ 1.3 and p. 25) Cigna's

Hospital Services Agreement with NCMC required NCMC to provide in the UB-04 claims form Box No. 47 "fees billed by Hospital under Hospital's Chargemaster." (DX. 83, p. 1, ¶ 1.3)

\* \* \*

**QUESTION NO. 6 TO MR. SIMON: "No. His argument is that—is the fundamental point on which you disagree, which is North Cypress stands in the shoes of the plan participants and the plan participants can't be charged with what you believe to be North Cypress's misconduct. That's his basic argument. The parties just disagree about that?" (Tr. 8-49:22 - 8-50:2)**

**ANSWER:** See the Answers to Questions Nos. 1, 2 and 4. In the alternative, NCMC did not commit any fraudulent act with regard to its Prompt Pay Discount Program. Not only did it prevail on the appeal to the Fifth Circuit with regard to its discount program and the manner in which Cigna responded to same (*North Cypress*, 781 F.3d at 196), but the Fifth Circuit also found that any allegation of fraud on the part of NCMC would be "particularly inapt…given that North Cypress expressly informed Cigna of its discounts prior to any representations about charges." *North Cypress*, 781 F.3d at 205.

\* \* \*

**QUESTION NO. 7 TO MR. SIMON: "[H]ow does one go about defining normal charge?" (Tr. 8-64:6-7)**

**ANSWER:** Cigna's e-mail communications to all payers define "normal charge" as the amount the healthcare providers bill from their Chargemaster rates. (PX. 3, p. 507) Furthermore, the "normal charge" is defined in INN contracts as the provider's (Chargemaster) rate. (DX. 83)

* * *

**QUESTION NO. 8 TO MR. SIMON:** **"So, normal charge is hospital by hospital, there is no community standard of normal charge?" (Tr. 8-64:19-20)**

**ANSWER:** Each hospital, whether it is OON or INN, has a Chargemaster of its charges and sets its own charges as it chooses. (Tr. 1-103:13 – 1-104:23) Under the identical factual circumstances, Judge Hoyt found that every provider, whether it be INN or OON, sets its own charges. *North Cypress at Medical Center Operating Co., Ltd. et al. v. Aetna Life Ins. Co., et al*, CA No. 4:13-cv-003359, U.S. Dist. Ct., So. Dist. Tx. (June 20, 2016) (Hoyt, J.). Even when a provider is INN, it still maintains its own Chargemaster rates; it simply agrees to discount those rates per whatever is agreed to in the INN contract. (DX. 83, pp. 1, 25; Tr. 1-121:10-24; 5-91:7 – 5-93:20) The commercial payers such as Cigna have complete discretion in determining what the UCR/MRC amount that they will "allow" from the provider's billed charges. (Tr. 4-193:12 - 4-194:25; 4-206:15- 4-207:2) NCMC has no control over this; Cigna has complete control over it. (Tr. 4-193:12 - 4-194:25; 4-206:15- 4-207:2)

* * *

**QUESTION NO. 9 TO MR. SIMON:** **"I can see why that [Hilger's] letter is misleading." (Tr. 8-48:15)**

**ANSWER:** Assuming that such a defense can be raised in an ERISA derivative claim, NCMC's counsel, Mr. Hilger's response letter to Cigna's General Counsel, Susan F. Morris (PX. 47) is *not* misleading. On February 9, 2007, David Hilgers responded to Morris's February 1, 2007 correspondence (PX. 3B) which demanded that NCMC place in Box No. 47 of the UB-04 claims form the amount NCMC collected from the patient to be eligible for the Prompt Discount rather than the "Total Charges" required by both CMS (Tr. 5-40:15-21) and Cigna in its internet

instructions to providers. (PX. 3) In that response to Morris' inquiry about NCMC's "actual charge" or "Total Charges" which is placed in Box No. 47, Mr. Hilger's stated the following:

