**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING CO., LTD. AND NORTH** | § | |
| **CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY GP, LLC.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:09-CV-02556** |
| | § | |
| **CIGNA HEALTHCARE,** | § | |
| **CONNECTICUT GENERAL LIFE** | § | |
| **INSURANCE COMPANY, AND** | § | |
| **CIGNA HEALTHCARE OF TEXAS, INC.** | § | |
| | § | |
| **Defendants.** | § | |

---

**CIGNA'S POST-TRIAL BRIEF AND MOTION FOR RECONSIDERATION
OF THE COURT'S SUMMARY JUDGMENT RULING ON THE ISSUES
OF LEGAL CORRECTNESS AND ABUSE OF DISCRETION**

---

**LAW OFFICE OF ALAN W. HARRIS**

Alan W. Harris
Attorney-in-charge
State Bar No. 09050800
Southern District ID No. 2171
325 N. St. Paul Street, Suite 3100
Dallas, Texas 75201
Telephone: (214) 965-8200
Facsimile: (214) 965-8209

Joshua B. Simon
Warren Haskel
Dmitriy Tishyevich
Richard Nicholson
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

**COUNSEL FOR DEFENDANTS**

**OF COUNSEL**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION...................................................................................................1

I.    The Fifth Circuit's *Humble* Decision Requires Reconsideration of this
      Court's 2016 Summary Judgment Rulings Against Cigna and the Entry of
      Judgment for Cigna. .................................................................................1

      A.    This Court's Summary Judgment Rulings Against Cigna Must Be
            Reconsidered and Resolved in Cigna's Favor. ......................................4

            1.    Judge Hoyt's Decision in *Humble* Was Vacated and Has No
                  Preclusive Effect on Whether Cigna's Interpretation Was Legally
                  Correct..............................................................................4

            2.    This Court Is Bound by the Fifth Circuit's Holding That Cigna's
                  Interpretation of the Identical Fee-forgiving Exclusion Was Not an
                  Abuse of Discretion; Thus, It Also Cannot Be Bad Faith...........5

            3.    *Humble* Confirms That Cigna's Actions in This Case Were
                  Supported by Substantial Evidence. ......................................8

      B.    While *Humble* Makes it Unnecessary to Analyze the Four Typical Abuse
            of Discretion Factors, the Trial Record Confirmed that Cigna Did Not
            Abuse Its Discretion.............................................................11

            1.    Cigna Did Not Act in Bad Faith. ..........................................11

            2.    The Trial Record Confirms that the Court's Ruling on Internal
                  Consistency Was Correct. ....................................................15

            3.    The Trial Record Shows Cigna Did Not Have a Conflict of
                  Interest............................................................................16

            4.    The Trial Record Shows That Cigna's Actions Were Supported by
                  Substantial Evidence. ..........................................................17

II.   Cigna Would Have Prevailed Even Without *Humble*, Because the Trial
      Evidence Proved NCMC's Inequitable and Unlawful Conduct. ..............17

            1.    NCMC Encouraged Its Physicians-Investors to Breach Their
                  Provider Contracts by Making Out-of-Network Patient Referrals to
                  NCMC.............................................................................19

            2.    NCMC Lured Patients by Waiving Patients' Cost-Share
                  Obligations—an Illegal Practice that Cigna's Plans Forbid. ..........23

i

**TABLE OF CONTENTS (CONT'D)**

Page

3.   NCMC Used Two Sets of Books:  One to Bill Patients, and One to Bill Cigna for the Same Services. ........................................................27

4.   NCMC Improperly Routed Cigna Plan Members Through the Emergency Room..........................................................................................29

5.   NCMC Knew That Its Conduct Was Illegal and Hid Its Scheme from Cigna. ...............................................................................................30

**III.   NCMC Is Barred from Recovering *Any* Additional Benefits. ....................33**

A.   As this Court Has Already Recognized, and as NCMC Conceded at Trial, Equitable Defenses Apply to ERISA Benefits Claims. .........................33

B.   NCMC Is Subject to Cigna's Defenses as an Assignee of Cigna's Members. ......................................................................................................34

C.   NCMC's Unlawful and Inequitable Conduct Bars It from Any Further Recovery. ....................................................................................................37

**IV.   If the Court Decides to Award Damages to NCMC Notwithstanding *Humble* and Cigna's Defenses, NCMC Could Recover $1.67 Million at Most.........40**

A.   NCMC's Damages Models Are Flawed and Overestimate Damages. .................41

1.   NCMC's Damages Model Is Flawed Because It Relies on Billed Charges Rather Than Normal Charges in Violation of Plan Language..................................................................................................41

2.   There Is No Basis to Award Any Damages for MRC-2 Claims, Because Cigna Did Not Apply the Fee-Forgiving Protocol to Those Claims. ..........................................................................................45

B.   Either of Cigna's Two Alternative Damages Models for NCMC's Exhausted Claims Provides a Reliable Way of Calculating Damages. .................45

1.   Dr. May's Model 1:  "Normal Charge" Damages. ....................................46

2.   Dr. May's Model 2:  "In-Network" Damages. ..........................................47

**V.   The Court Should Not Reconsider Its Summary Judgment Decision on Futility or Exhaustion of Administrative Remedies. ....................................48**

A.   The Court Has Already Declined to Reconsider Exhaustion and Futility............49

**TABLE OF CONTENTS (CONT'D)**

Page

B.   NCMC's Latest Attempts at Reconsideration Are Procedurally Improper, and Given the Court's Summary Judgment Ruling, Exhaustion and Futility Were Not Triable Issues......................................................................................50

C.   Nothing in the Trial Record Disturbs the Court's Exhaustion and Futility Decisions.....................................................................................................52

**CONCLUSION** ..................................................................................................**56**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Life Ins. Co. v. Humble Surgical Hospital, LLC,*
   2016 WL 7496743 (S.D. Tex. Dec. 31, 2016) ............................................................ *passim*

*Aetna Life Ins. Co. v. Humble Surgical Hospital, LLC,*
   2017 WL 3753665 (5th Cir. Apr. 5, 2017) ...........................................................................19

*Alexander v. Wells Fargo Bank, N.A.,*
   867 F.3d 593 (5th Cir. 2017) .............................................................................................1

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...........................................................................................................52

*Anderson, Greenwood & Co. v. Martin,*
   44 S.W.3d 200 (Ct. App. Tex. 2001) .................................................................................22

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.,*
   171 F. Supp. 3d 1092 (D. Colo. 2016)................................................................................6

*Ark. BC/BS v. St. Mary's Hosp.,*
   947 F.2d 1341 (8th Cir. 1991) ...........................................................................................6

*Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.,*
   173 F. Supp. 3d 363 (N.D. Tex. 2016) .............................................................................38

*Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.,*
   293 F.3d 1139 (9th Cir. 2002) ..........................................................................................33

*Bigelow v. United Healthcare of Miss., Inc.,*
   220 F.3d 339 (5th Cir. 2000) ............................................................................................34

*Bland v. Fiatallis N. Am., Inc.,*
   401 F.3d 779 (7th Cir. 2005) ......................................................................................26, 37

*Bourgeois v. Prentiss Props. Ltd.,*
   31 F. App'x 838 (5th Cir. 2002) ......................................................................................16

*Brittingham v. Wells Fargo Bank, N.A.,*
   2012 WL 12882139 (N.D. Tex. Nov. 8, 2012)..................................................................51

*Burns v. Bishop,*
   48 S.W.3d 459 (Tex. App. 2001).......................................................................................35

*Calpetco 1981 v. Marshall Expl., Inc.,*
   989 F.2d 1408 (5th Cir. 1993) ..........................................................................................52

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*Commc'ns Workers of Am. v. AT&T,*
    40 F.3d 426 (D.C. Cir. 1994) ........................................................................55

*Connecticut General Life Insurance Company v. Humble Surgical Hospital, LLC,*
    878 F.3d 478 (5th Cir. 2017) ........................................................ *passim*

*Creno v. Metro. Life Ins. Co.,*
    2014 WL 4053410 (D. Ariz. Aug. 15, 2014) ............................................6

*Denton v. First Nat'l Bank of Waco, Tex.,*
    765 F.2d 1295 (5th Cir. 1985) ......................................................................56

*Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.,*
    2014 WL 3732448 (N.D. Tex. July 29, 2014) ......................................51

*Ehrensaft v. Dimension Works Inc. Long Term Disability Plan,*
    33 F. App'x 908 (9th Cir. 2002) ................................................................6

*Ellenburg v. Brockway, Inc.,*
    763 F.2d 1091 (9th Cir. 1985) ..................................................................34

*Encompass Office Solutions, Inc. v. Connecticut General Life Insurance
    Company,*
    2017 WL 3268034 (N.D. Tex. July 31, 2017) ..............................55, 56

*Hinkle ex rel. Estate of Hinkle v. Assurant Inc.,*
    390 F. App'x 105 (3d Cir. 2010) ................................................................5

*Falgout v. McDermott, Inc.,*
    1993 WL 386253 (E.D. La. Sept. 22, 1993) ..............................55, 56

*Fitzgerald v. Colonial Life & Acc. Ins. Co.,*
    2012 WL 1030261 (D. Md. Mar. 26, 2012) ......................................6, 7

*Franco v. Conn. Gen. Life Ins. Co.,*
    299 F.R.D. 417 (D.N.J. 2014),
    *aff'd in relevant part*, 647 F. App'x 76 (3d Cir. May 2, 2016) ......42, 44

*Franco v. Conn. Gen. Life Ins. Co.,*
    289 F.R.D. 121 (D.N.J. 2013) ..............................................................43, 44

*Gonzalez v. Aztex Advantage,*
    547 F. App'x 424 (5th Cir. 2013) ............................................................53

*Harlick v. Blue Shield of Cal.,*
    686 F.3d 699 (9th Cir. 2012) ......................................................................37

*Harris v. Trustmark Nat'l Bank,*
    287 F. App'x 283 (5th Cir. 2008) ............................................................54

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*Matter of HECI Exploration Co., Inc.*,
862 F.2d 513 (5th Cir. 1988) ....................................................................34

*Jones v. U.S. Life Ins. Co.*,
12 F. Supp. 2d 383 (D.N.J. 1998) .............................................................34

*Kennedy v. Connecticut General Life Insurance Company*,
924 F.2d 698 (7th Cir. 1991) ............................................................. *passim*

*N.M. ex rel. Kershner v. Equitable Life Assurance Soc'y of U.S.*,
447 F.2d 620 (10th Cir. 1971) ....................................................................6

*In re Kizzee-Jordan*,
626 F.3d 239 (5th Cir. 2010) ....................................................................35

*Ky. Ass'n of Health Plans, Inc. v. Miller*,
538 U.S. 329 (2003)..................................................................................14

*McCorkle v. Metro Life Ins. Co.*,
757 F.3d 452 (5th Cir. 2014) .............................................................17, 46

*McGuffie v. Anderson Tully Co.*,
2014 WL 4658971 (S.D. Miss. Sept. 17, 2014)..........................................5

*Medina v. Anthem Life Ins. Co.*,
983 F.2d 29 (5th Cir. 1993) .....................................................................42

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
781 F.3d 182 (5th Cir. 2015) ................................................................2, 35

*N.E. Med. Servs., Inc. v. State of Cal. Dept. of Health*,
670 F. App'x 615 (9th Cir. 2016) .............................................................38

*Piecznski v. Dril-Quip, Inc. Long Term Disability Plan*,
354 F. App'x 207 (5th Cir. 2009) .............................................................54

*Prud. Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*,
413 F.3d 897 (8th Cir. 2005) ....................................................................14

*Quality Infusion Care, Inc. v. Health Care Servs. Corp.*,
628 F.3d 725 (5th Cir. 2010) ...............................................................18, 35

*Ross v. Marshall*,
426 F.3d 745 (5th Cir. 2005) ....................................................................51

*Salton, Inc. v. Phillips Domestic Appliances & Personal Care B.V.*,
391 F.3d 871 (7th Cir. 2004) ......................................................................4

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
88 F.3d 780 (9th Cir. 1996) ......................................................................13

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*Smith v. La Madeleine French Bakery & Café,*
2003 WL 22990649 (E.D. La. Dec. 17, 2003) ....................................................11

*Swanson v. Hearst Corp. Long Term Disability Plan,*
586 F.3d 1016 (5th Cir. 2009) .........................................................................54

*Templet v. HydroChem, Inc.,*
367 F.3d 473 (5th Cir. 2004) ...........................................................................50

*Ulico Cas. Co. v. Allied Pilots Ass'n,*
262 S.W.3d 773 (Tex. 2008) .............................................................................39

*Vaden v. PFL Life Ins. Co.,*
1994 WL 361515 (E.D. Pa. July 5, 1994) .............................................................6

*Vega v. Nat'l Life Ins. Servs., Inc.,*
188 F.3d 287 (5th Cir. 1999) ...........................................................................10

*Vessels v. Anschutz Corp.,*
823 S.W.2d 762 (Tex. App. 1992) .....................................................................39

*Wellness Aerobic & Sports Med. Clinic, Inc. v. Metra Health,*
1999 WL 118013 (E.D. La. Mar. 3, 1999) ......................................................6, 13

*WesternGeco L.L.C. v. Ion Geophysical Corp.,*
2011 WL 3608382 (S.D. Tex. Aug. 16, 2011) ...................................................51

*Wion v. Jenkins,*
484 F. App'x 943 (5th Cir. Aug. 2, 2012) ...........................................................4

**Statutes**

29 U.S.C. § 1132(g)(1) .......................................................................................36

ERISA § 502(a)(1)(B) ....................................................................................17, 40

ERISA § 1024(b) ..........................................................................................50, 52

Tex. Ins. Code § 1204.055(b) .........................................................................25, 30

Tex. Occ. Code § 102.001 .................................................................................30

Tex. Occ. Code § 102.001(a) .............................................................................22

**Rules**

Fifth Circuit Rule 42.3 .....................................................................................19

Fed. R. Evid. 103(a)(2) .....................................................................................51

## TABLE OF AUTHORITIES (CONT'D)

**Page**

**Other Authorities**

1 Fed. Evid. § 1:16 (4th ed.) ...........................................................................................51

## INTRODUCTION[1]

The Fifth Circuit's recent decision in *Connecticut General Life Insurance Company v. Humble Surgical Hospital, LLC*, 878 F.3d 478 (5th Cir. 2017) is dispositive and compels entry of judgment in Cigna's favor.   The Fifth Circuit has now unanimously held that Cigna's interpretation of its fee-forgiving exclusion was not an abuse of discretion, requiring reconsideration and reversal of this Court's earlier summary judgment ruling to the contrary. Even without reconsideration, NCMC's claims still fail due to its illegal and inequitable conduct, including its breach and interference with the very ERISA plans on which NCMC now bases its claims for relief.  The Court should enter judgment for Cigna.

