**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **NORTH CYPRESS MEDICAL CENTER** | § |
| **OPERATING CO., LTD.,** *et al,* | § |
| | § |
| **Plaintiffs,** | § |
| **VS.** | §    **CIVIL ACTION NO. 4:09-CV-2556** |
| | § |
| **CIGNA HEALTHCARE,** *et al,* | § |
| | § |
| **Defendants.** | § |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

The Court submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I.     BACKGROUND

This case centers on the intricacies of healthcare insurance. Before the Court are the procedures by which hospitals can bill patients and submit claims to an insurance company, and, in turn, how that insurance company pays for patients' care.

Plaintiffs North Cypress Medical Center Operating Co., Ltd. and North Cypress Medical Center Operating Company, GP, LLC (collectively "NCMC") filed suit against Defendants Cigna Healthcare and Connecticut General Life Insurance Company (collectively "Cigna") on August 11, 2009, seeking relief under state law and the Employee Retirement Income Security Act ("ERISA"). (Doc. No. 1.)

This Court initially made dispositive rulings several years ago, which both parties appealed. The Fifth Circuit affirmed in part and reversed in part. *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182 (5th Cir. 2015) ("*North Cypress I*"). Of importance here,

1

the Fifth Circuit ruled that NCMC had standing to bring ERISA claims as assignee of the patients. The Fifth Circuit "remand[ed] to allow the district court a full opportunity to consider all of North Cypress's claims for underpayment of benefits and its other closely related ERISA claims with a fully developed record." *Id.* at 197.

On remand, the parties developed a more complete record through discovery and filed cross-motions for summary judgment. (Doc. Nos. 443, 447, 489.) Based on the Court's summary judgment ruling, this case was narrowed to NCMC's ERISA § 502(a)(1)(B) claim and, within that claim, to the 575 benefit claims for which NCMC exhausted its administrative remedies.

On October 10, 2017, this Court commenced a bench trial. Over the course of the eight-day trial, the Court received evidence and heard sworn testimony. Having considered the evidence, testimony, oral arguments presented during the trial, post-trial filings[1], and the applicable law, the Court sets forth the following Findings of Fact and Conclusions of Law. Additionally, the Court rules on two pending motions filed by NCMC.

## II.     FINDINGS OF FACT

<u>Parties & Insurance Plans</u>

1.  North Cypress Medical Center Operating Company, Ltd. owns a hospital and North

    Cypress Medical Center Operating Company, GP LLC is the general partner for the

---

[1] The post-trial filings include the parties' post-trial briefs and proposed findings of fact and conclusions of law, as well as later-filed letters and notices to the Court. (Doc. Nos. 662-68, 672-73, 675-79, 681-83, 689.) The post-trial filings note, in particular, three cases that the Fifth Circuit decided after the conclusion of the instant bench trial: *North Cypress Medical Center Operating Company, Ltd. v. Aetna Life Insurance Company*, No. 16-20674, 2018 WL 3635231 (5th Cir. July 31, 2018); *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018) (en banc); *Connecticut General Life Insurance Company v. Humble Surgical Hospital., L.L.C.*, 878 F.3d 478 (5th Cir. 2017).

limited partnership; collectively they are "NCMC," the Plaintiff hospital in this case. (Tr. 1-94:22-95:2 (Behar).)[2]

2. The hospital is a general acute care hospital with an emergency room. (Tr. 1-77:10-15 (Behar).) It opened on January 4, 2007. (Tr. 1-90:14-15 (Behar).)

3. Cigna, the Defendant, is a health services company. (Tr. 4-198:15-19 (Sherry).)

4. Cigna administers insurance plans, the majority of which are self-funded. (Tr. 4-198:20-22 (Sherry); *see* Def. Exh. 1.001-1.186 (collectively, the "plans").) A self-funded insurance plan is an "Administrative Services Only" ("ASO") plan for which Cigna administers claims, but an employer, such as a school district, is responsible for paying all of the claims of its employee population. (Tr. 4-199:2-21 (Sherry); *see e.g.*, Def. Exh. 1.035 at CIG-NCMC0582383.)

5. ASOs explicitly delegate to Cigna "the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plans." (*See, e.g.*, Def. Exh. 1.051 ("Aperio Technologies ASO"); *see also* Doc. No. 677 at 15-16 (NCMC stating, in its own Proposed Findings of Fact, "all of the plans provided Cigna with the discretionary authority to interpret the provisions of the plan").)

6. Cigna has set up a network of healthcare providers who agree to give Cigna a discounted rate off of their billed charges and agree to refer patients within the network. (Tr. 4-197:20-198:11 (Sherry); *see also* Def. Exh. 82 at CIG-NCMC0011985.) Cigna's in-network healthcare providers agree to discounted fees in exchange for receiving access to Cigna's pool of plan members. (Tr. 4-202:25-203:6 (Sherry).)

---

[2] Citations to the trial transcript are identified as "Tr. X-Y:Z (Witness)," where X indicates the day of trial, Y and Z identify the page and line number, and the name of the witness is in parentheses.

7.   The amount a patient pays is called the "[c]oinsurance," and it is defined in the plans as "the percentage of charges for Covered Expenses that an insured person is required to pay under the plan." (*See e.g.*, Def. Exh. 1.035 at CIG-NCMC0582391.)

8.   Typically, a patient's coinsurance is lower when the patient goes to an in-network provider. (Tr. 4-203:18-24 (Sherry).) This is both because in-network providers have agreed to discounted fees and because the insurer will pay a larger share of the fee. For example, if a patient receives in-network care, the plan will pay 80 percent of the fee and the patient will pay 20 percent of the fee; whereas, if a patient receives out-of-network care, the plan will pay 60 percent of the maximum reimbursable charge and the patient will pay 40 percent. (Tr. 4-205:13-206:12 (Sherry); *e.g.*, Def. Exh. 1.035 at CIG-NCMC0582394; *see also* Tr. 4-208:14-19 (Sherry) (this scheme "is absolutely standard").)

9.   Payments for "charges which [the patient is] not obligated to pay or for which [the patient is] not billed" are "specifically excluded" from the plans. (*See, e.g.*, *id.* at CIG-NCMC0582421.)

10.  The Plans define the amounts to be paid as based on the "Maximum Reimbursable Charge." (*See, e.g.*, Def. Exh. 1.035.) Some claims are covered by Maximum Reimbursable Charge 1 ("MRC-1") and others by Maximum Reimbursable Charge 2 ("MRC-2").

11.  MRC-1 is defined as "the lesser of: (1) the provider's normal charge for a similar service or supply; or (2) the policyholder-selected percentile of all charges made by providers of such service or supply in the geographic area where it is received." (*Id.* at CIG-NCMC0582442; Tr. 4-206:19-22 (Sherry); *see also* Pl. Exh. 87 at CIG-NCMC0094360.)

12. Some Plans include a "note" in the MRC-1 section: "The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles, copayments and coinsurance." (Pl. Exh. 87 at CIG-NCMC0094360; Def. Exh. 1.026 at CIG-NCMC0156030; *but see* (Def. Exh. 1.035) (does not include the "may bill" language).)