> "In your letter you confuse the amount that NCMC is willing to accept from a patient that promptly pays the *patient portion* of *charges* with the amount that NCMC is willing to accept for the *entire charge*. [B]y implementing a prompt pay policy, NCMC does not intend to accept only the *patient portion of charges* as payment for the *entire charge*. As the name implies, this policy reduces the *patient portion of charges* if the patient pays promptly eliminating the need for NCMC to spend valuable time and money sending out bills and making other efforts to collect this amount….a reduction of the *patient portion of charges* for prompt payment is not the same a reduction of the *entire charge*. Cigna does not claim that payment of the *patient portion of the charges* waives Cigna's portion of the charges if there is no prompt pay policy….charges shown on claims forms submitted to Cigna are NCMC's *actual charges* and that patients are liable for amounts such as out-of-network coinsurance and deductibles [by virtue of the contractual provision in the Consent and Assignment signed by the patient [PX. 2] though, as indicated the *patient portion of the charges* may be reduced by NCMC if a patient meets the requirements of NCMC's Prompt Pay Policy Program." (PX. 47)

Nothing could be clearer than this letter. NCMC distinguishes between the *patient portion of charges* that will be discounted and NCMC's *total charges* for the goods and services provided to the patient, and Cigna knew that in February, 2007.

\* \* \*

**QUESTION NO. 10 TO MR. SIMON:** **"Which part of it you're saying the two [fee] schedules?"** **(Tr. 8-50:23-24)**

**ANSWER:** Assuming that Cigna can raise such a defense in an ERISA derivative case, collateral estoppel is applicable to this issue as Judge Hoyt has already ruled in CA No. 4:13-cv-003359; *North Cypress Medical Center Operating Co., Ltd. et al v. Aetna Life Insurance Company*; U.S. District Court, Southern District (Jun. 20, 2016) that NCMC has only one Chargemaster. Furthermore, the uncontroverted testimony and evidence at trial established this. (Tr. 1-72:21 – 1-73:1; 1-105:13-17; 2-174:1-12; 3-33:15-19) It is impossible for NCMC to determine what the total billed charges are at the time of patient registration when monies are collected from the patient "up-front" to be eligible for the subsequent discount so NCMC could not have possibly had a dual billing system. (Tr. 2-167:17 - 2-168:9) NCMC never "billed" patients for the up-front fee for the Prompt Pay Discount Program. *North Cypress,* 781 F.3d at 188) No such bills ever went out. *Id.* Furthermore, NCMC's David Hilger's February 9, 2007 response letter to Cigna's in-house counsel, Susan F. Morris, responding to Morris's February 1, 2007, letter wherein she demanded that NCMC place in Box No. 47 of the UB-04 claims form the amount NCMC collected from the patient to be eligible for the Prompt Pay Discount rather than the "Total Charges" required by CMS (Tr. 5-40:13-21) and Cigna in its internet instructions to providers (PX. 3) made it abundantly clear the purpose of the up-front monies collected from the patient and that money was not the "total billed charges." Mr. Hilger's specifically distinguished between the *patient portion of charges* to be paid to by the patient be eligible for the subsequent

12

discount from the amount that NCMC is willing to accept for the "*entire charge*" for the goods and services provided to the patient, that is the "Total Charges" in Box No. 47 of the UB-04 claims form. Mr. Hilgers clearly stated that by implementing a Prompt Pay policy, "NCMC does not intend to accept only the *patient portion of charges* as payment for the *entire charge*." (PX. 47) Therefore, as early as February 9, 2007, Cigna knew that the amount collected from the patient up-front in order for the patient to be eligible for the subsequent prompt pay discount was not the "total charges" and that there was not a dual billing system.

\* \* \*

**QUESTION NO. 11 TO MR. SIMON:** **"Would you like to say anything about the exhaustion issue? Yeah, we spent a lot of time on it." (Tr. 8-58:16-17) "How many? We're talking about 12,000 claims or something like that [regarding appeals] (Tr. 8-59:2-3) "Weren't there a whole lot of claims where that rationale is not applicable, where no matter what argument North Cypress made, Cigna wouldn't have changed its mind?" "That sounds like futility to me." (Tr. 8-60:1-9)**