## I.     The Fifth Circuit's *Humble* Decision Requires Reconsideration of this Court's 2016 Summary Judgment Rulings Against Cigna and the Entry of Judgment for Cigna.

On December 19, 2017, the Fifth Circuit issued an opinion in *Humble*.  *Humble* involves Cigna's application of its fee-forgiving protocol to another fee-forgiving Texas healthcare provider, and the relevant legal and factual issues in *Humble* are nearly identical to this case. *Humble* compels reconsideration of this Court's summary judgment rulings against Cigna in this case, and it also requires the entry of judgment in Cigna's favor.  *See Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593, 597 (5th Cir. 2017) ("intervening change in the controlling law" makes reconsideration under Rule 59(e) proper).

Like NCMC, Humble was a "physician-owned hospital" that was "considered an 'out-of-network' provider under Cigna insurance plans."  *Humble*, 878 F.3d at 482.  As with NCMC, Cigna suspected that Humble was engaged in fee-forgiving, "began flagging Humble's claims and funneling them through its Special Investigations Unit," and then sent surveys to Cigna

---

[1] "NCMC" refers to Plaintiffs, "Cigna" refers to Defendants, and "FOF" refers to Cigna's Post-Trial Findings of Fact and Conclusions of Law, filed along with this brief.  Unless otherwise noted, all emphasis has been added, and all ellipses, citations, and alterations have been omitted.

members who had received treatment at Humble. *Id.* Based on that investigation, Cigna "concluded that Humble was engaged in 'fee-forgiving'—i.e., waiving patients' co-insurance or deductible fees," and also that "Humble was intentionally inflating its prices to increase reimbursement fees." *Id.*

Like it did with NCMC in this case, Cigna then contacted Humble and asked for "an explanation of Humble's collection policy regarding patient deductibles, co-pays, and co-insurances"; in response, Humble assured Cigna that it had a policy to hold "patients responsible for the full payment of their respective out-of-network responsibilities and obligations." *Id.* Cigna also received survey responses from members which "indicated that Humble had informed them that they would not be charged their full member cost-share." *Id.* at 485. Cigna thus still "continued to suspect Humble was engaged in fee-forgiving, and refused to process Humble's claims without proof that the member had fully paid his co-pay or co-insurance." *Id.* at 482. If members paid less than their full co-pay or co-insurance, "Cigna would pay what it deemed to be its 'proportionate share,' in accordance with Cigna's own interpretation of the exclusionary language" in its plans. *Id.* As the Fifth Circuit recognized, this protocol was the same as the one that Cigna used with NCMC. *See id.* n.1 (referring to *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 189-190 (5th Cir. 2015) ("[f]or a detailed explanation of how Cigna calculated its 'proportionate share.'")).

There can be no real dispute that while some of the specifics of Cigna's investigation of Humble and NCMC differed, the key facts and legal issues that drove the outcome in *Humble*—and will drive the outcome in this case—are the same. Indeed, NCMC's own counsel argued repeatedly both before and during trial that *Humble* is so identical to this case that Judge Hoyt's rulings should be given preclusive effect. (*See, e.g.*, D.E. 489 (NCMC's Mem. of Law

Establishing Issue Preclusion Based on *Humble*); Tr. 2-66:25-67:14 (arguing that Judge Hoyt's decisions in *Humble* are "binding" and are "a matter of law as to the identical [discount] policy," and that in *Humble*, "the prompt-pay discount, ***exactly what's being discussed here***, was tried in another court and found not to violate Texas or federal law in the Fifth Circuit"); Tr. 2-67:24-68:5 (arguing that the *Humble* program was an "identical discount that is in this courtroom"); Tr. 7-158:9-15 (arguing that in *Humble*, Judge Hoyt "found . . . factually what the prompt-pay discount is, which is exactly what the individuals testified to on the stand in this case," and which is thus supposedly "collateral estoppel"); Tr. 7-195:19-23 (arguing that NCMC did not have a dual-billing system because in *Humble*, "[u]nder the ***identical*** program, Judge Hoyt found that there is one chargemaster at North Cypress [sic] with the identical allegations Aetna made and not dual documents").)[2]

On these same facts, the Fifth Circuit reversed Judge Hoyt.  And the Fifth Circuit's rulings, as detailed below—including that Cigna did ***not*** abuse its discretion in interpreting the fee-forgiving language in its plans given the available case law at the time; and that Cigna's application of the protocol to reduce payments to Humble was supported by substantial evidence including Cigna's SIU investigation—leave no doubt that these issues can only be resolved in Cigna's favor here too.  The Court should vacate the summary judgment rulings it had made against Cigna, and it should enter judgment for Cigna.

---

[2] Tellingly, NCMC's counsel changed his tune after the Fifth Circuit unanimously reversed Judge Hoyt—discounting the *Humble* decision, and arguing that the Fifth Circuit's prior decision in this case supposedly "provides all of the guidance, instructions and orders pertaining to this case."  (D.E. 660 at 2.)  This after-the-fact backpedaling is unavailing.

### A. This Court's Summary Judgment Rulings Against Cigna Must Be Reconsidered and Resolved in Cigna's Favor.

This Court's September 2016 ruling on the parties' cross-motions for summary judgment (D.E. 521) involved several issues that are directly impacted by *Humble*. <u>First</u>, this Court applied collateral estoppel to hold that Cigna's interpretation of the fee-forgiving plan language was legally incorrect, based on Judge Hoyt's now-vacated ruling on the same provision in *Humble*. (*Id.* at 8-9.) <u>Second</u>, the Court concluded that Cigna had acted in bad faith (*id.* at 14-15), but the Fifth Circuit's decision has made clear that Cigna's good or bad faith need not be considered at all. <u>Third</u> and related, given these findings, the Court did not reach the question of whether Cigna's action were based on substantial evidence. (*Id.* at 15.) Each of these rulings must now be reconsidered in light of *Humble*.

### 1. Judge Hoyt's Decision in *Humble* Was Vacated and Has No Preclusive Effect on Whether Cigna's Interpretation Was Legally Correct.

At summary judgment, this Court applied collateral estoppel to find Cigna's interpretation of its plans legally incorrect based on Judge Hoyt's analysis of this issue in *Humble*. (D.E. 521 at 8-9.) But the Fifth Circuit has now vacated Judge Hoyt's judgment, and a vacated judgment cannot provide a basis for collateral estoppel. *See, e.g., Wion v. Jenkins*, 484 F. App'x 943, at *1 (5th Cir. Aug. 2, 2012) (district court's decision "had no preclusive effect" where "this court [*i.e.*, the Fifth Circuit] reversed that judgment"); *Salton, Inc. v. Phillips Domestic Appliances & Personal Care B.V.*, 391 F.3d 871, 881 (7th Cir. 2004) ("once a judgment is reversed it ceases to have collateral estoppel effect.").

Cigna continues to believe that its interpretation of the fee-forgiving language was legally correct, for reasons Cigna set forth in prior briefing in this case and this Court's own August 2012 summary judgment opinion. (D.E. 268, Mar. 16, 2012 Cigna's Mot. for Partial Summ. J., at 31-35); D.E. 331, Aug. 10, 2012 Order on Summ. J., at 12-13 ("Defendants' interpretation was

4

legally correct.").)  But to the extent that the Court does not wish to revisit this issue, it can simply follow the Fifth Circuit's approach in *Humble* and skip the legal correctness inquiry, because there is ample evidence that Cigna's interpretation was not an abuse of discretion—as the Fifth Circuit has already so held.  *See Humble*, 878 F.3d at 482-85; *id.* at 484 (the court may skip the legal correctness inquiry if it "can more readily determine that the decision was not an abuse of discretion").

**2.    This Court Is Bound by the Fifth Circuit's Holding That Cigna's Interpretation of the Identical Fee-forgiving Exclusion Was Not an Abuse of Discretion; Thus, It Also Cannot Be Bad Faith.**

As it has done in several recent ERISA cases, in *Humble* the Fifth Circuit again took pains to underscore the deference that courts must afford to decisions of ERISA plan fiduciaries like Cigna.  The Fifth Circuit emphasized the "broad discretion" that plan fiduciaries enjoy, explaining this deference "serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan'" in different jurisdictions—"a result that would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them." 878 F.3d at 484.  Thus, "a plan administrator does not abuse its discretion when construing plan provisions unless its interpretation is 'arbitrary or capricious,'" *i.e.*, "without a rational connection between the known facts and the decision."  *Id.*

In determining whether Cigna's interpretation was an abuse of discretion, the Fifth Circuit relied on a line of cases which holds that "where an administrator's interpretation is supported by prior case law, it cannot be an abuse of discretion—even if the interpretation is legally incorrect."  *Id.* (citing *Hinkle ex rel. Estate of Hinkle v. Assurant Inc.*, 390 F. App'x 105, 108 (3d Cir. 2010) and *McGuffie v. Anderson Tully Co.*, 2014 WL 4658971 (S.D. Miss. Sept. 17,

5

2014)).[3]  The Fifth Circuit recognized that when Cigna made its decisions, "[a]t least two other courts have effectively or explicitly concluded that the provision at issue here was legally correct."  *Id.* at 485.  <u>First</u>, the Fifth Circuit noted that in *Kennedy v. Connecticut General Life Insurance Company*, 924 F.2d 698 (7th Cir. 1991), the Seventh Circuit interpreted "a nearly-identical exclusionary provision" and read it the same way as Cigna did both in *Humble* and in this case.  878 F.3d at 485.  <u>Second</u>, the Fifth Circuit then acknowledged that the Court in this case in 2012 "concluded that Cigna's interpretation *of this exact provision* was legally correct"— and that "[a]lthough the Fifth Circuit vacated this opinion on other grounds in 2015 . . . it was good law for most of the relevant period that Cigna was interpreting the disputed plan language here."  *Id.* (emphasis in original)).[4]

---

[3] Many other courts have held likewise.  *See, e.g.*, *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 33 F. App'x 908, 910 (9th Cir. 2002) (no abuse of discretion where plan chose interpretation not favored by court but where "case law is split"); *Creno v. Metro. Life Ins. Co.*, 2014 WL 4053410, at *11 (D. Ariz. Aug. 15, 2014) (no abuse of discretion where courts disagreed, noting that "interpretive dissonance may evince a longer continuum of reasonableness upon which an ERISA administrator's interpretation of the term may land."); *Fitzgerald v. Colonial Life & Acc. Ins. Co.*, 2012 WL 1030261, at *3 (D. Md. Mar. 26, 2012) ("arguably the fact that two courts have found [the insurer's] interpretation of the policy language reasonable *itself establishes* that the interpretation does not constitute an  abuse of discretion.").

[4] Another court in 2016 found that Cigna did not abuse its discretion in applying the same interpretation.  *See Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 171 F. Supp. 3d 1092, 1112-13 (D. Colo. 2016) (finding Cigna did not abuse its discretion in applying the fee-forgiving provision to reduce payments to providers to reflect the rate the providers obligated members to pay).  Many other decisions have also affirmed the basic principle that a plan does not have to cover charges that the member never incurred or was required to pay.  *See Ark. BC/BS v. St. Mary's Hosp.*, 947 F.2d 1341, 1346 (8th Cir. 1991) (citing *Kennedy* and provider's increase of cost of service and waiver of copayments to avoid the co-payment cost structure); *N.M. ex rel. Kershner v. Equitable Life Assurance Soc'y of U.S.*, 447 F.2d 620, 622-23 (10th Cir. 1971) (insurer not liable where insured "was not charged for, and incurred no expenses" for medical services and policy obligated insurer to pay benefits "for only those charges incurred by the insured . . . and only upon proof of loss by the insured"); *Wellness Aerobic & Sports Med. Clinic, Inc. v. Metra Health*, 1999 WL 118013, at *2 & n.2 (E.D. La. Mar. 3, 1999) (upholding administrator's interpretation, as plan "requires participants to pay co-payments and deductibles which cannot be waived," and "any other interpretation of the plan would result in unanticipated costs to the plan to cover expenses that are not covered by the [p]lan"); *Vaden v. PFL Life Ins.*

Because Cigna's reading of the plan was supported by then-available case law, the Fifth Circuit easily concluded that this interpretation "fell within [Cigna's] broad discretion."  *Id*.  And while the Fifth Circuit declined to adopt a bright-line rule that an interpretation supported by prior case law can never be an abuse of discretion (*id.*), in these particular circumstances—where "two courts have upheld interpretations similar to that of [Cigna]"—it held that those prior rulings are "***dispositive*** of the issue."  *Id.* (alteration in original); *see also id.* (quoting with approval *Fitzgerald*, 2012 WL 1030261, at *3 ("arguably the fact that two courts have found [Cigna's] interpretation of the policy language reasonable ***itself establishes*** that the interpretation does not constitute an abuse of discretion.") (alteration in original).

This holding from the Fifth Circuit is binding in this case:  Cigna interpreted the same fee-forgiving provision in *Humble* as it did in this case; Cigna interpreted that same provision the same way in both cases (*i.e.*, that Cigna's reimbursement obligations are limited to expenses that the member actually incurs, and if the member has no obligation to pay, then neither does Cigna); and Cigna relied on the same authority here as it did in *Humble* (including the Seventh Circuit's decision in *Kennedy*) to support its interpretation and the application of its fee-forgiving protocol.  On these same facts, the Fifth Circuit said that Cigna's interpretation fell within Cigna's broad discretion and was not abuse of discretion.  Just so here.

Finally, the Fifth Circuit's holding that Cigna did not abuse its discretion also requires reconsideration and reversal of this Court's summary judgment finding that Cigna had acted in bad faith.  Lack of good faith is merely one factor to be considered as part of the abuse of discretion analysis.  *See id.* at 484 ("In making this inquiry, we ordinarily would consider

---

*Co.*, 1994 WL 361515, at *4 (E.D. Pa. July 5, 1994) (rejecting plaintiff's reimbursement claim for $72,167 bill where provider accepted $6,439 as full payment and at "no point did plaintiff ever become liable to [the provider] for $72,167.00").

'whether Cigna had a conflict of interest, as well as the internal consistency of the plan and the factual background of the determination and any inferences of lack of good faith.'").)  But in *Humble*, the Fifth Circuit specifically declined to consider any of these factors—"[w]e need not review these factors today, however" (*id.*)—and instead held that Cigna's reliance on then-available case law was ***by itself*** sufficient to establish that Cigna's interpretation was not abuse of discretion.  *See id.* at *484-85.  Given the Fifth Circuit's holding that Cigna's interpretation was not an abuse of discretion, and that Cigna's good or bad faith (or other subsidiary elements of abuse of discretion) need not be considered, this Court should reconsider and reverse its summary judgment finding of bad faith.  Moreover, even if *Humble* were not dispositive on this issue (and it is), the trial evidence in any event warrants reconsideration of the Court's summary judgment ruling on bad faith—in light of ample evidence that there was nothing improper about Cigna's desire to secure an in-network contract with NCMC, and that aggressive negotiation tactics by both insurers and by hospitals are par for the course in this industry.  (*See infra* Sec. I.B.1.)