13. MRC-2 is the lesser of the provider's normal charge or a percentage of a Medicare-based fee schedule adopted by the Plan. (Tr. 4-206:24-207:2 (Sherry).)

14. Emergency and urgent care services are an exception to the differing coinsurance rates for in-network and out-of-network care. For emergency care, physicians are not restricted to in-network referrals and the Plans pay the same amount regardless of whether the provider was in-network. (*See, e.g.*, Def. Exh. 1.060 ("CLARCOR Inc. ASO") at CIG-NCMC0618694; Def. Exh. 82 ("Behar-Cigna Contract") at CIG-NCMC0011985.)

Assignments

15. When NCMC admitted patients to the hospital, the patients assigned their benefits to NCMC. The paperwork that patients signed is called, "Consent to Treatment and Release of Medical Information," and it contains a section called, "Assignment of Benefits." (*See, e.g.*, Pl. Exh. 2.) The Assignment of Benefits section explicitly assigned NCMC "the right to collect any and all unpaid insurance benefits, penalties, attorney's fees, court costs, and all other recoverable damages of any nature from the medical insurance company(ies) that provided coverage." (*Id*.) NCMC's policy is that "[e]very patient" gives their consent and assignment. (Tr. 2-127:2-8, 11 (Jones).)

16. NCMC informed Cigna of each patient's assignment of benefits. When NCMC submitted claims forms to Cigna ("UB-04 claims forms"), NCMC wrote "Benefits Assigned" on the form. (*See, e.g.*, Def. Exh. 84.)

NCMC's Prompt Pay Discount for Out-of-Network Patients

17. When NCMC opened in 2007, it was out-of-network with Cigna and all the major insurance carriers. (Tr. 1-252:13-21 (Behar).) NCMC remained out-of-network with Cigna from January 4, 2007 through July 31, 2012, when it entered into an in-network Hospital Services Agreement with Cigna. (Tr. 5-91:9-14 (Tankersley); Def. Exh. 83.)

18. NCMC created a program called the Prompt Pay Discount (or "Access NCMC") to simulate an in-network experience for patients. (*See* Def. Exh. 31 ("Access NCMC Program Patient Participation Form"); Def. Exh. 33 ("Access NCMC Script"); Tr. 3-42:7-13, 3-45:7-20 (Jones); Tr. 5-110:8-20 (Tankersley).)

19. NCMC could determine Cigna's in-network and out-of-network coinsurance rates by calling Cigna. (Tr. 3-32:20-23 (Jones).)

20. NCMC calculated the amount to bill a patient through the Prompt Pay Discount "by taking 125 percent of the Medicare fee schedule and multiplying it by the patient's in-network coinsurance rate." (Tr. 5-115:25-116:12 (Tankersley).) NCMC documents sometimes refer to this function as the "NCMC Fee Schedule calculator." (Def. Exh. 30 ("NCMC Decision and Business Office Assistance Manual") at NCMC 8 30069; *see also* Def. Exhs. 101-104 (showing those calculations).) NCMC referred to the amount that resulted from that calculation as the "estimated reasonable and customary in-network allowed amount." (Def. Exh. 31 ("Access NCMC Program Patient Participation Form"); Tr. 3-45:7-20 (Jones).). If the patient paid that amount—125 percent of the Medicare rate

multiplied by the in-network coinsurance rate—within 120 days, they would not have to pay anything else. (Tr. 3-53:23-55:1 (Jones); *see also* Tr. 5-117:12-118:11 (Tankersley).)

21. The Prompt Pay Discount was offered to any patient with commercial insurance, with the exception of patients who required emergency services. (Tr. 3-40:3-5 (Jones); Tr. 5-114:22-115:1 (Tankersley).) The Prompt Pay Discount was not offered to patients with Medicare. (Tr. 5-115:8-9 (Tankersley).)

22. Without the Prompt Pay Discount, patients may not have been able to afford care at NCMC. (Tr. 3-52:5-16 (Jones).)

23. At the same time, the Prompt Pay Discount put the hospital in a better negotiating position with insurance companies, and saved the hospital money in fee collection. (Def. Exh. 37 ("Access NCMC Powerpoint") at NCMC26 0069499-501; Tr. 1-84:1-24 (Behar) (noting how much more money NCMC collected from patients than the typical hospital); Tr. 2-190:13-19 (Jones) (same).)

Initial Communications About Billing Practices

24. When NCMC opened, NCMC and Cigna exchanged letters about billing practices. On January 3, 2007, NCMC sent Cigna a letter titled "Notice of Discount" about its "Prompt Pay Discount." (Pl. Exh. 1 ("Notice of Discount Letters") at CIG-NCMC0083279.) NCMC's letter stated, in part:

> Until such time as we can establish a contractual relationship to serve all of your beneficiaries, NCMC will provide "out-of-network" services to your beneficiaries who request such services. Your beneficiaries will be eligible to participate in the NCMC Prompt Payment Out-of-Network Discount Policy on patient responsibility amounts for services and items rendered.

(*Id*.) The letter did not disclose how the Prompt Pay Discount was calculated.

25. Over the course of the next two years, NCMC sent a substantially similar Notice of Discount Letter to Cigna over twenty times via certified mail. (Pl. Exh. 1; *see also* Tr. 1-88:12-14 (Behar).)

26. In response to the first Notice of Discount Letter, Cigna replied, in part:

> [Y]our letter would seem to propose a practice known as 'fee-forgiving,' whereby your organization accepts an insurer's payment as payment and waives any obligation of the patient to pay the amounts not covered by insurance or a benefit plan or otherwise agrees to collect only in-network coinsurance and deductibles rather than the deductible or co-insurance requirements applicable to services obtained from a non-participating provider.
>
> . . .
>
> It is [Cigna's] view that "fee-forgiving" on any particular claim, or any portion thereof, could constitute fraud and subject a provider to civil and criminal liability . . .
>
> Generally our health benefit plans exclude from coverage "charges which the Employee or Dependent is not legally required to pay." In other words, only expenses which patients are legally obligated to pay are reimbursable.
>
> . . .
>
> . . . [C]laim forms submitted to CIGNA by North Cypress Medical Center should reflect only the amount which North Cypress Medical Center will accept as payment from the patient. Any portion of a charge which is in any way waived or for which a patient is not personally responsible should not be reflected on a claim form . . . For example, if your facility has agreed to only charge a patient the amount of the in-network copayment (for example, $50.00), then only the $50 charge can be submitted as a claim for reimbursement under the benefit plan. Hence, if the patient has an out-of-network benefit, the payment would be $40.
>
> . . .
>
> Accordingly, payment for any claims North Cypress Medical Center submits may be delayed or denied until we have assurance that the charges shown on claim forms are your actual charges to the patient and that patients will be required to pay amounts such as out-of-network co-insurance and deductibles.

(Pl. Exh. 3B ("Morris Letter").)