**ANSWER:** The Firth Circuit has already concluded from the evidence in this case that *"[W]hen reduced payments were appealed [by NCMC], Cigna would likewise explain that it would not increase payment unless it was given evidence that the patient was held financially responsible for her portion of the total charge reported by North Cypress." North Cypress*, 781 F.3d at 190. This conclusion is binding on this case. From the date of the application of the Protocol, November 17, 2008, through July 31, 2012, 44 ½ months, Katrina M. Sharrow-Remlinger, an SIU Investigator and other SIU employees "oversaw," "handled" and "directed" *more than* **11,782** appeals from NCMC. On these almost 12,000 occasions, these individuals "tracked" and "reviewed" each NCMC appeal and then sent them back to the Appeals Committee "telling" those members how to rule on NCMC's appeals with regard to the adverse benefit

determinations previously made by the same individuals in the SIU "with instructions," "with directions," "to uphold" and/or "to handle NCMC's appeals." (PX. 86, 86A)  No matter what NCMC argued or presented on an appeal, the SIU instructed the Appeals Committee members to uphold the SIU's earlier ABDs.  (*Id.*) Cigna's plans specifically prohibit this type of activity because they state that the member's *"appeal will be reviewed and the decision made by someone not involved in the initial decisions"* and that *"[A]ny one involved in the prior decision [first appeal] may not vote on the [Appeals] Committee."* (PX. 87, p. CIG-NCMC0094400; PX. 88, CIG-NCMC00579702)  Furthermore, at trial Wendy Sherry, Cigna's Rule 30(b)(6) Representative, Cigna's SIU Manager and Rule 30(b)(6) Representative, Mary Ellen Cisar, and the SIU's Investigator, Katrina M. Sharrow-Remlinger, all testified that both NCMC's claims and the subsequent appeals were taken out of the normal claim and appeal handling processes and routed to the SIU so that the Protocol could be applied and that anytime either a claims person or an Appeals Committee member did not follow what the SIU directed, "they just messed up and did not follow [the instruction] for some reason they made a mistake….[the] majority of them were processing errors." (PX. 114, pp. 20, 50, 146; 104 pp. 64-68)  During this 44 ½ month period of time, on 29 separate occasions, Cigna's outside trial counsel and Cigna professional advocates, Andrew Dunlap, Melody Wells and Ryan McEnroe of Kirkland and Ellis, LLP in New York and Cigna's in-house General Counsel, Michael Wade, advised the SIU on NCMC's appeals.  (PX. 86; 86A, pp. 68a, 77-78, 80-81, 84, 86-87, 91-93, 97, 100-101)  Not one plan/policy permits Cigna's professional advocates, trial counsel or its General Counsel to be involved in the consideration and determination of appeals. (PX 87; 88)  This is not a "full and fair review" of NCMC's claims and appeals as ERISA and the Department of Labor Regulations require.  *See Encompass Office Solutions, Inc. v. Connecticut General Life Ins. Co. d/b/a Cigna Healthcare of*

*Texas, Inc., et al*, C.A. No. 3:11-cv-02487-L, 2017 WL 3268034 (N.D. Tex. July 31, 2017) wherein Cigna did the *identical* thing with regard to the provider's claims and appeals utilizing the *same* SIU Manager, Mary Ellen Cisar. The *Encompass* court found that Cigna and its SIU had *"stymied"* the appeal process when they "placed a permanent flag on all claims submitted by the provider which prevented its appeals from being decided under the plan's appeals protocol which violated ERISA…; the manner in which Cigna processed the [the provider's] claims and appeals did not give [the provider] a reasonable opportunity to have a full and fair review of the claim denials'….; and, this demonstrates deference was effectively given to all SIU's original denials and recommendations to summarily uphold the denials with little discussion within Cigna or within Encompass, and without considering the Appeal Record or information submitted by [the provider]" *Id*. at ** 13, 17, 18. The only few times that Cigna changed its mind on an appeal was when it failed to apply the correct MRC-2 Medicare percentage or failed to reimburse on an ER basis based upon "enhanced benefits" which were totally outside of the Protocol. (Tr. 5-204:17-25) A "*de-minimus* departure from otherwise systematic denials of payment when Cigna approved only a few appeals does not preclude a finding of exhaustion." *Productive MD, LLC v. Aetna Health, Inc.*, 969 F. Supp. 2d 901, 932 (M.D. Tenn. 2013). Cigna's officials and General Counsel stated that Cigna would not stop this process "until" NCMC provides Cigna with "clear evidence of [a] the charges shown on the NCMC UB-04 claim's form contained the amount that was collected from the patient member" as opposed to the "Total Charges" which NCMC is legally required to place in that box field and (b) the Cigna patient member has paid "all of its OON co-insurance or deductible," neither of which are legally required. (PX. 66; 70; *North Cypress*, 781 F.3d at 196) *29 CFR §2560.503-1(b)* prohibits any activity which "unduly inhibits or hampers the initiation or processing of claims for benefits" and *29 CFR §2560.530-1(l)* states that a claimant