> ### 3. *Humble* Confirms That Cigna's Actions in This Case Were Supported by Substantial Evidence.

At summary judgment in 2016, this Court declined to "reach the question of whether Cigna's actions were based on substantial evidence," given its finding that Cigna abused its discretion.  (*See* D.E. 521 at 15.)  But when the Court ***did*** reach this issue when it issued its first summary judgment ruling in 2012, it concluded—correctly—that Cigna's actions were based on substantial evidence.  (D.E. 331 at 13.)  The Fifth Circuit's decision in *Humble* confirms that this 2012 ruling was correct.  The Court should thus revisit its 2016 summary judgment ruling and hold that Cigna's actions indeed were supported by substantial evidence.

In its 2012 ruling, this Court reviewed the evidence of NCMC's fee-forgiving that Cigna was able to collect through its investigation. The Court noted that Cigna "conducted patient surveys to determine whether Plaintiffs [NCMC] were billing patients the copayment amounts stated under the ERISA plans." (*Id.*) Those surveys showed that most members were billed nothing at all; one paid $45; four paid $100; one paid $102; six paid between $320 to $1,146.71; and one was billed $3,000 but paid nothing. (*Id.* at 13-14.) The Court thus concluded:

> As Defendants did not receive any information from Plaintiffs as to the amount of copayments Plaintiffs actually charged their patients, the evidence Defendants gleaned through patient surveys constitutes substantial evidence. From the surveys, a reasonable mind could conclude that Plaintiffs were consistently waiving or reducing patient copayment amounts, and that patients were most often billed $100 or under. The survey evidence is substantial. (*Id.* at 14.)

The Fifth Circuit's decision in *Humble* confirms that this Court's prior findings with regard to substantial evidence were correct. There, the Fifth Circuit noted that the "substantial evidence" burden is a low one:  it "is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 878 F.3d at 485. It also recognized that "[i]n making this inquiry, we are 'constrained to the evidence before the plan administrator.'" *Id.* In *Humble*, that evidence consisted of surveys that Cigna had sent to members who were treated at Humble—just as it had sent surveys to NCMC's patients—which asked (among other things) "what the member had been told regarding 'responsibility for any non-paid costs, i.e., deductible, coinsurance.'" *Id.* In response, "[m]any members indicated that Humble had informed them that they would not be charged their full member cost-share." *Id.* The Fifth Circuit agreed that "[t]hese records clearly supported Cigna's belief that Humble was fee-forgiving." *Id.* at 486 (alteration in original).

Cigna obtained that same evidence—and more—as part of its investigation of NCMC in this case, and the information that was available to Cigna here easily clears the low bar for

substantial evidence.   Cigna extensively investigated NCMC's billing practices, including surveying members, speaking with employers, and seeking information directly from NCMC. (*See, e.g.*, Tr. 3-90:21-91:17; Tr. 3-202:20-203:6; DX.014 at 1-3; PX.3B at 130; PX.39.)  And, as this Court already found in 2012, the administrative record in this case (including survey responses) showed that NCMC most often collected nothing from members at all, which meant NCMC did not require plan members to pay the charges required by Cigna's plans. (*See, e.g.*, D.E. 331 at 13-14 (acknowledging responses to surveys by Cigna members, which indicated that "Plaintiffs did not bill any members the total copayment amounts that were specified under the patients' ERISA plans"); Tr. 3-90:21-91:17 (Sherry); DX.014 at 1-3; PX.86 (SIU case notes, documenting responses from Cigna plan members); PX.39 at 000636-37 (Nov. 10, 2008 letter from Cigna to NCMC, advising NCMC that Cigna's SIU uncovered "evidence of a pattern of behavior by NCMC in which NCMC generally collects $100 from the CIGNA Participant, if any amount is collected at all").)  Moreover, the fact that NCMC actively resisted Cigna's efforts to obtain information about its billing practices means that Cigna cannot be penalized for not having perfect knowledge about the way that NCMC billed patients and collected patient responsibility amounts.   *See* D.E. 331 at 14 (noting, in addressing substantial evidence, that Cigna "did not receive any information from Plaintiffs as to the amount of copayments Plaintiffs actually charged their patients"); *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 298 (5th Cir. 1999) ("If the claimant has relevant information in his control, it is not only inappropriate but inefficient to require the administrator to obtain that information in the absence of the claimant's active cooperation.") (en banc).  So just like in *Humble*, Cigna's conclusion that NCMC was fee-forgiving was supported by substantial evidence.

**B.      While *Humble* Makes it Unnecessary to Analyze the Four Typical Abuse of Discretion Factors, the Trial Record Confirmed that Cigna Did Not Abuse Its Discretion.**

The Fifth Circuit held in *Humble* that Cigna's reliance on case law to support its plan interpretation meant that Cigna did not abuse its discretion—without the need to consider any other abuse of discretion factors (conflict of interest, internal consistency of the plan, factual background of determination, and inferences of lack of good faith) that this Court had addressed at summary judgment.  878 F.3d at 485-86; (D.E. 521 at 10).  Given this binding ruling from the Fifth Circuit, this Court likewise need not consider these factors now, and it should simply apply *Humble* to hold that Cigna did not abuse its discretion because its plan interpretation was supported by case law.  But even if the Court were inclined to go through that analysis, the trial evidence confirmed that none of the factors supports finding an abuse of discretion.

**1.      Cigna Did Not Act in Bad Faith.**

At summary judgment, the Court interpreted certain statements from some of Cigna's employees as "suggest[ing] that Cigna's true motivation for the Fee-Forgiving Protocol was to negotiate an in-network contract, not to prevent harmful externalities in the insurance market." (D.E. 521 at 14.)  This ruling did not account for the considerable evidence Cigna presented at summary judgment showing that Cigna's decision was in fact motivated by its concerns about the impact of NCMC's billing practices on plan sponsors.  (D.E. 531 at 10.)

The trial testimony of Cigna's witnesses shows why the Court should not have granted summary judgment against Cigna on this issue—particularly because, as courts have recognized, inquiries into good or bad faith are inappropriate for such summary resolution.  *See, e.g.*, *Smith v. La Madeleine French Bakery & Café*, 2003 WL 22990649, at *3 (E.D. La. Dec. 17, 2003) ("bad faith is a highly subjective and complicated concept requiring substantial evidence to prove, especially at summary judgment stage.").   As Ms. Sherry testified, Cigna launched the

investigation of NCMC because plan sponsors like the Cypress Fairbanks Independent School District ("CFISD") were losing money and were forced to raise premiums as a result of having to pay unexpectedly high amounts for NCMC's claims.  (Tr. 3-192:15-193:3 (Sherry) (Cigna launched its investigation because "we were seeing employers like Cypress Fairbanks independent school district and some of the other ones . . . were losing a lot of money.  So we launched an investigation as one of several actions to help control those costs . . . and then as a result of the findings, we put in the protocol."); *see also* Tr. 3-90:24-91:17 (Sherry) (same).)

In its 2012 summary judgment decision, the Court did not question that a desire to combat NCMC's fee-forgiving and control plan costs would give Cigna a good-faith basis to deny NCMC's claims.  (*See* D.E. 331, Aug. 2012 Op. at 13 ("any alternative reading would result in significant and unanticipated costs to the ERISA plans").)   In its 2016 summary judgment ruling, however, the Court questioned Cigna's concern about the "harmful externalities in the insurance market."  (D.E. 521 at 14.)

But when it made that 2016 ruling, the Court did not have the benefit of hearing the testimony of Dr. Behar—which confirmed what Cigna had said about the troubling effects of NCMC's billing practices on local employers and makes clear that Cigna's concerns were far from hypothetical.  Dr. Behar admitted that "the Cypress-Fairbanks School District *suffered*" because of the "Access NCMC program."  (Tr. 2-42:21-43:4 (Behar).)  He also admitted, and documents confirmed, that NCMC was responsible for a large percentage of CFISD's out-of-network spend and that CFISD was forced to raise premiums for its employees due to increased costs.  (Tr. 1-292:18-293:6 (Behar); Tr. 1-295:4-25 (Behar); DX.062.)

NCMC's decision to continue its Access NCMC program and its outrageous charges—borne by local employers like CFISD—stands in sharp contrast to Cigna's good-faith response to

the plight of its plan sponsors:  launching its investigation and implementing the fee-forgiving protocol to staunch the bleeding caused by NCMC and its Access NCMC program.  And unlike Dr. Behar and NCMC's investors—who were making tens of millions of dollars and enjoying the "best investment" they ever made (Tr. 1-290:1-18 (Behar))—Cigna *lost money* by implementing the fee-forgiving protocol.  (Tr. 4-151:6-10 (Sherry) ("[T]he amount of vendor fees that we collected from 2008 to 2012 decreased significantly" as a result of the protocol); (Tr. 7-59:21-23 (May) ("[I]n implementing the fee-forgiving protocol, [Cigna] forsakes the money it's earning from the Network Savings Program in an effort to save its plan sponsors money.").)  When it came to concerns about plan sponsors like CFISD, Cigna did the right thing, while NCMC decidedly did not.  Thus, Cigna's actions in responding to the concerns of its plan sponsors were not bad faith.  *See SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996); *Wellness Aerobic & Sports Med. Clinic, Inc. v. Metra Health*, 1999 WL 118013, at *2 n.2 (E.D. La. Mar. 3, 1999).

Next, isolated statements from Cigna's contracting team about bringing NCMC in-network simply could not have supported a finding that Cigna acted in bad faith because, as trial evidence confirmed, there is nothing improper about Cigna's desire to secure an in-network contract.  Cigna viewed contracting as another possible solution to control the exorbitant out-of-network costs caused by NCMC's fee-forgiving—a practice that harms plan sponsors and is not permitted under Cigna's plans.  (Tr. 3-239:7-11 (Sherry) ("So again certainly getting a market competitive contract was certainly something that would help to control the cost but the ultimate goal was to help employers like Cypress Fairbanks and others in the market to control their out of network spending which was out of control.").)  Not only is there nothing wrong with that, but courts have recognized that contracting with providers like NCMC is a legitimate way for payors

like Cigna to "control the quality and cost of health-care delivery."  *See Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332 (2003); *Prud. Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 901 (8th Cir. 2005) ("closed 'provider networks' . . . control both the cost and quality of health care services.").

Finally, trial evidence also dispelled any doubts about whether Cigna's actions to secure an in-network contract were proper, given that the purpose of the Access NCMC program was to give NCMC leverage in those negotiations.  NCMC had no in-network contracts with the major payors upon opening; as a result, it "had no access to patients."  (Tr. 2-41:20-42:7 (Behar).)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████     ████████████████████████

██████

Indeed, while at summary judgment this Court questioned Cigna's contract negotiations with NCMC, the reality is that both NCMC and Cigna expected aggressive negotiations.  Dr. Behar himself admitted that there was nothing wrong with using leverage in contract negotiations.  (Tr. 2-118:24-119:4 (Behar) ("There's nothing wrong with it.  And it's what, 'A,' you're taught to do; and, 'B,' it's what is expected.").)  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████; Tr. 2-5:23-6:6 (Behar) (in Cigna-NCMC contract negotiations, "***both sides*** were being aggressive.").)

NCMC concessions that the Access NCMC program was, at bottom, an aggressive tactic to get leverage in negotiations with companies like Cigna underscores the problem with the

14

Court's bad faith ruling.  At trial, the Court noted it was "nervous about saying what's fair and what's unfair in business practices in an industry I don't know anything about" (Tr. 3-137:11-14)—but by finding that Cigna's attempts to negotiate an in-network contract as a solution to NCMC's improper billing practices amounted to bad faith, the Court did just that.  If the Court stands by its summary judgment ruling, it will penalize Cigna for trying to negotiate an in-network contract in response to the harmful externalities of sharply increasing costs for plan sponsors like CFISD that NCMC caused, while rewarding NCMC for making tens of millions of dollars for Dr. Behar and his investors ████████████████████████████ ████████████████████████████  That unfair result should not stand.

### 2.    The Trial Record Confirms that the Court's Ruling on Internal Consistency Was Correct.

In analyzing the internal consistency factor, the Court must determine whether Cigna's interpretation of the plan language conflicts with any other part of the plan.  (D.E. 521 at 12.) The Court has already resolved this issue in Cigna's favor in its summary judgment ruling.  (*Id.*) In doing so, the Court rejected NCMC's argument that plan language noting that a provider "may" bill a member for the difference between the provider's normal charge and the maximum reimbursable charge conflicted with Cigna's interpretation that providers were "required" to collect that amount.  (*Id.*)  Indeed, the Court found that NCMC's interpretation "extrapolates too much from the plan language; there is no clear inconsistency between the two statements."  (*Id.*) NCMC pressed Cigna's witness on this supposed inconsistency again at trial, but NCMC did not elicit any evidence of inconsistency.  (Tr. 4-180:18-181:6 (Sherry).)  This factor continues to weigh in Cigna's favor.

### 3.     The Trial Record Shows Cigna Did Not Have a Conflict of Interest.

At summary judgment, the Court found a dispute of fact as to whether Cigna had a conflict of interest because of "ambiguity in the record as to whether Cigna collected a 29 percent contingency fee on North Cypress claims subject to the Fee-Forgiving Protocol." (D.E. 521 at 11.)  The trial evidence showed that there is no ambiguity on this issue, and it can only be resolved in Cigna's favor.

Ms. Sherry testified without contradiction that Cigna's cost-containment programs (which can result in Cigna collecting savings in some circumstances) were ***not*** applied to NCMC claims subject to the fee-forgiving protocol.   (Tr. 4-44:23-45:4 (Sherry).)   Ms. Sherry's testimony was also supported by evidence NCMC itself presented at trial—a Cigna report that showed Cigna's cost containment fees from NCMC substantially decreasing from 2008 to 2012, after implementation of the protocol.  (PX.85B (summary of fees, which shows that Cigna made significantly more money from fees on NCMC claims in 2008 before the protocol was in place, than it did for the entirety of 2009 to 2012); *see also* Tr. 4-151:18-22 (Sherry) ("when we realized that those programs were no longer enabling us to control costs, we turned them off and as shown here, the amount of vendor fees that we collected from 2008 to 2012 decreased significantly.").)  NCMC put no contradictory evidence into the trial record, because none exists. Thus, Cigna's decision to forego these fees shows that it was not affected by any purported conflict of interest.  *See Bourgeois v. Prentiss Props. Ltd.,* 31 F. App'x 838, 838 (5th Cir. 2002) (affirming finding of no abuse of discretion where plaintiff argued the insurer had a structural conflict of interest and the insurer argued that the conflict had no impact on its decision because it actually "lost money" on the claim, and there was "no concrete evidence" the conflict influenced the claim decision).