27. NCMC replied to the Morris Letter by denying Cigna's suspicions: "NCMC's prompt pay policy does not waive any portion of NCMC's charges for a service." (Pl. Exh. 37 at CIG-NCMC0011457.) NCMC wrote that Cigna "confuse[s] the amount that NCMC is willing to accept from a patient that promptly pays the *patient portion of charges* with the amount that NCMC is willing to accept for the *entire charge*." (*Id*. (emphasis in original).) The letter did not explain how much a patient would be charged by NCMC, what portion of the patient charge would be waived, or how NCMC was calculating those amounts. (Tr. 1-239:24-240:9, 241:22-242:19 (Behar).)

NCMC's Chargemaster and Bills to Cigna

28. When NCMC treated patients covered by the Plans, it submitted claims to Cigna for reimbursement of those services using UB-04 claims forms. (Tr. 3-47:11-14 (Sherry).)

29. The fee calculations used for the Prompt Pay Discount were not used to bill Cigna. (Tr. 3-47:21-48:5 (Jones).)

30. Instead, NCMC used its Chargemaster to bill Cigna—and all other insurers to whom it submitted claims.

31. The Chargemaster is a database that NCMC maintains of all of the charges that NCMC could bill for a service. (Tr. 5-39:8:12-13 (Tankersley).) For example, it has separate prices for individual pharmacy items. (Tr. 5-40:1-7 (Tankersley).) Before the hospital opened, a third-party consultant set the charges in the Chargemaster. (Tr. 5-41:18-42:1 (Tankersley).) After the hospital opened, NCMC increased all Chargemaster prices, with the exception of pharmacy and supply prices, by five percent on an annual basis. (Tr. 5:42:2-12 (Tankersley).)

32. NCMC would bill Cigna the sum of the Chargemaster prices for different products and services provided. (Tr. 3:48:3-5 (Jones); Tr. 1-104:14-18 (Behar).) This means that NCMC calculated charges for patients based on an entirely different set of numbers than the charges for Cigna.[3] (*Compare* Def. Exh. 105 ("Chargemaster") *to* Def. Exhs. 101-104 ("NCMC Fee Calculators," each for a different year); *see also* Tr. 5-149:24-150:8 (Tankersley) (testifying that the amounts on the UB-04 claims forms come from the Chargemaster and the amounts used to calculate patient fees under Prompt Pay Discount do not come from the Chargemaster.).

33. NCMC's Chargemaster rates are higher than Medicare rates. (Tr. 6-20:15-21 (May).) NCMC's Chargemaster rates sometimes exceeded 600% or even 1,000% of the analogous Medicare rates. (Tr. 6-20:15-24 (May).) For example, patient CDH received gall bladder surgery at NCMC (Def. Exh. 84.) Patient CDH was charged $823.84. (*Id.* at NCMC37 141599; Tr. 5-139:19-140:3 (Tankerlsey).) That amount was based on 20 percent—an in-network coinsurance rate—of $4,119.24, the amount calculated via the Prompt Pay Discount, where $4,119.24 was 125 percent of Medicare. (Def. Exh. 84; Def. Exh. 103 ("NCMC Fee Calculator 2011") at 66; Tr. 5-136:21-24, 140:12-17 (Tankersley).) Patient CDH paid $823.84 within 30 days and was never going to be charged more. (Tr. 5-140:18-25 (Tankersley).) For that same gall bladder surgery of patient CDH, NCMC billed Cigna $30,968.70. (Def. Exh. 84 at NCMC37 141578; Tr. 5-147:17-148:1 (Tankersley).) The amount that formed the basis of the patient's charges came from Medicare and does not appear on the bill to Cigna; the amount that was billed

_____

[3] Later, when Cigna and NCMC entered into an in-network Hospital Services Agreement on July 31, 2012, the parties agreed to billing based upon NCMC's Chargemaster. (Def. Exh. 83 at 1.3 (defining "Billed Charges"), III(A) (addressing how Chargemaster charges could increase).)

to Cigna came from NCMC's Chargemaster. (Tr. 5-149:24-150:8 (Tankerlsey).) The Chargemaster amount was more than nine times the Medicare amount and more than seven times the 125 percent of Medicare amount that was used to calculate the patient's fee. (*See* Tr. 5-147:21-24, 149:18-23 (Tankersley).) The claim submission to Cigna for patient CDH noted "Prompt Pay Discount" in the "Remarks" section. (Def. Exh. 84 at NCMC37 141578.) NCMC made that remark on all UB-04 claims forms where it applied the Prompt Pay Discount. (Def. Exh. 33; Tr. 5-51:17-21, 156:25-157:9 (Tankersley).)

34. Cigna witnesses testified that they expected the total amount entered on the UB-04 claims forms to be the amount used to calculate the patient's responsibility, as well as Cigna's responsibility. (Tr. 4-90:10-14, 91:10-12, 99:7-20 (Sherry).) Neither the Notice of Discount letters nor the "Prompt Pay Discount" written into the UB-04 claims forms disclosed the use of Medicare or in-network coinsurance rates. (*See* Tr. 5-156:14-18 (Tankersley).)

35. Notes from an NCMC business meeting indicated that the Business Office "is not to disclose prompt pay amounts to insurance carriers should insurance request such" (Def. Exh. 50 at NCMC26 0075813), and, outside of this litigation, NCMC did not disclose the Prompt Pay Discount amounts or method of calculation to plan administrators.

36. From the time that NCMC opened through November 16, 2008, Cigna paid NCMC for claims using the total amount provided on the UB-04 claims forms, from the Chargemaster, to determine the out-of-network coinsurance amounts. In other words, Cigna would pay NCMC approximately 80 percent of the charges that NCMC submitted. (Tr. 4-18:4-24 (Sherry).) Cigna was using the first part of the MRC-1 definition, not the alternative MRC-1 approach that would have compared to other hospitals. (*Id.*)

37. For ASOs, Cigna was administering the payment, but the payment was actually the employer's money. At least one ASO plan sponsor complained about increasing out-of-network costs to both Cigna and NCMC. (Tr. 3-192:20-24 (Sherry) (noting that employers like Cypress Fairbanks School District "were losing a lot of money"); Tr. 2-43:3-7 (Behar) ("the Cypress-Fairbanks School District suffered"); Def. Exh. 62 at NCMC8 29893 (noting that 20 percent of the Cypress Fairbanks School District out-of-network claims were being paid to NCMC, for a total of $1.3 million dollars, and that this rate and amount were not sustainable for Cypress Fairbanks School District).) Cypress Fairbanks School District informed NCMC that, because of the ASO's increase in out-of-network expenses, "much" of which it attributed to NCMC, it would be raising premiums on employees. (Def. Exh. 62 at NCMC8 29896.)

38. High out-of-network expenses generally made Cigna suspicious of fee-forgiving activities. (Pl. Exh. 108 (Ramirez Testimony from March 17, 2011) at 50-53.)

39. Wendy Sherry, President of Payer Solutions at Cigna, testified that, in response to complaints from employers, Cigna "launched an investigation" that involved people from multiple areas of Cigna. (Tr. 3-90:21-91:17, 192:15-193:3 (Sherry).) Other facilities, including Northwest Surgical Center and Cy-Fair Surgery Center were also investigated. (Tr. 3- 157:14-24 (Sherry).)