shall be "deemed to have exhausted the administrative remedies available under the plan" when the payer fails to follow established claims procedures consistent with the plans. *29 CFR §2560.503-(h)(3)* prohibits the payer from affording "deference to the initial adverse benefits determination" as Cigna did.

* * *

**QUESTION NO. 12 TO MR. SIMON:** **"Do we have any evidence that Emergency Room services were being used improperly?" I mean, I know there are suspicions. But do we have any—can we point to any patient who was sent to the Emergency Room even though he was not dealing with an emergency?"** (Tr. 8-66:16-20)

**ANSWER:** Assuming that Cigna can raise such a defense in an ERISA derivative claim, even Cigna's counsel had to admit that he "*doesn't have a specific patient.*" (Tr. 8-66, l. 21) No medical records were produced by Cigna to demonstrate that this occurred which would have been necessary to establish a medical fact, that is, whether the patient's condition was emergent in nature; Cigna neither designated nor called a medical expert to opine on this medical fact; no NCMC ER doctors were called to testify in this regard; no patient testimony was presented to establish same; no effort was made to determine the existence of any emergent situation as defined in Cigna's plans: "*the sudden, unexpected onset of a bodily injury or serious Sickness which could reasonably be expected by a prudent lay person to result in serious medical complications, loss of life, or permanent impairment*" (PX. 87, p. 59); no evidence of the improper submission of ER charges to non-ER claims; and, the only alleged "evidence" was presented by Cigna's counsel, Joshua B. Simon, who argued at the trial's closing that he "guarantees" the Court that with regard to the patient's armbands, NCMC "charged them for ER prices." (Tr. 7-177:17-20) There was simply no evidence, only counsel's wishful thinking. This demonstrates that Cigna's assertion of

the alleged affirmative defenses were made at the last minute with no discovery conducted with regard to same. Cigna's counsel simply copied Aetna's failed arguments in *North Cypress Medical Center Operating Co., Ltd. et al. v. Aetna Life Ins. Co., et al*, CA No. 4:13-cv-003359, U.S. Dist. Ct., So. Dist. Tx. (June 20, 2016) (Hoyt, J.) while knowing that the assertions of these affirmative defenses against the assignee provider, NCMC, in an ERISA derivative suit is bogus. Days of trial were and now, post-trial briefing, are completely wasted on these bogus issues.

* * *

**QUESTION NO. 13 TO MR. SIMON:** **"And then, is there any law that says whether patients and their insures can be treated differently, that is ignoring out-of-network status for the patient but charging the insurance company as if its an out-of-network patient?" (Tr. 8-67:11-15)**

**ANSWER:** Assuming that Cigna can raise such a defense in an ERISA derivative claim, NCMC was OON with Cigna and had no contract with Cigna which would require it to collect any portion of the patient OON responsibility amounts. (Tr. 1-143:25 – 1-144:6; 3-89:9 – 3-90:4; 3-200:24 – 3-201:7; 3-238:1-5; 5-165:25 – 5-166:6; 7-8:1-10 – 7-41:13-15) Equally important is that when NCMC became INN with Cigna, it was still *not* required to collect patient INN responsibility amounts. That INN contract only said that NCMC was not "prohibited" from collecting INN patient responsibility amounts if it wanted to. (DX. 83, p. 8, ¶ 4.3.1) The same "may" language regarding collections was also in the plans for OON patient responsibility amounts! The only law is that providers cannot have separate charges on their Chargemaster for insurers from those charges on a different Chargemaster for uninsured patients. *See* Tex. Ins. Code §552.003. This did not occur here.