16

### 4. The Trial Record Shows That Cigna's Actions Were Supported by Substantial Evidence.

The Fifth Circuit held in *Humble* that Cigna's finding that Humble was engaged in fee-forgiving was supported by substantial evidence, based on survey responses Cigna received from members which "indicated that Humble had informed them that they would not be charged their full member cost-share."  878 F.3d at 485.  As detailed in Sec. **Error! Reference source not found.** above, Cigna had the same evidence (and more) of NCMC's fee-forgiving practices in this case.  The information available to Cigna easily clears the low bar for substantial evidence. *See McCorkle v. Metro Life Ins. Co.*, 757 F.3d 452, 457-58 (5th Cir. 2014) (substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

In sum, even independent of the Fifth Circuit's decision in *Humble*, the trial record confirms that Cigna did not abuse its discretion and that its actions were supported by substantial evidence.  Accordingly, the Court should enter judgment in Cigna's favor of NCMC's § 502(a)(1)(B) claim.

## II. Cigna Would Have Prevailed Even Without *Humble*, Because the Trial Evidence Proved NCMC's Inequitable and Unlawful Conduct.

For reasons detailed above, the Fifth Circuit's decision in *Humble* is dispositive, and it compels the entry of judgment in Cigna's favor.  But Cigna would have prevailed even without that decision because NCMC cannot recover any additional benefits in this case as a result of its illegal and inequitable conduct, including its breach and interference with the very ERISA plans on which NCMC now bases its claims for relief.

NCMC was well aware that Cigna's contracts with doctors required them to refer patients to in-network facilities and that it was illegal under Texas law to offer financial remuneration for patient referrals.  Nevertheless, it offered area doctors the financial opportunity of a lifetime if

17

they referred their patients to NCMC's out-of-network facility.  NCMC was also well aware that Cigna's plans required higher deductible and coinsurance payments when patients went out-of-network and that it was illegal under Texas law to waive these patient responsibility amounts. Nevertheless, NCMC waived approximately 90 percent of patient responsibility that it was supposed to collect.  And NCMC was well aware that it was supposed to bill the health plans only for its normal charges to patients.  Nevertheless, NCMC had two sets of fee schedules—one set for billing patients, where the rates were set at 125 percent of Medicare, and another set for billing health plans, where the rates were set at 600 to 1000 percent of Medicare.

At trial, NCMC did not seriously contest that it engaged in any of this illegal or inequitable conduct.  Instead, its primary argument was that its own conduct does not matter, because it had no contractual obligations to Cigna and instead was suing for ERISA benefits as an assignee.  But as the Fifth Circuit has made clear, "[t]he positive aspects of assigned rights are accompanied by their corollary negatives," and "[a]n assignee is also subject to *any* defenses, limitations, or setoffs that could be asserted against the assignor's rights."  *Quality Infusion Care, Inc. v. Health Care Servs. Corp.*, 628 F.3d 725, 729 (5th Cir. 2010) (allowing reduction in benefit payments based on prior interactions between provider and insurer where provider brought assigned claims).  Here, the patients who assigned ERISA claims to NCMC would not have been able to prevail on those claims if they breached the terms of their plans, lied on their claims submission forms, or failed to exhaust administrative remedies before bringing suit, and neither can NCMC, given that it engaged in the same conduct standing in their shoes.  As the Seventh Circuit aptly put it in *Kennedy*, "if [a provider] wishes to receive payment under a plan that requires co-payments, then he must collect those co-payments[.]"  924 F.2d at 699.

Indeed, even setting aside the Fifth Circuit's decision involving Humble and Cigna, this case is on all fours with another case involving Humble—that one decided by Judge Hughes, which involved Aetna, and likewise addressed allegations that Humble's fee-forgiving and patient referral practices violated the law. *See Aetna Life Ins. Co. v. Humble Surgical Hospital, LLC*, 2016 WL 7496743, at *3-4 (S.D. Tex. Dec. 31, 2016) ("*Aetna-Humble*").[5] First, like Humble, NCMC violated Texas law and interfered with Cigna's provider contracts by offering financial incentives to doctors for referring patients to NCMC—even though, as NCMC knew, Cigna's provider contracts require doctors to refer patients to in-network facilities. Second, like Humble, NCMC violated Texas law and interfered with Cigna's plans by waiving out-of-network insurance, even though Cigna's plans require members to pay more when they visit out-of-network providers like NCMC than in-network providers. And third, like Humble, NCMC had one fee schedule that it used to bill patients and a different—and much higher—fee schedule that it used to bill Cigna, even though "Texas does not allow hospitals to bill patients one way and the plan another." *Id.* at *2. All this evidence compels the conclusion that NCMC engaged in inequitable (if not outright illegal) conduct, which means that it is not entitled to any additional benefits in this case.

### 1. NCMC Encouraged Its Physicians-Investors to Breach Their Provider Contracts by Making Out-of-Network Patient Referrals to NCMC.

When NCMC opened its doors in 2007, it was out-of-network with Cigna and all the major carriers. (Tr. 1-252:13-21 (Behar).) Because it was out-of-network, NCMC had no access to patients that insurers like Cigna steer to providers in exchange for their agreement to accept

---

[5] Humble appealed Judge Hughes' decision, but that appeal was dismissed "for want of prosecution" under Fifth Circuit Rule 42.3 on April 5, 2017, after "appellants failed to timely order transcripts and make financial arrangements with the court reporter." *Aetna Life Ins. Co. v. Humble Surgical Hospital, LLC*, 2017 WL 3753665, at *1 (5th Cir. Apr. 5, 2017).

lower reimbursement rates.  (Tr. 2-42:5-7 (Behar); *see also* FOF ¶¶ 11-15, 44, 61-62.)  NCMC thus depended on patient referrals from physicians to fill its beds.  (Tr. 1-253:20-22 (Behar).)

The challenge for NCMC was that Cigna's contracts with in-network physicians require them to refer their patients to in-network facilities (except in emergencies).  (Ex. DX.082, at CIG-NCMC0011985; Tr. 1-257:15-22 (Behar).)  Dr. Behar was well aware of this requirement, both because it was included in his own physician contract with Cigna and because Dr. Lee, Dr. Behar's second-in-command at NCMC, told him a month before NCMC opened that all major insurers prohibit referrals to non-participating providers.  (Tr. 1-263:20-24 (Behar); ██████████

████████████████████████████████████████████████████████████

██████████

Knowing full well that physicians' contracts with Cigna and other insurers had provisions prohibiting out-of-network referrals, Dr. Behar nevertheless implored NCMC investors to refer patients to NCMC's out-of-network facility in breach of their obligations to Cigna.  (Tr. 1-253:23-24 (Behar).)   For instance,  █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████   As Dr. Behar admitted, he was "encouraging the recipients of this letter in this letter and in all the other letters to send us their patients, period."  (Tr. 1-275:20-22 (Behar); *see also* FOF ¶¶ 50-59.)[6]

---

[6] There was no need to have these services performed out-of-network at NCMC.  As Dr. Behar conceded at trial, referrals for procedures like X-rays or laboratories were not necessarily emergencies but are "elective."  (Tr. 1-275:25-276:10 (Behar).)  There were also plenty of in-

The reason why Dr. Behar implored doctors to refer patients to NCMC's much more expensive facility for non-emergency services was obvious at trial. As Dr. Behar acknowledged, NCMC was "the financial opportunity of a lifetime" and the "best investment [he] ever made." (Tr. 1-289:20-290:3 (Behar).)  So good, in fact, that Dr. Behar knew he made "[m]ore than ten million" dollars from it, and possibly even more than $100 million. (Tr. 1-290:15-18 (Behar) ("Q.  More than hundred million?  A.  I don't think so, no.  Q.  You're not sure though, are you? A.  I haven't looked at the figures.").)

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████     Dr. Behar in fact kept track of physician referrals in a document he called his "sacred" report, which contained a list of physicians who treated patients at NCMC, along with the sum of charges that were associated with each physician's referrals to NCMC. (Tr. 1-254:17-255:15 (Behar).)  And while Dr. Behar obviously could not admit on the stand that he had promised investors shares in NCMC directly in exchange for patient referrals—because he knows full well that such kickbacks are illegal (Tr. 1-278:16-18 (Behar) (agreeing that "that's illegal in the State of Texas"))—when faced with the evidence, Dr. Behar had to concede that "patient referrals *do serve as a proxy*" for NCMC deciding how to award shares. (Tr. 1-284:25 (Behar).)

---

network facilities at Cigna's network where those same procedures could have been done (Tr. 1-277:7-14 (Behar)) at a small fraction of NCMC's cost.  (*See* Tr. 6-59:4-18 (May).)

Dr. Behar's scheme worked: NCMC became profitable in its first year, ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████  ████████████████████ ; *see also* Tr. 1-279:17-19 (Behar)

(Dr. Behar agreeing that he was "trying to convey to the investors that you were just off to a

blockbuster start").)  And, of course, this success would not have been possible without NCMC

investors referring their patients to NCMC, as Dr. Behar also acknowledged.  (*See* Tr. 1-280:8-

15 (Behar) (agreeing that "one of the reasons why North Cypress was successful was . . . that

doctors were referring patients to North Cypress").)

NCMC's offers of financial rewards to doctors for breaching their Cigna contracts and

for sending their patients to NCMC were not just improper and inequitable; they were against the

law.  *See Aetna-Humble*, 2016 WL 7496743, at *2 ("Texas prohibits hospitals from paying

doctors to refer patients.") (citing Tex. Occ. Code § 102.001(a)).  Texas law makes it an offense

"if the person knowingly ***offers*** to pay or agrees to accept, directly or indirectly, overtly or

covertly ***any remuneration*** in cash or in kind to or from another for ***securing or soliciting a***

***patient*** or patronage for or from a person licensed, certified, or registered by a state health care

regulatory agency."  Tex. Occ. Code § 102.001(a).  There is no doubt that NCMC violated this

statute.  Dr. Behar's letters to investors were clearly soliciting patients.  And by offering

investors the opportunity to invest in future syndication rounds—and using patient referrals as "a

proxy" for awarding shares—NCMC was clearly offering remuneration to its investors for

patient referrals.

Finally, NCMC's solicitation of referrals meets all the elements of tortious interference

with Cigna's provider contracts.  *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200,

218 (Ct. App. Tex. 2001) (The elements of tortious interference are:   "(1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss."). <u>First</u>, there were contracts here: Cigna's contracts with its in-network physicians, which prohibit out-of-network patient referrals. (Tr. 4-202:5-7 (Sherry); Tr. 4-202:22-23 (Sherry).)   <u>Second</u>, Dr. Behar knew about Cigna's contractual requirements, he knew that these provisions were standard in Cigna's provider contracts, and he also knew that Cigna and other insurers regularly enforced those provisions (FOF ¶¶ 46-50)—and yet he still solicited referrals to his out-of-network hospital, for procedures like X-rays and laboratories, which clearly were not emergencies.  <u>Third</u>, proximate cause exists because as Dr. Behar testified, doctors regularly referred their patients to NCMC despite their contractual obligations to Cigna.  (Tr. 1-280:8-15 (Behar).)  <u>Finally</u>, the damages element is met: but for NCMC's interference with Cigna's provider contracts, the patients that NCMC's investors sent to NCMC never would have gone there.  *Id.*  And Cigna and its clients were damaged by the difference between what they actually paid NCMC and what they would have paid, had those patients gone to in-network facilities.

### 2.     NCMC Lured Patients by Waiving Patients' Cost-Share Obligations—an Illegal Practice that Cigna's Plans Forbid.

NCMC knew it had to do more than just get Cigna's network physicians to refer patients to the facility, because Cigna's plans generally require plan members to pay higher out-of-pocket costs when they go to out-of-network providers like NCMC than when they visit in-network providers.   (*E.g.*, DX.001.035 at CIG-NCMC0582391 ("The term Coinsurance means the percentage of charges for Covered Expenses that an insured person is ***required*** to pay under the plan."); *see also* FOF ¶¶ 60-62.)   Indeed, NCMC knew that patients ***would not have come*** if NCMC had charged them the out-of-network expenses required under the plans.  (Tr. 3-52:5-16

(Jones) ("Patients will not come to our hospital more than likely if we were to charge them their out of network expenses.").)

How did NCMC solve this problem?  By devising the "Access NCMC Program," whereby NCMC improperly and secretly waived patients' out-of-network cost-share so that it approximated what an ***in-network*** provider would charge.  Here is how the Access NCMC Program worked.  Rather than applying out-of-network co-insurance and deductible amounts to the billed charges that it submitted to Cigna for payment or what the plan ultimately allowed—as NCMC was supposed to do under the terms of Cigna's plans—NCMC instead applied in-network co-insurance and deductible amounts to 125% of the Medicare fee schedule, which NCMC internally described as the "NCMC Fee Schedule."  (*See* Tr. 5-115:25-116:9 (Tankersley); DX.030 at 30069; DX.101, 102, 103, 104; *see also* FOF ¶¶ 53-54.)  NCMC admitted the purpose of these calculations was to approximate what patients would have paid had NCMC been an ***in-network*** provider.  (Tr. 3-53:6-8 (Jones); Tr. 5-108:24-109:7 (Tankersley); *see also* FOF ¶¶ 55-56.)  And NCMC also admitted that patients would ***not*** have to pay anything more than their estimated in-network amount if they paid within 120 days.  (*See* FOF ¶¶ 69-70.)

These so-called "prompt pay discounts" were critical to NCMC's business because, as Judge Hughes, addressing a very similar scheme in *Aetna-Humble*, recognized, absent such discounts, "no economically rational patient would choose [the out-of-network hospital] over an in-network provider."  *Aetna-Humble*, 2016 WL 7496743, at *1; (*see also* Tr. 3-52:5-6 (Jones); Tr. 7-29:8-12 (May) ("If North Cypress had actually tried to collect its Chargemaster amounts as applied to the out of network benefits from patients, nobody would have used the hospital on an out of network basis.  It's very, very uncommon for patients to use out of network facilities because it's very expensive."); FOF ¶¶ 61-62).)  But again, payment of coinsurance is "required"

under Cigna's plans, and the waiver of patients' out-of-network cost-share destroyed the financial incentives that Cigna's plans use to steer patients toward in-network providers—mechanisms that courts have long recognized are legitimate. *See, e.g.*, *Kennedy*, 924 F.2d at 699 ("Co-payments sensitize employees to the costs of health care, leading them not only to use less but also to seek out providers with lower fees.").

The net effect of NCMC's co-insurance waiver was tremendous. An analysis of NCMC's "records regarding how much it actually collected from patients versus how much the patients would have owed under the terms of their health plans" indicated that "[NCMC] was offering patients about a ***90 percent*** discount"—meaning that NCMC collected only 10% of what it was required to collect under the plans. (Tr. 6-26:12-24 (May).) So it is no wonder that these aggressive discounts, coupled with improper out-of-network patient referrals by NCMC's investors, drove up patient volume and allowed NCMC to thrive.