40. Cigna's Special Investigations Unit ("SIU") was involved in investigating NCMC. (Tr. 4-216:2-10 (Sherry).) The SIU sent 34 survey letters to Cigna plan members (i.e. patients) about NCMC and received 19 responses. (Def. Exh. 14 at ¶ 4 (Declaration of Katrina Sharrow).) Seven members were billed nothing and paid nothing to NCMC; one member

was billed and paid $45.00; four members were billed and paid $100.00; one member was billed and paid $102.00; four members were billed and paid amounts ranging from $320.00 to $575.12; one member was billed $3,000 by NCMC but paid nothing; and one member could not remember if NCMC had billed her anything. (*Id*. at ¶ 7.) NCMC did not bill any of the members the amounts they were required to pay under their plans. (*Id*. at ¶ 7; *see also* Pl. Exh. 86.)

41. During its investigation, the SIU did not learn that NCMC was calculating patient responsibility based on 125 percent of Medicare. (*See* Tr. 4-222:11-15 (Sherry).)

42. On November 10, 2008, Cigna informed NCMC, by letter, that Cigna believed there was "evidence of a pattern of behavior by NCMC in which NCMC generally collects $100 from the CIGNA Participant, if any amount is collected at all." (Pl. Exh. 39 at 000636-37; Tr. 3-202:20-203:6 (Sherry).) In that letter, Cigna informed NCMC that it would reimburse claims based on the assumption that a patient was only billed $100; therefore, Cigna would imagine that $100 amount to be the patient's coinsurance amount for out-of-network services, and Cigna would pay the plan's corresponding coinsurance amount based on that. (Pl. Exh. 39.) This practice would continue until NCMC presented "clear evidence" that: "(1) the charges shown on the NCMC submitted billing are NCMC's actual charges for the services rendered; and (2) the CIGNA participant has paid their applicable out-of-network coinsurance and/or deductible in accordance with their Cigna benefit plan." (*Id*. at 000636-37.) This letter described, and marked the start of, Cigna's SIU's "Fee-Forgiving Protocol," which calculated the amount Cigna would pay based on the assumption that the patient's portion of the payment was $100. (*Id*.; *see also* Tr. 4-217:15-20 (Sherry).)

43. NCMC responded, "NCMC assures you that charges on claim forms submitted to Cigna are NCMC's actual charges . . . Cigna insureds are liable for amounts such as [out-of-network] co-insurance and deductibles, though, as indicated in NCMC's correspondence and bills to CIGNA, the patient portion of charges may be reduced if a patient meets the requirements of NCMC's prompt pay policy." (Pl. Exh. 46.)

44. Ms. Sherry testified that the Fee-Forgiving Protocol applied only to claims covered by MRC-1, and not to claims covered by MRC-2. (Tr. 4-217:21-218:5 (Sherry).)

45. The Fee-Forgiving Protocol resulted in a sharp reduction in how much Cigna paid to NCMC per claim. (*See* Pl. Exh. 64 at CIG-NCMC0082919 ("our spend[ing] at North Cypress Medical Center as [sic] come down from $2Million/month to $200 thousand a month").)

46. One of Cigna's goals in implementing the Fee-Forgiving Protocol was to get NCMC to the negotiating "table" to work toward an in-network agreement. (*See* Pl. Exh. 16 at CIG-NCMC0398827; Pl. Exh. 23; Pl. Exh. 53 (discussing what contract to offer NCMC after implementing the Fee-Forgiving Protocol); Pl. Exh. 108 (Ramirez Testimony from March 17, 2011) at 104-05.)

47. Also when the fee-forgiving protocol began, Cigna stopped applying its cost-containment program to NCMC claims subject to the Fee-Forgiving Protocol. (Tr. 4-44:23-45:4, 151:6-10 (Sherry) (noting, however, that Cigna did continue to collect vendor fees).) Cost-containment programs can result in Cigna collecting savings in some circumstances. Once the cost-containment programs were "turned off" with respect to NCMC claims, the amount of money that Cigna made on NCMC claims decreased. (*Id.*; Pl. Exh. 85B (summary of fees, showing that Cigna made significantly more money from fees on

NCMC claims in 2008 before the protocol was in place, than it did for the entirety of 2009 to 2012, though it made money throughout); Pl. Exh. 62 (showing "a large savings" of approximately $621,000 on North Cypress claims from December 2008).)

48. Once Cigna implemented the Fee-Forgiving Protocol, an initial reviewer would determine if the claim submitted by NCMC was an MRC-2 claim, and then all other NCMC claims were flagged and sent to the SIU. (Pl. Exh. 49; Pl. Exh. 50; Pl. Exh. 82 ("continue applying SIU processing rules to ALL claims at this point."); Pl. Exh. 85D at 2 (Ms. Sherry's handwritten notes stating, "[f]lag a provider → all claims go to SIU"); Tr. 4-119:22-120:1 (Sherry) (Ms. Sherry confirming the meaning of her handwritten notes).) The SIU would make a recommendation on the claim. (Pl. Exh. 104 (Remlinger-Sharrow Testimony from Feb. 3, 2017) at 64.) This was a change in practice from how claims were previously processed.

49. Where there were processing errors, the claim processor would not follow the SIU's recommendation. (*Id*. at 66-67.)

50. After the Fee-Forgiving Protocol was implemented, Cigna's SIU sent 29 more survey questionnaires to plan members and received 8 responses. (Def. Exh. 14 at ¶ 9.). The results of the responses were that five members were billed nothing and paid nothing, two members were billed amounts greater than 0 but less than was required, and one member could not remember, but thought NCMC had charged him a "copay" of "several hundred dollars. (*Id*. at ¶ 11.)

NCMC's Appeals of Claims

51. Cigna maintained its position on the Fee-Forgiving Protocol in the months that followed, even as NCMC protested and appealed some claims. (*See* Pl. Exh. 66; Pl. Exh. 70 ("July 31, 2009 Letter").)

52. When NCMC appealed a claim to which the Fee-Forgiving Protocol was applied, Cigna would respond by letter. Letters that upheld the original decision would say that it was based on Cigna's policy of not paying for charges that "patients are not legally obligated to pay." (*See* Pl. Exh. 86B at 1.) The letters would then explain the process for submitting a second appeal. (*See id.* at 2.)

53. As set out in the plans, Cigna has a multi-level appeals procedure. (*See* Def. Exh. 1.014 at CIG-NCMC0114174-5 (describing two levels of appeals and an additional, separate "Independent Review Procedure"); Def. Exh. 1.035 at CIG-NCMC0582434-5 (same).) Appeals of claims are to be "reviewed and the decision made by [someone/a health professional] not involved in the initial decision." (*See* Def. Exh. 1.014 at CIG-NCMC0114174; Def. Exh. 1.035 at CIG-NCMC0582435.)