**QUESTION NO. 14 TO MR. SUTTER:** **"Do you agree that the laws reach a situation where patients and insureds are being charged different amounts using different Protocols, one in-network, and one out-of-network? (Tr. 8-68:12-15)**

**ANSWER:** Assuming that Cigna can raise such a defense in an ERISA derivative claim, that is not the law. The law is that if a provider maintains one Chargemaster for insured patients and a different Chargemaster for non-insured patients, that would be improper. *See* Tex. Ins. Code §552.003.

* * *

**QUESTION NO. 15 TO MR. SUTTER:** **"On North Cypress depending on plan language for the argument—that plans between Cigna and patients used non-mandatory language like may collect the full coinsurance amount, does it matter at all that at the time North Cypress adopted its Prompt-Pay discount they had not seen the contract?" (Tr. 8-68:21 – 8-69:1)**

**ANSWER:** It makes no difference whether NCMC saw the plan or not at the point of the use of the Prompt Pay Discount Program in the patient registration department with regard *only* to the subject matter of this particular question because all OON providers know that since they have no contract with the commercial payer, there is no contractual obligation for them collect the patient responsibility amounts referred to in in the plans or policies. (PX. 87, 88; Tr. 1-17:2-21; 8-70:1-10) Even when NCMC became INN with Cigna, it did not have an obligation to collect he patient responsibility amount. (DX. 83, p. 8, ¶ 4.3.1); *see also North Cypress*, 781 F.3d at 196. "[A]lso relevant is whether Cigna <u>denied</u> <u>all</u> <u>coverage</u> to patients who were not charged or "<u>billed</u>" for their co-payments or co-insurance by *in-network* providers." Cigna never imposed these

conditions on INN providers. (PX. 103; Depo. of Mary Ellen Cisar, 11/11/15 at pp. 28-29, 46, 57-58, 68-69, 99-100) But when NCMC did receive copies of the plans after the discovery in this lawsuit began, it could confirm that there was no obligation on the part of the OON provider to collect the OON patient responsibility amounts or for the patient to pay any of the OON patient responsibility amounts. (PX. 87, p. 12; Tr. 1-143:25 – 1-144:6; 5-165:25 – 5-166:6; 7-8:1-10 – 7-41:13-15) Anyway, there could be no contractual obligation since NCMC had no contract. Further, the Fifth Circuit has held that an ordinary plan member with average intelligence would have to understand that if he did not pay 100% of his OON responsibility amount, he would "*have no insurance coverage*" at all. *North Cypress*, 781 F.3d at 196. No member would *ever* believe that. Nor would this ever happen to an INN member. *Id.* Therefore, NCMC seeing or not seeing the plan for purposes of this question is irrelevant.

* * *

**QUESTION NO. 16 TO MR. SUTTER: "Cigna leans heavily on two Texas statutes, the Texas Insurance Code saying that a physician or other healthcare provider may not waive a deductible or co-payment [not co-insurance!] on the acceptance of an Assignment, and….the Texas Occupation Code which prohibits false, misleading, or deceptive advertising; represents that healthcare insurance deductibles or co-payments may be waived." (Tr. 8-69:16-25)**

**ANSWER:** Assuming that Cigna can assert such defenses in an ERISA derivative claim,

§ **1204.055(b), Tex. Ins. Code**—This statute only applies to the "contractual responsibility" on the part of an INN provider to collect deductibles and co-payments and is titled "*Contractual Responsibility for Deductibles and Co-Payments*." Only INN providers have or may have "*contractual responsibility*" to collect these amounts. (Tr. 1-17:2-21; 8-70:1-10) The statute