But while no doubt helpful to NCMC's financial success, this waiver of co-insurance violated Texas law—which prohibits health care providers from "waiv[ing] a deductible or copayment by the acceptance of an assignment." Tex. Ins. Code § 1204.055(b). The evidence could not be clearer that NCMC violated this statute: while NCMC repeatedly tried to obfuscate this issue at trial, the plans and other trial evidence make clear that patient payment responsibilities are not optional—Cigna's plans require members to pay higher deductibles and co-insurance when they go to out-of-network providers. (*See, e.g.*, DX.001.060, at CIG-NCMC0618689 ("Coinsurance means the percentage of charges for Covered Expenses that an insured person is ***required*** to pay under the plan."); *see also* FOF ¶¶ 16-17, 60-61.) While NCMC tried to argue at trial that there was no waiver because it supposedly left patients legally responsible for the undiscounted amounts, the reality is that these approximated in-network

amounts that NCMC calculated were *all* that NCMC would ever bill or collect from the patient. (*See* FOF ¶¶ 69-70 (citing evidence).)

NCMC's waiver tortiously interfered with Cigna's plans too. The first element is met because Cigna's plans were contracts (*e.g.*, *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) ("An ERISA plan is a contract.")), and those plans required payment of out-of-network co-insurance. The second element is also met because NCMC plainly knew what the out-of-network co-insurance rates were but disregarded them. (Tr. 3-42:7-13 (Jones).) The third element—proximate cause—is also satisfied, because patients would not have come to NCMC if it had collected the required out-of-network co-insurance amounts. (Tr. 3-52:5-16 (Jones); Tr. 6-64:17-65:2 (May).) ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

Finally, it would be inequitable to allow NCMC to claim benefits as an assignee under Cigna's plans without also requiring NCMC to comply with plan obligations (including the obligation to collect co-insurance). By accepting assignments from Cigna's plan members, NCMC made itself subject to all of the same plan requirements to which those members are subject. *See Kennedy*, 924 F.2d at 702 ("[I]f [a provider] wishes to receive payment under a plan that requires co-payments, then he must collect those co-payments[.]"). And NCMC cannot come to this Court and argue that it is entitled to more benefits under Cigna's plans when, by its own actions, it breached the co-insurance requirements set forth in those plans. (Tr. 4-223:19-

224:1 (Sherry) ("[W]hat they were doing was in violation of the plan documents," and "they were definitely interfering with the plan design in terms of interfering with how coinsurance and deductibles should work.").)

### 3. NCMC Used Two Sets of Books: One to Bill Patients, and One to Bill Cigna for the Same Services.

The last piece of the scheme is how NCMC then actually reaped its windfall profits from Cigna and the sponsors of plans Cigna administered—by using a completely different and much higher fee schedule to bill Cigna than it used to bill patients.

After treating a Cigna plan member, NCMC would send Cigna a UB-04 claim form listing its services and charges.  Typically, a provider's charge that appears on the UB-04 form submitted to Cigna is the same as the charge used to calculate patient responsibility.  (Tr. 3-123:7-16 (Sherry).)  So when Cigna receives a UB-04 form, it "assume[s] as a normal course of business that what the provider is sending us is the same schedule they're using to calculate the patient's responsibility."  (Tr. 3-169:24-170:8 (Sherry).)

But that is not what NCMC did.  In submitting claims to Cigna, NCMC did not bill Cigna based on the 125% Medicare rate that it used to calculate Cigna plan members' cost-share responsibility.  (Tr. 3-47:21-48:5 (Jones).)  Instead, with Cigna, NCMC used charges from its alternative fee schedule (known as its "Chargemaster").  And those charges were generally in the range of 600% to 1,000% of Medicare—*i.e.*, substantially higher than the 125% Medicare methodology that NCMC used to charge patients.  (Tr. 6-20:15-24 (May).)

NCMC never told Cigna that it was charging patients differently than it was charging Cigna, and NCMC never disclosed to Cigna the 125% Medicare-based amounts that it charged patients.  (Tr. 3-49:14-22 (Jones).)  In fact, this 125% of Medicare calculation was for "internal purposes only."  (Tr. 3-48:6-8 (Jones).)  And Cigna had no "knowledge about that 125 percent of

Medicare figure back in 2007, 2008"; indeed, Cigna learned about NCMC's 125% patient-billing methodology "*[o]nly* as a result of this litigation."  (Tr. 4-222:11-15 (Sherry).)

Take for example patient CDH, who went to NCMC for outpatient gall bladder surgery. (DX.084.)  As Ms. Tankersley confirmed, NCMC calculated the charge for that procedure as $4,119.24 using the 125% Medicare fee schedule.  (Tr. 5-136:21-137:2 (Tankersley); DX.103 at 66.)  NCMC then applied the 20% in-network co-insurance rate it received from Cigna to that amount—not the higher, 40% out-of-network co-insurance rate that NCMC was required to apply.  (Tr. 5-139:19-140:3 (Tankersley)); DX.084 at NCMC37 141599.)  NCMC thus charged the patient just $823.84—which the patient paid in full at the time of service, and which was all that patient was ever going to pay NCMC.  (Tr. 5-140:12-25 (Tankersley).)

But while NCMC calculated the total charge as $4,119.24 when calculating patient responsibility, NCMC used a completely different charge when it submitted the claim to Cigna. Instead, NCMC charged Cigna $30,968.70 for the same procedure—over *seven times* as much as the charge that NCMC used with the patient.  (DX.084 at NCMC37 141578; (Tr. 5-147:17-148:1 (Tankersley).)   In other words, NCMC used one set of fee schedules (DX.101-104) to bill patients, but another—much higher—set of fee schedules to bill Cigna.  (DX.105; 5-149:24-150:8 (Tankersley) (agreeing that "the amounts on the UB form . . . came from North Cypress's chargemaster," while "the amounts on the Access NCMC fee schedule," used to calculate patient responsibility, "come from the fee schedule calculator"); *see also* FOF ¶¶ 73-79.)[7]

---

[7] At trial, NCMC tried to obscure this dual-billing system by contending that the fee schedules that it used with patients (DX.101-104) were just calculators, not fee schedules.  This post-hoc explanation is semantic at best.  As Ms. Tankersley admitted at trial, NCMC used these so-called calculators "to calculate what we are going to ask for the patient to pay at the time of service" (Tr. 5-127:20-21 (Tankerlsey))—and under the Access NCMC Program, these time-of-service calculated amounts were *all* that patients were ever going to pay.  (*See* FOF ¶ 80.)  Moreover, the patient fee schedules that NCMC now insists are mere calculators *themselves* refer to the 125%

NCMC's dual-billing scheme is precisely what Humble used in the *Aetna v. Humble* lawsuit, and it is exactly what led Judge Hughes to find that Humble was "filthy up to the elbows from lies and corrupt bargains." 2016 WL 7496743, at *3. As Judge Hughes explained, "Texas does not allow hospitals to bill patients one way and the plan another." *Id.* at *2. Nor is Judge Hughes alone in this finding: in the Cigna *Humble* decision, the Fifth Circuit held that Judge Hoyt erred in dismissing Cigna's fraud claims that were based on Humble "misrepresenting its 'actual charges by billing Cigna for amounts Humble never intended to collect from members,'" 878 F.3d at 487—just as NCMC had misrepresented its charges to Cigna in this case. NCMC's use of a 125% Medicare schedule to bill patients and a different and higher schedule to bill Cigna was thus at the very least inequitable, if not outright fraudulent.

### 4. NCMC Improperly Routed Cigna Plan Members Through the Emergency Room.

NCMC's inequitable conduct did not stop there. Cigna, like other insurers, typically pays emergency room claims at higher rates than non-emergency claims. (Tr. 5-115:14:21 (Tankersley).) Indeed, Mr. Jones admitted the Prompt Pay Discount was not offered to E.R. patients because insurance companies like Cigna reimburse at 100% of the in-network level. (Tr. 3-40:6-9 (Jones).) The evidence at trial showed that Dr. Behar imposed a rule that required all Cigna patients to be admitted through the emergency room. (Tr. 2-15:8-11 (Behar).) Dr. Behar tried to explain away this rule, but that testimony was not credible given that even as NCMC was

---

Medicare amount as ██████████████████████; *see also* FOF ¶ 80), and the NCMC's "Decision & Business Office Assistance Manual" similarly refers to these rates as "the NCMC Fee Schedule." (Tr. 5-122:3-18 (Tankersley); Tr. 5-123:14-18 (Tankersley) (agreeing that "the NCMC fee schedule that [she] refer[s] to in the business office manual is the Medicare addendum times 125 percent of Medicare").) Indeed, NCMC's internal documents refer to 125% of Medicare as NCMC's "normal" charge. (DX.024 at NCMC19 60319; *see also* FOF ¶ 82.)

routing all Cigna patients through the emergency room, NCMC was admitting Medicare, Medicaid, and in-network Blue Cross Blue Shield patients directly.  (Tr. 2-16:23-17:18 (Behar).)

**5.    NCMC Knew That Its Conduct Was Illegal and Hid Its Scheme from Cigna.**

NCMC's internal documents reveal it knew from the very beginning that what it was doing was illegal.  For example, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

Because NCMC knew that its scheme ran afoul of Texas law,[8] its lawyers advised NCMC to send out notices about its discount program to payors like Cigna—so that later, NCMC could argue (as it does now) that it had supposedly disclosed what it was doing.  This is precisely why NCMC sent twenty-four so-called "Notice of Discount" letters to Cigna and other insurers, where NCMC contends it supposedly disclosed its program.  (Tr. 1-88:12-14 (Behar).)  But those notices in fact disclosed ***no specifics whatsoever*** about the mechanics of NCMC's discount.  All that the notice said was the following:  "Your beneficiaries will be eligible to

---

[8] Along with this post-trial brief, Cigna is also filing a motion to compel NCMC to produce certain communications between NCMC and its lawyers regarding NCMC's prompt-pay discount program, because Dr. Behar waived any privilege as to those documents by testifying about them at trial.

participate in the NCMC Prompt Payment Out-of-Network Discount Policy on patient responsibility amounts for services and items rendered."  (PX.1, at CIG-NCMC0083279.)

As NCMC's own witnesses conceded, "nothing in those notices discloses that North Cypress was basing patient responsibility amounts on 125 percent of Medicare."  (Tr. 5-114:7-10 (Tankersley); Tr. 1-237:1-6 (Behar) (agreeing that he "didn't see a letter in which North Cypress disclosed to Cigna that it was basing patient responsibility on 125 percent of Medicare").)  Nor did NCMC's letters "disclose[] that North Cypress was basing patient responsibility on in-network coinsurance rates rather than out-of-network coinsurance rates."  (Tr. 5-114:11-18; *see also* Tr. 5-156:14-18 (Tankersley) (agreeing she is not aware of any document "in which North Cypress disclosed to Cigna that it was using 125 percent of Medicare as the basis for the calculation of patient responsibility"); Tr. 1-235:17-236:16 (Behar) (unable to identify letters "in which North Cypress disclosed to Cigna that it was using in-network coinsurance rates instead of out-of-network coinsurance rates").)[9]

It is pure fiction for NCMC to now argue that it would have truthfully told Cigna about these billing practices had Cigna only asked.  Cigna repeatedly asked NCMC for information to explain what these notices actually meant and specifically what NCMC was collecting from patients.  (*See, e.g.*, PX.3B, at CIG-NCMC0000129-30 (Cigna Feb. 1, 2007 letter to NCMC); PX.39 at 000636-37 (Cigna Nov. 10, 2008 letter to NCMC).)  █████████████████

---

[9] NCMC's counsel argued at trial that NCMC supposedly disclosed these discounts to Cigna via UB-04 forms.  This, too, is simply not true.  The ***only*** reference to discounts on those forms was "Prompt Pay Discount," added to Box 00 (Remarks).  (DX.084 at NCMC37 141578.)  This three-word phrase did not tell Cigna anything about the 125% Medicare rate NCMC used; indeed, it did not tell Cigna anything specific about NCMC's discount program at all.  (Tr. 5-157:14-158:4) (Tankersley) (agreeing that "by stamping a claims form 'prompt-pay discount,' you're not disclosing to Cigna that the in-network coinsurance rate was used instead of the out-of-network coinsurance rate," nor did the form "disclos[e] to Cigna that you use 125 percent of Medicare to calculate patient responsibility amounts instead of the chargemaster prices").)

██████████████████████████████████████████████████████████████████

████████████████████████████████; Tr. 5-90:1-9 (Tankersley) ("it was

the practice" for the business office not to disclose this information to insurers.).)

For instance, immediately after receiving NCMC's vague notice of a discount program

(PX.1), Cigna wrote a letter to NCMC on February 1, 2007, and asked for "assurance that the

charges shown on claim forms are your actual charges to the patient and that patients will be

required to pay amounts such as out-of-network co-insurance and deductibles."  (PX.3B, at CIG-

NCMC0000130.)   In response, NCMC's lawyers wrote: "NCMC assures you that . . . charges

shown on claim forms submitted to Cigna are NCMC's **actual charges** and that patients are

liable for amounts such as **out-of-network** co-insurance and deductibles."   (PX.47 at CIG-

NCMC0011459.)  As Dr. Behar admitted, nowhere in this letter did NCMC disclose that it was

calculating patient responsibility using **in-network** co-insurance or based on a charge of 125% of

Medicare.  (Tr. 1-239:24-240:9 (Behar); Tr. 1-241:22-242:14 (Behar).)   Moreover, NCMC's

representations about its billing practices were misleading at best, given the ample trial evidence

that the charges on NCMC's claim forms (600-1,000% Medicare) were substantially higher than

its normal charges to patients (125% Medicare) and that NCMC had estimated patients' co-

insurance amounts on an in-network—not out-of-network—basis.

After NCMC failed to provide Cigna with any specifics about its billing practices—and

in response to repeated plan sponsor complaints, including from Cypress Fairbanks Independent

School District—Cigna conducted a multi-month SIU investigation to try to learn how NCMC

was billing patients.  (Tr. 4-216:13-15 (Sherry).)  At the conclusion of that investigation, Cigna

wrote another letter to NCMC on November 10, 2008, advising NCMC that the SIU had

uncovered "evidence of a pattern of behavior by NCMC in which NCMC generally collects

$100.00 from the CIGNA Participant, if any amount is collected at all," and Cigna again asked NCMC for "clear evidence" that "the charges shown on the NCMC submitted billing are NCMC's actual charges for the services rendered" and that "the CIGNA Participant has paid their applicable out-of-network coinsurance and/or deductible in accordance with their CIGNA benefit plan."  (PX.39 at 000636-37.)  NCMC responded as it had before, falsely "assur[ing Cigna] that charges shown on claims forms submitted to Cigna are NCMC's actual charges" and that "Cigna insured are liable for amounts such as OON co-insurance and deductibles."  (PX.46 at 000705.)