54. Ms. Sharrow, who worked for the SIU until April 2011 (Def. Exh. 14 at ¶ 2), was involved in the appeals process. (Pl. Exh. 86). Notes indicate that Ms. Sharrow received or handled thousands of appeals and "sent back w/ direction" or "sent back w/ with instruction." (*Id.*) The same notes indicate: "The appeals unit will are [sic] the ones who make the final decision of how claim is going to be handled. SIU can only make recommendations that is why we do not get involved with appeals." (*Id.* at CIG-NCMC0012252.) In a discussion of an NCMC claim on December 1, 2009, Ms. Sharrow's notes say, "We will continue to handle on a claim by claim basis." (*Id.* at CIG-

NCMC0012254.) Notes from that same date state, "recd 1 appeal, handled without SIU recommendation." (*Id.*) In a discussion of an NCMC claim on November 4, 2009, Ms. Sharrow writes, "I advised why OON [out-of-network] claim should remain denied and recommended not to enhance since NCMC does not collect member responsibility," but indicates that if NCMC can show how member is being held responsible for the entire amount, then she would advise differently. (*Id.* at CIG-NCMC0012256.) The SIU sometimes communicated with Cigna's in-house counsel. (*See, e.g.*, Pl. Exh. 86 at CIG-NCMC0012256.)

55. Sometimes the person reviewing the claim would respond to Ms. Sharrow's recommendation to indicate that the appeal would be upheld—and sometimes this affirmation email would be sent the same day that Ms. Sharrow sent her recommendation. (Pl. Exh. 86A at CIG0NCMC0547692.)

## III.    CONCLUSIONS OF LAW

Legal Standard

1. A benefits plan participant may bring a civil action under ERISA § 502(a)(1)(B) "to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the plan." 29 U.S.C. § 1132(a)(1)(B). Healthcare providers may bring ERISA suits standing in the shoes of their patients. *N. Cypress I*, 781 F.3d at 191.

2. ERISA claimants are required to exhaust administrative remedies prior to filing a lawsuit. *Denton v. First Nat'l Bank of Waco*, 765 F.2d 1295, 1301 (5th Cir. 1985); *see also Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 231 (5th Cir. 1997) (the exhaustion requirement "is not one specifically required by ERISA, but has been uniformly imposed by the courts in

keeping with Congress's intent in enacting ERISA"). "Exhaustion is to be excused only in the most exceptional circumstances." *Davis v. AIG Life Ins. Co.*, No. 95-60664, 1996 WL 255215, at *2 (5th Cir. Apr. 26, 1996) (citing *Commc'ns Workers of Am. v. AT&T*, 40 F.3d 426, 433 (D.C. Cir. 1994)). A claimant is excused from demonstrating exhaustion if she can show that pursuit of administrative remedies would have been futile. *Bourgeois v. Pension Plan for Employees of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000). To qualify for the futility exception to the exhaustion requirement, the claimant must show a "*certainty* of an adverse decision." *Id.* (citing *Commc'ns Workers of Am.*, 40 F.3d at 433) (emphasis in original); *see also Rando v. Standard Ins. Co.*, 182 F.3d 933 (10th Cir. 1999); *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996). The claimant is also required to show hostility or bias on the part of the administrative review committee. *McGowin v. ManPower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004). The focus of futility is on the bias in the review process, not based on company officials' views. *Bourgeois*, 40 F.3d at 479–80 (reasoning that a "company's preclusive interpretation . . . does not establish that the actual Committee would not have considered his claim."); *see also Commc'ns Workers of Am.*, 40 F.3d at 433 ("[T]his Court will not assume that, merely because members of a pension-plan review committee are drawn from a company's management, the review committee will never reach an interpretation of the plan different from that of the company.").

3.  The Fifth Circuit has adopted a multi-step process for determining whether a plan administrator such as Cigna abused its discretion in construing a plan's terms.

4. "The first question is whether Cigna's reading of the plans is 'legally correct.'" *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 483 (5th Cir. 2017)

("*Humble*") (quoting *North Cypress I*, 781 F.3d at 195). The most important factor at this stage is whether the contested interpretation is consistent with a fair reading of the plan. *Gosselink v. Am. Tel. & Tel.*, 272 F.3d 722, 727 (5th Cir. 2001). Because ERISA requires that plan descriptions be written in a manner calculated to be understood by the average plan participant, the court must assess whether the administrator's interpretation is consistent with the plan language in its "ordinary and popular sense." 29 U.S.C. § 1022(a); *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 260 (5th Cir. 2009). Additional factors in determining whether an administrator's interpretation is legally correct include whether the administrator has given the plan a uniform construction and whether there are any unanticipated costs resulting from different interpretations of the plan. *Crowell*, 541 F.3d at 312. If the plan is legally correct, "the inquiry ends and there is no abuse of discretion." *Humble*, 878 F.3d at 483 (quoting *Stone*, 570 F.3d at 257).

5.  Second, if the court finds the insurer's interpretation was legally incorrect, the court must then determine whether it was an abuse of discretion. *Id*. This is the "functional equivalent of arbitrary and capricious review." *Id*. (citing *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999))). "A decision is arbitrary if it is made without a rational connection between the known facts and the decision." *Id*. (citation omitted). "[O]rdinarily," the abuse of discretion factors that courts consider are "whether [the administrator] had a conflict of interest, as well as the internal consistency of the plan and the factual background of the determination and any inferences of lack of good faith." *Id*. at 484 (quotation omitted).

6. In some circumstances, "where an administrator's interpretation is supported by prior case law, it cannot be an abuse of discretion—even if the interpretation is legally incorrect." *Id.* (applying the rule that an administrator may interpret plans consistent with prior case law without adopting this as a bright-line rule).

7. Third, the court determines whether the insurer's decision to deny benefits was supported by substantial evidence. *Id.* (citation omitted).

8. Deviation from the three-step test is possible; the court may "skip the first step if it can more readily determine that the decision was not an abuse of discretion." *Id.* at 483-84 (citing *Holland*, 576 F.3d at 246 n.2).

9. The abuse of discretion standard, however, does not apply to insurance policies that were effective or amended after January 1, 2012; for those policies, courts apply de novo review. *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018).

Reconsideration of Administrative Exhaustion

10. The Court granted summary judgment "to Cigna for all claims for which [NCMC] did not exhaust administrative remedies." (Doc. No. 521 at 15-16.) In 3 of 24 appeals presented in the cross-motions for summary judgment, Cigna reversed its decision and paid the full requested amount, and in 3 other appeals Cigna partially reversed itself. (Doc. No. 521 at 15-16.) The Court adopted Cigna's claim-by-claim exhaustion analysis from summary judgment briefing because NCMC failed to meaningfully address it. (Doc. No. 568.) Thus, 575 claims for benefits remained under ERISA § 502(a)(1)(B).

11. Before trial, NCMC moved, for a second time, for the Court to reconsider its administrative exhaustion ruling. (Doc. No. 577.) At trial, the Court permitted NCMC to present exhaustion-related evidence in the form of an "offer of proof."

12. First, NCMC's present motion for reconsideration is largely based upon two exhibits that were produced in discovery in August 2017 (after the Court's ruling on exhaustion). (*See* Doc. No. 578 (cover letter to document production, dated August 31, 2017.) The exhibits are the case notes of members of the SIU at Cigna. (*See* Pl. Exh. 86.) NCMC argues that these documents show that the SIU improperly controlled the appeals process, rendering appeals futile.