states that just because an (INN) provider obtains an assignment from a patient, that does not relieve it of its INN "*contractual responsibility*" to collect deductibles and co-payments. Here, Cigna admits that NCMC is OON and has no contract with Cigna. (Tr. 3-89:9 – 3-90:4; 3-200:24 – 3-201:7; 3-238:1-5). Therefore, NCMC has *no* "*contractual responsibility*" to collect deductibles or co-payments. The Commentary to the statute states that the statute simply "clarifies that a healthcare provider who accepts an assignment of benefits is not *relieved of any [contractual] obligations regarding billing or collecting a co-payment or deductible*." (*Id.*) Since NCMC has no such obligation, the statute cannot apply to it. The statute does not even speak to or apply to co-insurance, usually the largest portion of the patient responsibility amount. Also, the statute is a part of the Insurance Code enforceable only by the Texas Insurance Commissioner. NCMC is neither licensed by nor regulated by the Texas Insurance Commission. The Texas Attorney General has interpreted this statute in the same manner noted above, to wit: "by virtue of accepting an assignment, the [INN] provider is not relieved of its [contractual] obligation regarding billing for or collecting co-payment or deductible." (Texas Attorney General Opinion DM-215 (April 13, 1993)) Finally, § 1204.055 has been Texas statutory law since 1991 and there is not one case interpreting it, let alone interpreting it in the manner Cigna does. For good reason, it does *not* apply to OON providers and the Texas Insurance Commission has no authority over licensed healthcare providers.

**§ 101.201(b)(6) & (7), Tex. Occ. Code** — This statute prohibits a provider from "advertising" that which is false, misleading or deceptive with regard to the waiver of deductibles or co-payments (not co-insurance), and the violation of same is only "grounds for license revocation or denial." Cigna has no authority or standing to have NCMC's license revoked. It has been established that NCMC never did and does not advertise its Prompt Pay Discount Program.

(Tr. 1-87:23-25; 2-186:17-18; 4-78:11-18) If it does not advertise, the statute does not apply. There is also no private cause of action that Cigna may bring for the "revocation or denial" of NCMC's license which is the statutory remedy for any violation. Again, Cigna does not state that NCMC advertises its Prompt Pay Discount and therefore violates the statute. It simply states what the statute says. Cigna provides no evidence that NCMC was involved in *any* false or misleading advertising with regard to its Prompt Pay Discount Program. More importantly, § 101.201(b)(6) prohibits false advertising that "deductibles or co-payments may be waived or are not applicable to healthcare services to be provided if the deductibles or co-payments *are required*." First, NCMC does not advertise its Prompt Pay Discount. (Tr. 1-87:23-25; 2-186:17-18; 4-78:11-18). Second, NCMC is not "required," contractually or legally, to collect deductibles or co-payments. Third, the statute does not even apply to co-insurance, usually the largest portion of the patient responsibility amount. The same is true with regard to § 101.201(b)(7) which prohibits false advertising that "health benefit plan will be accepted as full payment when deductibles or co-payments are required." NCMC is neither "required," contractually or legally, to collect such payments. Further, Cigna has no state law claims against NCMC that would include these statutes enforceable only by the State of Texas. This Court pre-empted those claims and dismissed them. (Dkt. 283, p. 19, 33-34) Cigna did not appeal to the Fifth Circuit this Court's pre-emption ruling and dismissal with prejudice, therefore, it is now final and non-appealable. *North Cypress*, 781 F.3d at 182.

* * *

**QUESTION NO. 17 TO MR. SUTTER: "Do you agree with Mr. Simon's definition of normal fees, it doesn't have a meaning other than hospital by hospital?" (Tr. 8-70:20-22)**

**ANSWER:** It is correct that there is no legal definition of "normal fee" nor do the Cigna plans/policies define that term. (PX. 87, pp. 57-63; Tr. 8-70:23 - 8-71:5) What Cigna's counsel attempted to do in this case was to change the plans'/policies' language from the undefined "normal fee and add to it "to the patient." Not one single plan or policy defines "normal fees" as those "normal fees 'to the patient'." (*Id.*)

\* \* \*

**QUESTION NO. 18 TO MR. SUTTER:** "On the damages Mrs. Tankersley did, it looks like North Cypress is calculating damages for claims to which fee-forgiving Protocol was not applied." (Tr. 8-71:6-8)