As Cigna learned only from this lawsuit, none of this was true, but NCMC never told Cigna that even after Cigna implemented the fee-forgiving protocol.  And, of course, NCMC never provided Cigna with evidence concerning its actual charges or proof of patients' payment of out-of-network coinsurance, as NCMC conceded at trial.  (Tr. 5-165:1-24 (Tankersley) (agreeing that despite this request, NCMC "has never disclosed to Cigna that it was using 125 percent of Medicare as the basis for the calculation of patient responsibility," nor did NCMC "ever disclose[] to Cigna in writing that it was using in-network coinsurance rates").)

III.    **NCMC Is Barred from Recovering _Any_ Additional Benefits.**

A.    **As this Court Has Already Recognized, and as NCMC Conceded at Trial, Equitable Defenses Apply to ERISA Benefits Claims.**

Again, while this Court need not reach these issues given the dispositive holdings of the Fifth Circuit's decision in _Humble_, NCMC's illegal and inequitable conduct precludes it from recovering any additional benefits under ERISA.  Courts have long recognized that equitable defenses apply to a claim for benefits under ERISA and can preclude recovery on such a claim. _See Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc._, 293 F.3d 1139, 1146 n.3 (9th Cir. 2002) ("the affirmative defenses of fraud and estoppel are available to plan administrators

33

against employees seeking benefits."); *Matter of HECI Exploration Co., Inc.*, 862 F.2d 513, 523 n.18 (5th Cir. 1988) ("federal courts have entertained the defense of waiver in actions to recover benefits under ERISA.").[10]  Indeed, this Court has already recognized at trial that unclean hands are a viable defense to an ERISA claim for benefits.  (Tr. 8-37:14-16 ("[Cigna Counsel:]  [T]he law is clear in an ERISA case that unclean hands is a viable defense.  We briefed those cases.  THE COURT:  I think it is a viable defense.").)  And NCMC's counsel likewise admitted at trial that equitable defenses may be asserted against plan members.  (Tr. 8-15:15-16 ("they [Cigna] could have claimed unclean hands against the member and come up with some argument on that.").)  Thus, there is no real dispute that such defenses apply to this ERISA case.

### B.    NCMC Is Subject to Cigna's Defenses as an Assignee of Cigna's Members.

Faced with the mountain of evidence of its inequitable conduct, during trial NCMC resorted to a novel argument in an attempt to escape Cigna's equitable defenses and NCMC's obligations under the plans—contending that an unclean hands defense is viable only if it involved unclean hands conduct by the Cigna plan member directly and that NCMC's own conduct could ***never*** provide the basis for that defense.  (*See* Tr. 8-14:19-21; Tr. 8-18:3-9.)

This theory—that as an assignee, NCMC can take advantage of all the rights that Cigna's plan members may enjoy under ERISA (such as the right to recover unpaid benefits due under the plan), but that NCMC does not have to accept ***any*** of the corresponding burdens (such as the obligation to comply with plan terms, or being subject to defenses like unclean hands)—is

---

[10] *See also Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) (claimant's unclean hands in falsifying age to obtain retirement benefits barred relief); *Bigelow v. United Healthcare of Miss., Inc.*, 220 F.3d 339 (5th Cir. 2000) (denying equitable relief to plaintiff with unclean hands who brought claims under the Public Health Service Act, an ERISA equivalent that applies to government-sponsored health plans); *Jones v. U.S. Life Ins. Co.*, 12 F. Supp. 2d 383, 390 (D.N.J. 1998) (finding that equitable fraud applied as an affirmative defense against a plaintiff seeking additional benefits where plaintiff had made misrepresentations in coverage application).

simply not the law.   An assignee-provider like NCMC stands in the shoes of Cigna's plan members.   *See, e.g.*, *N. Cypress*, 781 F.3d at 191-92 ("providers . . . may bring ERISA suits standing in the shoes of their patients" when they receive "assignments of rights" from members).   And an assignee like NCMC cannot pick and choose what rights and responsibilities it wishes to keep when accepting an assignment.   To the contrary, as the Fifth Circuit explained, "[t]he positive aspects of assigned rights are accompanied by their corollary negatives," and "[a]n assignee is also subject to *any* defenses, limitations, or setoffs that could be asserted against the assignor's rights."   *Quality Infusion Care*, 628 F.3d at 729.   In that case, for example, BCBS of Texas had overpaid for certain claims from Quality Infusion Care ("QIC"), a healthcare provider who accepted assignments from patients, and then later set off those overpayments by underpaying other claims from QIC—even though those claims were from different patients and under different plans.   *Id.* at 726.   The Fifth Circuit rejected QIC's argument that BCBS was not allowed to offset payments in this manner, explaining that QIC took the assignment "subject to a setoff if the assignor could be subject to the same setoff under the assigned contract [i.e., the plan]."   *Id.* at 729.

Other cases likewise recognize that an assignee takes an assignment subject to defenses that the other party (here, Cigna) may assert.   *See, e.g.*, *Burns v. Bishop*, 48 S.W.3d 459, 466 (Tex. App. 2001) ("It is axiomatic that an assignee or subrogee walks in the shoes of his assignor and takes the assigned rights subject to *all defenses* which the opposing party might be able to assert against his assignor."); *In re Kizzee-Jordan*, 626 F.3d 239, 245 (5th Cir. 2010) (same).   And courts have also accepted this basic proposition in ERISA cases, recognizing, for instance, that "if [a provider] wishes to receive payment under a plan that requires co-payments, then he must collect those co-payments[.]"   *Kennedy*, 924 F.2d at 702.   Accepting NCMC's

35

argument would upend this basic proposition of assignment law because it would allow NCMC to pursue ERISA benefits from Cigna while immunizing NCMC's own conduct—no matter how egregious—from Cigna's defenses, substantially changing the nature of the rights and obligations that NCMC accepted via assignments from Cigna's plan members.

This common-sense proposition is not controversial.  For instance, as even NCMC agrees, patients who assigned their ERISA claims to NCMC could not prevail on those claims if they lied on their forms, breached the terms of their plans, or failed to exhaust administrative remedies before bringing suit.  Nor can NCMC, given the ample evidence that it engaged in this same conduct while standing in the members' shoes.  And tellingly, NCMC has not previously disputed that after taking assignments it was still obligated to exhaust administrative remedies (even though the members themselves had not).  Nor has NCMC ever argued that after taking assignments it somehow does not have to follow other requirements in Cigna's plans, such as (for example) Cigna's requirements for how claims should be submitted, Cigna's requirements for pre-authorizing medical services, or Cigna's administrative guidelines that apply to providers.  There is no basis for NCMC to pick and choose its obligations in the entirely one-sided way that it is trying to do here.

Finally, NCMC's argument that its own conduct should be disregarded is also difficult to square with NCMC's other positions in this lawsuit.  For instance, NCMC does not only seek additional ERISA claim benefits; it seeks attorneys' fees too.  As with a claim for benefits, ERISA only allows fee awards when the lawsuit is brought by a "participant, beneficiary, or fiduciary," 29 U.S.C. § 1132(g)(1), and so the only way that NCMC could potentially recover fees here is through its derivative status as a beneficiary by virtue of its assignments.  Clearly, when NCMC took assignments from Cigna members, those members had no entitlement to any

fee award (just as NCMC argues members were not liable for any unclean hands conduct at the time of the assignment), and the only arguments NCMC might have for an award would arise not from the **pre-assignment** conduct of Cigna plan members, but from NCMC's own **post-assignment** conduct in pursuing this case.  It is hard to see why NCMC should be allowed to benefit from its own conduct when seeking fees, but then simultaneously immunize its conduct from any consequences when it comes to Cigna's defenses.  Nor would the policies that undergird ERISA be furthered by allowing NCMC to engage in inequitable (indeed, illegal) conduct, and yet allow NCMC to recover additional benefits and fees from Cigna notwithstanding this bad behavior.[11]

> ### C.    NCMC's Unlawful and Inequitable Conduct Bars It from Any Further Recovery.

NCMC's conduct described above amounts to unclean hands, estoppel, and waiver, and NCMC should thus be precluded from recovering any further benefits.  At a bare minimum, NCMC should be precluded from recovering any benefits beyond the 125% Medicare rate that it used to calculate patients' costs—or, alternatively, the rate that NCMC would have received as an in-network provider, given its billing practices for Cigna's members were designed to mimic that of an in-network provider.

First, NCMC should not be allowed to recover any additional benefits because its hands were unclean.  Rather, like another Texas medical provider who ran a functionally identical fee-waiving program, NCMC's hands are "filthy up to the elbows."  *Aetna-Humble*, 2016 WL

---

[11] At trial, NCMC also argued that Cigna's ERISA plans are not actually contracts and therefore NCMC has no obligations under those plans as the members' assignees. (Tr. 8-13:6-16; Tr. 8-14:8-13.)  But it is well settled that an ERISA plan is a written contract between the insurer and the participant—and, by extension, an assignee like NCMC who accepts an assignment from the participant-member. *See, e.g., Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) ("An ERISA plan is a contract."); *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 708 (9th Cir. 2012) ("An ERISA plan is a contract").

7496743, at *3.   NCMC encouraged its physicians-investors to breach their contracts by improperly sending their Cigna patients to NCMC, routed patients through the ER to get more favorable reimbursement on claims that were not actual emergency claims, hid from Cigna the fact that it was charging patients substantially less than their cost-sharing responsibilities under the plans, and obtained reimbursement from Cigna based on its inflated billed charges rather than based on its normal 125%-Medicare charges.   Given all this, NCMC certainly has unclean hands, and it is not entitled to recover any more money.   *Cf. N.E. Med. Servs., Inc. v. State of Cal. Dept. of Health*, 670 F. App'x 615, 616 (9th Cir. 2016) (unpublished) (finding that a provider had unclean hands where it claimed that it should be allowed to seek reimbursement under one type of Medicaid program where it for years reaped the benefits of obtaining reimbursement under another program).

Second, at a bare minimum, NCMC should not be allowed to recover any additional benefits beyond the 125% Medicare rate that it used to calculate patients' cost-sharing responsibilities—whether under a waiver, equitable estoppel, or quasi-estoppel theory.

The elements of waiver are "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right."   *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 404-05 (N.D. Tex. 2016).   Here, NCMC had both the right and the obligation to charge Cigna plan members their appropriate cost-share amounts, and NCMC also knew that those amounts are generally higher (and often significantly so) than in-network costs.   But rather than charge Cigna plan members their proper cost-share, NCMC charged them as if it were an in-network provider based on a rate of 125% of Medicare.   And NCMC then

waived the right to collect more money from members by specifically promising them that they would not be required to pay a dollar more, as detailed above.

NCMC should similarly be barred from seeking any additional money under an equitable estoppel theory, the elements of which are: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). NCMC falsely represented to Cigna members that they did not have to pay their fair share of the out-of-network costs, while knowing that Cigna's plans and Texas law in fact prohibit such a waiver; NCMC made these representations with the intent of luring members to its facilities—which otherwise it would make no economic sense for members to visit; and Cigna plan members relied on these representations in deciding to receive treatment at NCMC.

Finally, any attempts by NCMC to recover more money beyond the 125% Medicare rate are also independently foreclosed by quasi-estoppel, which "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him," and it "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765-66 (Tex. App. 1992).[12] NCMC consistently calculated the cost-share of Cigna's plan members at the 125% Medicare rate as if it were an in-network provider, but it now tries to turn around and contend that Cigna should be required to pay its claims at a different and much higher out-of-network rate. The positions that NCMC took with respect to its billing with

---

[12] For quasi-estoppel, "no misrepresentation on one side, and no reliance on the other, is necessary to make out the defense." *Id.* at 765.

Cigna and Cigna's plan members are plainly inconsistent, and the disadvantage to Cigna from these changing positions—having to pay significantly more on NCMC's claims—is equally clear too. NCMC charged members as if it were an in-network provider; it is only fair that Cigna should have to pay NCMC's claims at no more than such rate. *Cf. Aetna-Humble*, 2016 WL 7496743, at *2 ("Texas [law] does not allow hospitals to bill patients one way and the plan another.").

## IV.  If the Court Decides to Award Damages to NCMC Notwithstanding *Humble* and Cigna's Defenses, NCMC Could Recover $1.67 Million at Most.

For reasons detailed above, the Court need not reach the issue of damages because the Fifth Circuit's decision in *Humble* is dispositive and requires entry of judgment in Cigna's favor, and because NCMC's illegal and inequitable conduct bars recovery.

If, notwithstanding the foregoing, the Court were inclined to address damages, NCMC's alleged damages are significantly overstated. As Cigna set out in its pre-trial brief, the scope of this case was greatly narrowed by the Court's 2016 ruling on the parties' cross-motions for summary judgment—which dismissed all of NCMC's claims save for its ERISA § 502(a)(1)(B) count and which also eliminated all but 575 of NCMC's near-10,000 benefit claims that were originally in dispute due to NCMC's failure to exhaust its administrative remedies. (*See* D.E. 521, 568.) Additionally, Cigna did not apply the fee-forgiving protocol to 395 of the 575 benefit claims that survived summary judgment (Tr. 6-31:5-12 (May))—which means that there are only 180 claims on which this Court could conceivably award damages after trial. NCMC's damages expert, Ms. Tankersley, did not dispute at trial that "only 180 of the 575 claims had anything to do with the fee-forgiving protocol." (Tr. 5-182:21-23 (Tankersley).) Below, Cigna addresses these 180 claims, as well as what model the Court should apply in the event it decides to award NCMC any damages.

A.      **NCMC's Damages Models Are Flawed and Overestimate Damages.**

NCMC had originally submitted four damages models.  Just three weeks before trial, NCMC had also served *four* new damages expert opinions, and then served another new report a week later.  Cigna moved to exclude those opinions (D.E. 603, 617), and the Court granted that motion as to NCMC's expert report served on September 11, 2017, but denied it as to the expert report served on September 22.  (Tr. of Oct. 4, 2017 Conf., at 7:11-14.)  In a pretrial filing, NCMC apparently abandoned three of its four models, stating that "Mrs. Tankersley's methodology/Model No. 3 . . . is what NCMC is going to proffer at trial during its case in chief (not during its Offer of Proof) to calculate its damages based upon Cigna's list of remaining claims."[13]  (D.E. 597 at 5.)  But as explained below, even Model 3 is not reliable and overstates damages.  So to the extent the Court may award NCMC any damages on its surviving claims, it should not use NCMC's damages model, and should rely on one of Cigna's models instead.