13. The recently-produced case notes cover a critical time period, but the information in them about how the SIU was involved in appeals was not new. The case notes produced in August 2017 are a continuation of case notes that had been produced several years ago. (Doc. No. 581-4 (Letter from J. Douglas Sutter to Joshua Simon, Aug. 14, 2017).) The previously-produced notes covered the time period of November 8, 2008 through January 14, 2010. (*Id.*) The new notes cover the time period of January 14, 2010 through July 31, 2012. In summary, the case notes show that the SIU received or handled thousands of appeals and "sent back w/ direction" or "sent back w/ with instruction." (Pl. Exh. 86.) They were being sent back to the actual claims administrators. The same "sent back with direction" language appears in the earlier set of case notes; which were available to NCMC years before the summary judgment motions and exhaustion rulings. (*See* Doc. No. 582-5 at CIG-NCMC0012251.)

14. The recently-produced case notes do not alter the fact that—as Cigna demonstrated at summary judgment—NCMC could not show certainty of denial because Cigna was willing to grant some appeals and modify some payments. Also, there are occasional instances where the case notes indicate that Cigna would "adjust" a claim based on how much the patient paid the provider, demonstrating that, with more information about the

patient's share of the payment, Cigna would reassess its benefits determination. (*See* Doc. No. 578 at CIG NCMC0719000 ("With regards to NCMC your EOB reflects $250 but we will adjust your claim accordingly since you paid the provider $1103.35."), CIG NCMC0719004 ("if the employer has proof of payment from a member showing what the member paid at the time of service such as a credit card receipt, etc. we will adjust claim accordingly possibly allowing an additional payment").)

15.  Second, NCMC maintains that the Court was wrong on the law by applying a "certainty of an adverse decision" on appeal standard. This Court maintains that it applied the correct standard. A claimant is excused from demonstrating exhaustion if she can show that pursuit of administrative remedies would have been futile. *Bourgeois*, 215 F.3d at 479. To qualify for the futility exception to the exhaustion requirement, the claimant must show a "*certainty* of an adverse decision." *Id.* (citing *Commc'ns Workers of Am.*, 40 F.3d at 433) (emphasis in original).[4]

16. The cases that NCMC cites are inapposite. First, in *Encompass Office Sols., Inc. v. Conn. Gen. Life Ins. Co.*, 2017 WL 3260834 (N.D. Tex., July 31, 2017), the district court did not reach the question of administrative exhaustion. Second, in *Encompass Office Sols., Inc. v. La. Health Srv. & Indemn. Co.*, 2013 WL 12310676 (N.D. Tex. Sept. 17, 2013), the district court was convinced that the single exhausted claim was evidence that seeking

---

[4] NCMC suggests that instead this court follow an approach from another circuit, citing to *Productive MD, LLC v. Aetna Health, Inc.*, 969 F. Supp. 2d 901 (M.D. Tenn.). In *Productive MD*, an out-of-network medical test provider alleged that a health insurer wrongfully failed to pay claims in order to coerce it into network contract at unreasonably low reimbursement rates. About 45 claims were exhausted and denied, and the provider argued that exhausting the others (approximately 120 claims) would be futile. The district court agreed that it would have been futile based on the futility factors set out in *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998). The Fifth Circuit has never cited to *Fallick*. *See also Gosselink v. Am. Tel. & Tel., Inc.*, No. CIV.A. H-97-3854, 1999 WL 33737443, at *3 n.3 (S.D. Tex. Aug. 9, 1999).

further review of other claims meant they would be denied because the claims were "very similar" and "would merely produce an avalanche of duplicative proceedings." *Id.*, at *15 (quoting *In re Household Int'l Tax Reduction Plan*, 441 F.3d 500, 501-02 (7th Cir. 2006) (holding that unnamed class members are not required to exhaust remedies as a condition to being members of the class)). Later in that case, the district court found a demand letter indicating the insurer's intention to reject any claim for benefits to be a compelling basis for futility. (Findings of Fact and Conclusions of Law at 5, Encompass Office Sols., Inc. v. La. Health Srv. & Indemn. Co., 3:11-cv-01471-M, ECV Doc. No. 601.) Here, in contrast, Cigna explained what information was necessary on appeals and, once again, did sometimes change the amount paid on a claim. Third, in *Arapahoe Surgery Ctr. LLC v. Cigna Healthcare, Inc.*, 2016 WL 1089697 (D. Colo., March 21, 2016), the district court recognized that the Seventh Circuit applies the (same) certainty standard and found that exhaustion was futile because of Cigna's blanket fee-forgiving policy, but the district court did not recognize that any claims were successfully appealed, in contrast to the present circumstances.

17. Third, NCMC objects that Cigna's appeal requirements were not clear and NCMC was not provided the plans. This argument also fails. A plaintiff cannot be excused from exhausting administrative remedies on the basis that he was not provided with plan documents or a summary plan description unless there was no other way for him to know how to appeal. *Gonzalez v. Aztex Advantage*, 547 Fed. Appx. 424, 428 (5th Cir. 2013) (lack of summary plan description was no excuse for failure to exhaust administrative remedies where the notice of denial clearly stated where to address the appeal); *see also Bourgeois*, 215 F.3d at 480-81 (provided limited relief to a plaintiff who was not

provided a summary plan description where the only way the plaintiff could have found the address of the appeals committee was in the summary plan description). Here, the denial letters indicated the process for submitting a second-level appeal.

18. NCMC's Motion for Reconsideration is **DENIED**.

Scope of Remaining Claims

19. The Fifth Circuit found that the patients assigned their rights under their insurance contracts to NCMC, and that NCMC has standing under ERISA to enforce the contracts. *N. Cypress I*, 781 F.3d at 191-95. On remand, at the summary judgment stage, NCMC was unable to produce written assignments of benefits for a fraction of the benefits claims. (Doc. No. 521 at 16.) The Court considered whether those patients had actually assigned their benefits to be a disputed issue of material fact. (*Id*. at 17.) Based on reliable trial testimony that all patients actually assigned their benefits, this Court finds that all of the claims at issue were properly assigned to NCMC. *See also Encompass Office Solutions v. Cigna*, 2017 WL 3268034, at *9 (N.D. Tex., July 31, 2017).

20. Of the 575 claims remaining at trial, 395 were MRC-2 claims. Cigna argued at trial that 395 of them were MRC-2 claims to which the Fee-Forgiving Protocol was not applied. Trial testimony demonstrated that the parties no longer dispute the (non-emergency room) MRC-2 claims. Cigna did not apply the Fee-Forgiving Protocol to the MRC-2 and those are no longer within the scope of this case. NCMC's own witness stated that the Fee-Forgiving Protocol "was not intended to be applied against [MRC-2] claims" (Tr. 4-187:9-13 (Sherry)), and NCMC's expert admitted that Cigna generally didn't apply the Fee-Forgiving Protocol to MRC-2 claims (Tr. 5-196:16-18 (Tankersley)). Then, in its post-trial brief, NCMC writes, "by its own admission, Cigna did not apply the [Fee-

Forgiving] Protocol to MRC-2 plan claims." (Doc. No. 662 at 70.) This leaves 180 remaining claims.