**ANSWER:** It was impossible for NCMC to know exactly when Cigna was applying the Protocol to its claims. Cigna did not always state "charges for which you are not obligated to pay" on the EOBs/EOPs (PX 84, pp. 8-11; Tr. 5-172:2-15). Furthermore, Cigna's own file materials indicate that it was going to apply the Protocol to "ALL" NCMC's claims. (PX. 3B, 66, 82)

\* \* \*

**QUESTION NO. 19 TO MR. SUTTER:** "And also, on damages, Dr. May assumed that patients were not billed for Emergency Room services based on the 125% of Medicare fee schedule. He instead applied Mrs. Tankersley's Model 3 to the ER claims and 300% was as to MRC-1 and 300% to Medicare fee schedule for MRC-2 ER claims." (Tr. 8-71:24 – 8-72:4)

**ANSWER:** Dr. May failed to determine MRC-2 ER claims with Cigna's required "enhanced benefits" wherein if NCMC only appealed the adverse benefit determination on *one* occasion, then Cigna had to "allow" 100% of NCMC's billed charges for the ER services and to pay based upon same. (PX. 101, pp. 211-221, 235) Mrs. Tankersley selected the MRC-2 charges

for ER admissions where there were two appeals and "enhanced" damages only if there were two appeals to a claim, not just one, which would have increased NCMC's MRC-2 ER damages.  (Tr. 5-210:18 - 5-211:7)  She did not have to do that.  As Cigna's Christopher Kulig who is in charge of the application of MRC-2 "enhanced benefits" testified, *only* one appeal will require Cigna to pay the claim based upon NCMC's billed charges and not 300% of Medicare "without any patient responsibility amount."  (PX. 101, pp. 62-63, 79-80)  Cigna received the benefit of the doubt in this regard by Mrs. Tankersley's MRC-2 ER damage calculations being less than they should have been.

\* \* \*

**QUESTION NO. 20 TO MR. SUTTER:**  **"You got up because you wanted to say something else.  Let me give you a chance."**  **(Tr. 8-72:25 – 8-73:1)**

**ANSWER:**  On not one single occasion during Cigna's counsel's closing argument did he ever contest NCMC's position that only ERISA applies in this case and that the affirmative defenses of "unclean hands and waiver" can only apply to the inequitable conduct on the part of the assignor members, not on the part of the assignee, NCMC.  At no time did Cigna ever present any evidence of any inequitable conduct on the part of the members, but rather, testified and stipulated in open court that there were no defenses or claims against any of the Cigna members. (Tr. 3-132:7-23; 4-4:11-19)

Respectfully submitted,

By:    */s/ J. Douglas Sutter*
       J. Douglas Sutter
       Fed. ID No. 3791
       SBN 19525500
**ATTORNEY FOR PLAINTIFFS
NORTH CYPRESS MEDICAL CENTER
OPERATING COMPANY LTD. AND
NORTH CYPRESS MEDICAL CENTER
OPERATING COMPANY GP, LLC**

**OF COUNSEL:**
**KELLY, SUTTER & KENDRICK, P.C.**
3050 Post Oak Boulevard, Suite 200
Houston, Texas 77056
Tel.: (713) 595-6000
Fax: (713) 595-6001
Email: dsutter@ksklawyers.com

### CERTIFICATE OF SERVICE

      I hereby certify that on this 18th day of January, 2018, a true and correct copy of the foregoing document was provided to opposing counsel via electronic mail and the Court's ECF filing system as follows:

      Joshua B. Simon
      Warren Haskel
      Richard Nicholson
      Kirkland & Ellis LLP
      601 Lexington Avenue
      New York, New York 10022
      Telephone: (212) 446-4800
      Facsimile: (212) 446-4900
      E-Mail joshua.simon@kirkland.com

      Alan W. Harris
      Law Office of Alan W. Harris
      325 N. St. Paul Street, Suite 3100
      Dallas, Texas 75201
      Telephone: (214) 965-8200
      Telecopier: (214) 965-8209
      E-Mail alan@alanharris.com

                      */s/ J. Douglas Sutter*
                      **J. DOUGLAS SUTTER**