1.      **NCMC's Damages Model Is Flawed Because It Relies on Billed Charges Rather Than Normal Charges in Violation of Plan Language.**

Model 3, NCMC's damages model at trial, relies on NCMC's calculations of how Cigna actually paid NCMC's claims before Cigna implemented the fee-forgiving protocol.  Applying the percentages of NCMC's billed charges that Cigna historically paid NCMC before applying the fee-forgiving protocol, NCMC calculates damages based on a range of 28% of billed charges (for laboratory claims) to 80% of billed charges (for inpatient claims).  (Ex. DX.005, Tankersley Report at 27-28; Tr. 5-184:21-185:10 (Tankersley).)   On average, those pre-protocol paid amounts were equal to 65% of NCMC's billed charges.  (Tr. 5-187:1-17 (Tankersley).)

---

[13] NCMC had good reason to abandon these three other damages models at trial because, as Cigna explained in its pre-trial brief and as Dr. May explained at trial (Tr. 6-55:6-23 (May)), NCMC's Models 1, 2 and 4 are entirely untethered to Cigna's plan language or how Cigna historically reimbursed NCMC's claims before implementing the fee-forgiving protocol.

The problem with this model is that it assumes, but for the protocol that Cigna would have paid claims based on NCMC's **billed** charges to Cigna—rather than basing them on the substantially lower 125% Medicare amounts that NCMC **normally** charged patients. This theory is foreclosed by Cigna's plan terms, as further detailed below, and damages in an ERISA case cannot be based on some hypothetical framework untethered from the plan and the administrator's actual payment practices. Instead, the only proper measure of damages is the amount of benefits "due to [the participant] **under the terms of his plan**." *See* 29 U.S.C. § 1132(a)(1)(B); *e.g.*, *Medina v. Anthem Life Ins. Co.*, 983 F.2d 29, 32-33 (5th Cir. 1993) (recovery in suits for ERISA claims for benefits is limited "to the terms of the plan at issue"); *Franco v. Conn. Gen. Life Ins. Co.*, 299 F.R.D. 417, 430 (D.N.J. 2014) ("*Franco II*") ("In an ERISA action to recover unpaid benefits . . . the theory of liability, and thus the awardable damages, must be grounded in the plan documents."), *aff'd in relevant part*, 647 F. App'x 76 (3d Cir. May 2, 2016) (unpublished).

Cigna's plans impose various reimbursement limits on provider claims, one of which is the Maximum Reimbursable Charge ("MRC"). A typical definition of MRC in Cigna's plans is "the lesser of the provider's **normal charge** for a similar service or supply; or a percentile of charges made by providers of such service or supply in the geographic area where the service is received." (DX.001.035 at CIG-NCMC0582442; Tr. 4-221:5-10 (Sherry).) Alternatively, the plans sometimes refer to this limitation as "Reasonable and Customary (R&C) Charges," which is typically (and very similarly to MRC) defined as "charges . . . based on what your provider normally charges and on what most other medical and dental providers in your geographic region charge." (DX001.107, CIG-NCMC0656667, at 673; Tr. 4-207:18-23 (Sherry).) As Ms. Tankersley agreed at trial, the "Maximum Reimbursable Charge" definition in the plans "is

essential for figuring out how much Cigna should pay North Cypress." (Tr. 5-176:20-23 (Tankersley).)

This difference between billed charges and normal charges is important. The normal charge is what the provider actually charges patients. (Tr. 4-220:7-19 (Sherry).) This interpretation is supported by the fact that everything in the plan documents relates to patient charges, and the covered charges in the plan document relate to the patient. (Tr. 3-164:9-19 (Sherry); Tr. 7-75:3-12 (May) (Cigna's "interpretation makes sense to me because that amount, the amount that was charged to the patient, is the amount that is driving the patient's decision about where to receive care.") A provider's billed charges can thus be higher—and often substantially so—than the provider's normal charges. (Tr. 4-236:6-11 (Sherry).)

Courts have recognized this distinction, and they have also recognized that Cigna's plans only obligate it to pay providers' normal charges to patients—not billed charges. *See Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121 (D.N.J. 2013) ("*Franco I*"). In *Franco I*, the court denied class certification to a putative class of out-of-network providers who claimed that Cigna failed to pay their claims correctly and argued that they could prove classwide damages by reference to their billed charges. *See id.* at 137. But after reviewing Cigna's plans and noting that they "do not use the term 'billed charge'" and instead typically limit reimbursement to "the '*normal*' charge made by the provider," the court rejected the providers' attempt to equate billed charges with normal charges for reimbursement purposes. *See id.* at 138 (emphasis in original); *see also id.* ("'normal charge'—not the 'billed charge'—is the key factor in the damages formula supported by [Cigna] plan language.").

Indeed, the court in *Franco I* noted that provider-plaintiffs had "not presented a ***single [Cigna] plan*** that states that a provider's billed charge may serve as an alternate basis for paying

ONET [out-of-network] claims, much less any evidence that this payment standard appeared in the plans of putative class members generally." *Id.* at 139. The court likewise denied the plaintiffs' renewed motion for class certification, which again depended on a "billed charge model of damages," explaining that it previously "rejected th[at] model because it does not adhere to plan language" and that the model ignored the "normal charge" limitations in Cigna's plans. *Franco II*, 299 F.R.D. at 429; *see also id.* ("the plan language the Court is called upon to consider provides that the ONET [out-of-network] allowed amount cannot exceed the healthcare provider's '***normal charge***.' Nothing in the plan documents suggests that the word 'normal' should be read out of the ONET provision.").

As the court recognized in *Franco I*, this "distinction between the terms 'billed charge' and 'normal charge' is not . . . merely semantic or hypothetical," because the "amount billed by a Nonpar [non-participating or out-of-network provider] on any given Cigna plan member's particular service could, for example, ***far exceed*** that provider's 'normal' charge if . . . the provider has a practice of forgiving or 'writing off' the unreimbursed balances of his insured patients." 289 F.R.D. at 138. This is precisely how NCMC's so-called prompt pay discount worked: NCMC agreed to accept discounted amounts from patients and not to seek any more money from them later. Call it a waiver or a discount, the end result was the same: NCMC's normal charges to patients were not the same as what it charged Cigna.

So the appropriate focus in determining reimbursement under Cigna's plans must be on the provider's normal charges—***not*** billed charges—as the *Franco* decisions recognized. And here, NCMC's "normal charge" for non-emergency care services was indisputably 125% of the Medicare fee schedule, far below the billed charges that NCMC then submitted to Cigna (which were generally 600% to 1,000% of Medicare). (*See, e.g.*, Tr. 4-220:7-19; Tr. 4-221:25-222:9

44

(Sherry); Tr. 3-55:9-12 (Jones) ("Q: As everything we just talked about showed, North Cypress normally charged the patient 125 percent of Medicare under the Access NCMC program, correct? A: For the program, yes.").)  But Ms. Tankersley did not use 125% of Medicare when calculating damages under Model 3.  (*See* Tr. 5-177:23-178:1 (Tankersley) (agreeing that Model 3 is based on NCMC's Chargemaster).)  As a result, NCMC's Model 3 is not consistent with the "normal charge" limitation in Cigna's plans, and it is thus unreliable and wrong.

> **2.    There Is No Basis to Award Any Damages for MRC-2 Claims, Because Cigna Did Not Apply the Fee-Forgiving Protocol to Those Claims.**

Finally, in one of her September 2017 reports, Ms. Tankersley also calculated $2,388,182 in damages for MRC-2 claims.  (Tr. 5-196:10-12 (Tankersley).)  There is no basis to award *any* damages on these claims, however, because as Ms. Tankersley conceded at trial, Cigna "didn't apply the fee-forgiving protocol to MRC-2 claims."  (Tr. 5-196:16-18 (Tankersley); *see also* Tr. 4-187:9-13 (Sherry) (Cigna's fee-forgiving protocol "was not intended to be applied against [MRC-2] claims.").)

> **B.    Either of Cigna's Two Alternative Damages Models for NCMC's Exhausted Claims Provides a Reliable Way of Calculating Damages.**

Cigna's expert, Dr. May, proposed two methods of calculating damages for claims that survived summary judgment: (1) "normal charge" damages, which account for the fact that NCMC normally charged patients based on a 125% Medicare rate; or (2) "in-network" damages, which calculate damages based on estimated rates Cigna would have paid NCMC if it had been an in-network provider during the relevant time.  Either model provides a more reliable way of calculating damages than any of NCMC's proposals.

### 1.   Dr. May's Model 1:  "Normal Charge" Damages.

This approach applies the "normal charge" limits in Cigna's MRC plans, which, as described above, cap the maximum out-of-network charges that Cigna will cover at the provider's "normal" charge.  As the plans set forth (and as Cigna's corporate representative, Ms. Sherry, testified at trial), this "normal charge" cap is the lesser of the provider's normal charge or the percentile of charges based on a geographic database or Medicare.  For MRC1 non-emergency room claims, Cigna interprets NCMC's "normal charge" to be 125% of Medicare—because this is what NCMC generally charged patients on such claims during the relevant time period, as detailed above.

Under well-settled core ERISA principles, Cigna's interpretation of what "normal charge" means under its plans is entitled to significant deference under the "abuse of discretion" standard—which in the ERISA context is "the functional equivalent of arbitrary and capricious review."  *McCorkle*, 757 F.3d at 457 n.12.  That is, Cigna's interpretation can only be overturned if it is "arbitrary" or "not supported by at least substantial evidence," with substantial evidence meaning simply that it is "merely more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at 457-58; *see also id.* at 457-59 (emphasizing that "[o]bviously, no court may substitute its own judgment for that of the plan administrator," and that the question "is not whether the interpretation of the Plan is most persuasive, but whether the plan administrator's interpretation is unreasonable").  NCMC's interpretation of "normal" charge as meaning its chargemaster prices, conversely, is obviously entitled to no deference at all.  (*See* Tr. 5-178:19-22 (Tankersley) (Ms. Tankersley testifying that "normal" charge being equal to NCMC's chargemaster was "my interpretation of the maximum reimbursable charge.").)

Based on this interpretation, Dr. May calculates a "but-for" allowed amount applying MRC "normal charge" plan limitations to any remaining non-emergency claims, and then applies the patient's cost-sharing amount to determine the "actual allowed amount." To calculate damages, Cigna then subtracts what it paid NCMC from this "actual allowed amount."

Under this methodology, Dr. May's damages calculations break down as follows for the remaining 575 claims. 395 of the 575 claims are non-protocol claims (the vast majority of which are MRC-2 claims); thus, no damages can be awarded on such claims. (*See* Tr. 6-30:23-31:9 (May); Tr. 6-60:22-23 (May) ("I don't calculate damages for the non-protocol claims.").) 180 protocol claims are broken down into ER claims and non-ER claims, with damages for each category calculated separately. (Tr. 6-31:13-24 (May).) For the 76 ER claims, Dr. May calculates damages the same as Ms. Tankersley; for the 104 non-ER claims, Dr. May calculates damages by assuming a 125% Medicare rate rather than the higher billed charge that NCMC used. (Tr. 6-60:25-61:16 (May).) Applying this methodology results in damages of $1,677,014. (Tr. 6-62:3-6 (May).)

### 2.    Dr. May's Model 2:  "In-Network" Damages.

NCMC designed its Access NCMC Program ███████████████████████████ ██████████████████████████████ Thus, NCMC was able to get higher patient volumes, without accepting the lower rates an in-network provider would have to accept in exchange for greater patient access. (DX.003, May 2012 Report ¶ 27.) Because NCMC received the full benefit of additional patient volume as if it had been an in-network provider—indeed, patients would ***not*** have come to NCMC had it charged patients their appropriate out-of-network costs, as NCMC's own witness Mr. Jones testified—it is only fair to reimburse NCMC's claims at in-network rates as well.

Thus, as an alternative damages approach, Dr. May also calculates damages based on amounts that it would have paid NCMC under the terms of the in-network contract that the parties negotiated in August 2012.  This model makes economic sense because under NCMC's discount model, "the patients see no difference between North Cypress and an in-network hospital," and "North Cypress was getting referrals from physicians who were in network with Cigna."  (Tr. 6-62:14-24 (May).)  Moreover, NCMC was "receiving the benefits of being an in-network provider without agreeing to the discounts that in-network providers, typically, have to in order to become in network."  (Tr. 6-62:25-63:3 (May).)  Finally, these rates also provide a reasonable measure of damages because the contract rates to which Cigna and NCMC agreed were "the result of arm's length negotiations between the two parties" that represent "fair market value for North Cypress's services."  (Tr. 6-63:8-12 (May); Tr. 1-252:2-10 (Behar) (the Cigna-NCMC in-network contract was "consistent with the market" and the result of a "fair" negotiation).)  Applying these rates to NCMC's out-of-network claims for the period during the fee-forgiving protocol would result in $1,051,426 in damages.  (Tr. 6-67:15-20 (May); Tr. 6-68:4-7 (May).)

## V.     The Court Should Not Reconsider Its Summary Judgment Decision on Futility or Exhaustion of Administrative Remedies.

Before trial, NCMC had moved several times to have the Court reconsider its summary judgment decision on exhaustion and futility—requests this Court correctly rejected every time they were made.  Undeterred, NCMC then put on an "offer of proof" at trial, and again argued that the Court should change its mind.  The Court has already heard this evidence at summary judgment and then again in ruling on NCMC's requests for reconsideration.  The Court was correct to find that this evidence cannot support reconsideration, and it should yet again so hold.

48

### A.     The Court Has Already Declined to Reconsider Exhaustion and Futility.

In 2016, Cigna raised exhaustion in both its summary judgment motion and its opposition to NCMC's summary judgment motion, performing a claim-by-claim exhaustion analysis for the 10,000 claims then at issue.  (D.E. 447 at 27-29 & Ex. 2; *see also* D.E. 262 at 19-21; D.E. 473, at 13.)  NCMC did not dispute the accuracy of Cigna's claim analysis spreadsheet, which showed that NCMC failed to exhaust administrative remedies for all but 575 of its claims.  Instead, NCMC argued only that exhaustion would have been futile, contending that its appeals "were universally rejected per the Cigna Protocol."  (D.E. 458 at 19.)  Cigna demonstrated that NCMC was wrong because there were a number of appeals where Cigna reversed its initial benefits determination after implementing the fee-forgiving protocol.  (D.E. 462 at 19-20 & Exs. 47-48.)

On this record, the Court rejected NCMC's futility arguments in its September 28, 2016 order.  (D.E. 521.)  The Court found that NCMC conceded that it failed to exhaust administrative remedies for the "vast majority" of its benefit claims and that NCMC's futility argument failed because it could not show a "certainty of an adverse decision" on appeal due to the fact that "Cigna was willing to grant [administrative relief] in some cases."  (*Id.* at 15-16.)