21. Trial testimony also indicates that the parties no longer dispute the emergency room claims. Where Cigna applied the Fee-Forgiving Protocol to them, those claims remain within the scope of the dispute.

<u>Reconsideration of Abuse of Discretion</u>

22. All of the 180 claims remaining in this case are subject to self-funded plans or to insurance policies that predate January 1, 2012. Therefore, the abuse of discretion standard applies, and *Ariana M.* has no bearing on this case.

23. Before trial, this Court believed part of its legal analysis on NCMC's ERISA § 502(A)(1)(b) claim was collaterally estopped by the district court decision in *Connecticut General Life Insurance Co., et al. v. Humble Surgical Hosp.*, LLC, C.A. No. 4:13-cv-3291, 2016 WL 3077405 (S.D. Tex. Jun. 1, 2016). (Doc. No. 521 at 8-9 (applying collateral estoppel and holding that Cigna's interpretation of the plan language was legally incorrect).) Shortly after trial in the present case, the Fifth Circuit vacated in part and reversed in part the district court opinion that this Court previously relied upon. *Humble*, 878 F.3d 478. *Humble* concerned Cigna's application of the Fee-Forgiving Protocol, and the Fifth Circuit stated, "even if [Cigna's] construction of the plans' exclusionary language was legally incorrect, its interpretation still fell within its broad discretion." *Id*. at 484. The Court will therefore reconsider its ruling on NCMC's § 502(A)(1)(b) claim.

24. In two recent cases the Fifth Circuit has skipped the legal correctness analysis. *Humble*, 878 F.3d at 483-84 (citing *Holland*, 576 F.3d at 246 n.2). One of those cases involved

Cigna's Fee-Forgiving Protocol, *id*, and the other involved NCMC's Prompt Pay Discount. This Court will do the same.

25. Cigna interpreted the plans to require an out-of-network healthcare provider to collect the full portion of coinsurance from a patient. With the Fee-Forgiving Protocol, Cigna would pay benefits claims amounts to NCMC based on the assumption that what NCMC charged the patient was the correct coinsurance amount, calculated using the coinsurance percentages in the plans. Thus, Cigna would assume that what the patient had paid was 40 percent of the "normal" charge for the service, and Cigna would pay the remaining 60 percent. Cigna invited NCMC to appeal these determinations by providing proof of the amounts that the patient paid. (*See* Pl. Exh. 39.)

26. In *Humble*, Cigna had interpreted plans the same way. The Fifth Circuit held that Cigna's interpretation falls within its "broad discretion." *Humble*, 878 F.3d at 484. Fifth Circuit noted the Supreme Court's explanation that deference to the plan administrator's decisions "serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan, like the one here, that covers employees in different jurisdictions—a result that 'would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them.'" *Id*. (quoting *Conkright v. Frommert*, 559 U.S. 506, 517 (2010)). The Fifth Circuit dismissed the ordinary abuse of discretion factors in favor of a legal policy that "where a plan administrator's interpretation is supported by prior case law, it cannot be an abuse of discretion—even if the interpretation is legally incorrect." *Id*. (citing *Hinkle ex rel. Estate of Hinkle v. Assurant Inc*., 390 Fed. Appx. 105, 108 (3d Cir.) (applying the rule that an

administrator may interpret plans consistent with prior case law without adopting this as a bright-line rule); *McGuffie v. Anderson Tully Col.*, 2014 WL 4658971, at *3-4 (S.D. Miss. Sept. 17, 2014).

27. The Fifth Circuit concluded that Cigna did not abuse in *Humble* because "[a]t least two other courts have effectively or explicitly concluded that the provision at issue here was legally correct. *Id.* at 485 (citing *Kennedy v. Connecticut General Life Insurance Co.*, 924 F.2d 698, 701 (7th Cir. 1991) (the Seventh Circuit stated a nearly identical provision "means that the patient must be legally responsible for the whole charge."); *N. Cypress I*, 781 F.3d at 196 (this Court's summary judgment ruling, which was vacated on other grounds, was relevant for most of the relevant period that Cigna was interpreting the disputed plan language here)).

28. One of the courts to which the Fifth Circuit referred had effectively concluded that the provision at issue here was legally correct at the time that Cigna was administering NCMC's claims. In *Kennedy*, Judge Easterbrook had highlighted the benefits of requiring patients to pay for part of their medical care, even when insured: "Co-payments sensitize employees to the cost of health care, leading them not only to use less but also to seek out providers with lower fees. The combination of less use and lower charges . . . makes medical insurance less expensive and enables employers to furnish broader coverage (or to pay higher wages coupled with the same level of coverage)." 924 F.2d at 699. Accordingly, the Seventh Circuit found that Cigna was entitled to withhold payment where a healthcare provider had intentionally collected its entire fee from Cigna by waiving patient contribution. *Id.* The reasoning in *Kennedy* is sound.

29. Cigna explicitly relied on *Kennedy* by citing it in letters that Cigna sent to NCMC. (*See, e.g.*, Pl. Exh. 3B.)

30. Additionally, in a case that the Fifth Circuit recognizes involves "substantially similar facts" as the instant case, the healthcare provider's ERISA claim failed as a matter of law. *North Cypress Medical Center Operating Company, Ltd. v. Aetna Life Insurance Company*, No. 16-20674, 2018 WL 3635231, at *1 n.1 (5th Cir. July 31, 2018) ("*North Cypress II*"). NCMC was also the plaintiff in *North Cypress II*, and brought an ERISA claim against a different plan administrator for underpayment of benefits. NCMC was also out-of-network with that insurer and offering patients the Prompt Pay Discount. The plan administrator was recognized to have "discretionary authority to determine eligibility for benefits and construe plan terms." *Id*. at * 1.

31. In the interest of uniformity of decisions, *Conkright*, 559 U.S. at 517, and adhering to the prior case law of *Kennedy*, *Humble*, 878 F.3d at 484, this Court concludes that Cigna did not abuse its discretion.