Two weeks after the Court's ruling, NCMC moved for reconsideration.  That motion not only re-raised arguments about the law and facts that the Court had rejected, but also improperly introduced new evidence and legal arguments on futility.  (D.E. 525.)  The main thrust of NCMC's motion was the same as at summary judgment—that exhaustion was supposedly futile because Cigna applied the fee-forgiving protocol to all of NCMC's claims, and because SIU provided guidance to Cigna personnel for claims that NCMC appealed.  (*Id.* at 10-11.)  NCMC then also filed numerous follow-up briefs on exhaustion and futility.  (D.E. 546 at 1; D.E. 549 at 21-22; D.E. 558 at 1-3; D.E. 559 at 1-3.)

In February 2017, the Court denied NCMC's motion, again explaining that Cigna's re-adjudication of some of NCMC's claims on appeal defeated futility, because in such circumstances "no degree of hostility or bias can establish a certainty of adverse decision on appeal."  (D.E. 557 at 6-7.)  Rejecting NCMC's "misunderstand[ing]" of the law that "in order to establish certainty, it would have had to appeal all 10,000 claims at issue," the Court explained:

> The purpose of the futility exception is to allow claimants to proceed despite failure to pursue administrative appeals, by showing that an appeal would have served no purpose.  Here North Cypress simply cannot show that.

(*Id.* at 8.)   The Court also rejected NCMC's argument "it was not required to exhaust administrative remedies because of Cigna's alleged failure to produce plan documents," finding a lack of authority to suggest "that Cigna's alleged failure to produce plan documents has any effect on the administrative exhaustion requirement," and noting that "[i]n any event, the Court is not persuaded that Cigna refused to provide plan documents as required by ERISA § 1024(b)."  (*Id.*)

### B.   NCMC's Latest Attempts at Reconsideration Are Procedurally Improper, and Given the Court's Summary Judgment Ruling, Exhaustion and Futility Were Not Triable Issues.

A month before trial, NCMC argued yet again that the Court should reconsider its summary judgment ruling on exhaustion and futility.  (D.E. 577.)  NCMC then also raised a litany of arguments on exhaustion and futility in its pre-trial brief (at least thirty pages of which were a cut-and-paste job from NCMC's prior motions for reconsideration).  (D.E. 619-6; *compare* D.E. 619-6 at 1-29, 37-38, *with* D.E. 526, D.E. 577, D.E. 585.)

NCMC's latest bid for reconsideration—raising these same arguments again after the Court has already ruled on exhaustion and futility, and has already declined to reconsider those rulings—is improper.  *See, e.g.*, *Templet v. HydroChem, Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004) (Rule 59(e) "is not the proper vehicle for rehashing evidence, legal theories, or arguments

that could have been offered or raised before the entry of judgment."). To succeed, a Rule 59(e) motion must "clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005). As Cigna has explained multiple times now, NCMC's repeated bids for reconsideration fail to clear this hurdle—particularly given this Court's prior rejection of these same arguments for reconsideration. *See, e.g.*, *Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 3732448, at *7 (N.D. Tex. July 29, 2014) (denying motion for reconsideration where "brief supporting reconsideration is replete with arguments previously made in its earlier opposition to Plaintiffs' motion for partial summary judgment, and in support of its own cross-motion for summary judgment").[14]

NCMC's attempt to put on evidence of exhaustion at trial in the guise of an "offer of proof" was likewise improper. An offer of proof is an evidentiary tool used to create ***an appellate record*** to review exclusion of evidence, *see* Fed. R. Evid. 103(a)(2); it does not give carte blanche to introduce evidence on issues already decided on summary judgment. *See* 1 Fed. Evid. § 1:16 (4th ed.) ("an offer of proof is unnecessary if the trial court excludes in advance a whole class or category of evidence, or accomplishes the same end by narrowing the issues to be tried."). During trial, NCMC used this supposed "offer of proof" evidence as yet another attempt to re-argue the exhaustion and futility issues the Court has already decided on summary judgment—just as Cigna had predicted NCMC would do. (D.E. 603 at 14-16.). These were not

---

[14] *See also WesternGeco L.L.C. v. Ion Geophysical Corp.*, 2011 WL 3608382, at *15 (S.D. Tex. Aug. 16, 2011) (denying motion for reconsideration where movants failed to raise argument "though they certainly could have done so, have not demonstrated a clear error in law or fact, a change in controlling law, or previously unavailable evidence to persuade us to reconsider this issue"); *Brittingham v. Wells Fargo Bank, N.A.*, 2012 WL 12882139, at *1 (N.D. Tex. Nov. 8, 2012) ("Because Plaintiffs' motion is a mere rehash of the arguments raised in opposition to Defendants' summary-judgment motion, their request for relief from the final judgment must be denied.").

triable issues and NCMC had no reason to elicit testimony on them, whether in the guise of an "offer of proof" or not.  Indeed, to do so contravened the entire purpose of summary judgment—which was to narrow issues for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial"); *Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993) ("Where, as here, partial summary judgment is granted, the length and complexity of trial on the remaining issues are lessened.").

NCMC's "offer of proof" was also prejudicial to Cigna because Cigna had no opportunity to present counter-evidence on these issues at trial.  Thus, the result of NCMC's "offer of proof" was allowing NCMC to put on a one-sided case on exhaustion and futility, which has absolutely no basis in the Federal Rules of Civil Procedure or Evidence.

### C.   Nothing in the Trial Record Disturbs the Court's Exhaustion and Futility Decisions.

In addition to being procedurally improper, NCMC's latest bid for reconsideration should be rejected out of hand for the same reasons that this Court has denied this relief in the past.  Even if the Court were inclined to entertain NCMC's motion on the merits (and it should not), NCMC's arguments support reconsideration.

<u>First</u>, NCMC argued at trial that it could not appeal claims because it did not have access to Cigna's plans.  This is wrong on both the facts and the law.  This Court has already found at summary judgement that NCMC failed to prove "that Cigna refused to provide plan documents as required by ERISA § 1024(b)."   (D.E. 557 at 8.)   None of NCMC's "offer of proof" established otherwise.   In fact, NCMC's own exhibit PX.86B—an example of appeals correspondence that Cigna sent to NCMC—showed that Cigna expressly informed NCMC of how many appeals it needed to file.  (PX.86B at 2 ("[i]f you are not satisfied with this decision,

you may request a second appeal review within 180 days").)  Thus, Ms. Tankersley admitted that NCMC was "given that [information] in a response to an appeal that we had submitted," and she also admitted that Cigna's letters informed NCMC when it had "exhausted all of the appeals process."  (Tr. 5-174:1-5 (Tankersley); Tr. 5-174:13-15 (Tankersley).)  So whether NCMC had the plans or not, NCMC had sufficient information to pursue and exhaust appeals.

NCMC is wrong on the law too.  As the Court already found when denying reconsideration, NCMC cited "no binding authority suggesting that Cigna's alleged failure to produce plan documents has any effect on the administrative exhaustion requirement."  (D.E. 557 at 8.)  That is not surprising, since Fifth Circuit case law holds the opposite.  *See, e.g.*, *Gonzalez v. Aztex Advantage*, 547 F. App'x 424, 428 (5th Cir. 2013) (holding that exhaustion was not excused where "the notice of denial provided to Gonzalez clearly stated where he should address his appeal," despite plaintiff arguing "that his failure to exhaust his remedies should be excused because he was not provided with a summary plan description").

Second, NCMC asserts that it did not have to provide evidence of how it calculated patient responsibility on appeal, as Cigna's plans require.[15]  Even before the fee-forgiving protocol, NCMC knew that Cigna would process claims under the protocol until NCMC provided evidence that patients actually paid their cost-sharing responsibility.  (PX.39.) ███

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████; *see also* D.E. 462 at 19-20 & Exs. 47-48; D.E. 521 at 15-16.)  But instead

---

[15] NCMC admitted as much in its pre-trial brief, noting that Cigna's plans "***require***" an appeal to "state the reason why you feel your appeal should be approved and ***include any information supporting your appeal***."  (D.E. 619-9 at 34; *see also* DX.001.060 at 51.)

of providing this evidence, NCMC sent Cigna thousands of form appeal letters that did not disclose how or how much it was charging patients.[16]  (Tr. 5-172:2-15 (Tankersley); *see also* PX.85 at 56 (merely stating that "a prompt pay discount **may** have been offered to the member patient who qualified.").)  For those thousands of instances where NCMC gave Cigna "nothing . . . to consider on appeal," the Court correctly found that NCMC failed to exhaust its appeals.  *See Swanson v. Hearst Corp. Long Term Disability Plan*, 586 F.3d 1016, 1019 (5th Cir. 2009) (finding no exhaustion where "letter included no factual or substantive arguments, and no evidence."); *Piecznski v. Dril-Quip, Inc. Long Term Disability Plan*, 354 F. App'x 207, 211 (5th Cir. 2009) (finding no exhaustion where "the letter did not include the required information for an appeal letter; he did not 'include . . . the reasons(s) [sic] [he] believed that [his] claim was improperly denied,' and he did not 'submit any additional comments, documents, records or other information relating to [his] claim that [he] deem[ed] appropriate for [the Plan] to give [his] appeal proper consideration'").

Third, again repeating an argument from its summary judgment and reconsideration motions, *see supra* Sec. V.A, NCMC claims that the SIU's involvement in the claims process is in itself enough to establish futility.  (Tr. 3-130:4-9; Tr. 8-29:3-12.)  Once again, though, NCMC offers no newly-discovered evidence on this point, instead again relying on documents showing

---

[16] As Cigna showed at summary judgment, many of NCMC's letters did not appeal fee-forgiving or even mention the prompt pay discount at all (D.E. 447 at 29), and those claims were correctly dismissed for failure to exhaust.  (D.E. 521 at 15-16; D.E. 568 at 1-2.)  In its pre-trial brief, NCMC tried for the first time to distinguish Fifth Circuit case law Cigna cited in its summary judgment brief, which holds that "[a] plaintiff has not exhausted his administrative remedies on an issue if he fails to raise it before the plan administrator."  *Harris v. Trustmark Nat'l Bank*, 287 F. App'x 283, 288 (5th Cir. 2008).  This is both untimely (since there is no reason NCMC could not have raised this issue at summary judgment), and also wrong on the merits in any event.  The goal of the exhaustion requirement is to allow the administrator to adjudicate the claim on a full record before review by a federal court.  *See id.*  By failing to appeal for the right reason and providing no information about amount collected from Cigna's member, NCMC failed to give Cigna the opportunity to adjudicate the claim on a full administrative record.

the SIU's practice of providing a "recommendation" for handling a particular benefits determination.  (*See, e.g.*, PX.86A, at CIG-NCMC0539103.)  The Court has already declined to reconsider futility based on this type of evidence; moreover, the evidence at trial in fact showed that Cigna's appeals unit—not the SIU—had final say on appeals.  (Tr. 4-177:15-18 (Sherry) ("The SIU was involved in the initial claim determination but as it states here a separate unit the appeals unit is responsible for the decision on the appeal."); (Tr. 4-167:18-21 (Sherry) ("So what I see is Katrina in the SIU unit recommending to uphold the denial but ultimately as indicated here, the appeals unit has the ultimate decision and the decision that the appeals unit made was to uphold.").)  It is not reasonable to assume that "the review committee will never reach an interpretation of the plan different from that of the company."  *See Commc'ns Workers of Am. v. AT&T*, 40 F.3d 426, 433 (D.C. Cir. 1994).  That is particularly true here, given that Cigna in fact *did* re-adjudicate appeals after NCMC provided proof of payment.  (*See, e.g.*, PX.86, at CIG-NCMC0719001); *see also Falgout v. McDermott, Inc.*, 1993 WL 386253, at *4 (E.D. La. Sept. 22, 1993) (no futility where administrator "expressed its willingness to reconsider [its decisions] upon submission of further supporting documentation," and it "reassessed the amount it originally paid plaintiff for some covered services and . . . thereafter increased the payable benefit.'").

With no new evidence, NCMC argued at trial that the *Encompass Office Solutions, Inc. v. Connecticut General Life Insurance Company*, 2017 WL 3268034, at *13 (N.D. Tex. July 31, 2017), is determinative because that case held "the minute that those claims and appeals were diverted to the SIU . . . exhaustion is deemed to have occurred."  (Tr. 8-29:13-20.)  Of course, *Encompass* is not binding on this court; more importantly, NCMC misreads it because there, the court did *not* rule on exhaustion.  *Encompass* is also factually distinct because there, the court

found Cigna had upheld denials on appeal "in every instance," 2017 WL 3268034, at *13, whereas here—as the Court previously recognized—Cigna reversed a number of claim determinations when provided with additional information.  (D.E. 557 at 10.)

Fourth, NCMC argues that exhaustion was futile because, even if it had disclosed its calculation of patient responsibility, Cigna would have still applied the protocol to the portion NCMC did not collect.  NCMC's argument ignores the Court's correct holding that partial re-adjudication also defeats futility, because it shows that the appeal would not have served "no purpose."  (D.E. 557 at 7-8); *see also Falgout*, 1993 WL 386253, at *4.

Indeed, to find otherwise would be inconsistent with the "primary purposes" of the exhaustion requirement, which include "Congress' desire that ERISA trustees be responsible for their actions, not the federal courts," and to "provide a sufficiently clear record of administrative action if litigation should ensue."  *Denton v. First Nat'l Bank of Waco, Tex.*, 765 F.2d 1295, 1300 (5th Cir. 1985).  By refusing to provide Cigna with information regarding its billing practices and patient collection amounts, NCMC failed to give Cigna the opportunity to adjudicate its claims on a full administrative record.  Instead, Cigna had to spend years of costly litigation to find out that NCMC's normal charges to Cigna members was based on the member's in-network portion of 125% of Medicare.

## CONCLUSION

Cigna respectfully requests that the Court enter the proposed findings of fact and conclusions of law that Cigna is filing herewith, and enter an order dismissing all of NCMC's remaining claims and awarding NCMC nothing in damages, fees, or costs.

DATED this 18th day of January, 2018

Respectfully submitted,

*/s/ Joshua B. Simon*
Alan W. Harris
Attorney-in-charge
State Bar No. 09050800
Southern District ID No. 2171
325 N. St. Paul Street, Suite 3100
Dallas, Texas 75201
Telephone: (214) 965-8200
Facsimile: (214) 965-8209

**COUNSEL FOR DEFENDANTS**

Joshua B. Simon
Warren Haskel
Dmitriy Tishyevich
Richard Nicholson
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

**OF COUNSEL**

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on January 18, 2018, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who are known "Filing Users":

> J. Douglas Sutter, Esq.
> Kelly, Sutter & Kendrick, P.C.
> 3050 Post Oak Blvd., Suite 200
> Houston, TX 77056
> Telephone: (713) 595-6000
> Facsimile: (713) 595-6001

  In addition, I caused a true and correct copy of the foregoing document to be served via e-mail on Mr. Sutter.

*/s/ Joshua Simon*
Joshua Simon