32. A review of the traditional abuse of discretion factors supports this conclusion. First, while Cigna had a conflict of interest, trial testimony that Cigna took steps to reduce its conflict (with respect to the cost-containment plan). (Tr. 4-44:23-45:4, 4-151:6-10 (Sherry).) Cigna "turned off" the cost-containment programs that could result in Cigna collecting savings in some circumstances when it implemented the Fee-Forgiving Protocol. (*Id*.) Also, a trial exhibit showing summaries of fees revealed that Cigna made significantly more money from fees on NCMC claims before the Fee-Forgiving Protocol was in place than in the years in which it was implemented. (*See* Pl. Exh. 85B.) "[W]here the administrator has taken active steps to reduce potential bias and promote accuracy,"

conflicts of interest are afforded less weight in the abuse of discretion analysis. *Hagen v.*
*Aetna Ins. Co.*, 808 F.3d 1022, 1027 (5th Cir. 2015); *see also Arapaho Surgery Center,*
*LLC*, 171 F.Supp.3d at 1113 (even where there is a conflict of interest, a court can
conclude that an administrator did not abuse its discretion). Second, Cigna's
interpretation of the plans was consistent with other parts of the plans.[5] Third, this Court
previously concluded that the factual background and lack of good faith factor weighed
"heavily" in NCMC's favor because there were "strong inferences" that Cigna did not act
in good faith. (Doc. No. 521 at 14.) The Court's position was based on evidence that
Cigna's "true motivation for the Fee-Forgiving Protocol was to negotiate an in-network
contract, not to prevent harmful externalities in the insurance market." (*Id.*) Some trial

---

[5] The Court's conclusion about consistency of plan language is unchanged since
summary judgment. (*See* Doc. No. 521 at 12.) NCMC presented the same arguments then that it
does now. First, NCMC argues that the following two parts of the plans are inconsistent: (1)
Payment for "charges which [the patient is] not obligated to pay or for which you are not billed"
are "specifically excluded" from the plan; and (2) "The provider may bill you for the difference
between the provider's normal charge and the Maximum Reimbursable Charge, in addition to
applicable deductibles, copayments and coinsurance." (*See* Pl. Exh. 87 at CIG-NCMC0094360;
Def. Exh. 1.026 ("TransCore, LP ASO") at CIG-NCMC0156030; Def. Exh. 1.035 ("Cy Fair ISD
ASO") at CIG-NCMC0582421.) NCMC argues that Cigna's interpretation converts the "may"
language to "shall" language. Those statements are not clearly inconsistent. Rather than reading
as if the provider has discretion as to whether to charge a patient their coinsurance amount, it
seems to suggest that the provider could charge patients *more* than their coinsurance amount
where the provider's normal charge exceeds what reimbursements the plans contemplate.

Second, NCMC argues that Cigna interpreted the plan language inconsistently across
providers. This is not the question of *internal* inconsistency that the abuse of discretion factor
raises. And, in fact, Cigna has consistently reduced payments to out-of-network providers when
it concluded that the out-of-network providers were not collecting the full coinsurance amount.
*Humble*, 878 F.3d 478; *Arapaho Surgery Center, LLC*, 171 F.Supp.3d 1092.

Third, NCMC argues that Cigna applied its interpretation of the plans inconsistently
between MRC-1 and MRC-2 claims and between in-network and out-of-network providers.
(Doc. No. 662 at 79.) Again, NCMC's arguments are not based on plan language inconsistencies,
but plan application inconsistencies. These arguments are unpersuasive. MRC-1 and MRC-2 are
different types of charges. Enforcing coinsurance rates for out-of-network providers and not for
in-network providers is consistent with the policy of encouraging patients to seek in-network
care to keep health care costs lower for the employers who fund the ASOs.

evidence suggests that both the Prompt Pay Discount and the Fee-Forgiving Protocol were implemented to improve each party's respective negotiating position. (*See* Def. Exh. 37 ("Access NCMC Powerpoint") at NCMC26 0069499-501; Pl. Exh. 16 ("Targeted non par facility e-mail and powerpoint") at CIG-NCMC0398827; Pl. Exh. 23; Pl. Exh. 53 (discussing what contract to offer NCMC after implementing the Fee-Forgiving Protocol).) At the same time, trial testimony presented two good faith bases for the Fee-Forgiving Protocol: (1) concerns that the employer sponsors of ASOs were losing money while NCMC administered the Prompt Pay Discount and would have to raise the price of insurance on all plan members (Tr. 3-192:20-24 (Sherry); Def. Exh. 62 (E-mail from Jurney to Behar) at NCMC8 29896); and (2) the importance of "sensitiz[ing] employees to the cost of health care, leading them . . . to seek out providers with lower fees" and make medical insurance less expensive for all, *Kennedy*, 924 F.2d at 699. *See also SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (noting approval of an insurer prohibiting waiver of coinsurance).

33. The Court must also address whether Cigna's interpretation was based on substantial evidence.

34. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Humble*, 878 F.3d at 485 (quoting *Corry v. Liberty Life Assurance Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007)). In making this inquiry, the Court is "constrained to the evidence before the plan administrator." *Id.* (citing *Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 312 (5th Cir. 2015)).

35. Where Cigna has reduced benefits payments based on survey responses, that show the healthcare provider forgave out-of-network coinsurance amounts, courts have found Cigna's actions to be supported by substantial evidence. Both in *Humble* and in the present case, Cigna sent surveys to patients who had received treatment at the applicable provider and requested additional information. There, Cigna received 154 responses that supported Cigna's determination that the provider was fee-forgiving, and the Fifth Circuit considered that substantial evidence. *Humble*, 878 F.3d at 485-86. Similarly, a district court in Colorado concluded that where, as a result of patient surveys, Cigna concluded that the provider was only charging patients 150 percent of Medicare and then paid the provider accordingly, Cigna's interpretation of the plans was based on substantial; however, where Cigna completely denied coverage, it had abused discretion.[6] *Arapaho Surgery Center, LLC*, 171 F.Supp.3d at 1113.

36. Here, Cigna sent a total of 62 survey letters and received 19 responses before implementing the Fee-Forgiving Protocol, as well as an additional 8 responses after implementing the Fee-Forgiving Protocol. (Def. Exh. 14 at ¶¶ 4, 9 (Declaration of Katrina Sharrow).) NCMC did not bill any of the members the amounts they were required to pay under their plans. (*Id*. at ¶ 13; *see also* Pl. Exh. 86 (SIU Case Notes).) Moreover, NCMC had informed Cigna, in Notice of Discount Letters and on UB-04 claims forms that it offered patients discounts, though NCMC did not explain the discounts. (*See, e.g.*, Pl. Exh. 1; Def. Exh. 84.) Cigna had substantial evidence of that NCMC was discounting or forgiving out-of-network coinsurance.

---

[6] It is unclear how many survey responses Cigna received in *Arapahoe*.

37. Twelve of the 19 initial respondents said they were billed nothing and paid nothing. (*Id*.) Five of the other initial respondents paid around $100, which is the amount that Cigna believed NCMC was charging patients, as it told NCMC. (*Id*. at ¶ 7.) Cigna then administered claims based on the assumption that the patients had paid $100 in coinsurance. At no time—when collecting the survey responses or in communications with NCMC prior to this litigation—did Cigna learn that NCMC was calculating patient responsibility based on 125 percent of Medicare. Cigna had "more than a scintilla" of relevant and reasonable evidence that the normal charges for claims produced $100 coinsurance amounts for patients. *Humble*, 878 F.3d at 485.

## IV.     CONCLUSION

Any Finding of Fact that should be a Conclusion of Law shall be deemed such, and any Conclusion of Law that should be a Finding of Fact shall be deemed such.

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds and holds for Cigna. Accordingly, NCMC's Motion to Compel Cigna to Adjudicate Claims (Doc. No. 418) is **DENIED** as moot.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 7th day of August, 2018.

_____
THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE